Nos. 23-1286, 23-1335

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

CHAYA WERFEL, et al.,
Plaintiffs/Appellants

v.

THE PALESTINE LIBERATION ORGANIZATION, et al.,
Defendants/Appellees

---------------------

UNITED STATES OF AMERICA,
Intervenor.

---

CHAYA WERFEL, et al.,
Plaintiffs,

v.

THE PALESTINE LIBERATION ORGANIZATION, et al.,
Defendants/Appellees

---------------------

UNITED STATES OF AMERICA,
Intervenor/Appellant.

---

On Appeal from the United States District Court
For the District of Colorado
The Honorable Gordon P. Gallagher
D.C No. 21-cv-03043-GPG-STV

---

**CONSOLIDATED JOINT APPENDIX**
**Volume II of IV**

---

Daniel K. Calisher
Michael A. Rollin
Chip G. Schoneberger
FOSTER GRAHAM MILSTEIN
& CALISHER LLP
360 S. Garfield Street, 6th Floor
Denver, CO 80209
Telephone: (303) 333-9810
Emails: calisher@fostergraham.com
mrollin@fostergraham.com
cschoneberger@fostergraham.com

Asher Perlin
4600 Sheridan Street, Suite 303
Hollywood, Florida 33021
Telephone: (786) 687-0404
Email: asher@asherperlin.com

# TABLE OF CONTENTS

## Volume I

| ECF No. | Document Title | Date Filed | Page No. |
|---|---|---|---|
| | Civil Docket for Case No. 1:21-cv-03043-GPG-STV | | 0001 |
| 50 | First Amended Complaint and Jury Demand | 5/17/22 | 0022 |
| 58 | Defendants' Motion to Dismiss First Amended Complaint Under Rule 12(b)(2) and Rule 12 (b)(6) | 6/27/22 | 0077 |
| 69 | Plaintiffs' Opposiiton to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12 (b)(6) | 9/19/22 | 0134 |
| 69-1 | Declaration of Asher Perlin in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12 (b)(6) | 9/19/22 | 0190 |
| 69-2 | Exhibit A to Declaration of Asher Perlin | 9/19/22 | 0193 |
| 69-3 | Exhibit B to Declaration of Asher Perlin | 9/19/22 | 0209 |

## Volume II

| ECF No. | Document Title | Date Filed | Page No. |
|---|---|---|---|
| 69-4 | Exhibit C to Declaration of Asher Perlin | 9/19/22 | 0277 |
| 69-5 | Exhibit D to Declaration of Asher Perlin | 9/19/22 | 0314 |
| 69-6 | Exhibit E to Declaration of Asher Perlin | 9/19/22 | 0373 |
| 69-7 | Exhibit F to Declaration of Asher Perlin | 9/19/22 | 0398 |
| 69-8 | Exhibit G to Declaration of Asher Perlin | 9/19/22 | 0401 |
| 69-9 | Exhibit H to Declaration of Asher Perlin | 9/19/22 | 0423 |
| 69-10 | Exhibit I to Declaration of Asher Perlin | 9/19/22 | 0467 |

**Volume III**

| ECF No. | Document Title | Date Filed | Page No. |
|---------|----------------|------------|----------|
| 69-11 | Exhibit J to Declaration of Asher Perlin | 9/19/22 | 0554 |
| 69-12 | Exhibit K to Declaration of Asher Perlin | 9/19/22 | 0592 |

**Volume IV**

| ECF No. | Document Title | Date Filed | Page No. |
|---------|----------------|------------|----------|
| 69-13 | Declaration of Dr. Boaz Shnoor | 9/19/22 | 0832 |
| 71 | Table of Authorities Supplement to Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12 (b)(6) | 9/20/22 | 0855 |
| 73 | Intervenor United States of America's Brief in Support of the Constitutionality of the Promoting Security and Justice for Victims of Terrorism Act of 2019 | 9/26/22 | 0868 |
| 76 | Defendants' Reply in Support of Their Motion to Dismiss Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12 (b)(6) | 11/14/22 | 0895 |
| 106 | Plaintiffs' Supplemental Briefing Concerning *Mallory v. Norfolk* | 7/24/23 | 0943 |
| 107 | Intervenor United States of America's Supplemental Brief | 7/24/23 | 0949 |
| 110 | Defendants' Supplemental Brief Concerning *Mallory* | 8/3/23 | 0955 |
| 111 | Order | 8/23/23 | 0964 |
| 112 | Final Judgment | 8/23/23 | 0980 |
| 113 | Notice of Appeal (Plaintiffs) | 9/13/23 | 0982 |
| 122 | Notice of Appeal (Intervenor United States of America) | 10/20/23 | 1003 |

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

THE PUERTO RICO PUBLIC )
HOUSING ADMINISTRATION, )
et al., )
)
    Plaintiffs, )
)
    v. )    C. A. No. 96-1304 (PG)
)
UNITED STATES DEPARTMENT )
OF HOUSING AND URBAN )
DEVELOPMENT, et al., )
)
    Defendants. )

## DEFENDANTS' MOTION FOR PARTIAL DISMISSAL AND TO LIMIT DISCOVERY

Plaintiffs have sued the United States Department of Housing and Urban Development and the Secretary of the United States Department of Housing and Urban Development (collectively "HUD"), asserting, inter alia, claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), Title VIII of the Civil Rights Act of 1964, 42 U.S.C. § 3601, et seq. ("Title VIII"), the Equal Protection and Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution and the Administrative Procedure Act, 5 U.S.C. § 553, et seq. ("APA").

With the exception of PRPHA and PRDH's claims under the APA, plaintiffs' complaint suffers from numerous legal deficiencies and should be dismissed. First, Ms. Alameda lacks standing to pursue any of these claims. Second, sovereign immunity bars suit under any of the provisions cited by plaintiffs except the APA. Third, plaintiffs do not possess an implied right of action under either Title VI or Title VIII. Finally, since neither PRPHA nor

**0278**

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 6

PRDH is a "person" within the meaning of the Equal Protection and Due Process Clauses, they cannot state claims under these provisions. Nor can they pursue these claims on behalf of PRPHA tenants as such parens patriae suits do not lie against HUD, an agency of the United States.

Accordingly, the only justiciable claims advanced in this proceeding are the APA claims stated by PRPHA and PRDH. Under the applicable federal six-year statute of limitations, these APA claims are limited to final agency actions taken up to six years before the filing of this action in March 14, 1996. Moreover, since this action involves only the limited inquiry conducted under the APA, this Court's review is restricted to the administrative records upon which HUD's various funding and related decisions were made, and discovery into extra-record materials is therefore inappropriate.

WHEREFORE, HUD respectfully moves the Court to dismiss all claims asserted by plaintiffs except the APA claims stated by PRPHA and PRDH in Count IV of the Complaint. HUD respectfully further moves the Court to order that the federal statute of limitations bars claims arising more than six years prior to the March 14, 1996, filing of this action; to require HUD to provide to PRPHA and PRDH only administrative records relevant to final agency actions not barred by the statute of limitations; and to prohibit forbid the parties from serving or otherwise engaging in discovery.

A proposed order and memorandum in support of this motion are submitted herewith.

Dated:  Oct. _8_, 1996          Respectfully submitted,

OF COUNSEL:                     FRANK W. HUNGER
                                Assistant Attorney General

HOWARD SCHMELTZER
MAURA MALONE                    GUILLERMO GIL
Office of General Counsel       United States Attorney
U.S. Department of Housing
     and Urban Development
451 7th St., S.W.
Washington, D.C.    20410       _Fidel  Sevillano/ lau_
(202) 708-0300                  FIDEL SEVILLANO
                                Assistant United States Attorney


                                _Lois Bonsal Os_
                                MICHAEL SITCOV
                                Assistant Branch Director
                                LOIS BONSAL OSLER
                                Trial Attorney
                                U.S. Department of Justice
                                Civil Division
                                Federal Programs Branch
                                901 E Street, N.W.
                                Room 990
                                Washington, D.C.   20530
                                (202) 514-3770
                                Attorneys for Defendant

-3-

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 7

Page: 8     Date Filed: 01/29/2024     Document: 010110991829     Appellate Case: 23-1286

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

|  |  |  |
|---|---|---|
| THE PUERTO RICO PUBLIC HOUSING ADMINISTRATION, <u>et al.</u>, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C. A. No. 96-1304 (PG) |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, <u>et al.</u>, | ) ) ) ) | |
| Defendants. | ) ) | |

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
<u>PARTIAL DISMISSAL AND TO LIMIT DISCOVERY</u>

I.   <u>INTRODUCTION</u>

Citing allegedly unfairly low levels of federal subsidization dating back nearly three decades and a variety of constitutional and statutory theories, plaintiffs sue the United States Department of Housing and Urban Development and the Secretary of the United States Department of Housing and Urban Development (collectively "HUD"), asserting, <u>inter alia</u>, that HUD has discriminatorily shortchanged the Puerto Rico Public Housing Administration ("PRPHA"). Specifically, plaintiffs, PRPHA, the Puerto Rico Department of Housing ("PRDH") and Myriam Alameda ("Alameda") purport to state claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), Title VIII of the Civil Rights Act of 1964, 42 U.S.C. § 3601, <u>et seq.</u> ("Title VIII"), the Equal Protection and Due Process Clauses of the Fifth

and Fourteenth Amendments to the United States Constitution and the Administrative Procedure Act, 5 U.S.C. § 553, et seq. ("APA").

With the exception of PRPHA and PRDH's claims under the APA, plaintiffs' Complaint for Declaratory and Injunctive Relief ("Complaint") suffers from numerous legal deficiencies and should be dismissed. First, Ms. Alameda lacks standing to pursue any of her claims. Second, sovereign immunity bars suit under any of the provisions cited by plaintiffs except the APA. Third, plaintiffs do not possess an implied right of action under either Title VI or Title VIII. Finally, since neither PRPHA nor PRDH is a "person" within the meaning of the Equal Protection and Due Process Clauses, they cannot state claims under these provisions. Nor can they pursue these claims on behalf of PRPHA tenants as such parens patriae suits do not lie against HUD, an agency of the United States.

Accordingly, the only justiciable claims advanced in this proceeding are the APA claims stated by PRPHA and PRDH. Under the applicable federal six-year statute of limitations, these APA claims are limited to final agency actions taken up to six years before the filing of this action on March 14, 1996. Moreover, since this action involves only the limited inquiry conducted under the APA, this Court's review is restricted to the administrative records concerning HUD's various funding and related decisions, and discovery into extra-record materials is therefore inappropriate.

-2-

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 10

In short, stripped of its meritless claims and improper claimant, this complaint presents a simple APA case involving a quarrel over HUD's 1992 review of PRPHA's federal subsidy level. Accordingly, this Court's review is limited to the administrative records of HUD's recent decisions regarding the appropriate approach to, and calculation of, funding levels for PRPHA.

## II. STATUTORY AND FACTUAL BACKGROUND

### A.   Statutory and Regulatory Background

Through a number of statutes, Congress has charged HUD with primary responsibility for providing housing subsidies for public housing authorities ("PHAs"). See, e.g., Complaint, ¶ 12.[1] Of relevance here, Congress empowered the Secretary of HUD to determine the annual operating subsidies paid to PHAs located throughout the United States and its territories (including the Commonwealth of Puerto Rico). See 42 U.S.C. §§ 1437g(a)(1)(A) and 1437a(b)(7). See also Complaint, ¶ 12. These subsidies compensate PHAs for, among other matters, the shortfall between PHAs' annual operating expenses and PHAs' receipt of rent payments from tenants in the PHAs' housing. See, e.g., id., ¶ 12. To this end, HUD annually enters into Annual Contributions Contracts ("ACCs") with PHAs to provide for payment of subsidies by HUD to PHAs. See 42 U.S.C. § 1437g. See also Complaint, ¶ 10.

---

[1] Solely for purposes of this motion, plaintiffs' factual allegations are taken as true. See Washington Legal Foundation v. Massachusetts Bar Foundation, 993 F.2d 962, 971 (1st Cir. 1993).

In 1974, Congress enacted the Housing and Community Development Act of 1974, 42 U.S.C. § 1437g(a)(1), which, in relevant part, mandated that HUD adopt a new system for calculating PHAs' annual subsidies. See Complaint, ¶ 17.[2]  In 1975, HUD issued regulations establishing the Performance Funding System ("PFS") under which HUD considered certain factors affecting PHAs' operating costs and approximated the costs which would be incurred by a hypothetical "well-managed" PHA, as specifically required by statute.[3]  See 42 U.S.C. § 1437g(a)(1); 24 C.F.R. §§ 990, et seq.  See also Complaint, ¶ 18.  The PHAs of Guam, the Virgin Islands, Alaska and Puerto Rico were not included in the PFS.  See 24 C.F.R. § 990.103(b).  See also Complaint, ¶ 22.  Thus, with these four exceptions, HUD did and does use the PFS to calculate PHAs' annual subsidies.  See id., ¶¶ 24-28.  Congress has never directed HUD to include the PHAs of Guam, the Virgin Islands, Alaska or Puerto Rico in the PFS.  See generally Complaint.

Although a given PHA's other expenses are considered, the primary factor in the PFS calculation is a PHA's "allowable expense level" ("AEL").  A PHA's AEL is derived from that PHA's

---

[2]HUD includes a description of the development of PHA funding which predates March 1990 only for the Court's information.  Reference to these events, which are time-barred and therefore non-justiciable in this action, should not be construed as an admission by HUD that plaintiffs may assert any claims based on HUD final agency actions which predate March 1990.  See § D(1), infra.

[3]As plaintiffs themselves note, PRPHA is and has been a "troubled," i.e., poorly managed, PHA rather than the type of well-managed PHA contemplated under PFS.  See Complaint, ¶ 67.

-4-

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 11

Page: 12     Date Filed: 01/29/2024     Document: 010110991829     Appellate Case: 23-1286

approved operating expenses during the PHA's base year, and is then adjusted for inflation. The base year for PFS PHAs was 1974. See Complaint, ¶¶ 19-20. Although Guam, the Virgin Islands, Alaska and Puerto Rico are "non-PFS PHAs" (i.e., not subject to PFS), in 1984 HUD nevertheless calculated approximate AELs based on data for the PHAs of Guam, the Virgin Islands, and Alaska. See Complaint, ¶ 24. HUD did not, however, calculate an approximate AEL for the PRPHA until 1989. See id., ¶ 28.

In 1988, Congress amended § 1437g to direct HUD to conduct a formal review of PHAs included in the PFS system (which, as noted above, did not and does not include Guam, the Virgin Islands, Alaska or Puerto Rico). See 42 U.S.C. § 1437g(a)(3)(B)(iii). See also Complaint, ¶ 27. This review was intended to ensure that PFS PHAs' AELs accurately reflected their operating costs. See id. In 1992, HUD implemented this review requirement through an optional review process based on a "formula expense level" ("FEL") calculation. See id., ¶ 30. The FEL calculation assessed and assigned a weighted value to five aspects of a given PHA's characteristics:

(a) the number of pre-1940 rental units occupied by poor households as a percentage of the population of the community;

(b) the local government wage rate index ("LGWI");

(c) the number of two-or-more bedroom units owned and operated by the PHA;

(d) the ratio of three-or-more bedroom units to the total number of dwelling units owned by the PHA; and

(e) the ratio of two-or-more bedroom units in high rise family public housing projects to the total dwelling units owned by the PHA.  See id., ¶ 32.

For those PHAs which chose to participate in the FEL process, HUD determined, in essence, whether the PHA's FEL was less than 85% of its AEL.  See id., ¶ 30.  If it was, the AEL was increased to a level to equal 85% of the FEL.  See id.  Although PRPHA was not included in the PFS system and therefore was not covered by the 1988 amendments, HUD reviewed the PRPHA's estimated AEL (established in 1989) in conjunction with the optional review process.  See id., ¶¶ 30-31.  Based on this review, HUD determined not to apply all of the FEL factors as they were applied to the PFS-PHAs.  See id., ¶¶ 31-43, 47-53.

B.   Plaintiffs' Claims

As noted above, there are three plaintiffs in this action. Ms. Alameda is an Hispanic, Puerto Rican resident of public housing provided by PRPHA.  See id., ¶ 4.  The two governmental plaintiffs, PRPHA and PRDH, are, respectively, a government instrumentality and an agency of the Commonwealth of Puerto Rico. See id., ¶¶ 2-3.  Each plaintiff purports to state constitutional and statutory challenges to HUD's calculation of PRPHA's subsidies over the past 25 years.  See id., ¶¶ 71-94.[4]

─────────────

[4]In addition to their substantive claims, plaintiffs cite 28 U.S.C. §§ 1331 and 2201, as well as the APA and 42 U.S.C. § 1404a, as jurisdictional bases for their suit.  Of these statutes, neither the APA nor § 2201 provides an independent basis for jurisdiction.  See Califano v. Sanders, 430 U.S. 99, 105 (1977)(APA); Schilling v. Rogers, 363 U.S. 666, 667

(continued...)

-6-

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 14

### III.   ARGUMENT

PLAINTIFF ALAMEDA'S CLAIMS AS WELL AS
NON-APA CLAIMS OF PRPHA AND PRDH SHOULD BE
DISMISSED AND THE APA CLAIMS SHOULD BE LIMITED
TO FINAL AGENCY ACTIONS TAKEN SINCE MARCH 1990

Plaintiffs articulate five legal bases for their claims:
Title VI, Title VIII, the Equal Protection Clause, the Due
Process Clause and the APA.  Under firmly established principles
of standing, sovereign immunity, statutory construction and
constitutional jurisprudence, only PRPHA and PRDH, on their own
behalves, have standing, but these plaintiffs may only pursue
claims under the APA.  Furthermore, these APA claims are limited
to final agency actions HUD has taken over the six years
predating the filing of this action, and the Court's review of
these actions must be confined to the administrative records of
HUD's decisions.  Therefore, Ms. Alameda should be dismissed as a
plaintiff, PRPHA and PRDH's Title VI, Title VIII and

---

[4](...continued)
(1960)(Declaratory Judgment Act).  Furthermore, § 1331 confers
jurisdiction only if and to the extent that the United States has
expressly waived sovereign immunity.  See Robishaw Engineering,
Inc. v. United States, 891 F. Supp. 1134, 1142 (E.D. Va. 1995)
(§ 1331 "generally confers jurisdiction on federal courts to
review agency actions and decisions" only where sovereign
immunity waived); Hayes v. Federal Bureau of Investigation, 562
F. Supp. 319, 322 (S.D. N.Y. 1983)("broad jurisdictional statutes
like 28 U.S.C. § 1331 do not operate -- in and of themselves --
as waivers of sovereign immunity . . . The plaintiff, therefore,
must look beyond the jurisdictional provision[s] -- to the
statute which supplies the substantive basis of [plaintiff's]
claim -- for a waiver of sovereign immunity.").  Finally, § 1404a
provides a very limited waiver of sovereign immunity for HUD by
permitting the agency to be sued "only with respect to its
functions under the United States Housing Act," but does not
itself vest jurisdiction in the district court.  See, e.g.,
Portsmouth Redevelopment and Housing Authority v. Pierce, 706
F.2d 471, 475 (4th Cir.), cert. denied, 464 U.S. 960 (1983).

-7-

Appellate Case: 23-1286    Document: 010110991829    Date Filed: 01/29/2024    Page: 15

constitutional claims should be dismissed and no discovery should be permitted.

A.    Standards for Dismissal
      Under Rules 12(b)(1) and 12(b)(6)

Pursuant to Rule 12(b)(1), Fed. R. Civ. P., a litigant's claims must be dismissed if the court lacks jurisdiction over the subject matter of the claim.  See, e.g., Barrios v. Aeela, 84 F.3d 487, 489-490 (1st Cir. 1996).  See also National Association for Mental Health, Inc. v. Califano, 717 F.2d 1451 (D.C. Cir. 1983), cert. denied, 469 U.S. 817 (1984).  Under Rule 12(b)(6), a claim must be dismissed if it fails to state a basis upon which relief may be granted.  See Rule 12(b)(6).  Under both rules, the court takes those allegations of the complaint as true and views the allegations in the light most favorable to the claimant.  See, e.g., Hart v. Mazur, 903 F. Supp. 277, 279 (D.R.I. 1995).[5] The court need not, however, "accept a complainant's unsupported conclusions or interpretations of law."  Washington Legal Foundation v. Massachusetts Bar Foundation, 993 F.2d at 971.

---

[5] Where, as here, a "facial" attack is made to standing based on the allegations of the complaint, the Court's review under Rule 12(b)(1) is limited to the four corners of the complaint. See, e.g., RMI Titanium Co. v. Westinghouse Electric Corp., 78 F.3d 1125, 1134 (6th Cir. 1996).

-8-

Page: 16   Date Filed: 01/29/2024   Document: 010110991829   Appellate Case: 23-1286

B.   The Court Lacks Subject Matter Jurisdiction
     Over Ms. Alameda's Claims and Over the
     Title VI, Title VIII and Constitutional Claims

     1.   Ms. Alemeda Lacks Standing and
          Her Claims Should Be Dismissed

          a.   Principles of Standing

Standing to sue is "a threshold issue [] determining whether
the court has the power to hear the case." Libertad v. Welch, 53
F.3d 428, 437 (1st Cir. 1995). As demonstrated below, Ms.
Alemeda lacks standing because she has not suffered an alleged
injury in fact traceable to HUD's actions and any relief granted
by this Court would not be likely to redress her alleged injury.

Federal courts lack subject matter jurisdiction over, and
therefore must dismiss, actions which do not present a
justiciable "case or controversy." See, e.g., O'Shea v.
Littleton, 414 U.S. 488, 493 (1974)(jurisdiction of federal
courts is dependent on an actual "case or controversy . . .
Plaintiffs in the federal courts 'must allege some threatened or
actual injury resulting from the putatively illegal action before
a federal court may assume jurisdiction.'")(quoting Linda R.S. v.
Richard D., 410 U.S. 614, 617 (1973)(footnote omitted)); DeFunis
v. Odegaard, 416 U.S. 312, 316 (1974)(same). Accordingly, where
a plaintiff does not properly plead sufficient facts to support
his or her standing, the action should be dismissed for lack of
subject matter jurisdiction. See, e.g., City of Los Angeles v.
Lyons, 461 U.S. 95, 101 (1983). As the Supreme Court has stated:

-9-

0289

Page: 17     Date Filed: 01/29/2024     Document: 010110991829     Appellate Case: 23-1286

> In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III.  This is the threshold question in every federal case, determining the power of the court to entertain the suit.

Warth v. Seldin, 422 U.S. 490, 498-99 (1975).  Explaining this "bedrock principle," the Supreme Court held:

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is fairly likely to be redressed by a favorable decision' . . .

Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472 (1982)(footnotes and citations omitted).

To satisfy Article III's "case or controversy" requirement, a plaintiff must establish the elements of his or her standing to sue.  First, the plaintiff must show that he or she has suffered an "injury in fact," i.e., an "actual or threatened injury as a result of the putatively illegal conduct of the defendant." Valley Forge, 454 U.S. at 472 (quoting Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979)).  See also Lujan v. Defenders of Wildlife, -- U.S. --, 112 S.Ct. 2130 (1992).  The "injury in fact" required for standing must be immediate, objective, and concrete, see, e.g., City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983); Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 40 (1976); O'Shea v. Littleton, 414 U.S. 488, 494-99 (1974), rather than merely speculative,

-10-

Page: 18   Date Filed: 01/29/2024   Document: 010110991829   Appellate Case: 23-1286

subjective or abstract.  <u>See</u>, <u>e.g.</u>, <u>City of Los Angeles</u> v. <u>Lyons</u>, 461 U.S. at 101-02, 107 n.8.

Second, the standing doctrine mandates that federal court jurisdiction be invoked only where the plaintiff's "injury in fact" "fairly can be traced to the challenged action." <u>Valley Forge</u>, 454 U.S. at 472 (quoting <u>Eastern Kentucky</u>, 426 U.S. at 38).  Requiring that a direct, causal relationship exist between the alleged illegal conduct and the alleged palpable injury ensures that the injuries do not result from independent action. <u>Eastern Kentucky</u>, 426 U.S. at 41-42.  In short, the plaintiff must make a "reasonable showing that 'but for' defendants' action the alleged injury would not have occurred." <u>Community Nutrition Institute</u> v. <u>Block</u>, 698 F.2d 1239, 1247 (D.C. Cir. 1983), <u>rev'd on other grounds</u>, 467 U.S. 340 (1984).  Consequently, a plaintiff lacks standing where the court must accept speculative inferences and assumptions in order to connect the alleged injury with the challenged activity.  <u>Winpisinger</u> v. <u>Watson</u>, 628 F.2d 133, 139 (D.C. Cir.), <u>cert</u>. <u>denied</u>, 446 U.S. 929 (1980).

Finally, the alleged concrete injury must be "likely to be redressed by a favorable decision." <u>Valley Forge</u>, 454 U.S. at 472.  Of paramount significance in this action, the "redressability" element of standing is not satisfied unless the relief sought is "likely" to follow from a favorable decision. <u>Eastern Kentucky</u>, 426 U.S. at 38.

Page: 19   Date Filed: 01/29/2024   Document: 010110991829   Appellate Case: 23-1286

b.   <u>Ms. Alemeda Does Not Have Standing</u>

Ms. Alemeda alleges that she is an Hispanic, Puerto Rican resident in public housing provided by PRPHA. <u>See</u> Complaint, ¶ 4.   In the vaguest of terms, Ms. Alemeda asserts that her living conditions -- in an unidentified PRPHA public housing project and over an unspecified period of time -- have deteriorated as a result of HUD's alleged underfunding of PRPHA. <u>See</u> Complaint, ¶¶ 61, 83 and 89.   Ms. Alemeda does not purport to sue on behalf of any other public housing residents.   <u>See generally</u> Complaint.

Under the principles outlined above, Ms. Alemeda has failed to offer allegations sufficient to demonstrate standing.   Most glaringly, Ms. Alemeda has not alleged any facts that establish a direct link between HUD funding levels for PRPHA and her alleged injury -- the purported failure of PRPHA to provide services and conditions to which she claims to be entitled.   As noted above, the causation component of the standing doctrine mandates that a plaintiff must demonstrate that his or her alleged injury "fairly can be traced to the challenged action" of the defendant. <u>Eastern Kentucky</u>, 426 U.S. at 41-42.   It is insufficient for standing purposes merely to assert that the challenged action might have influenced the factors resulting in the alleged injury to the plaintiff if the alleged injury is just as likely to result from independent, intervening causal factors.   The Supreme Court has consistently abided by this tenet.   <u>See</u>, <u>e.g.</u>, <u>Eastern Kentucky</u>; <u>Allen</u> v. <u>Wright</u>, 468 U.S. 737 (1984).

-12-

Ms. Alemeda's alleged concerns simply are not fairly traceable to HUD's supposed underfunding of PRPHA.  For example, Ms. Alemeda makes no assertion that PRPHA or any other entity advised her that the allegedly deteriorating conditions in PRPHA housing were due to a lack of funding from HUD.  Indeed, the allegations of the Complaint demonstrate that it is PRPHA's decisions regarding how and where to spend its HUD subsidies which have directly resulted in Ms. Alemeda's alleged difficulties.  In this regard, PRPHA states that it uses its federal subsidy to operate 332 public housing projects comprising 57,345 housing units. <u>See</u> Complaint, ¶¶ 2, 10.  The PRPHA's public housing tenant population tops 250,000.  <u>See</u> <u>id</u>., ¶. 2.  Unquestionably, PRPHA determines how to divide between these projects and these tenants the annual federal subsidy which PRPHA receives from HUD.  Thus, decisions concerning use of federal subsidies rest with PRPHA, not HUD.  Therefore, Ms. Alemeda's claims involve not HUD's actions, but the failure of PRPHA to dedicate funding to the anonymous housing project in which she resides.  Therefore, since PRPHA, not HUD, controls the services, conditions and facilities available to Ms. Alameda, her purported injuries are not traceable to any actions by HUD.

Turning to "redressability," the courts have observed that mere allegations of redressability will not suffice.  Instead, "the Supreme Court has explicitly interpreted the standard for redressability as 'substantial likelihood.'" [cite to be

-13-

0293

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 21

supplied] at 670 (quoting <u>Duke Power Co.</u> v. <u>Carolina Environmental Study Group</u>, 438 U.S. 59, 75 n.20 (1975)).

As noted above, PRPHA operates hundreds of housing developments and thousands of rental units.  PRPHA also services hundreds of thousands of individual tenants.  Consequently, there is no basis for believing that Ms. Alameda's alleged injuries -- inadequate services and facilities -- will be affected by any relief granted in this action.  Moreover, the Complaint is devoid of any allegation that Ms. Alameda would directly receive any benefit from increased PRPHA funding.  Thus, it is entirely speculative that her alleged injury would be redressed in any way whatsoever should the Court order HUD to recalculate PRPHA's funding level.  PRPHA would be entirely free to devote any and all increased funding it might be awarded in this litigation to other operations, or to 331 projects which PRPHA manages and claims are in disrepair, instead of to Ms. Alemeda's unit or even her project.  Indeed, PRPHA affirmatively alleges that the additional funding it seeks through this action will be devoted to improving its management infrastructure.  <u>See</u> Complaint, ¶¶ 62, 66.

Thus, it is problematic at best to suggest that a court order raising PRPHA's funding level would have any impact whatsoever on Ms. Alemeda's particular public housing unit.  As the Supreme Court has held, "unadorned speculation will not suffice to invoke the federal judicial power." <u>Eastern Kentucky</u>, 426 U.S. at 44.  Since the Complaint does not demonstrate that an

-14-

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 22

order of this Court granting in full the relief against HUD
requested in the Complaint would redress Ms. Alameda's alleged
injury, she has not satisfied the requirements for standing.
Because she plainly lacks standing, the Court lacks jurisdiction
over any of her claims.[6]

      2.   <u>Sovereign Immunity Bars Plaintiffs' Non-APA Claims</u>

Even assuming that Ms. Alemeda possesses standing, her Title
VI and Title VII claims, as well as her constitutional claims,
and those of her co-plaintiffs, are barred by the doctrine of
sovereign immunity and this Court accordingly lacks subject
matter jurisdiction over such claims.  This action is, of course,
against an agency of the United States.  <u>See</u> Complaint, ¶ 5 ("HUD
is a federal agency of the United States").  The Supreme Court
has treated as "axiomatic that the United States may not be sued
without its consent and that the existence of consent is a
prerequisite for jurisdiction."  <u>United States</u> v. <u>Mitchell</u>, 463
U.S. 206, 212 (1983).  <u>See also</u> <u>Lane</u> v. <u>Pena</u>, -- U.S. --, 116 S.
Ct. 2092 (1996); <u>United States</u> v. <u>Nordic Village, Inc.</u>, 503 U.S.
30 (1992); <u>United States</u> v. <u>Testan</u>, 424 U.S. 392, 399 (1976).
Unless there is express evidence of consent to be sued, suits
against the sovereign accordingly must be dismissed under Rule
12(b)(1) for lack of subject-matter jurisdiction.  <u>See</u>, <u>e.g.</u>,
<u>United States</u> v. <u>Sherwood</u>, 312 U.S. 584, 586 (1941)(the "terms of
[the United States'] consent to be sued in any court define the

---

    [6]Even if Ms. Alameda possessed standing, her non-APA claims
should be dismissed for the reasons stated <u>infra</u> concerning the
claims of her co-plaintiffs.

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 23

court's jurisdiction to entertain the suit").  Such consent cannot be implied but must be explicitly stated and narrowly construed.  See Lane v. Pena, 116 S. Ct. at 2096; United States v. Testan, 424 U.S. at 399; Affiliated Ute Citizens v. United States, 406 U.S. 128, 141 (1971); United States v. King, 395 U.S. 1, 4 (1969).

Neither Title VI[7] nor the statutory provision in Title VIII on which plaintiffs rely[8] contains an explicit, independent waiver of sovereign immunity which would allow plaintiffs to sue HUD under those provisions.  See Drayden v.  Needville Independent School District, 642 F.2d 129, 133 n.6 (5th Cir. 1981)("There is no statutory waiver of sovereign immunity in Title VI cases"); Unimex, Inc. v. U.S. Dept. of Housing and Urban Development, 594 F.2d 1060, 1061 (5th Cir. 1979)("the United States has not consented to suit under the civil rights statutes"); United States v. Yonkers Board of Education, 594 F. Supp. 466 (S.D.N.Y. 1984)(Title VI claim barred by sovereign immunity).  Similarly, the bar of sovereign immunity extends to plaintiffs' purported constitutional claims.  See, e.g., United

---

[7]Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

[8]Plaintiffs specifically rely on § 3608(e) of Title VIII, see Complaint, ¶ 79, which provides, in relevant part, that the Secretary of HUD "shall . . . administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter."  42 U.S.C. § 3608(e)(5).  See Complaint, ¶ 79.

-16-

States v. Timmons, 672 F.2d 1373, 1380 (11th Cir. 1982)("claims based directly on Fifth Amendment violations are likewise barred by the doctrine of sovereign immunity"); Jaffee v. United States, 592 F.2d 712, 718 (3d Cir. 1979)(rejecting claim against United States for deliberate violation of constitutional rights, noting "[t]he repeated statements of the Supreme Court from its inception [] are plain and unequivocal: the United States is subject to suit only by its consent); Forbes v. Reno, 893 F. Supp. 476, 482 (W.D. Pa. 1995)("Because there is no basis for a waiver of sovereign immunity, Forbes' attempts to assert a cause of action directly against the United States for alleged violation of the Fifth, Thirteenth and Fourteenth Amendments . . . fail for lack of jurisdiction."); Benvenuti v. Department of Defense, 587 F. Supp. 348, 352 (D.D.C. 1984)("None of the statutes cited by plaintiff -- the general federal question provision [] and the All Writs and Declaratory Judgment Acts [] -- nor the Constitution itself -- operate as such waivers" of sovereign immunity)(citations omitted); Kelly v. United States, 512 F. Supp. 356, 362 (E.D. Pa. 1981)("Even where there exists a direct cause of action under the Constitution, the United States is not liable for the deprivation of constitutional rights unless it has waived immunity from suit").

Thus, plaintiffs' Title VI, Title VIII and constitutional claims against HUD are barred under the doctrine of sovereign immunity and this Court lacks subject matter jurisdiction to consider them.

Appellate Case: 23-1286    Document: 010110991829    Date Filed: 01/29/2024    Page: 24

Page: 25   Date Filed: 01/29/2024   Document: 010110991829   Appellate Case: 23-1286

C.   Plaintiffs Have Not Stated Claims
     Under Title VI, Title VIII, the Equal
     Protection Clause or the Due Process
     <u>Clause Upon Which Relief Can Be Granted</u>

As noted above, Rule 12(b)(6) mandates dismissal where a litigant fails to state a claim upon which relief can be granted. Under this rule, only PRPHA and PRDH's APA claims survive.

   1.   Title VI Does Not Apply
        <u>to the Federal Government</u>

Leaving aside for the purposes of argument the bar of sovereign immunity, plaintiffs would be entitled to sue the federal government directly under Title VI only if that statute gave them a right to do so.  It does not, and plaintiffs' Title VI claims therefore must be dismissed under Rule 12(b)(6).

The fact that a federal statute may have been violated and some person harmed "does not automatically give rise to a private cause of action in favor of that person." <u>Cannon</u> v. <u>University of Chicago</u>, 441 U.S. 677, 688 (1979).  "The federal judiciary will not engraft a remedy onto a statute, no matter how salutary, that Congress did not intend to provide." <u>California</u> v. <u>Sierra Club</u>, 451 U.S. 287, 297 (1981).

As noted above, Title VI does not explicitly provide plaintiffs a right to sue the federal government for failing to enforce the statute.  While the absence of an express right of action in the statute would not be dispositive if plaintiffs could establish that a private right of action is implied in the statute, they face a difficult burden in this regard, <u>Middlesex County Sewerage Authority</u> v. <u>National Sea Clammers Association</u>,

-18-

Page: 26   Date Filed: 01/29/2024   Document: 010110991829   Appellate Case: 23-1286

453 U.S. 1, 14-15 (1981), a burden that cannot be met in this case.

Indeed, the burden applicable to plaintiffs here is even greater than that which must be borne by a party seeking to sue a private entity or individual on an "implied right of action" theory.  The familiar four-part test enunciated by the Supreme Court in Cort v. Ash, 422 U.S. 66 (1975), under which private rights of action against private parties may be inferred in federal statutes, does not squarely fit a case brought against the federal government.

> A private right of action may be implied against a non-governmental defendant even though the statutory language grants no such right explicitly and the legislative history is silent on Congress' intent to provide it.  A silent statute and silent legislative history, however, cannot justify implying a private right of action against the United States because Congress must unequivocally express its intent to create such a right.

Doe v. Attorney General of the United States, 941 F.2d 780, 789 (9th Cir. 1991)(citations omitted).  As this Circuit has forcefully stated en banc, "it rarely makes sense to find that a substantive statute creates an 'implied private right of action' against the federal government for relief from unlawful regulatory action," given that judicial review of federal agency action is generally available under the APA.  Cousins v. Secretary of U.S. Dep't of Transportation, 880 F.2d 603, 606 (1st Cir. 1989)(en banc)(Breyer, J.).  To do so would vitiate Congress' effort to create, though the APA, "a single unified method for review of agency action."  Id. at 605.  See also id. (APA designed to create a "system of administrative law that

-19-

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 27

seeks regularity . . . securely embraced within the uniform procedural confines of the APA."). Accordingly, as this Circuit correctly noted,

> In fact, it is difficult to understand why a court would ever hold that Congress, in enacting a statute that creates federal obligations, has implicitly created a private right of action against the <u>federal</u> government, for there is hardly ever any need for Congress to do so [because under the APA] federal action is nearly always reviewable for conformity with statutory obligations without any such 'private right of action.'

<u>N.A.A.C.P.</u> v. <u>Secretary of Housing and Urban Development</u>, 817 F.2d 149, 152 (1st Cir. 1987)(Breyer, J.).

For this reason, courts have rejected litigants' efforts to sue the federal government under a purported implied private right of action under Title VI. For example, in <u>Women's Equity Action League (WEAL)</u> v. <u>Cavazos</u>, 906 F.2d 742 (D.C. Cir. 1990), Judge (now Justice) Ruth Bader Ginsburg confronted head-on the assertion of a private right of action to sue the federal government to compel enforcement of Title VI and determined that there is no such right of action.

Judge Ginsburg premised her decision largely on the Supreme Court's opinion in <u>Cannon</u> v. <u>University of Chicago</u>, 441 U.S. 677 (1979). In that case, the Supreme Court analyzed the availability of relief for the victim of discrimination in a federally-funded program. The precise issue in <u>Cannon</u> was whether an implied private right of action permits a lawsuit against a recipient of federal funding under Title IX of the Education Amendments of 1972. Although Title IX relates to sex discrimination in educational programs, and not to racial or

-20-

Page: 28      Date Filed: 01/29/2024      Document: 010110991829      Appellate Case: 23-1286

national origin discrimination in federally funded programs
generally or HUD programs in particular, Title IX was patterned
after Title VI in all relevant respects.  441 U.S. at 694.
Consequently, the legislative background of Title VI provided the
primary analytical framework for the Court's consideration in
Cannon.

Relying on that legislative history, the Court concluded
that the statute did authorize suit directly against the non-
federal discriminating entity.  In so doing, however, the Court
clearly restricted the reach of such a suit to that entity, and
not to the federal government.  As the Court explained,

> [i]n its final form, [Title VI] was far more conducive to
> implication of a private remedy against a discriminatory
> recipient than was the original language, but at the same
> time was arguably less conducive to implication of a private
> remedy against the Government (as well as the recipient) to
> compel the cutoff of funds.

441 U.S. at 677 (emphasis in original).  Writing in WEAL, Judge
Ginsburg explained the Supreme Court's dictum in the following
terms:

> The Cannon opinion contrasts two private remedies: suit
> against a discriminatory fund recipient to terminate the
> offending discrimination; and suit against the government to
> terminate federal funding.  The Court found strong support
> in legislative history for the former, but resistance on the
> part of lawmakers toward the latter.

906 F.2d at 750.

This Circuit has strongly intimated that there is no right
to sue the federal government under Title VI.  Cousins v. U.S.
Dep't of Transportation, 880 F.2d 603, 607 (1st Cir. 1989)(en
banc)(no private right of action to obtain judicial supervision

-21-

Appellate Case: 23-1286    Document: 010110991829    Date Filed: 01/29/2024    Page: 29

of federal funding agency under § 504 of Rehabilitation Act, which is modeled after Title VI).  Other courts have agreed that no private right of action against the federal government exists under either Title VI itself or under statutes modeled upon Title VI.  See Marlow v. U.S. Dep't of Education, 820 F.2d 581, 583 (2d Cir. 1987), cert. denied, 484 U.S. 1044 (1988); Salvador v. Bennett, 800 F.2d 97, 99 (7th Cir. 1986); Grimes v. Cavazos, 786 F. Supp. 1184, 1189-91 (S.D. N.Y. 1992).[9]

Finally, plaintiffs cannot attack HUD for alleged failure to comply with Title VI through their APA claims.  As noted above, Title VI supports a cause of action against a recipient of federal funds.  See, e.g., Cannon v. University of Chicago, supra (finding private right of action against educational institution receiving federal funds).  HUD is not a "recipient" of federal funds within the meaning of Title VI.  See 24 C.F.R. § 1.2(f)(defining "recipient").  Therefore, HUD is not subject to

---

[9]The WEAL court did mention several pre-Cannon cases which seem at least to assume the existence of a Title VI private right of action to sue the federal government, including Garrett v. City of Hamtramck, 503 F.2d 1236 (6th Cir. 1974).  Judge Ginsburg suggested that those cases could be distinguished on the ground that they involved narrowly focused situation-specific claims of failure to enforce civil rights statutes, while the allegations in WEAL were very broad-based.  In Abramson v. Bennett, 707 F.Supp. 13 (D.D.C.), aff'd, 889 F.2d 291 (D.C. Cir. 1989), though, the court held that a narrowly focused attempt to force the federal government to enforce Title VI cannot succeed for lack of a private right of action.  Thus, whether a case is broad or narrow in scope, the post-Cannon rule should be that Title VI does not provide a private right of action.  But see Young v. Pierce, 544 F.Supp. 1010 (E.D. Tex. 1982) (holding that there is a private right of action to sue federal government under Title VI).

-22-

suit under Title VI because HUD is not a recipient of federal funds.

As the preceding discussion demonstrates, the conclusion that plaintiffs have no right to sue the federal government directly under Title VI is inescapable.  Therefore, plaintiffs' Title VI claims should be dismissed.

> 2.   No Private Right of Action Against the
>      Federal Government Exists Under Title VIII

As noted earlier, plaintiffs also purport to bring this action under Title VIII, and specifically under § 3608(e).

> The short, conclusive answer to this argument [] is that
> [the First Circuit] has recently held that Congress did not
> create any such direct private right of action under Title
> VII.

N.A.A.C.P. v. Secretary of Housing and Urban Development, 817 F.2d 149, 152 (1st Cir. 1987).  See also Latinos Unidos de Chelsea v. Secretary of Housing and Urban Development, 799 F.2d 774, 791-793 (1st Cir. 1986)(finding no private right of action against HUD under Title VIII and holding that HUD's failure to comply with Title VIII only may be attacked through an APA claim).  Numerous other courts have reached the same conclusion for Title VIII claims (including, specifically, § 3608(5)).  See, e.g., Pleune v. Pierce, 687 F. Supp. 113, 119-20 (E.D. N.Y. 1988)(collecting cases).  Therefore, plaintiffs simply cannot proceed under this provision.

-23-

0303

3.   PRPHA and PRDH Have No Rights Under
the Due Process and Equal Protection Clauses

PRPHA and PRDH purport to bring Equal Protection and Due
Process claims against HUD.  See Complaint, 86-90.  Neither
possesses such claims.[10]

Most fundamentally, the Equal Protection and Due Process
clauses "relate[] to equality between persons" and accordingly
afford no independent rights to entities such as PRPHA and PRDH.
McGowan v. Maryland, 366 U.S. 420, 427 (1960)(discussing Equal
Protection); South Carolina v. Katzenbach, 383 U.S. 323-24
(1966)(states are not persons within meaning of Fifth Amendment
and therefore enjoy no due process protections); East St. Louis
v. Circuit Court for Twentieth Judicial Circuit, 986 F.2d 1142,
1144 (7th Cir. 1993)(municipalities are not "persons" within
meaning of Fifth or Fourteenth Amendments); State of New York v.
United States, 942 F.2d 114, 118 (2d Cir. 1991)(noting that
states have no due process rights); Reeder v. Kansas City Board
of Police Commissioners, 796 F.2d 1050, 1053 (8th Cir.), cert.
denied, 479 U.S. 1065 (1986)(Equal Protection Clause "protects
people"); State of Alabama v. United States Equal Protection
Agency, 871 F.2d 1548, 1554 (11th Cir.), cert. denied, 493 U.S.
991 (1989)("State of Alabama is not included among the entities

---

[10]The Fourteenth Amendment by its terms does not apply to the
federal government, see, e.g., Carter v. District of Columbia,
409 U.S. 418 (1973), and the Fifth Amendment contains no equal
protection clause.  Nonetheless, the Supreme Court has held that
the Fifth Amendment protects against the same types of invidious
discrimination that the Fourteenth Amendment prohibits.  See
Rostker v. Goldberg, 453 U.S. 57 (1981).

-24-

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 31

Page: 32      Date Filed: 01/29/2024      Document: 010110991829      Appellate Case: 23-1286

protected by the due process clause of the fifth amendment);
Delta Special School District No. 5 v. State Board of Education
for State of Arkansas, 745 F.2d 532, 533 (8th Cir. 1984)
(political subdivisions of a state possess no right under Equal
Protection Clause).  Political entities, including specifically
PRPHA and PRDH, therefore lack justiciable rights under these
amendments.

PRPHA's attempt to pursue such claims against the federal
government as the supposed representative of PRPHA tenants is
similarly without merit.  See Complaint, ¶ 2 (PRPHA "represents
the interests of [PRPHA] residents").  See, e.g., South Carolina
v. Katzenbach, 383 U.S. 301, 323 (1966)(state cannot sue federal
government on behalf of state's citizens because "the Federal
Government [] [is] the ultimate parens patriae of every American
citizen"); Massachusetts v. Mellon, 262 U.S. 447, 485-86
(1923)(same).

Therefore, these constitutional claims cannot lie against
HUD and should be dismissed.[11]

_____

[11]Furthermore, even if Ms. Alameda possessed standing, she
has failed to state an equal protection or due process claim.
Ms. Alameda bases these claims not on the assertion that HUD
discriminates against the entire class of Hispanic, Puerto
Ricans, but on the allegation that HUD discriminates against
residents of PRPHA many, but not all, of whom are Hispanic
citizens of Puerto Rico.  In this regard, Ms. Alameda does not
allege that HUD treats or treated Puerto Ricans living in HUD-
assisted public housing located outside of Puerto Rico
discriminatorily although, as plaintiffs presumably would not
contest, there are Hispanics (including Puerto Ricans) residing
HUD-subsidized public housing in numerous locations.  See, e.g.,
Latinos Unidos, supra.; Huntington Branch, N.A.A.C.P. v. Town of
Huntington, 844 F.2d 926, 929 (2d Cir. 1988), cert. denied, 488
(continued...)

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 33

D.   The Court May Not Review HUD
Final Agency Actions that Occurred
More than Six Years Before the Complaint
Was Filed, and Must Confine its Review to
the Administrative Records of those Actions

1.   The Applicable Federal Statute
of Limitations Bars Litigation of
Claims Arising from Actions Taken Over
Six Years Prior to the Filing of this Lawsuit

28 U.S.C. § 2401(a) provides that

[e]xcept as provided by the Contract Disputes Act of 1978,
every civil action commenced against the United States shall
be barred unless the complaint is filed within six years
after the right of action first accrues.

"Every civil action" means what it says: it "'applies to all

civil actions whether legal, equitable or mixed.'" Nesovic v.

United States, 71 F.3d 776, 778 (9th Cir. 1995)(quoting Spannaus

v. Department of Justice, 824 F.2d 52, 55 (D.C. Cir. 1987)).  Of

significance here, this time period unquestionably governs APA

claims, which are the only justiciable claims in this proceeding.

See, e.g., James Maditon Ltd., by Hecht v. Ludwig, 82 F.3d 1085,

---

[11](...continued)
U.S. (1989)(Hispanics in HUD-subsidized public housing); Jaimes
v. Toledo Metropolitan Housing Authority, 758 F.2d 1086, 1090
(6th Cir. 1985)((Hispanics in HUD-subsidized public housing).
Ms. Alameda also does not allege that all residents of PRPHA's
public housing are Puerto Ricans of Hispanic origin.  See
Complaint, ¶ 11 ("The residents of public housing in Puerto Rico
are low-income and are predominantly of Hispanic origin)(emphasis
added).  Accordingly, Ms. Alameda attacks not HUD's alleged
treatment of Puerto Ricans or Hispanics, but rather HUD's
treatment of PRPHA, a public housing provider which happens to be
located in Puerto Rico.  As noted above, the Equal Protection
Clause protects people; this protection does not extend to
places.  Finally, HUD's funding of PRPHA arises from a
contractual relationship between those parties.  See Complaint,
¶ 12.  Ms. Alameda is not a party to that contract and
accordingly possesses no due process rights regarding funding
levels.

-26-

Page: 34      Date Filed: 01/29/2024      Document: 010110991829      Appellate Case: 23-1286

1094 (D.C. Cir. 1996); <u>Village of Elk Grove Village</u> v. <u>Evans</u>, 997 F.2d 328, 331 (7th Cir. 1993); <u>Wind River Mining Corp.</u> v. <u>United States</u>, 946 F.2d 710, 712-13 (9th Cir. 1991); <u>Balssingame</u> v. <u>Secretary of the Navy</u>, 811 F.2d 65, 70 (2d Cir. 1987).  The consequences of filing suit after the limitations period has run are unequivocal and dispositive:

> 'The failure to sue the United States within the period of limitations is not simply a waivable defense; it deprives the district court of jurisdiction to entertain the action.'

<u>Nesovic</u>, 71 F.3d at 777-78 (citation omitted).  <u>See also</u> <u>Walters</u> v. <u>Secretary of Defense</u>, 725 F.2d 107, 112 n.12 (D.C. Cir. 1983); 14 Wright, Miller & Cooper, <u>Federal Practice and Procedure</u> § 3654 (1985).[12]  Since the statute of limitations is jurisdictional, it must be strictly construed.  <u>See</u>, <u>e.g.</u>, <u>Lehman</u> v. <u>Nakshian</u>, 453 U.S. 156, 160-61 (1981)("limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto will not be implied."); <u>Spannaus</u> v. <u>United States Department of Justice</u>, 824 F.2d 52, 55 (D.C. Cir. 1987).  Accordingly, the statute of limitations begins to run when "'facts which would support a cause of action are apparent or should be apparent to a person with reasonable prudent regard for his rights." <u>Rozar</u> v. <u>Mullis</u>, 85 F.3d 556, 561-62 (11th Cir. 1996).

---

[12]The jurisdictional nature of the statute of limitations arises out of principles of sovereign immunity.  <u>See</u>, <u>e.g.</u>, <u>Diliberti</u> v. <u>United States</u>, 817 F.2d 1259, 1261 (7th Cir. 1987).

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 35

The Complaint affirmatively states that PRPHA and PRDH were fully aware of the alleged unfairness in HUD's approach to calculating PRPHA's subsidies as early as 1970.  See Complaint, ¶¶ 14-16, 26 (describing allegedly discriminatory "deficit-funding method" applicable to PRPHA from 1970 to 1989). Moreover, these plaintiffs were aware of their claims that PRPHA's AEL was allegedly inequitably low when it was set in 1989, and when HUD purportedly refused to allow an appeal of the subsidization level.  See id., ¶ 28.  Therefore, since the basis for their claims were known to plaintiffs, but they did not file suit within the applicable six years period, their claims dating from actions taken prior to March 14, 1990, are time-barred.[13]

> 2.   Since the Court's Review
>      of HUD's Actions Is Confined
>      to the Appropriate Records,
>      Plaintiffs Are Not Entitled to Discovery

The APA specifically contemplates that judicial review of agency action will be undertaken on the basis of the record compiled by the agency in the course of informal proceedings in which a hearing has not been held.  Florida Power & Light v. Lorion, 470 U.S. 729, 743-44 (1985).  "The factfinding capacity of the district court is thus typically unnecessary to judicial review of agency decisionmaking."  Id. at 744.  Instead, a

---

[13]As a practical matter, it should be noted that even in the unlikely event that plaintiffs were to prevail in this action, the Court's limitation on their claims to the past six years would not affect the substantive nature of either prospective or retroactive relief.  In this regard, plaintiffs seek an order directing HUD to make monetary payments for alleged underfunding only for fiscal years 1993 through 1996, or less than six years ago.  See Complaint, prayer for relief, pg. 26.

Page: 36   Date Filed: 01/29/2024   Document: 010110991829   Appellate Case: 23-1286

reviewing court's task is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision "based on the record the agency presents to the reviewing court." Id. at 743-44 (emphasis supplied)(citing Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971)). Accord PBGC v. LTV, Corp., 496 U.S. 633, 656 (1990); Camp v. Pitts, 411 U.S. 138, 142 (1973)("focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). This Circuit, of course, also abides by this principle. See, e.g., Cousins, 880 F.2d at 610 ("APA review typically takes place on the basis of a record compiled by the agency in making the challenged decision."). Where a federal agency's action "is reasonably supported by the administrative record, [the court's] inquiry must end." Town of Norfolk v. U.S. Army Corps of Engineers, 968 F.2d 1438, 1448 (1st Cir. 1992).[14]

Accordingly, the Court should order that no discovery be taken in this matter and that HUD be required only to produce relevant administrative records.[15]

---

[14]Significantly, this Circuit has expressly held that restricting review to the agency's administrative record in no way places the party challenging the agency's action at a disadvantage and has rejected efforts, such as those made in this case, to "build a record in the district court." See Cousins, 880 F.2d at 610.

[15]To the extent that this request may be construed as a motion relating to discovery, as the Court is aware, the parties have met to discuss this motion and agreed, with the Court's approval at the August 16, 1996 status conference, to submit briefing on the propriety of discovery. Accordingly, the parties have effectively complied with Local Rule 311.11.

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 37

## IV.   CONCLUSION

For the foregoing reasons, the Court should dismiss all claims asserted by plaintiffs except the APA claims stated by PRPHA and PRDH in Count IV of the Complaint.  Furthermore, the Court should hold that the federal statute of limitations bars claims arising more than six years prior to the March 14, 1996, filing of this action and should limit its review of the surviving APA claims to HUD's administrative record.

Dated:  Oct. _8_, 1996

OF COUNSEL:

HOWARD SCHMELTZER
MAURA MALONE
Office of General Counsel
U.S. Department of Housing
   and Urban Development
451 7th St., S.W.
Washington, D.C.    20410
(202) 708-0300

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

GUILLERMO GIL
United States Attorney


_Fidel Sevillano / LBO_
FIDEL SEVILLANO
Assistant United States Attorney


_Lois Bonsal OK_
MICHAEL SITCOV
Assistant Branch Director
LOIS BONSAL OSLER
Trial Attorney
U.S. Department of Justice
Civil Division
Federal Programs Branch
901 E Street, N.W.
Room 990
Washington, D.C.    20530
(202) 514-3770
Attorneys for Defendant

-30-

0310

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 38

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

THE PUERTO RICO PUBLIC )
HOUSING ADMINISTRATION, )
et al., )
                         )
     Plaintiffs, )
                         )
       v. )     C. A. No. 96-1304 (PG)
                         )
UNITED STATES DEPARTMENT )
OF HOUSING AND URBAN )
DEVELOPMENT, et al., )
                         )
     Defendants. )

ORDER

Upon consideration of Defendants' Motion for Partial Dismissal and to Limit Discovery, the memorandum in support thereof, the opposition thereto and the record in this matter,

IT IS HEREBY ORDERED THAT Defendants' Motion for Partial Dismissal and to Limit Discovery be and hereby is granted; and

IT IS FURTHER ORDERED THAT all claims asserted by plaintiff Myriam Alameda be and hereby are dismissed with prejudice; and

IT IS FURTHER ORDERED THAT, with the exception of claims asserted by plaintiffs Puerto Rico Public Housing Administration and Puerto Rico Department of Housing under the Administrative Procedure Act, 5 U.S.C. § 533, et seq., as set forth in Count IV of the complaint, all claims asserted by plaintiffs Puerto Rico Public Housing Administration and Puerto Rico Department of Housing be and hereby are dismissed with prejudice; and

IT IS FURTHER ORDERED THAT claims asserted by plaintiffs Puerto Rico Public Housing Administration and Puerto Rico Department of Housing under the Administrative Procedure Act, 5

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 39

U.S.C. § 533, et seq., as set forth in Count IV of the complaint, which arise from actions occurring prior to March 14, 1990, be and hereby are dismissed with prejudice; and

IT IS FURTHER ORDERED THAT defendant United States Department of Housing and Urban Development shall provide administrative records to Puerto Rico Public Housing Administration and Puerto Rico Department of Housing which relate to these plaintiffs' claims under the Administrative Procedure Act, 5 U.S.C. § 533, et seq., as set forth in Count IV of the complaint, which arose from actions occurring prior to March 14, 1990; and

IT IS FURTHER ORDERED THAT no discovery shall be served or otherwise engaged in by either party.


Dated: _____

                     UNITED STATES DISTRICT COURT JUDGE

0312

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 40

CERTIFICATE OF SERVICE

I certify that true and correct copies of Defendants' Motion for Partial Dismissal and to Limit Discovery, Memorandum of Points and Authorities in Support of Defendants' Motion for Partial Dismissal and to Limit Discovery and proposed order were served by hand, addressed to:

> James F. Hibey, Esq.
> William R. Sherman, Esq.
> Lisa K. Hsiao, Esq.
> Verner, Liipfert, Bernhard
>   McPherson and Hand, Ctd.
> 901 15th Street, N.W.
> Suite 700
> Washington, D.C.  20005.

Dated: Oct. _8_, 1996

0313

# EXHIBIT D

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 42

(TO BE ARGUED ON FEBRUARY 23, 1988)

No. 87-5398

FILED JAN 2 2 1988

CONSTANCE L. DUPRÉ
CLERK

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

PALESTINE INFORMATION OFFICE, ET AL.,

Plaintiffs-Appellants,

v.

GEORGE P. SHULTZ, Secretary of State, ET AL.,

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRIEF FOR THE APPELLEES

ABRAHAM D. SOFAER
  Legal Adviser

PATRICK M. NORTON
  Assistant Legal Adviser
  For Near Eastern and
  South Asian Affairs

JOHN B. REYNOLDS
  Attorney Adviser
  U.S. Department of State

RICHARD K. WILLARD
  Assistant Attorney General

JOSEPH E. DIGENOVA
  United States Attorney

DOUGLAS LETTER
  Appellate Litigation Counsel
  Appellate Staff, Civil Division
  Room 3617, Department of Justice
  Washington, D.C.  20530
  Telephone:  (202) 633-3602

BEST AVAILABLE COPY

0315

**TABLE OF CONTENTS**

                                                                    Page

QUESTIONS PRESENTED ................................   1

STATUTE INVOLVED ...................................   2

STATEMENT OF THE CASE ..............................   2

    A.    Nature Of The Proceeding .................   2

    B.    Statement Of The Facts ..................   3

        1.    The Statutory Scheme ................   3

        2.    The Palestine Information Office
            and the PLO ........................   4

        3.    The Designation of the PIO as a
            Foreign Mission and the Order to
            Cease Operations ...................   5

        4.    This Litigation and the District
            Court's Ruling .....................   7

        5.    The Anti-Terrorism Act of 1987 .......   9

INTRODUCTION AND SUMMARY OF ARGUMENT ...............  11

ARGUMENT ...........................................  14

    I.    THE EXECUTIVE BRANCH VALIDLY EXERCISED
        ITS SUBSTANTIAL AUTHORITY IN DESIGNATING
        THE PIO AS A FOREIGN MISSION OF THE PLO,
        AND IN ORDERING IT TO CEASE OPERATIONS
        IN THAT FORM .............................  14

    A.    The Executive Acted At The Very Height
        Of His Constitutional Authority In This
        Matter ...................................  14

    B.    In The Foreign Missions Act Itself,
        Congress Assigned The Key Functions To
        The Discretion Of The Secretary, And The
        Role Of The Courts Here Is Thus Highly
        Restricted ...............................  17

    C.    The State Department Was Well Within Its
        Authority In Determining That The PIO
        Was A Foreign Mission Of The PLO ..........  20

i

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 44

**Page**

II.   THE STATE DEPARTMENT'S ACTION CLOSING
      A MISSION OF THE PLO DID NOT VIOLATE
      ANY FIRST AMENDMENT RIGHTS ................   28

A.    Because The Executive Closed A Mission Of
      A Foreign Entity, No First Amendment
      Rights Are Implicated Here ...............   28

B.    Even If First Amendment Rights Are
      Implicated, They Are Overcome By The
      Valid Foreign Policy Actions Of The
      Executive Here ...........................   40

III.  PLAINTIFFS' DUE PROCESS RIGHTS WERE NOT
      INFRINGED ................................   44

A.    A Hearing Here Would Have Served No
      Purpose, And Was Thus Not Required
      Under The Due Process Clause .............   44

B.    Since Plaintiffs' Conduct Fell Within The
      Heart Of The Conduct Covered By The
      Foreign Missions Act, They Cannot Attack
      The Statute As Unconstitutionally Vague ...   45

CONCLUSION ........................................   48

CERTIFICATE OF SERVICE ............................   49

### TABLE OF AUTHORITIES

**Cases:**

Adams v. Vance, 570 F.2d 950 (D.C. Cir. 1977) .......   15

American Ass'n of Exporters and Importers
    v. United States, 751 F.2d 1239
    (Fed. Cir. 1985) ..............................   19

Aptheker v. Secretary of State,
    378 U.S. 500 (1964) ...........................   39

Blum v. Bacon, 457 U.S. 132 (1982) ................   21

Boutilier v. INS, 387 U.S. 118 (1967) .............   46

Buckley v. Valeo, 424 U.S. 1 (1976) ...............   42

ii

Cases (cont'd):                                                      Page

Bugajewitz v. Adams, 228 U.S. 585 (1913) ............. 34

Butterfield v. Stranahan, 192 U.S. 470 (1904) ....... 31

Chevron U.S.A. v. Natural Resources Defense
     Council, 467 U.S. 837 (1984) ................... 20

Chicago and Southern Air Lines Inc. v. Waterman
     Steamship Corp., 333 U.S. 103 (1948) .......... 15

City of Renton v. Playtime Theatres,
     475 U.S. 41 (1986) ............................ 43

Codd v. Velger, 429 U.S. 624 (1977) ................ 44,45

*Communist Party of the United States v.
     Subversive Activities Control Board,
     367 U.S. 1 (1961) ............................. 17,22,35,
                                                     37,39

*Dames & Moore v. Regan, 453 U.S. 654 (1984) ........ 15

Dupont Circle Citizens' Ass'n v. District of
     Columbia Bd. of Zoning Adjustment,
     530 A.2d 1163 (D.C.App. 1987) ................. 18

Ekiu v. United States, 142 U.S. 651 (1892) ......... 34

Fiallo v. Bell, 430 U.S. 787 (1977) ................ 33,34

Finzer v. Barry, 798 F.2d 1450
     (D.C. Cir. 1986), cert. granted,
     107 S.Ct. 1282 (1987) ......................... 41

First National City Bank v. Banco Para El
     Comercio Exterior de Cuba,
     462 U.S. 611 (1983) ........................... 35

Fong Yue Ting v. United States,
     149 U.S. 698 (1893) ........................... 30,31

Galvan v. Press, 347 U.S. 522 (1954) ............... 33,34

Haig v. Agee, 453 U.S. 280 (1981) .................. 15,41,46

Hanoch Tel-Oren v. Libya, 726 F.2d 774
     (D.C. Cir. 1984) .............................. 28

*Harisiades v. Shaughnessy, 342 U.S. 580 (1952, ...... 16-17,33

iii

Page: 45     Date Filed: 01/29/2024     Document: 010110991829     Appellate Case: 23-1286

**Cases** (cont'd):                                           **Page**

Hoffman Estates v. The Flipside, Hoffman
    Estates, Inc., 445 U.S. 489 (1982) ............. 47

Hull v. Eaton Corp., 825 F.2d 448
    (D.C. Cir. 1987) ............................... 22,23

Jaffke v. Dunham, 352 U.S. 280 (1957) ............. 22

*Kleindienst v. Mandel, 408 U.S. 753 (1972) ........ passim

Kent v. Dulles, 357 U.S. 116 (1958) ............... 39

Mathews v. Diaz, 426 U.S. 67 (1976) ............... 33

Missouri v. Holland, 252 U.S. 416 (1920) .......... 31

Oceanic Steam Navigation Co. v. Stranahan,
    214 U.S. 320 (1909) ........................... 33

Oetjen v. Central Leather Co.,
    246 U.S. 297 (1918) ........................... 16

Parker v. Levy, 417 U.S. 733 (1974) ............... 46

Penhallow v. Doane, 3 U.S. 54 ..................... 30

Pfizer Inc. v. India, 434 U.S. 308 (1978) ......... 31,32

Principality of Monaco v. Mississippi,
    292 U.S. 313 (1934) ........................... 31

Regan v. Wald, 468 U.S. 222 (1984) ................ 15,39

Russello v. United States, 464 U.S. 16 (1983) ...... 25

Sanchez-Espinoza v. Reagan, 770 F.2d 202
    (D.C. Cir. 1985) .............................. 15

Scales v. United States, 367 U.S. 203 (1961) ....... 33

Schooner Exchange v. McFadden,
    11 U.S. (7 Cranch) 116 (1812) ................. 30,31

South Carolina v. Katzenbach, 383 U.S. 301 (1966) .. 44

Teague v. Regional Commissioner of Customs,
    404 F.2d 441 (2d Cir. 1968),
    cert. denied, 394 U.S. 977 (1969) ............. 43

Udall v. Tallman, 380 U.S. 1 (1965) ............... 20

iv

Page: 46   Date Filed: 01/29/2024   Document: 010110991829   Appellate Case: 23-1286

<u>Cases</u> (cont'd):                                           <u>Page</u>

United States v. Belmont, 301 U.S. 324 (1937) ......  16

United States v. Curtiss-Wright Export Corp.,
    299 U.S. 304 (1936) ............................  19,20,30

United States v. Harriss, 347 U.S. 612 (1954) ......  42

United States v. New York Telephone Co.,
    434 U.S. 159 (1977) ............................  27

United States v. O'Brien, 391 U.S. 367 (1968) ......  42,43

United States v. Petrillo, 332 U.S. 1 (1947) .......  46

United States v. Pink, 315 U.S. 203 (1942) .........  16,32

Williams v. Suffolk Insurance Co.,
    38 U.S. (13 Peters) 415 (1839) ................  16

Young v. American Mini Theatres,
    427 U.S. 50 (1976) ............................  46

Youngstown Sheet & Tube Co. v. Sawyer,
    343 U.S. 579 (1922) ...........................  15

*Zemel v. Rusk, 381 U.S. 1 (1965) ..................  19,20,39,47

<u>Constitutions, Statutes and Regulations</u>:

<u>United States Constitution</u>:

        Article II, Section 3 .........................  2,15
        First Amendment ...............................  <u>passim</u>
        Fifth Amendment ...............................  7

v

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 48

<u>Constitutions, Statutes and Regulations</u> (cont'd):     <u>Page</u>

Foreign Agents Registration Act,
    22 U.S.C. 611 <u>et seq</u>. ............................ 4,25,27

Foreign Missions Act:

    22 U.S.C. 4301 <u>et seq</u>. .......................... 2,3
    22 U.S.C. 4301(a) ............................... 3
    22 U.S.C. 4302(a)(1) ............................ 4
    22 U.S.C. 4302(a)(4) ............................ 3,5,23,25
    22 U.S.C. 4302(b) ............................... 3,17,18
    22 U.S.C. 4304(b) ............................... 4
    22 U.S.C. 4305(b) ............................... 4
    22 U.S.C. 4308(g) ............................... 3,17

Anti-Terrrorism Act of 1987 <u>reprinted in</u>
    133 Cong. Rec. H11319
    (daily ed. December 14, 1987): ................. 9

    Sec. 1002(b); H11320 ............................ 10
    Sec. 1003; H11320 .............................. 10
    Sec. 1004; H11320 .............................. 10
    Sec. 1005; H11320 .............................. 11

Emergency Economic Powers Act,
    50 U.S.C. 1701 <u>et seq</u>. .......................... 27

Pub. L. 97-241, Title II, Sec. 202;
    96 Stat. 283 .................................... 26

Pub. L. 99-93, Title I, Sec. 127;
    99 Stat. 418 .................................... 26

Pub. L. 99-569, Title VII, Sec. 701
    100 Stat. 3204 .................................. 26

<u>Legislative Materials</u>:

131 Cong. Rec. H2991 (1985) ........................ 26

H.R. Conf. Rep. No. 952, 99th Cong.,
    2d Sess. 28 (1986) ............................. 19

H.R. Rep. No. 102 (Part 1) 97th Cong.,
    1st Sess. 30 (1981) ............................ 18

S. Rep. No. 329, 97th Cong.,
    2d Sess. 8 (1982) .............................. 18,19

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 49

**Legislative Materials** (cont'd):

S. Rep. No. 283, 97th Cong.,
    1st Sess. 7 (1981) ............................. 18

S. Rep. No. 307, 99th Cong.,
    2d Sess. 23 (1986) ............................. 19,26


S. Doc. No. 56, 54th Cong., 2d Sess. 19 (1897) ...... 15-16

S. Doc. No. 82, 92d Cong., 2d Sess. 537 (1973) ...... 16


**Miscellaneous:**


Damrosch, <u>Foreign States and the Constitution</u>,
    73 Va. L. Rev. 483 (1987) ..................... 31

Kassim, <u>The Palestine Liberation Organization's
    Claim To Status: A Juridical Analysis Under
    International Law</u>, 9 Den. J. Int'l L &
    Policy 1 (1980) ............................... 29

L. Henkin, <u>Foreign Affairs and the Constitution</u>,
    254 (1972) .................................... 31

<u>The American Heritage Dictionary</u> (2d College Ed.
    1982) ......................................... 25

<u>Webster's Ninth New Collegiate
    Dictionary</u> (1985) ............................. 25

\*    Authorities chiefly relied upon are marked with asterisks.


vii

0322

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

### A.   Parties And Amici

We believe that all parties, intervenors, and <u>amici</u> appearing below have been listed in the Brief of Plaintiffs-Appellants.  We note that the Anti-Defamation League of B'nai B'rith has indicated by letter that it intends to file an <u>amicus</u> brief in this Court.

### B.   Rulings Under Review

Reference to the ruling below appears at page 2 of the Brief of Plaintiffs-Appellants.

### C.   Related Cases

This case was previously before this Court on a request for an emergency stay pending appeal, which was denied on December 4, 1987 by Judges Starr and Buckley.  We are not aware of any related cases pending in this or any other court.

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 50

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 87-5398

PALESTINE INFORMATION OFFICE, ET AL.,

Plaintiffs-Appellants,

v.

GEORGE P. SHULTZ, Secretary of State, ET AL.,

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRIEF FOR THE APPELLEES

## QUESTIONS PRESENTED

1.   Whether the Secretary of State properly designated as a foreign mission of the Palestine Liberation Organization an office that is largely funded by the PLO, has direct contact with that organization, and performs its activities on behalf of that organization.

2.   Whether the First Amendment prohibits the Executive from barring an American citizen from operating a mission for a foreign political entity, when that citizen is left free to express his ideas on his own behalf.

3.   Whether the Executive violated due process requirements by defining an organization as a foreign mission without a hearing, when the facts gleaned from the organization's own admissions show that it is indeed a foreign mission.

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 52

4.     Whether plaintiffs can challenge a statute as unconstitutionally vague when plaintiffs' status itself plainly falls within the wording of the statute.

### STATUTE INVOLVED

The relevant portions of the Foreign Missions Act (22 U.S.C. 4301 et seq.) are reprinted in an addendum to this brief.

### STATEMENT OF THE CASE

#### A.   Nature Of The Proceeding

This case involves a challenge to an order issued by the Department of State to the Palestine Information Office (hereafter "the PIO") on September 15, 1987 to cease operations. Until that time, the PIO had operated an office in Washington, D.C. as an agent of the Palestine Liberation Organization (hereafter "the PLO").  The order to cease operations was issued pursuant to Article II of the Constitution and the Foreign Missions Act (hereafter "the Act").

Plaintiffs are the PIO and its director, Hasan Abdel Rahman. They filed this action in United States District Court against the Secretary of State and two of his subordinates, attacking the State Department order as unauthorized under the Act, and in violation of their First Amendment and Due Process Clause rights. The district court granted judgment to the Government based on the facts set out in plaintiffs' papers, and plaintiffs are now appealing that order.

0325

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 53

B.   **Statement Of The Facts**

1.   **The Statutory Scheme**

The relevant statutory scheme is set out in the Foreign Missions Act. 22 U.S.C. 4301 et seq. In that statute, Congress declared the operation of foreign missions in this country to be a proper subject for statutory-based federal regulation. 22 U.S.C. 4301(a).

The statute defines as a "foreign mission," among other bodies, any "entity in the United States which is involved in the diplomatic, consular, or other activities of, or which is substantially owned or effectively controlled by * * * an organization * * * representing a territory or a political entity which has been granted diplomatic or other official privileges and immunities under the laws of the United States or which engages in some aspect of the conduct of the international affairs of such territory or political entity * * *." 22 U.S.C. 4302(a)(4).

Administration of the Foreign Missions Act is assigned to the Secretary of State (hereafter "the Secretary") and determinations of the meaning and applicability of terms contained in the statute (such as "foreign mission") are committed to his discretion. 22 U.S.C. 4302(b). The Act also explicitly states that, unless otherwise provided, determinations required under the Act are committed to the Secretary's discretion. 22 U.S.C. 4308(g).

If an entity is defined as a foreign mission, the Secretary may, in order "to protect the interests of the United States," require that mission to seek to obtain any and all "benefits"

3

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 54

through the Office of Foreign Missions, which is part of the
State Department. 22 U.S.C. 4304(b). "Benefits" is broadly
defined to include virtually everything needed to operate an
office, including real estate. 22 U.S.C. 4302(a)(1). The
Secretary can require a foreign mission to divest itself of any
real property when "necessary to protect the interests of the
United States." 22 U.S.C. 4305(b). Thus, a foreign mission can
operate under the statute only at the sufferance of the
Secretary.

2.    **The Palestine Information Office and the PLO**

Plaintiff-appellant PIO is a registered agent of the PLO
under the Foreign Agents Registration Act (22 U.S.C. 611 et
seq.), as is its director, plaintiff-appellant Hasan Rahman.
App. 30-40, 75. Until last month, the PIO was located in
Washington, D.C., and had been operating there since 1978. App.
22. It had, other than Director Rahman, eight full or part-time
employees, and all of its employees were either United States
citizens (Director Rahman is a naturalized citizen) or legal
permanent resident aliens. App. 22.

The PIO's annual budget in 1987 was approximately $350,000.
Rahman's salary was paid by an organization called the League of
Arab States (of which the PLO is a member), while the self-
described "Finance Department" of the PLO -- the Palestine
National Fund -- paid the remainder of the PIO's expenses. App.
75-76. PIO funds, apparently provided by the PLO, were used to
purchase cars and a house for Director Rahman. App. 76.

Director Rahman has direct contact with the PLO, and the PIO
regularly engaged in informational and advocacy activities in the

4

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 55

United States on that organization's behalf.  App. 76.  The PLO
is the only foreign principal served by the PIO, and the PIO
engaged in no activity that benefitted other foreign principals.
App. 35.

### 3. The Designation of the PIO as a Foreign Mission and the Order to Cease Operations

On September 15, 1987, the State Department Office of
Foreign Missions sent the PIO a letter from its Director, James
Nolan, Jr., enclosing a notice designating the PIO as a foreign
mission of the PLO under the Foreign Missions Act.  The
designation was executed by Deputy Secretary of State John
Whitehead, and was based on several determinations.  He found
that: (1) the PIO was an entity "substantially owned and/or
effectively controlled by the PLO"; (2) the PIO engaged in "other
activities" within the meaning of the Act (22 U.S.C. 4302(a)(4))
because it engages in political activity and political propaganda
on behalf of the PLO; (3) the PIO conducted its functions on
behalf of the PLO, which is an organization that has received
privileges and immunities under American law by virtue of its
status as an observer to the United Nations; and (4) the PLO
engages in "some aspect of the conduct of international affairs"
as evidenced by its membership in the League of Arab States and
its status at the United Nations.   App. 16.

At the same time, Deputy Secretary Whitehead issued an order
pursuant to both the Executive's general foreign affairs power
and specific authority to receive ambassadors under Article II of
the Constitution, and the Secretary's authority under the Act.
App. 17.  That order stated that "it is reasonably necessary to

0328

protect the interests of the United States to require that the Palestine Information Office cease operation as a mission representing the Palestine Liberation Organization." App. 17.

The Deputy Secretary explained that this action was being taken because of "U.S. concern over terrorism committed and supported by individuals and organizations affiliated with the PLO, and as an expression of our overall policy condemning terrorism." App. 17.

More particularly, the Deputy Secretary noted that the PLO recently had retained on its Executive Committee Abu Al-Abbas despite the fact that this individual was implicated in the murder of an American citizen during the Achille Lauro hijacking. App. 17. In addition, at the recent Palestine National Congress, other terrorist groups were reunited with the PLO. App. 17. Deputy Secretary Whitehead explained that "[t]errorism by this minority of Palestinians and their supporters has been a serious obstacle to the realization of a peaceful settlement of the Arab-Israeli conflict, and an accommodation between Israelis and Palestinians." App. 17.

The covering letter from Director Nolan to the PIO emphasized that nothing in the State Department's actions with respect to the PIO "derogates from the constitutionally protected rights of U.S. citizens and permanent residents who are now associated with the Palestine Information Office." App. 77.[1]

-----

[1] This cover letter was attached to the original complaint filed here, but was inexplicably not attached to the Amended Complaint, and only the latter is reprinted in the Joint Appendix. Consequently, although this letter is in the district court record and the relevant part of it is quoted in the Joint

(continued...)

6

**0329**

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 57

On October 13, 1987, the State Department granted an extension of the PIO closing date until December 1, 1987.  App. 78.

4.   **This Litigation and the District Court's Ruling**

On November 13, 1987, the PIO and Director Rahman filed this action.  They contended that the Foreign Missions Act does not authorize designation of the PIO as a foreign mission, and that the Act as applied violates their First Amendment speech and association rights, and their Fifth Amendment due process rights. App. 13.  They sought an injunction against the closing of the PIO under the Foreign Missions Act or based on the PIO's "advocacy of unpopular political ideas."  App. 14.

After plaintiffs sought a preliminary injunction, the case was transferred from Judge Sporkin to Judge Richey.[2]  On December 2, 1987, the latter granted judgment to the Government based on the undisputed facts adduced by the parties, and he dismissed the complaint.  App. 105, 115.

The district court first noted that because this matter involves foreign affairs, the court was concerned solely with whether the Secretary's exercise of his discretion was proper, and not the substance of the Secretary's decision.  App. 105-06, 108-09.  Next, the court held that the Secretary had properly

---

[1](...continued)
Appendix, it is not reprinted in full in the Appendix.  It is therefore reprinted in an Addendum to this brief.

[2] The transfer occurred at plaintiffs' request after Deputy Secretary Whitehead explained that, in making the September 15, 1987 determinations, he had "relied upon all the information available to me as Deputy Secretary of State, including classified information."  App. 74.

7

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 58

designated the PIO as a foreign mission.  The PIO was found to fit within the plain meaning of the statutory term "entity," and to have conducted "other activities" on behalf of the PLO.  App. 106-08.  The court avoided the question whether the PIO is owned or controlled by the PLO because it found it sufficient for statutory purposes that the PIO engages in "other activities" on behalf of the PLO.  App. 108.

Having found the PIO to be a foreign mission, the district court then rejected plaintiffs' constitutional claims.  App. 110. The court found compelling the fact that neither Rahman nor the PIO were prevented from speaking or disseminating their message; rather they were simply prohibited from doing so as a mission of the PLO.  App. 110.  The narrow scope of the State Department order was found to help it overcome any possible First Amendment rights plaintiffs held.  App. 110-12.

The district court also concluded that, as a mission of a foreign entity, the PIO has no constitutional due process rights. App. 112.  It further ruled that Rahman's individual rights had not been violated because he is free to espouse his personal political views.  App. 113.  Moreover, the court held that there is no due process right to be employed by a foreign entity.  App. 113.  And, Rahman had failed to show how any procedural safeguards would benefit him.  App. 113.

8

**0331**

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 59

The district court concluded by stating that plaintiffs' various claims were "utterly meritless." App. 113-14.[3] Plaintiffs appealed the judgment against them.

After the district court denied an emergency injunction pending appeal (App. 118), this Court too denied such an injunction on December 4, 1987. The Court held that plaintiffs had failed to make the "extraordinarily strong showing [needed] to succeed" in a request for an injunction against the Secretary in matters of foreign affairs. The Court concluded: "As we read the Department of State's order, the First Amendment activities of individuals in the United States are in no wise infringed."

It is our understanding, that, as of December 5, 1988, the PIO has ceased operations.

## 5.   The Anti-Terrorism Act of 1987

After the district court ruled in this case, Congress enacted the Anti-Terrorism Act of 1987.[4] In that statute, Congress found, _inter alia_, that (Sec. 1002; H11319):

(a)  the PLO was directly responsible for the murder of an American citizen during the Achille Lauro hijacking, and that a member of the PLO's Executive Committee had been indicted here for that murder;

---

[3] The district court subsequently amended its opinion to make clear that Director Rahman's rights were not violated because he was left free to express his ideas "provided he complies with all relevant U.S. laws." App. 116.

[4] That statute appears as Title X of the Foreign Relations Authorization Act of 1988-89 (H.R. 1777). Printed copies of the statute do not yet appear to be available. The statute is reprinted in the Congressional Record of December 14, 1987, at H11319-20, and we have cited to that document.

0332

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 60

(b)   the head of the PLO has been implicated in the murder of an American ambassador;

(c)   the PLO and its constituent groups have taken credit for, and been implicated in, the murders of dozens of American citizens; and

(d)   the PLO covenant states that "armed struggle" is part of the organization's "overall strategy" and not just a "tactical phase," and that the organization recently rededicated itself to a policy of "struggle in all its armed forms."

Congress accordingly concluded that the PLO and its affiliates constitute a terrorist organization and a threat to the interests of the United States, and should not enjoy the benefits of operating in the United States.  Sec. 1002(b); H11320.

As a result of these determinations, Congress made it unlawful, if the purpose is to further the interests of the PLO or its agents, to receive anything of value (except informational material) from the PLO, to expend funds received from the PLO, or to maintain an office in the United States at the behest or direction of the PLO, or with funds provided by the PLO.  Sec. 1003; H11320.  The Attorney General is directed to take the steps necessary to effectuate this statute, and federal district courts are empowered to grant injunctive or other necessary relief, at the request of the Attorney General, in order to enforce it. Sec. 1004; H11320.

The Anti-Terrorism Act is not effective until March 21, 1988, and its provisions lapse if the President subsequently

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 61

certifies that the PLO no longer practices or supports terrorism. Sec. 1005; H11320.

## INTRODUCTION AND SUMMARY OF ARGUMENT

. A.   Our case here is premised on two basic points, and the second flows from the first.  The initial one is that the State Department acted well within its foreign affairs authority in determining that the PIO operated in the United States as a mission of the PLO.

Our second point is that this proper determination provides the answer to plaintiffs' various constitutional arguments attacking the Executive Branch decision to close the PIO because foreign entities such as the PLO have no right to operate in the United States in any form whatsoever, except as the political branches of the Federal Government allow.  Any argument to the contrary asks this Court to adopt the revolutionary principle that foreign entitites can maintain offices here over the opposition of the political branches of our Government as long as they pay United States citizens or permanent resident aliens to be their representatives.

Plaintiffs' arguments about First Amendment and Due Process Clause rights are flawed because they fail to acknowledge that they depend upon this startling concept.  Moreover, as this Court recognized when it denied the request for an injunction pending appeal, plaintiffs' First Amendment rights have been left untouched; plaintiffs have been barred only from operating as a mission of the PLO, a foreign entity identified by Congress as a terrorist group responsible for murdering American citizens, and not officially recognized by our Government.

11

**0334**

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 62

B.   In our argument, we initially point out that the
Executive Branch acted at the zenith of its power in this matter.
The Executive has inherent constitutional foreign affairs
authority stemming from his power to recognize foreign entities
or to decline to do so.  Additionally, Congress has foreign
policy powers arising in part from its plenary authority to
control entry into this country by foreigners.  In this instance,
Congress delegated its authority to the Executive Branch, and the
State Department therefore acted here under the Executive's
broadest authority.

   We next show that, in the Foreign Missions Act, Congress has
explicitly delegated to the Secretary's discretion the
determination of what is a foreign mission.  Consequently, if any
judicial review is appropriate here at all, it should be
extremely limited.  If the Secretary has even plausibly acted
within his substantial discretion, no further judicial review is
appropriate.

   We then demonstrate that the uncontroverted facts establish
that the State Department clearly did not abuse its broad
discretion in designating the PIO as a foreign mission of the
PLO.  Those facts reveal that the PIO operated as an agent of the
PLO, and carried out advocacy activities on its behalf.  The PLO
funded the PIO expenses entirely, except for the salary of the
PIO Director, which was paid by an organization of which the PLO
is a member.  The PIO Director consulted with the PLO, and his
house and cars were purchased with funds apparently provided by
the PLO.  Finally, the PIO acted on behalf of no foreign
principal other than the PLO, and undertook no actions on its own

12

behalf benefitting any foreign principal other than the PLO. These facts fully support the Secretary's finding that the PLO substantially owned and effectively controlled the PIO.

In the second part of our argument, we show that no First Amendment rights have been violated by ordering the PIO to cease its operations as a PLO mission.  The PLO has no right to operate a mission in the United States, even if it has hired American citizens and resident aliens in order to do so.

Moreover, plaintiffs Rahman and the PIO are free to express any views they choose; they simply cannot do so as a PLO mission. Given this freedom, plaintiffs cannot show any First Amendment violation; nor can they show that the content of their speech has been regulated, since they are free to say whatever they please, including precisely what they have previously been saying.  Only plaintiffs' ability to serve as a PLO mission has been curtailed.

Indeed, even if First Amendment rights are at stake here, an assertion with which we disagree, those rights are not absolute in this context.  Here, they are outweighed by the bona fide, but narrowly drawn, foreign policy actions taken by the Executive against the PLO.

In the third part of our argument, we refute plaintiffs' claim that their due process rights were violated because they were not given a hearing before being designated as a PLO mission.  Plaintiffs could possibly have had a right to a hearing only if they had something apposite to say.  Here, plaintiffs' own admissions show sufficient grounds for the State Department

13

**0336**

to conclude that the PIO was a PLO mission.   Therefore, a hearing would have served no purpose.

Finally, we show that plaintiffs' challenge to the Foreign Missions Act as unconstitutionally vague is unavailing.   This argument is directed at the district court's reading of the Act, which caused it to bypass the issue of the PLO's substantial ownership and/or effective control of the PIO.   In this brief, however, we defend the State Department's action on the rationale it used, based on ownership or control.   Hence, this argument evaporates if the Court accepts our merits argument.

Even if the vagueness argument survives, one whose conduct falls squarely within the terms of a statute cannot challenge its application to conduct on the fringes.   Here, the uncontroverted facts show the PIO to be within the heart of the foreign mission definition.

ARGUMENT

I.   **THE EXECUTIVE BRANCH VALIDLY EXERCISED ITS SUBSTANTIAL AUTHORITY IN DESIGNATING THE PIO AS A FOREIGN MISSION OF THE PLO, AND IN ORDERING IT TO CEASE OPERATIONS IN THAT FORM.**

A.   **The Executive Branch Acted At The Very Height Of Its Constitutional Authority In This Matter.**

It is essential in considering this matter to bear in mind that the Executive Branch acted here pursuant to a statutory delegation from Congress in the area of foreign affairs.   In designating the PIO as a mission of a foreign entity and ordering it to cease operations, the State Department therefore acted at the apex of its authority because it wielded the combined authority of the Executive and Legislative Branches to govern the foreign relations of the United States, to regulate a foreign

14

**0337**

Page: 65   Date Filed: 01/29/2024   Document: 010110991829   Appellate Case: 23-1286

presence in this country, and to recognize foreign entities.  See Dames & Moore v. Regan, 453 U.S. 654, 668 (1984); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 5,9, &.,/  . 152) (Jackson, J. concurring); Chicago and Southern Ai.   .     . v. Waterman Steamship Corp., 333 U.S. 103, 111 (1948).  These are areas entrusted to the political branches of our Government, and are ones in which the Judicial Branch plays an extremely limited role.  See Regan v. Wald, 468 U.S. 222, 242-243 (1984); Dames & Moore, 453 U.S. at 674, 678; Haig v. Agee, 453 U.S. 280, 292 (1981).

This Court too has recognized its restricted authority in matters involving foreign relations.  See, e.g., Adams v. Vance, 570 F.2d 950, 954-55 (D.C. Cir. 1977) ("[c]ourts must beware ignoring the delicacies of diplomatic negotiations, the inevitable bargaining for the best solution of an international conflict, and the scope which in foreign affairs must be allowed to the President"); Sanchez-Espinoza v. Reagan, 770 F.2d 202, 210 (D.C. Cir. 1985) (declining to find a private right of action in the Neutrality Act because doing so might interfere with the broad leeway traditionally afforded to the President in foreign affairs).

Specifically, Article II, Section 3 of the Constitution provides that the President "shall receive Ambassadors and other public Ministers."  This is a power granted to the Executive Branch exclusively.

The President's responsibility to recognize ambassadors includes the power to determine the identity of a legitimate foreign delegation.  See S. Doc. No. 56, 54th Cong., 2d Sess. 19

15

**0338**

(1897); S. Doc. No. 82, 92d Cong., 2d Sess. 537-44 (1973). For example, when a revolution or a civil war occurs in a foreign state, the President has the authority to decide which group shall be recognized by the United States. See Oetjen v. Central Leather Co., 246 U.S. 297, 302-03 (1918); United States v. Belmont, 301 U.S. 324, 327-30 (1937); Williams v. Suffolk Insurance Co., 38 U.S. (13 Peters) 415, 420 (1839). Accord S. Doc. No. 54-56, supra, at 18 ("the President alone is granted power to receive a minister from the Republic of Cuba and a fortiori to recognize its existence"); id. at 15, 19-20.

The power to recognize foreign entities and to accept their emissaries includes the "power to determine the policy which is to govern the question of recognition." United States v. Pink, 315 U.S. 203, 229 (1942). Once the Executive makes these determinations, his decisions are binding on the courts. Pink, 315 U.S. at 222-23, 229-30.

At the same time, Congress possesses significant foreign affairs authority, including the power to enact legislation governing the opening and closing of our borders to aliens and foreign organizations. See Kleindienst v. Mandel, 408 U.S. 753, 765 (1972); Harisiades v. Shaughnessy, 342 U.S. 580, 588-89 (1952) ("any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power and maintenance of republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference").

16

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 67

This power to regulate foreign encroachments does not apply only to alien individuals.  The Supreme Court has explained that the "[m]eans for effective resistance against foreign incursion -- whether in the form of organizations which function, in some technical sense, as 'agents' of a foreign power, or in the form of organizations which, by complete dedication and obedience to foreign directives, make themselves the instruments of a foreign power -- may not be denied to the national legislature." Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1, 95-96 (1961).

Thus, in this instance, the State Department acted with the inherent foreign affairs authority of the President and the foreign policy and regulatory authority of Congress delegated to the Secretary through the Foreign Missions Act.  For that reason, the Court must be very wary of intruding into the domain of the political branches by overruling the State Department's determinations.

### B.   In The Foreign Missions Act Itself, Congress Assigned The Key Functions To The Discretion Of The Secretary, And The Role Of The Courts Here Is Thus Highly Restricted.

1.  As noted earlier, the Foreign Missions Act states that "[d]eterminations with respect to the meaning and applicability of the terms used [such as "foreign mission"] shall be committed to the discretion of the Secretary." 22 U.S.C. 4302(b).  See also 22 U.S.C. 4308(g) ("[e]xcept as otherwise provided, any determination required under this chapter shall be committed to the discretion of the Secretary").

17

0340

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 68

Therefore, assuming that there is to be any judicial review of the Secretary's determinations under this Act, Congress plainly intended that review to be extremely narrow.[5]  See Dupont Circle Citizens' Ass'n v. District of Columbia Bd. of Zoning Adjustment, 530 A.2d 1163, 1168 (D.C. App. 1987) (leaving open question of whether judicial review is available under the Act, but finding no abuse of discretion by the Secretary).  Indeed, the language of the statute appears to provide, at a minimum, that there be no judicial review when the Secretary has even plausibly acted within his authority.

The assignment by Congress to the Secretary's discretion here was quite deliberate.  The legislative history of Section 4302(b) pointedly notes the impact that determinations under the Act may have on the foreign affairs of the United States and the paramount need to avoid conflicting actions.  Thus, the House report explained that Section 4302(b) "is intended to avoid conflicting interpretations by different government agencies and courts and potential litigation that might detract from the efficient implementation of this title or might adversely affect the management of foreign affairs."  H.R. Rep. No. 102 (Part 1), 97th Cong., 1st Sess. 30 (1981) (emphasis added).  Accord S. Rep. No. 283, 97th Cong., 1st Sess. 7 (1981); S. Rep. No. 329, 97th Cong., 2d Sess. 8 (1982).

---

[5] Plaintiffs note (Br. at 16) that the Senate report on the original statute indicated that nothing in the legislation precludes "appropriate judicial review" of matters committed to the Secretary's discretion.  S. Rep. No. 329, 97th Cong., 2d Sess. 8 (1982).  Given the wording of the Act, that "appropriate" review is obviously to be very limited.

18

0341

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 69

Moreover, the second amendment to the Act in 1986, further reflects the congressional intent to give full effect to the Secretary's exercise of discretion.  The congressional reports concerning that amendment, which expanded the types of organizations that are included as foreign missions, demonstrate the intent to leave such determinations to the informed discretion of the Secretary.  See S. Rep. No. 307, 99th Cong., 2d Sess. 23 (1986) (amendments do not require the Secretary to act, but "enable the Secretary of State to apply [Foreign Missions Act] controls in appropriate circumstances"); H.R. Conf. Rep. No. 952, 99th Cong., 2d Sess. 28 (1986).

This legislative intent dovetails with the authorities cited in the prior section which establish that the federal courts have a very limited role to play in matters affecting foreign relations.

2.  Even more relevant to this case is the Supreme Court's recognition that, because of the rapidly changing and "explosive nature of contemporary international relations," legislative delegations of authority to the Executive in the area of foreign relations msut often be broader than those in domestic matters, and such broad delegations are to be given full effect.  Zemel v. Rusk, 381 U.S. 1, 17 (1965); United States v. Curtiss-Wright, 299 U.S. 304, 320-22, 324 (1936).  Accord American Ass'n of Exporters and Importers v. United States, 751 F.2d 1239, 1248 (Fed. Cir. 1985) ("[i]n the area of international trade, intimately involved in foreign affairs, Congressional authorizations of presidential power should be given a broad construction and not hemmed in or cabined, cribbed, or confined by anxious judicial blinders").

19

**0342**

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 70

Hence, before accepting plaintiffs' arguments here that the Executive has exceeded its statutory authority, this Court must be firmly convinced that the Secretary has acted so cavalierly that he has abused the substantial discretion given him under the Act.[6]  A ruling by the Court contrary to the Secretary's pronouncement would raise the very problem Congress sought to avoid, i.e., conflicting voices speaking for the United States in the international arena.  See <u>Curtiss-Wright Corp.</u>, 299 U.S. at 320.

In the next section, we show that not only did the Secretary not abuse his discretion under the Act, he acted fully within it by designating the PIO as a foreign mission of the PLO.

> **C.   The State Department Was Well Within Its Authority In Determining That The PIO Was A Foreign Mission Of The PLO.**

1.   Simply stating the uncontroverted facts here demonstrates the manifest reasonableness of the Secretary's action in designating the PIO as a foreign mission of the PLO.[7]

---

[6] Even if this case did not involve foreign affairs, the Secretary's implementation of a new statute that he is charged with implementing would be entitled to substantial deference. See <u>Chevron U.S.A.</u> v. <u>Natural Resources Defense Council</u>, 467 U.S. 837, 843-44, 865-66 (1984); <u>Zemel</u>, 381 U.S. at 11; <u>Udall</u> v. <u>Tallman</u>, 380 U.S. 1, 16 (1965).

[7] Plaintiffs assert (Br. at 46 n.24) that there is a factual dispute as to whether the PLO substantially owned or effectively controlled the PIO.  However, as reflected from our citations, the Executive's finding on this point is supported by facts drawn entirely from plaintiffs' papers.  While there may be a <u>legal</u> dispute as to whether these facts constitute substantial ownership or effective control within the meaning of the Act, there is no dispute as to the material facts themselves at this point because we have thus far chosen to rely on uncontroverted facts rather than on any of the classified material alluded to by Deputy Secretary Whitehead.  App. 74.

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 71

The PIO is a registered agent of the PLO, and it represented no other foreign principals. App. 35. The PIO actively and regularly carried out advocacy activities on behalf of the PLO. App. 34-35, 76. The PIO conducted no activities on its own behalf that benefitted any other principal. App. 35.

In carrying out these activities, the salary of the PIO Director was paid by an organization of which the PLO is a member. App. 75-76. The remainder of the PIO's budget was funded entirely by the finance arm of the PLO. App. 75-76. The Director of the PIO had direct contact with the PLO. App. 76. The PIO Director used office funds apparently provided by the PLO to purchase his cars and house. App. 76.[8]

Under these circumstances, no persuasive argument can be made that the Secretary's broad discretion was abused in finding that the PIO was "substantially owned and/or effectively controlled" by the PLO.[9]

---

[8] Moreover, in a recent U.S. television interview on January 8, 1988, PLO chairman Yasir Arafat complained about United States policy involving the Middle East. In answering questions from ABC news reporter Ted Koppel, Arafat stated: "Are you against international legality, Mr. Koppel? It seems that you are not only with closing of our offices, but also you are against international legality and international United Nations resolutions." See "Nightline" transcript, "Talking with Yasir Arafat," at 5 (Jan. 8, 1988). Thus, the Chairman of the PLO apparently was complaining about the closing of "our offices" (emphasis added) by the United States.

[9] Plaintiffs state (Br. at 23-24 n.12, 42) that the issue of whether the PIO was substantially owned or effectively controlled by the PLO (and is for that reason a foreign mission of the PLO) is not now before this Court because the district court did not reach it, even though it was the reasoning relied upon by the State Department. App. 16. Plaintiffs' claim is flatly wrong. A judgment can be supported on any ground with support in the record. See Blum v. Bacon, 457 U.S. 132, 137 n.5 (1982); Jaffke v. Dunham, 352 U.S. 280, 281 (1957). And here, as
(continued...)

Appellate Case: 23-1286    Document: 010110991829    Date Filed: 01/29/2024    Page: 72

Plaintiffs concede (Br. at 24 n.12) the funding of the PIO by the PLO, and describe the relationship between these two groups as that of grantee-grantor. This analogy does not assist them because it is apt only if the grantee is one that receives virtually all of its funds from the grantor, and does nothing other than spend that grantor's funds. In such circumstances, common sense compels that the grantor effectively controls the grantee for the obvious reason that otherwise the funds are likely to be withdrawn.

The State Department's determination of effective control here is also supported by the ruling in <u>Communist Party</u> v. <u>SACB</u>, <u>supra</u>. There, the Supreme Court held that the term "control," as used in a statute relating to or regulating foreign policy interests, should not be given an "arcane, technical meaning." 367 U.S. at 38. The Court noted that "substantial direction, domination, or control of one entity by another may exist without the latter's having power, in the event of non-compliance, effectively to enforce obedience to its will." <u>Id</u>. at 36. The Court then examined the many potential indicia of foreign control over an organization, and found that the existence of foreign control "is largely a matter of the working out of legislative policy in multiform situations of potentially great variety * * *." <u>Id</u>. at 40.[10]

_____

[9](...continued)
shown in the text above, there is more than ample support in the record for the Executive's finding that the PLO substantially owned and/or effectively controlled the PIO.

[10] Plaintiffs cite (Br. at 24 n.12) <u>Hull</u> v. <u>Eaton Corp.</u>, 825 F.2d 448, 457 (D.C. Cir. 1987), for the proposition that the
(continued...)

0345

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 73

If this Court holds that the Secretary cannot define an office with the characteristics of the PIO as a foreign mission, there will be little left of the Secretary's power under the Act beyond designating an embassy or a consulate as a foreign mission, a task that hardly would require the type of detailed definition set out in the Foreign Missions Act. 22 U.S.C. 4302(a)(4). Yet, the legislative history of the 1986 amendment to the Act, which broadened the definition of "foreign mission," shows that Congress meant the Secretary to use his expert judgment in designating foreign missions despite efforts to obscure or disguise them. See _infra_, at 26.

2.   Plaintiffs nevertheless contend (Br. at 20) that, even though the State Department obviously meant to designate the PIO as a foreign mission, there was a technical flaw in its designation document. They argue that although the Deputy Secretary described the PLO as an organization that had been given privileges under American law (App. 16), he failed to state that the PLO represents a territory or a political entity, as required by the Act.

This overly technical argument is without merit because the State Department documents make clear that the Executive found the PLO to fall within the meaning of the statute. The State

---

[10](...continued) determining factor here should be control over the day-to-day operations of an office. _Hull_, however, concerned the question of a manufacturer's vicarious liability for a seller's negligence. The terms in the Foreign Missions Act are not governed by vicarious liability law, but deal with foreign affairs. Not only do the political branches enjoy plenary power in this area, but Congress has granted the Secretary explicit authority under the Foreign Missions Act to define its terms as appropriate to the proper conduct of the foreign affairs.

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 74

Department documents had to be carefully phrased because the United States does not officially recognize the PLO. Nevertheless, the PLO is the type of entity contemplated by the Act since it is obviously an organization that represents a political entity: the PLO itself.

Plaintiffs' assertion (Br. at 21 n.9) that the Act cannot be so read is wrong. The wording of the Act can be read to cover as a foreign mission an entity controlled by an organization that represents a political entity even if that political entity is not one that we recognize as having a constituency. To read the Act otherwise is to defeat the congressional purpose behind the 1985 and 1986 amendments, which was to ensure that the Secretary has the ability to deal with complex and fluid situations as appropriate. See _infra_, at 26.[12]

Plaintiffs' argument on this point asks the Court to take precisely the type of action upsetting delicate foreign affairs matters that both it and the Supreme Court have on numerous occasions instructed against. See _supra_, at 14-15. Given the significant foreign relations concerns at stake here and our non-recognition policy of the PLO, plaintiffs' claim should be rejected.

3. Plaintiffs also attempt (Br. at 21-23) to escape the coverage of the Act by giving the delegation to the Secretary a narrow reading that conflicts with the statute's plain language. The district court correctly rejected this argument. App. 106-07.

---

[12] Moreover, the PLO claims to represent the Palestinians as a political entity. See _infra_, at 28-29 n.17.

24

**0347**

Page: 75

Date Filed: 01/29/2024

Document: 010110991829

Appellate Case: 23-1286

Plaintiffs argue that, although the Act does not say so, Congress meant to limit the word "entity" in the Act to commercial establishments.  Besides adding words that Congress did not, this argument collides head-on with the admonitions cited earlier (supra, at 19) that the courts should not read restrictively a legislative delegation to the Executive in the foreign affairs area.

Any "mission to or agency or entity in the United States" which meets the other requirements of Section 4302(a)(4) may be designated by the Secretary as a foreign mission.  Congress did not specifically define the terms "mission to or agency or entity in."  However, given the ordinary meaning of these words,[13] the discretion Congress granted the Secretary to define terms in the statute, and the PIO's status as a registered agent under the Foreign Agents Registration Act (22 U.S.C. 611, et seq.), the State Department properly found that the PIO qualifies for designation as an agency or entity.

The Secretary's conclusion is also consistent with the evolution of the statutory definition of "foreign mission," which has been expanded twice to give the Secretary greater power to regulate foreign missions.

As originally defined, an office that met various other statutory requirements could qualify as a "foreign mission" under the Foreign Missions Act if it was an "official mission."  Pub.

---

[13] When Congress fails to define a term, a reviewing court may look to the ordinary meaning of the words employed.  Russello v. United States, 464 U.S. 16, 21 (1983).  The PIO plainly qualifies under the definitions for "agency" and "entity" given in The American Heritage Dictionary (2d College Ed. 1982), and Webster's Ninth New Collegiate Dictionary (1985).

0348

Page: 76   Date Filed: 01/29/2024   Document: 010110991829   Appellate Case: 23-1286

L. 97-241, Title II, Sec. 202; 96 Stat. 283-84. But, in 1985, Congress expanded the term "official mission" to "mission to or agency in" the United States. Pub. L. 99-93, Title I, Sec. 127; 99 Stat. 418. It again enlarged the scope of the Act in 1986 to include also an "entity." Pub. L. 99-569, Title VII, Sec. 701; 100 Stat. 3204. Nevertheless, plaintiffs urge that even the broad word "entity" as used in the Act really means "commercial enterprise." If Congress meant to reach only certain commercial entities, the amendment could have been so restricted.

Moreover, one of the legislative reports cited by plaintiffs (Br. at 22) supports a broad interpretation of the term "mission to or agency or entity in." The Senate Report explains that Congress twice amended the definition of foreign mission, as set forth above, to make explicit the potential reach of the Act so that foreign missions cannot frustrate congressional intent by use of "covers" that arguably avoid the reach of the Act as originally written, due to Congress's inability to predict the various masks a foreign mission might don. S. Rep. No. 99-307, supra, at 22-23 (1986).[14]

4. Plaintiffs further claim (Br. at 27 n.15) that the explicit coverage of groups like the PIO in the new Anti-Terrorism Act of 1987 (described above at 9-10) suggests that the PIO was not covered by the Foreign Missions Act. This argument is meritless. The new statute governs groups or activities

---

[14] The floor debate on the 1985 amendments also reflected general concern with the ability of "so-called unofficial missions" to use the somewhat restrictive language of the original definition as a "loophole." 131 Cong. Rec. H2991 (1985) (Rep. Mica).

0349

Page: 77   Date Filed: 01/29/2024   Document: 010110991829   Appellate Case: 23-1286

connected with the PLO well beyond those that would constitute foreign missions; thus, it has a different purpose and reach than the Foreign Missions Act.[15]

Moreover, the type of argument raised by plaintiffs has been rejected on numerous occasions by the Supreme Court. The fact that Congress passes new legislation explicitly covering a situation does not mean that the prior statute did not already do so. See, e.g., United States v. New York Telephone Co., 434 U.S. 159, 177 n.25 (1977). Therefore, nothing in the new Anti-Terrorism Act suggests that t' \ State Department abused its discretion in finding the PIO covered by the Foreign Missions Act.

\*       \*       \*       \*       \*

In sum, the Executive Branch acted well within its very broad authority stemming from the statute and the Constitution in designating the PIO as a foreign mission of the PLO. Therefore, the remainder of this case must be analyzed with the recognition that the Executive's action has been taken against a foreign entity that has no right whatsoever to operate in the United States, except as the political branches of the Government allow.

---

[15] Plaintiffs also seem to dispute the Executive's ability to close the mission of a foreign entity by asserting (Br. at 25-26, 37) that the President's power is limited by the Foreign Agents Registration Act (22 U.S.C. 611 et seq.) and the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.). The former regulates persons acting on behalf of foreign principals and the latter recognizes the Executive's power to declare economic embargoes. The constitutional and statutory power here is quite distinct; it is the power to control an office operated by a foreign entity, not simply to require disclosures by lobbyists. Nothing in either statute cited by plaintiffs even hints that Congress meant to restrict in any way this separate authority.

27

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 78

II.   **THE STATE DEPARTMENT'S ACTION CLOSING A MISSION OF THE PLO DID NOT VIOLATE ANY FIRST AMENDMENT RIGHTS.**

A.   **Because The Executive Closed A Mission Of A Foreign Entity, No First Amendment Rights Are Implicated Here.**

As described above, the Executive decided to close the PLO mission in Washington, D.C. in order to express its disapproval of the PLO's continued support for terrorists, including the PLO's retention on its Executive Committee of an official allegedly responsible for the recent murder of a United States citizen, Leon Klinghoffer. The congressional findings in the Anti-Terrorism Act of 1987 further detail the ways in which the PLO acts against the interests of the United States and its citizens.[16]

In order to put the First Amendment analysis in this context in its proper perspective, it is essential to focus on who is asserting the First Amendment rights, and the entirely different constitutional status of foreign entities and American citizens. Foreign political entities such as the PLO, which purport to be sovereign entities, have no constitutional rights.[17] Since the

---

[16] See _Hanoch Tel-Oren_ v. _Libya_, 726 F.2d 774, 776, 799 (D.C. Cir. 1984) for an example of other PLO terrorist activities.

[17] It is explicit and long-standing U.S. policy not to recognize or negotiate with the PLO so long as it does not recognize Isael's right to exist and does not accept U.N. Security Council Resolutions 242 and 338. Nonetheless, the PLO, which purports to represent the Palestinian people considers itself a "state," or representative of one, entitled to recognition in the international arena, and claims privileges and immunities generally extended only to a sovereign nation and its representatives. The PLO has been accorded observer status at the United Nations (G.A.Res. 3237, 29 U.N. GAOR Supp. (No. 31) at 4 U.N.Doc. A/9631 (1974)). Members of the PLO Observer Mission

(continued...)

28

purpose of the PIO is to act as the "voice" of the PLO, it has only the constitutional non-status of the PLO.  In any event, assuming arguendo that the PIO has an existence and legal status separate from the PLO, it is at most a foreign juridical "person" which is present here at the sufferance of the United States Government, a privilege which may be withdrawn at any time for any bona fide foreign policy reason.

It is true, of course, that plaintiff Rahman and other American citizens staffing the PIO have complete First Amendment rights.  However, they have no right to speak as a representative of a putative foreign political entity.  This is the only disability which has been imposed upon them here.  Rahman remains wholly free, individually or in concert with others, to engage in any political speech he desires, including speech in support of, or derived from, the teachings of a foreign organization hostile to the United States.  Accordingly, Rahman has suffered no cognizable deprivation of free speech rights he possesses as an individual, but only the right to speak as the alter ego of an entity against which the United States must be able to take adverse action to fulfill its plenary and necessary authority to conduct foreign affairs.  We will examine each of these points in turn.

---

17(...continued)
have been accorded certain privileges in the United States by virtue of the Headquarters Agreement between the United States and the United Nations (21 U.S.T. 1416).  In addition, the PLO is reported to have diplomatic relations with approximately one hundred countries throughout the world.  See Kassim, The Palestine Liberation Organization's Claim To Status: A Juridical Analysis Under International Law, 9 Den. J. Int'l L. & Policy 1, 2-3 (1980).

0352

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 80

1.   There is no question that the PLO is a foreign entity for constitutional purposes and that it interacts with the United States only as a foreign entity.  As such, it has no constitutional rights.  This conclusion flows inexorably from the nature of foreign entities and their interaction with the United States as foreign entities.

The United States, as a nation among nations, is neither subject, nor sovereign, but one among equals.  See Curtiss-Wright Corp., 299 U.S. at 315-18; The Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 136 (1812).

The Framers of the Constitution understood that the United States, as an entity, derived its power to conduct foreign relations not from its domestic instrument of government but from its status in international law as an independent state.  Rather than conferring on the United States the power to wage war and conduct diplomacy, the authors of the Constitution understood that they were only allocating those powers among the branches of the national government and providing sufficient domestic powers to make them effective.  See Curtiss-Wright, 299 U.S. at 315-18.

Consistent with this understanding, the Supreme Court has held from the earliest times to the present that the United States as an entity possesses the full powers of a sovereign nation not by grant under the Constitution but under international law.  See, e.g., Kleindienst v. Mandel, 408 U.S. 753, 762 (1972); Fong Yue Ting v. United States, 149 U.S. 698 (1893); Schooner Exchange, 11 U.S. at 116; Penhallow v. Doane, 3 U.S. (3 Dal.) 54, 80-81 (Patterson, J.).

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 81

As a direct result of that sovereignty, the United States interacts with foreign entities not within the constitutional system, but as a juridical equal, on the level of international law and diplomacy. Simply put, the PLO "lies outside the structure of the Union." *Principality of Monaco* v. *Mississippi*, 292 U.S. 313, 330 (1934).

This principle makes sense because foreign entities such as the PLO "[have] undertaken no general obligation to abide by the constitutional norms to which the federal government and the several states are subject, nor are there any effective means to place [them] on a parity with the United States or the states for purposes of enforcement of particular norms." Damrosch, *Foreign States and the Constitution*, 73 Va. L. Rev. 483, 522 (1987). Accord L. Henkin, *Foreign Affairs and the Constitution* 254 (1972) (foreign governments have no constitutional rights).[18]

A natural attribute of the United States' sovereignty is the oft-mentioned "plenary" authority of the federal political branches over foreign affairs, described earlier (at 15-17). See, *e.g.*, *Butterfield* v. *Stranahan*, 192 U.S. 470, 492-93 (1904); *Curtiss-Wright*, 299 U.S. at 320. All matters of international concern fall within federal power. *Missouri* v. *Holland*, 252 U.S. 416, 432-35 (1920) (foreign affairs power allows the Federal

---

[18] This is not to suggest that the courts have not entertained suits by foreign nations. Several cases of statutory interpretation and occasional dicta support the notion that foreign sovereigns should be treated the same as other juridical persons. See, *e.g.*, *Pfizer Inc.* v. *India*, 434 U.S. 308 (1978) (interpreting "person" in section 4 of the Clayton Act to include foreign states).

31

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 82

Government to regulate by treaty even subjects traditionally falling within state jurisdiction).[19]

Application of these principles here compels the conclusion that the PIO cannot be heard to assert First Amendment rights on behalf of the PLO. Because the PLO purports to be an independent foreign entity, it has no constitutional rights. While the United States does not have diplomatic relations with the PLO, this fact does not affect this basic principle. Certainly, the PLO cannot claim to have greater constitutional rights than foreign entities recognized as such by the United States. Since, the PIO was substantially owned or effectively controlled by the PLO, it has only the constitutional non-status of the PLO. Thus, ordering it to cease operating as a _foreign_ _mission_ does not implicate the First Amendment in any way.[20]

2.   Even assuming that the PIC had an identity separate from the PLO, as a legal and foreign policy matter because it was substantially owned or effectively controlled by the PLO, it may nonetheless be closed pursuant to the political branches' plenary authority to prohibit foreign encroachments.

---

[19] Thus, United States courts will not even take cognizance of a constitutional (or other) claim by a foreign political entity unless the Executive recognizes it. United States v. Pink, 315 U.S. 203 (1942). The "established rule" is one of "complete deference to the executive branch" in its determination whether to grant a foreign entity access to United States courts. Pfizer, Inc., 434 U.S. at 319-20. Accordingly, the political branches may deny foreign entities as such all constitutional rights and preclude them from seeking to vindicate those rights in United States courts.

[20] Contrary to plaintiffs' rhetoric (Br. at 33), this case does not involve guilt of one party by association with another party. Rather, here, the first party has been found to be the alter ego of the second party.

32

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   ·Page: 83

As described earlier, the Supreme Court has repeatedly emphasized that the power to exclude or to deport foreign nationals is "inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers -- a power to be exercised exclusively by the political branches of government." Mandel, 408 U.S. at 765. "[O]ver no conceivable subject is the legislative power of Congress more complete than it is over" the admission of foreigners. Oceanic Steam Navigation Co. v. Stranahan, 214 U.S. 320, 339 (1909). Accord, Fiallo v. Bell, 430 U.S. 787, 792 (1977).

The Supreme Court has noted that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power and maintenance of republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." Harisiades, 342 U.S. at 588-89. See also Galvan v. Press, 347 U.S. 522, 531 (1954) ("that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government").

Pursuant to this sweeping power over entry into the United States, "Congress regularly makes rules that would be unacceptable if applied to citizens." Fiallo, 430 U.S. at 792. Accord Scales v. United States. 367 U.S. 203, 222 (1961); Mathews v. Diaz, 426 U.S. 67, 80 (1976).

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 84

Specifically, Congress may exclude aliens on the basis of criteria that would clearly be proscribed in the domestic arena, such as political beliefs, sex, and illegitimacy. See, e.g., Kleindeinst v. Mandel, supra; Fiallo v. Bell, supra. At most, courts may review these congressional policy choice to determine whether they are supported by a "facially legitimate and bona fide reason." Fiallo, 430 U.S. at 795. If such a reason exists, "the courts may neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interest of those who seek some communication with the applicant." Mandel, 408 U.S. at 770.

In short, the basic rationale underlying the Executive action here is that "[i]t is an accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self preservation, to forbid the entrance of foreigners within its domain, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." Ekiu v. United States, 142 U.S. 651, 659 (1892). Accord Galvan, 347 U.S. at 530-32. Accordingly, deportation is not viewed as "punishment," but merely withdrawal of the privilege of remaining in the United States. See Bugajewitz v. Adams, 228 U.S. 585, 591 (1913).

There is no principled basis for concluding that Congress has less authority with respect to fictional juridical persons, such as the PIO, which was essentially a foreign organization because of its tie to the PLO, than it does over individual aliens. Because physical removal of an entity such as the PIO from the country is obviously impossible, the ability to order

34

Appellate Case: 23-1286 · Document: 010110991829 · Date Filed: 01/29/2024 · Page: 85

cessation of its organizational activities is within the Government's authority.

Here, the Executive has taken action pursuant to the broad power of the political branches over alien encroachments and foreign affairs.  Even accepting plaintiff's argument that the PIO was an entity separate from the PLO, the political branches of our Government nevertheless have the authority to stop incursions by such foreign juridical "persons."[21]  As a foreign "person" because of its substantial ownership or effective control by the PLO, the PIO was subject to closure for any <u>bona</u> <u>fide</u> foreign policy reason, regardless of whether that reason is premised on ideological disagreement with the foreign entity to which the PIO was allied.

Accordingly, the PIO either as an official representative of the PLO, or an entity substantially owned or effectively controlled by it, may be barred from intruding into this country consistent with the Constitution.  The action taken here -- prohibiting the maintenance of an office -- was a permissible way of accomplishing this power.

3.    As a citizen, plaintiff Rahman enjoys the full protection of the First Amendment and other constitutional

---

[21] For obvious reasons, even if the PIO and the PLO denied their alleged link -- which the PIO has not -- such a denial would not be controlling.  For example, the Supreme Court accepted Congress's definition of the Communist Party as an organization "substantially directed, dominated or controlled" by a foreign power even though the Party itself vigorously resisted such a designation.  See <u>Communist Party</u>, 367 U.S. at 8-9; see also <u>First National City Bank</u> v. <u>Banco Para El Comercio Exterior de Cuba</u>, 462 U.S. 611 (1983) (Cuban bank, established by Cuban government as separate juridical entity, would not be so treated due to relationship between the bank and the Cuban government).

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 86

provisions.  But he does not have a constitutional right to act as the agent or representative of a foreign entity such as the PLO.  Put simply, there is no First Amendment right to speak as a foreign entity.  The political branches, as they have done here pursuant to their extraordinarily broad foreign affairs authority, may forbid Rahman from establishing a formal agency relationship with the PLO -- a hostile foreign entity.  Looked at another way, the political branches may forbid Rahman from speaking as the personification of the PLO.

Any contrary conclusion would render the political branches' plenary and necessary authority to preserve national sovereignty largely chimerical.  Also, a prohibition such as this one, which extends only to conveying ideas in the name of another but does not otherwise in any way impede the transmittal of those ideas, does no discernible harm to the First Amendment rights of the speaker.

If the political branches were foreclosed from taking any action against a foreign entity because it conducted its operations through American citizens or alter ego domestic organizations, then the Federal Government would be unable to exercise its clear authority to regulate or bar a foreign presence from the United States.

For example, if the Federal Government has severed diplomatic relations with a foreign nation and expelled its diplomats, then that government could not continue its operations by having American citizens hold themselves out as the nation's "embassy."  As the Supreme Court explained, "[m]eans for effective resistance against foreign incursion -- whether in the

0359

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 87

form of organizations which function, in some technical sense, as 'agents' of a foreign power, or in the form of organizations which, by complete dedication and obedience to foreign directives, make themselves the instruments of a foreign power -- may not be denied to the national legislature." Communist Party, 367 U.S. at 96 (footnote omitted). Indeed, the Court in that case went so far as to say that to find a constitutional bar to registration and disclosure requirements of foreign-dominated groups would "make a travesty of [the First] Amendment and the great ends for the well-being of our democracy that it serves." Id. at 89.

Moreover, it is crucial to recognize that the Executive's action went no further than was necessary to accomplish the legitimate foreign policy objective.  The State Department acted here to deny only the PLO a presence in this country; its order has no effect on the right of plaintiff Rahman to say anything be chooses in support of the PLO.  And, if Rahman wishes to open an office for the purpose of expressing approval of the policies and actions of the PLO, he is free to do so, as long as it is not done in a form owned or controlled by the PLO.[22]

It is difficult to discern how this restriction could significantly affect the content or persuasiveness of the speaker's message.  To be sure, it is conceivable in some circumstances that speaking in the name of a foreign entity would enhance the visibility and audience of the agent.  But this is not an advantage protected by the Constitution, because, by

---

[22] Accordingly, plaintiffs' implication (Br. at 31-32) that Rahman has been barred from acting collectively is simply wrong.

0360

definition, it is one derived from the existence of an entity without First Amendment rights. If the reason more people are listening is because the agent is speaking in the name of a foreign principal, then it follows that the prohibition against the agency relationship does not impede the <u>agent's</u> ability to contribute to the marketplace of ideas; it only affects negatively his master's unprotected voice. Simply put, the citizen-agent cannot have it both ways. He may not claim the right to enhance his speech by stepping into the shoes of a foreign entity without accepting the constitutional disabilities that flow from this foreign status.

Because Rahman is free to express views favoring the PLO, and to found an organization to do so in order to reach a wider audience, there is thus no credible argument that the Government has acted here to silence his point of view or to limit domestic debate.[23] The only thing the Government has curbed is the PLO itself; all citizens retain their rights to espouse the same views as the PLO if they wish, and even to band together to do so.

It is important to emphasize that this sort of restriction is not premised on the content of the political beliefs or views espoused by the speaker, but on the speaker's relationship with a

---

[23] For this reason, this case does not involve the principle, cited by plaintiffs (Br. at 35), that our society is strong enough that its citizens can be trusted to determine for themselves which views to reject. As we have repeatedly emphasized, plaintiffs' views can still be heard and considered, and accepted or rejected by the American public as appropriate. The Executive has not acted to stifle debate, but instead to make clear to the PLO that it cannot continue to support terrorism while maintaining an office in Washington, D.C.

Page: 89     Date Filed: 01/29/2024     Document: 010110991829     Appellate Case: 23-1286

foreign entity.  The Supreme Court has recognized and attached significance to this distinction in analogous contexts.  For example, in the <u>Communist Party</u> case, the Court emphatically rejected the assertion that it was permitting the imposition of burdens against "any group which pursues unpopular political objectives or which expresses an unpopular political ideology." 367 U.S. at 104.  As the Court put it:

> Nothing which we decide here remotely carries such an implication.  The Subversive Activities Control Act applies only to <u>foreign-dominated</u> organizations which work primarily to advance the objectives of a world movement controlled by the government of a <u>foreign</u> country * * *.  It applies only to organizations directed, dominated, or controlled by a <u>particular foreign</u> country.

<u>Ibid.</u> (emphasis in original).

Similarly, the Supreme Court upheld restrictions on travel by American citizens to Cuba.  In both cases, the court distinguished prior cases invalidating international travel restrictions on Communist Party members on the ground that the Communist Party restrictions were based on political belief and affiliation, while the restriction on travel to Cuba was based on the current policy of the United States toward Cuba's government. <u>Zemel</u>, 381 U.S. at 13; <u>Wald</u>, 468 U.S. at 241.  Compare <u>Kent</u> v. <u>Dulles</u>, 357 U.S. 116 (1958); <u>Aptheker</u> v. <u>Secretary of State</u>, 378 U.S. 500 (1964).  In short, the fact that ideological differences often motivate the political branches to take adverse action against a foreign political entity does not mean that restrictions on United States citizens vis-a-vis that entity are "content-based" for First Amendment purposes.

0362

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 90

In addition, plaintiffs' assertion (Br. at 6, 28, 41 n.21) that the PIO acted no differently from normal lobbying activities carried out on behalf of foreign countries is highly misleading. Lobbyists normally are part of law firms or public relations groups that are not owned or controlled by a lone foreign entity; nor do they conduct their activities for the benefit of a sole foreign entity. Thus, lobbyists do not attempt to operate a mission for a foreign entity. Affirmance of the State Department's action here would have no impact on the activities of lobbyists.

Accordingly, both this Court, in denying the injunction pending appeal, and the district court correctly concluded that plaintiffs' First Amendment rights have been preserved. App. 110-11.[24]

> **B.   Even If First Amendment Rights Are Implicated, They Are Overcome By The Valid Foreign Policy Actions Of The Executive Here.**

1. As the Supreme Court has made clear in any event, even if a governmental regulation restricts an individual's freedom of speech, that regulation is not necessarily invalid. Regulations relating to foreign policy interests, for example, have been upheld over claims of First Amendment infringement. See, e.g.,

---

[24] Plaintiffs' contention (Br. at 10, 45-46) that discovery is needed, or that there are factual disputes on this point are puzzling. Plaintiffs' speculation that the State Department wished to silence their political message makes no sense since the State Department has emphasized that plaintiffs are free to speak as they wish, as long as it is not in the form of a mission of the PLO. Furthermore, the State Department has fully explained its foreign policy purpose for taking action against the PLO. App. 17. Plaintiffs have not attempted to attack the reasonableness of this motivation, and the district court correctly recognized that it is not a subject for judicial review. App. 105.

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 91

Haig v. Agee, 453 U.S. at 308-09 (passport revoked because speech activities abroad likely to damage foreign policy of the United States); Finzer v. Barry, 798 F.2d 1450 (D.C. Cir. 1986), cert. granted, 107 S.Ct. 1282 (1987) (upholding D.C. statute limiting protests and demonstrations in front of foreign embassies here).

Indeed, in Mandel, 408 U.S. 753, the Supreme Court held that First Amendment cases are no exception to the doctrine of judicial deference to government decisions potentially affecting the Government's foreign policy interests. In Mandel, the plaintiffs had claimed infringement of their First Amendment rights due to the Attorney General's refusal to grant a temporary non-immigrant visa to a Belgian Marxist whom plaintiffs had invited to this country. The Supreme Court acknowledged that the Attorney General's action implicated First Amendment concerns (id. at 765), but held that, when the Government states a "facially legitimate and bona fide" reason for a decision made pursuant to the plenary power of the Government over exclusion of aliens, "courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant." Id. at 769-70.

The identical principle should be applied here. Plaintiffs argue that their First Amendment rights allow them to override the Executive's plenary power to regulate the activities of foreign missions in this country. As in Mandel, the Executive has stated a facially legitimate and bona fide reason for its action.

0364

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 92

Thus, even if this Court reads the State Department's order as affecting plaintiffs' associational rights, the closure order is permissible because it furthers a <u>bona fide</u> foreign policy objective, and does not materially affect the potential for debate on any issues that plaintiffs wish to discuss publicly or privately.  See also <u>United States</u> v. <u>Harriss</u>, 347 U.S. 612, 626 (1954) (legitimate governmental interests overcome First Amendment attack on Federal Regulation of Lobbying Act even if some deterrent effect on speech is assumed); <u>Buckley</u> v. <u>Valeo</u>, 424 U.S. 1, 29-30 (1976) (limits on political campaign contributions outweigh associational interests even if only to preserve the <u>appearance</u> of the integrity of the electoral system).

2.   The State Department's action is valid even if the Court uses a test for governmental measures that affect First Amendment rights outside the context of foreign relations.

In <u>United States</u> v. <u>O'Brien</u>, 391 U.S. 367, 377 (1968), the Supreme Court stated the following test to determine the constitutionality of government regulations that "incidentally" burden speech:

> a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.[25]

---

25 The Supreme Court has apparently also added the criterion of whether there are alternative means of communication

(continued...)

0365

Page: 93    Date Filed: 01/29/2024    Document: 01011099182829    Appellate Case: 23-1286

As our prior discussion demonstrates, all of these factors have been met in this case.  First, plaintiffs do not attempt to dispute that it is within the constitutional power of the political branches of our Government to bar operation of a mission of a foreign entity.  Second, closing the PLO mission here further ⌐ substantial foreign policy interest of reinforcing our opposition to PLO-supported terrorism.  Third, the State Department action is unrelated to suppression of free expression since Rahman and others are left open to advocate the views held by the PLO; the purpose of the Executive action, as explained by the State Department (App. 17) is to discourage terrorism.  Fourth, in leaving Rahman free to advocate, the Government has taken the most limited means possible of shutting down the PLO mission while minimally affecting First Amendment freedoms.[26]

Finally, in assessing the available alternative means of communication, it is important to note what the restriction on a relationship with a foreign political entity does <u>not</u> do.  In the case of the closure at issue, it does not prevent anyone in the United States from engaging in independent advocacy of the Palestinian cause, raising money from the public, or using personal funds in any amount for this purpose.

---

[25](...continued)
available.  See <u>City of Renton</u> v. <u>Playtime Theatres</u>, 475 U.S. 41, 53-54 (1986).

[26] We note that the <u>O'Brien</u> standards have been used in upholding restrictions on the importation of publications from foreign countries under the Trading with the Enemy Act.  See, <u>e.g.</u>, <u>Teague</u> v. <u>Regional Commissioner of Customs</u>, 404 F.2d 441, 445 (2d Cir. 1968), <u>cert</u>. <u>denied</u>, 394 U.S. 977 (1969).

0366

To summarize, the State Department order to the PIO to cease operations does not burden plaintiffs' individual rights to free speech and association; it prohibits only their practice of acting as a mission for the PLO. Nevertheless, even if the closure order is read to implicate plaintiffs' ability to distribute information or associate without restriction, it is justified as an incidental effect of the Government's power to preclude foreign encroachments and conduct foreign policy.

### III. PLAINTIFFS' DUE PROCESS RIGHTS WERE NOT INFRINGED.

#### A. A Hearing Here Would Have Served No Purpose, And Was Thus Not Required Under The Due Process Clause.

Foreign entities such as the PLO obviously do not have due process rights since they are not part of our constitutional scheme. See supra, at 31. Cf. South Carolina v. Katzenbach, 383 U.S. 301, 323-24 (1966) (states are not covered by the Due Process Clause). Plaintiffs nevertheless contend (Br. at 42-44) that they were entitled to a hearing before the PIO was designated as a mission of the PLO. This contention is incorrect.

The Supreme Court has applied the common sense notion that an individual is ordinarily entitled to a hearing if there is a purpose to be served by such a hearing. See Codd v. Velger, 429 U.S. 624 (1977). There, a police officer sought a hearing to contest his dismissal and to answer a stigmatizing part of his record, but he did not dispute the critical fact that he had attempted suicide, which was the reason given for his dismissal.

44

**0367**

The case at bar is nearly identical.  Plaintiffs seek a hearing; yet, their own papers reveal ample facts to support the State Department's conclusion under the Foreign Missions Act that the PIO operated as a mission of the PLO.  Thus, plaintiffs do not contest the facts that justify the agency's finding and designation.

As in <u>Codd</u> v. <u>Velger</u>, no hearing was necessary here since the key facts, rather than the legal or foreign policy conclusions to be drawn from them, are not disputed.  Plaintiffs merely wished to argue that a different legal conclusion should be drawn from those uncontroverted facts.[27]  But the Due Process Clause does not mandate a hearing for that purpose.

**B.  Since Plaintiffs' Conduct Fell Within The Heart Of The Conduct Covered By The Foreign Missions Act, They Cannot Attack The Statute As Unconstitutionally Vague.**

Plaintiffs argue (Br. at 39-42) that the Foreign Missions Act is unconstitutionally vague as applied by the district court. They base their claim on the district court's decision not to reach the "substantial ownership or effective control" issue because of its finding that the PIO was covered by the Act in light of its "other activities" on behalf of the PLO. App. 108.

_____

[27] Plaintiffs have given no indication that they wish to show that Rahman disregarded orders or directions from the PLO, or otherwise took actions that would demonstrate independence despite the outward compelling signs of PLO substantial ownership or effective control.  We note that Rahman submitted a somewhat lengthy declaration in the district court (App. 22-28), but provided no details or specifics regarding his dealings with the PLO leadership over the past several years.  In light of the apparent absence of any desire by Rahman to reveal more to the Government than is already shown by the public papers in this case, the call for a hearing rings rather hollow.

45

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 96

However, the State Department ordered the closing of the PIO because it was substantially owned or effectively controlled by the PLO (App. 16-17), and, as this brief shows, we are defending the Executive's action on the grounds stated by the State Department.  Consequently, if the Court accepts our argument that the PIO was validly found to be a mission of the PLO, because of its substantial ownership or effective control, this vagueness allegation disappears.

If the vagueness argument nonetheless survives, it is unavailing in any event.  If the PIO is substantially owned or effectively controlled by the PLO, as we contend, it is not affected by any alleged vagueness in the statute.  Therefore, the Court should not consider plaintiffs' vagueness claim, which is in essence raised on behalf of some other hypothetical litigant.  See Haig v. Agee, 453 U.S. at 309 n. 61 ("since Agee's conduct falls within the core of the regulation, he lacks standing to contend that the regulation is vague and overbroad"); Young v. American Mini Theatres, 427 U.S. 50, 58-59 (1976); Parker v. Levy, 417 U.S. 733, 755 (1974); Harriss, 347 U.S. at 618.

Even if the vagueness doctrine were held to apply to this case, it would not affect the validity of the Secretary's order because the doctrine does not require impossible standards of specificity.  See United States v. Petrillo, 332 U.S. 1, 7 (1947).  The purpose of the "void for vagueness" doctrine is to assure that individuals have adequate notice of the conduct that will bring them within the reach of a statutory provision or regulation.  See Boutilier v. INS, 387 U.S. 118, 124 (1967).

0369

The degree of vagueness that the Constitution tolerates depends in part upon the nature of the enactment. Thus, economic regulations and statutes with civil rather than criminal penalties are subject to a more lenient test. See, e.g., Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99, (1982). As discussed already (at 19), the need for flexibility in regulations affecting foreign policy interests is even more compelling. See Zemel, 381 U.S. at 17; Curtiss-Wright, 299 U.S. at 321-22. Thus, to prevail on a vagueness claim here, plaintiffs must present an especially strong case, which they have failed to do.

Applying these, or even the strictest standards, the Foreign Missions Act provides sufficient guidance to enable a reasonable person to avoid operating a foreign mission. As we have already pointed out (at 40), the nature of the operation of the PIO stands in marked contrast to that of a law or public relations firm doing lobbying work on behalf of foreign entities. There is thus very little danger of lobbyists becoming concerned about their ability to operate in light of the Secretary's application of the Foreign Missions Act to the PIO.[28]

---

[28] Plaintiffs incorrectly state (Br. at 39) that the Government itself does not know the bounds of the Act. This claim is apparently based on the fact that the State Department has not told plaintiffs precisely how they may reorganize in order to operate. The State Department has informed plaintiffs that they are free to operate as long as they are not substantially owned or effectively controlled by the PLO; there is no obligation of which we are aware that the Government give more detailed advice on how to avoid coming within the terms of a statute.

0370

Appellate Case: 23-1286     Document: 010110991829     Date Filed: 01/29/2024     Page: 98

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

ABRAHAM D. SOFAER
  Legal Adviser

PATRICK M. NORTON
  Assistant Legal Adviser
  for Near Eastern and
  South Asian Affairs

JOHN B. REYNOLDS
  Attorney Adviser
  U.S. Department of State

RICHARD K. WILLARD
  Assistant Attorney General

JOSEPH E. DIGENOVA
  United States Attorney

DOUGLAS LETTER
  Appellate Litigation Counsel
  Appellate Staff, Civil Division
  Room 3617, Department of Justice
  Washington, D.C.  20530
  Telephone:  (202) 633-3602

JANUARY 22, 1988

48

0371

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of January, 1988, I served the foregoing Brief for the Appellees by causing two copies to be hand delivered to:

Steven Shapiro
American Civil Liberties Foundation
132 West 43d St.
New York, NY   10036

Arthur Spitzer
ACLU
1400 20th St., N.W.
Washington, D.C.   20036

DOUGLAS LETTER
Attorney

Page: 99   Date Filed: 01/29/2024   Document: 010110991829   Appellate Case: 23-1286

49

0372

# EXHIBIT E

**0373**

# Constitutionality of Closing the Palestine Information Office, an Affiliate of the Palestine Liberation Organization

The federal government may, without violating the First Amendment or the Bill of Attainder Clause of the Constitution, order the Palestine Information Office in Washington to close. The political branches have broad authority to control the flow of funds into the United States, and may prevent all commerce between foreign and domestic entities, or cut off the supply of all noninformational material from a foreign country to a domestic entity.

Furthermore, neither foreign political entities, nor domestic organizations and individuals to the extent they profess an identity with such entities, have constitutional rights under the First Amendment. The First Amendment also permits restrictions on the speech and association rights of domestic organizations and individuals when they act pursuant to the direction and control of a foreign entity. The same restrictions on the expressive activities of domestic organizations and individuals are not permitted, however, outside the scope of such a relation- .ship.

August 14, 1987

MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL

We have been asked to assess the constitutionality of various restrictions on the Palestine Liberation Organization (PLO) and groups associated with it. Specifically, we have been asked whether the State Department's exercise of its statutory authority under the Foreign Missions Act, 22 U.S.C. §§ 3401 *et seq.*, to "close" the Palestine Information Office (PIO) in Washington, D.C., would be constitutionally permissible. For the reasons discussed below, we believe that such action by the Secretary of State under the broad authority accorded him by the Foreign Missions Act over foreign missions would be a constitutionally permissible exercise of the political branches' authority over foreign relations.

We first explore the authority of the political branches to act against foreign political entities and their agents. Next, we apply that analysis to the specific case of the PIO. We then discuss the constitutionality of H.R. 2548 and S. 1203, the recently-introduced bills which would prohibit the expenditure of funds provided by the PLO, or the maintenance of an office "at the behest or direction of, or with funds provided by" the PLO. These restrictions would also apply to monies or direction provided by any of the PLO's "constituent groups," its "successors," and its "agents."

In sum, we believe that restrictions on the speech of foreign political entities are permissible, as such entities do not have constitutional rights. Similarly,

104

0374

restrictions on the speech of domestic organizations and individuals professing an identity with such foreign entities are permissible, as they assume the constitutional non-status of the foreign entity with which they profess an identity. Difficulties arise with respect to those organizations or entities which do not profess an identity with a foreign political entity, but which nonetheless serve its interests. We believe that restrictions on the speech of such organizations and on American citizens are permissible if the latter are acting pursuant to the direction and control of the foreign entity. Furthermore, restrictions on the ability of domestic organizations and citizens to form such a relationship or which tend to inhibit the formation of a relationship with a foreign entity are constitutional. We believe, however, that restrictions on the expressive activities of American citizens outside the scope of such a relationship with a foreign entity are impermissible under the First Amendment.

## I. General Principles

The fundamental focus of First Amendment analysis in this context must be on *who* is asserting the right of speech or of political association. As we understand the facts, the PIO professes an identity with the PLO, maintaining that it is the "voice" of the PLO in the United States. The PIO, we also understand, is staffed by foreign nationals and American citizens. Accordingly, there are three different juridical entities whose First Amendment rights are potentially affected by the proposed action. First, there is the PLO itself. Second, there is the PIO, an organization that professes an identity with, and perhaps derives its legal status from, the PLO. Finally, there are the American citizens and foreign nationals who staff the PIO. Thus, before assessing the speech or associational rights at issue, we must inquire whether and to what extent these entities possess First Amendment rights.

With respect to foreign sovereigns and states, it is clear that they exist outside the constitutional compact and have no rights or responsibilities under it. Rather, their legal rights and duties are exclusively governed by treaties, international law, and other agreements binding coequal sovereigns in the international arena. Because the PLO purports to be an independent sovereign entity, we have little difficulty concluding that it falls into this category.

Real or juridical "persons" not United States citizens possess some constitutional rights while on American soil. Nevertheless, they may constitutionally be expelled from the United States for exercising these rights, including the rights of political association or speech, at least if the expulsion is pursuant to a legitimate foreign policy objective. Accordingly, even if the PIO is viewed as having a juridical identity distinct from the PLO — or if the PLO is viewed as a foreign entity without sovereign status — it may nonetheless be banned from American soil for any bona fide foreign policy reason. The same is true of a foreign national.

American citizens obviously have the full protection of the First Amendment and may neither be denied the right to political expression nor expelled because

105

they have engaged in such expression. However, a citizen's First Amendment rights must be examined in light of his interaction with a foreign government. Specifically, it must be determined, in view of this relationship, whose speech is actually at issue: that of the citizen or of the foreign entity.

For the reasons discussed more fully below, we believe that because the political branches may deny foreign governments all First Amendment rights, they may restrict the expressive activities of citizens speaking pursuant to the direction and control of — that is, as agents of — the PLO and/or foreclose ties indicative of such an agency relationship. So long as the scope of the prohibition on speech does not exceed the contours of the speaker's relationship with the foreign government — thereby infringing on the citizen's independent right to espouse beliefs in support of foreign powers — we believe it would survive constitutional scrutiny. Although such restrictions would implicate the citizen's ability to gather information and associate with foreign governments, we believe this limitation would be justified as an incidental effect of the United States's necessary and inherent power to preclude foreign encroachment. Finally, we conclude that the United States political branches may prevent all commerce between foreign and domestic entities, and may cut off the supply of all noninformational material from a foreign entity to a domestic entity.

We will examine each of these questions in turn and then apply them to the specific issues before us.

## A. Foreign States

As noted, the starting point of our analysis is that the PLO itself, as a foreign political entity, has no constitutional rights. This conclusion flows inexorably from the nature of foreign sovereigns and their interaction with the United States as a foreign, co-equal sovereign. The United States, as a nation among nations, is neither subject, nor sovereign, but one among equals. *See United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304, 315–18 (1936); *The Chinese Exclusion Case*, 130 U.S. 581, 604–06 (1889); *The Schooner Exchange* v. *M'Faddon*, 11 U.S. (7 Cranch) 116, 136 (1812). The authors of the Constitution allocated the powers to wage war and conduct diplomacy among the political branches of the national government, but they did not believe that the existence of such powers depended on a direct grant in the Constitution.[1] Such powers are an inherent and necessary attribute of independent sovereignty and the Framers did not intend to diminish this preexisting authority.

As this Office previously stated in connection with proposed legislation to conduct electronic surveillance of foreign agents:

It was understood by the Framers thật the United States, as an entity, derived its power to conduct foreign relations not from its domestic instrument of government but from its status in inter-

---

[1] *See* 1 M. Farrand, *Records of the Federal Convention*, 19, 25 (E. Randolph), 316 (J. Madison), 323 (R. King) (1937 ed.); *The Federalist* No. 15, at 156 (A. Hamilton), No. 42, at 302–03 (J. Madison) (John Harvard Library ed. 1961).

106

> national law as an independent state. Rather than conferring on
> the United States the power to wage war and conduct diplo-
> macy, the authors of the Constitution understood that they were
> only allocating those unquestioned powers among the branches
> of the national government and providing sufficient domestic
> powers to make them effective. Consistent with this understand-
> ing, the Supreme Court has held from the earliest times to the
> present that the United States as an entity possesses the full
> powers of a sovereign nation not by grant under the Constitution
> but under international law.

Letter to Edward P. Boland, Chairman, House Permanent Select Comm. on Intelligence from John M. Harmon, Assistant Attorney General, Office of Legal Counsel (Apr. 18, 1978) (Harmon Letter), *reprinted in Foreign Intelligence Electronic Surveillance: Hearings on H.R. 5794, H.R. 9745, H.R. 7308, H.R. 5632 before the Subcomm. on Legislation of the House Permanent Select Comm. on Intelligence*, 95th Cong., 2d Sess. 23 (1978). *See also Kleindienst* v. *Mandel*, 408 U.S. 753, 762 (1972); *Fong Yue Ting* v. *United States*, 149 U.S. 698 (1893); *The Chinese Exclusion Case*, 130 U.S. 581; *The Schooner Exchange*, 11 U.S. (7 Cranch) 116; *Penhallow* v. *Doane's Administrator*, 3 U.S. (3 Dall.) 54, 80–81 (Paterson, J.).

As a direct result of that sovereignty, the United States interacts with foreign states not within the constitutional system, but as a juridical equal, on the level of international law and diplomacy. Thus, Chief Justice Marshall spoke of the "perfect equality and absolute independence of sovereigns" as tied to the fact that "[o]ne sovereign [is] in no respect amenable to another." *The Schooner Exchange*, 11 U.S. (7 Cranch) at 137. And because no sovereign is "amenable," or subject to the other, "the rights and duties of the United States and foreign sovereignties *vis-a-vis* one another derive not from the domestic law of either, but from the mutual agreements contained in treaties and the consensus known as customary international law." Harmon Letter, *supra*, at 5. Simply put, a foreign political entity such as the PLO, "lies outside the structure of the union." *Principality of Monaco* v. *Mississippi*, 292 U.S. 313, 330 (1934). It "[has taken] no general obligation to abide by the constitutional norms to which the federal government and the several states are subject, nor are there any effective means to place [it] on parity with the United States or the states for purposes of enforcement of particular norms." Damrosch, *Foreign States and the Constitution*, 73 Va. L. Rev. 483, 522 (1987) (Damrosch).[2]

---

[2] This conclusion — that foreign states have no constitutional rights — is supported by those scholars who have addressed the issue and a number of prior opinions by this Office. *See, e.g.,* Damrosch, *supra*, 73 Va. L. Rev. at 519–23; L. Henkin, *Foreign Affairs and the Constitution* 254 (1972) (foreign governments and foreign diplomats in their official capacity "have no constitutional rights, and there are no constitutional obstacles, say, to tapping wires of foreign embassies"); Presidential Authority to Settle the Iranian Crisis, 4A Op. O.L.C. 248, 260 n 9 (1980) ("A foreign nation, however, unlike a foreign national, does not have rights under the Fifth Amendment."); 5 *Intelligence Activities — The National Security Agency and Fourth Amendment Rights: Hearings on S. Res. 21 Before the Senate Select Committee to Study Governmental*
Continued

The oft-mentioned "plenary" authority of the federal political branches is a natural attribute of such sovereignty. *See, e.g., Buttfield* v. *Stranahan*, 192 U.S. 470, 492–93 (1904); *United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. at 320. All matters of international concern fall within federal power. *Missouri* v. *Holland*, 252 U.S. 416, 432–35 (1920) (foreign affairs power allows federal government to regulate by treaty even subjects traditionally falling within state jurisdiction). The converse of this power is judicial reluctance to set aside actions affecting foreign relations taken by the political branches. The judiciary has recognized the need for the United States to "speak with one voice" with respect to foreign nations. As Justice Jackson stated in *Chicago & Southern Air Lines, Inc.* v. *Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948):

> It would be intolerable that courts, without the relevant informa-
> tion, should review and perhaps nullify actions of the Executive
> taken on information properly held secret . . . . [T]he very nature
> of executive decisions as to foreign policy is political, not judi-
> cial. Such decisions are wholly confided by our Constitution to
> the political departments of the government, Executive and
> Legislative. They are delicate, complex and involve large ele-
> ments of prophecy. They are and should be undertaken only by
> those directly responsible to the people whose welfare they
> advance or imperil. They are decisions of a kind for which the
> Judiciary has neither the aptitude, facilities, nor responsibility
> and which has long been held to belong in the domain of
> political power not subject to judicial intrusion or inquiry.

Thus, United States courts will not even take cognizance of a constitutional (or other) claim by a foreign political entity unless the Executive recognizes it. *See United States* v. *Pink*, 315 U.S. 203 (1942). The "established rule" is one of "complete deference to the executive branch" in its determination whether to grant a government access to United States courts. *Pfizer, Inc.* v. *Government of India*, 434 U.S. 308, 319–20 (1978). Accordingly, the political branches may deny foreign entities as such all constitutional rights and preclude them from obtaining access to United States courts.

### B. Foreign Nationals and Juridical "Persons"

For reasons analogous to those set forth above, the Supreme Court has repeatedly emphasized that the power to exclude or to deport foreign nationals is "inherent in sovereignty, necessary for maintaining normal international

---

[2] (. . . continued)

*Operations with Respect to Intelligence Activities*, 94th Cong., 1st Sess. 66, 74 (1975) (statement of Attorney General Edward H. Levi) ("The Fourth Amendment guards the right of the people and it can be urged that it was not meant to apply to foreign nations, their agents and collaborators.") (Levi Testimony).

We do not mean to suggest that courts of the United States have not entertained suits by foreign nations. Several cases of statutory interpretation and occasional dicta support the notion that foreign sovereigns should be treated the same as other juridical persons. *See, e.g., Pfizer Inc.* v *Government of India*, 434 U.S. 308 (1978) (interpreting "person" in § 4 of the Clayton Act to include foreign states). Such cases have only arisen, however, in the absence of an explicit directive from the political branches.

0378

relations and defending the country against foreign encroachments and dangers — a power to be exercised exclusively by the political branches of government." *Mandel*, 408 U.S. at 765 (quoting with approval Brief of the United States). "[O]ver no conceivable subject is the legislative power of Congress more complete than it is over" the admission of aliens. *Oceanic Steam Navigation Co.* v. *Stranahan*, 214 U.S. 320, 339 (1909). *Accord Fiallo* v. *Bell*, 430 U.S. 787, 792 (1977); *Hampton* v. *Mow Sun Wong*, 426 U.S. 88 (1976); *Shaughnessy* v. *United States ex rel. Mezi*, 345 U.S. 206 (1953); *Fong Yue Ting* v. *United States*, 149 U.S. 698 (1893). As the Court has noted, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power and maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades* v. *Shaughnessy*, 342 U.S. 580, 588–89 (1952). *See also Galvan* v. *Press*, 347 U.S. 522, 531 (1954) ("that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government").

Pursuant to this sweeping power over immigration and naturalization, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Fiallo*, 430 U.S. at 792 (quoting *Mathews* v. *Diaz*, 426 U.S. 67, 80 (1976)). Specifically, Congress may exclude aliens on the basis of criteria that would clearly be proscribed in the domestic arena, such as political beliefs, sex, and illegitimacy. *See, e.g., Kleindeinst* v. *Mandel,* 408 U.S. 753; *Fiallo* v. *Bell*, 430 U.S. 787. Congress has equally broad authority to deport resident aliens on the basis of political beliefs or affiliation, and may even do so on the basis of conduct that wholly antedated the relevant prohibitory regulation. *See, e.g., Galvan*, 347 U.S. 522 (upholding deportation of resident alien for former membership in communist party); *Harisiades*, 342 U.S. 580 (same). At most, courts will review the congressional policy choice to determine whether it is supported by a "facially legitimate and bona fide reason." *Fiallo*, 430 U.S. at 795 (quoting *Mandel*, 408 U.S. at 770). If such a reason exists, "the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interest of those who seek some communication with the applicant." *Mandel*, 408 U.S. at 770.

In short, the basic rationale underlying this doctrine is the "accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self preservation, to forbid the entrance of foreigners within its domain, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Ekiu* v. *United States*, 142 U.S. 651, 659 (1892). Accordingly, deportation is not viewed as "punishment," but merely withdrawal of the privilege of remaining in the United States. *See Bugajewitz* v. *Adams*, 228 U.S. 585, 591 (1913).[3]

---

[3] That aliens may be deported based upon behavior that would be constitutionally protected if undertaken

Continued

109

We can discern no principled basis for concluding that Congress has less authority with respect to fictional juridical persons, such as foreign corporations or organizations. Because physical removal of these fictional entities from the country is obviously impossible, the equivalent of deportation of individuals would be a cessation of organizational activities and/or expulsion of corporate assets.

## C. *United States Citizens*

American citizens, of course, are subject to the full protection of the First Amendment and other constitutional provisions. There are two aspects to a citizen's First Amendment interests in this context. First, citizens have the right to engage in political or other expressive activity, collectively or on an individual basis. Moreover, they have an interest in receiving information from or having contact with foreign nationals or other entities.

The question remains, however, whether one has a constitutional right to act as an agent or official representative of a foreign government. Citizens, collectively or individually, have a right to engage in whatever political speech they desire, including speech in support of, or directly derived from, the teachings of a foreign power hostile to the United States. In our view, however, there is no First Amendment right to speak *as* a foreign government. That is, the political branches, pursuant to their extraordinarily broad foreign affairs authority, may forbid an individual from establishing a formal agency relationship with a hostile foreign power or, looked at another way, forbid him from speaking as the personification of a foreign power.

Of course, this direct prohibition against speech may not extend beyond the scope of the agency relationship. To the extent that a citizen speaks his own mind, rather than serves as the voice of his foreign principal, his speech is fully protected by the guarantees of the First Amendment.

---

[3] ( . . . continued)

by citizens does not mean that aliens are wholly without constitutional rights while in this country In fact, it is well settled that certain constitutional protections do extend to aliens. For example, the Supreme Court has stated that "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges* v. *Wixon*, 326 U.S. 135, 148 (1945) (citing *Bridges* v. *California*, 314 U.S. 252 (1941)). In fact, "the Court has treated certain restrictions on aliens with 'heightened judicial solicitude.'" *Foley* v. *Connelie*, 435 U.S. 291, 294 (1978) (quoting *Graham* v. *Richardson*, 403 U.S. 365, 372 (1971)). Nevertheless, the Supreme Court has also recently upheld a New York statute requiring state troopers to be United States citizens, *Foley* v. *Connelie*, 435 U.S. 291 (1978), a State's refusal to employ as elementary and secondary school teachers aliens eligible for United States citizenship who failed to seek naturalization, *Ambach* v. *Norwick*, 441 U.S. 68 (1979), and a California statute prohibiting aliens from becoming "peace officers," *Cabell* v. *Chavez-Salido*, 454 U.S. 432 (1982). In distinguishing these restrictions from those "on lawfully resident aliens that primarily affect economic interests," which are subject to "heightened judicial scrutiny," the Supreme Court has concluded that "strict scrutiny is out of place when the restriction primarily serves a political function" *Id.* at 439. In any event, we need not resolve the difficult question of precisely when restrictions may be placed on an alien's rights greater than those placed on citizens. We deal here only with the expulsion of foreign entities, which is plainly permissible under *Harisiades* and *Galvan*. For purposes of this analysis, therefore, we assume that aliens are entitled to the First Amendment protections of freedom of speech and of association so long as they remain in this country. Accordingly, during the discussion set forth above, "citizens" should be understood to mean permanent resident aliens as well.

110

We do not believe however, that the citizen-agent may transfer these rights to his foreign principal. We so conclude for two reasons. First, a contrary conclusion would render the political branches plenary and necessary authority to preserve national sovereignty largely chimerical. Second, a prohibition which extends only to an individual's ability to speak *as* a foreign sovereign, but does not otherwise in any way impede his ability to express his ideas, does no discernible harm to the First Amendment rights of the speaker.

Foreign powers, like all other organizations with a juridical status separate and distinct from their members and employers, can obviously act only through individuals. If the political branches were foreclosed from taking any action against a foreign sovereign solely because it conducted its operations through American citizens or through alter ego domestic organizations, the federal government would be utterly disabled from exercising its clear sovereign power to expel a foreign presence from United States soil.

Although there is a paucity of case law on this specific question, we believe the political branches' inherent authority to preclude foreign encroachments necessarily carries with it a residual authority to treat citizen-agents as instrumentalities of a foreign government or sever the official ties that bind them. We should think, for example, that if the federal government has severed diplomatic relations with a foreign nation and expelled its diplomats, then that government could not continue its operations by having American citizens hold themselves out as the nation's "embassy." As Justice Frankfurter said, "[m]eans for effective resistance against foreign incursion — whether in the form of organizations which function, in some technical sense, as 'agents' of a foreign power, or in the form of organizations which, by complete dedication and obedience to foreign directives, make themselves the instruments of a foreign power — may not be denied to the national legislature." *Communist Party* v. *Subversive Activities Control Board*, 367 U.S. 1, 96 (1961) (footnote omitted). Indeed, the Court in that case went so far as to say that to find a constitutional bar to registration and disclosure requirements of foreign-dominated groups would "make a travesty of [the First] Amendment and the great ends for the well-being of our democracy that it serves." *Id.* at 89.

For similar reasons, this Office has previously concluded that the "official conversations on diplomatic premises" of foreign nationals or American citizens employed by a foreign mission were not subject to the protections of the Fourth Amendment's prohibition against unreasonable searches or seizures. Harmon Letter, *supra*, at 8. We there stated: "[A] state can only act through its employees. It is therefore inherent in the acquisition of the foreign state's communications that the privacy of the individuals speaking them be invaded." *Id.* Similarly, in 1975 Attorney General Levi testified that because the preamble of the Constitution refers to "We the People," it could "be urged that it was not meant to apply to foreign nations, their agents and collaborators. Its application may at least take account of that difference" and therefore justify a finding that any such search was reasonable. Levi Testimony, *supra*, at 74. By analogy, a citizen's statements in his capacity as an official representative of a

111

foreign power would not be protected "speech" within the meaning of the First Amendment.

Moreover, a prohibition running only against speaking as the official voice of a foreign power or foreign political entity would not seem to affect adversely the speaker's right as an individual to freedom of speech. Such persons or organizations remain free to advocate support for the foreign regime and to advocate its teachings and philosophy. The exclusive disability imposed is the citizen's "right" to speak as a representative of a foreign government — to characterize his words as those of a foreign sovereign.

It is difficult to discern how this restriction could significantly affect the content or persuasiveness of the speaker's message. To be sure, it is conceivable in some circumstances that speaking in the name of a foreign sovereign would enhance the visibility and audience of the agent. But this does not strike us as an advantage protected by the Constitution, because, by definition, it is one derived from the existence of an entity without First Amendment rights. If the only reason people are listening is because the agent is speaking in the name of a foreign principal, then it follows that the prohibition against the agency relationship does not impede the *agent's* ability to contribute to the market-place of ideas; it only affects negatively his master's unprotected voice. Simply put, we do not think the citizen-agent can have it both ways. He may not claim the right to enhance his speech by stepping into the shoes of a foreign power without accepting the constitutional disabilities that flow from this foreign status.

It is important to emphasize that this sort of restriction is not premised on the content of the political beliefs or views espoused by the speaker, but on the speaker's relationship with a foreign government. The Supreme Court has recognized and attached significance to this distinction in analogous contexts. For example, in the *Communist Party* case, the Supreme Court emphatically rejected the assertion that it was permitting the imposition of burdens against "any group which pursues unpopular political objectives or which expresses an unpopular political ideology." 367 U.S. at 104. As the Court put it:

> Nothing which we decide here remotely carries such an implica-
> tion. The Subversive Activities Control Act applies only to
> *foreign-dominated* organizations which work primarily to ad-
> vance the objectives of a world movement controlled by the
> government of a *foreign* country. . . . It applies only to organiza-
> tions directed, dominated, or controlled by a *particular foreign*
> country.

*Id.* (emphasis in original). Similarly, in *Zemel* v. *Rusk*, 381 U.S. 1 (1965) and *Regan* v. *Wald*, 468 U.S. 222 (1984), the Supreme Court upheld restrictions on travel by American citizens to Cuba. In both cases, the court distinguished prior cases invalidating international travel restrictions on Communist Party members on the ground that the Communist Party restrictions were based on political belief and affiliation, while the restriction on travel to Cuba was based

112

on the current policy of the United States toward Cuba's government. *See Zemel*, 381 U.S. at 13; *Wald*, 468 U.S. at 241. *Cf. Aptheker* v. *Secretary of State*, 378 U.S. 500 (1964); *Kent* v. *Dulles*, 357 U.S. 116 (1958). In short, the fact that ideological differences often motivate the political branches to take adverse action against a foreign nation does not mean that restrictions on United States citizens vis-a-vis that government are "content-based" for First Amendment purposes.[4]

Such non-content-based restrictions furthering foreign policy objectives would, at most, be scrutinized under the test for "incidental" restrictions on speech employed by the Supreme Court in *United States* v. *O'Brien*, 391 U.S. 367, 377 (1968). In that case, the Court established four requirements necessary to sustain government action not intended to suppress speech but having some effect on speech as a by-product of the government action. One must assess: (1) whether the restriction is within the constitutional power of the government; (2) whether it furthers an important or substantial interest; (3) whether the governmental interest is unrelated to the suppression of free expression; and (4) whether the incidental restriction on alleged First Amendment freedoms is any greater than is essential to the furtherance of that interest.[5] In two later cases, the Court apparently added a fifth criterion: that there be available alternative means of communication. *City of Renton* v. *Playtime Theatres, Inc.*, 475 U.S. 41 (1986); *Young* v. *American Mini-Theatres Inc.*, 427 U.S. 50 (1976). As explained below, restrictions on an agency relationship with a foreign government — ranging from outright prohibition of the relationship to those restrictions which tend to inhibit its formation — meet

---

[4] Restrictions on the physical presence of a foreign sovereign in the United States do have the collateral consequence of limiting somewhat the ability of citizens directly to receive information and ideas from that sovereign. The Supreme Court in *Mandel* held that such a limitation is sufficient to trigger a First Amendment inquiry. However, as noted, the finding that the reason for the restriction was facially legitimate and *bona fide* obviates the need for further consideration or balancing of the citizen's First Amendment interest. *See Mandel*, 408 U.S. at 770. Again, *Zemel* and *Wald* add further support outside the specific immigration context. Both cases held that Congress' decision to foreclose travel to a foreign country for a weighty foreign policy interest, to which the courts will give substantial deference, is sufficient to justify the diminished information-gathering ability resulting from the travel ban. As the *Zemel* court put it:

> There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion on the way the country is being run, but that does not make entry into the White House a First Amendment right. The right to speak in public does not carry with it the unrestrained right to gather information.

381 U.S. at 16–17. We think this principle would apply with at least equal force in this context; we can perceive no distinction between preventing Americans from traveling abroad to exchange information with foreigners and preventing foreigners from traveling here to exchange information with Americans.

[5] This test was used by this Office in analyzing the proposed closure of the Rhodesia Information Office. *See* Memorandum from John M. Harmon, Assistant Attorney General, Office of Legal Counsel at 5–8 (Dec. 13, 1977) (Harmon Memorandum). The *O'Brien* test was also applied in a series of lower court decisions which upheld restrictions on the importation of publications and films under the Trading with the Enemy Act, a situation similar to that presented here. *See Teague* v. *Regional Comm'r of Customs*, 404 F.2d 441, 445 (2d Cir. 1968), *cert. denied*, 394 U.S. 977 (1969), *American Documentary Files, Inc.* v. *Secretary of the Treasury*, 344 F. Supp 703 (S.D.N.Y. 1972). *Cf. Welch* v. *Kennedy*, 319 F. Supp. 945 (D D.C. 1970). A similar conclusion was reached by the Third Circuit in *Veterans & Reservists for Peace in Vietnam* v. *Regional Comm'r of Customs*, 459 F.2d 676 (3d Cir.), *cert. denied*, 409 U.S. 933 (1972).

each of these criteria. This is certainly true of a regulation mandating the closure of offices maintained at the direction of the PLO, which is, in fact, a less restrictive alternative to a complete prohibition of the relationship:

1. Plainly, a decision to prohibit a relationship with — or to close an office directed and controlled by — a hostile foreign entity is within the constitutional foreign affairs power of government.

2. The action furthers an important interest of the United States government. In the specific case of the PLO, it "was directly responsible for the murder of an American citizen on the Achille Lauro cruiseliner in 1985," S. 1203, 100th Cong., 1st Sess. (1987); it has taken credit for and been implicated in the murders of dozens of United States citizens, including that of a United States ambassador overseas; and it has violated numerous international laws as expressed in several international conventions, *see*, *e.g.*, Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation (Montreal Convention), Sept. 23, 1971, 24 U.S.T. 564, T.I.A.S. No. 7570; Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents (New York Convention), Dec. 12, 1973, 28 U.S.T. 1975, T.I.A.S. No. 8532 (*quoted in Tel-Oren* v. *Libyan Arab Republic*, 726 F.2d 774, 806–07 (D.C. Cir. 1984), *cert. denied*, 470 U.S. 1003 (1985)). It is vital for the United States, as a world leader in the fight against terrorism, to be able to deny to the PLO access to its shores, and to give force to the Executive's decision not to recognize it.

3. The governmental interest here is not directed at suppressing free speech. Prohibiting a citizen from serving as the agent of a foreign government effectuates the President's decision not to recognize a foreign political entity, as does closing the offices of the PLO or those of its agents. In the specific case of the PLO, the purpose of the closure is to discourage terrorism and international lawlessness. What is at stake here is "the very delicate, plenary and exclusive power of the President" in the field of international relations," *United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936), which includes the constitutional authority and responsibility to recognize, or not to recognize, the representatives of a foreign state or regime, *see United States* v. *Pink*, 315 U.S. 203, 229 (1942). Again, with respect to the PLO, if other offices of the PLO or its agents were present in the United States, including offices that do not engage in expressive activity, they would similarly be closed. Thus, the closing of the PLO's offices — or those of its principals or partners — is only incidental to the fulfillment of the President's decision not to recognize the PLO and of the purposes that decision is intended to achieve. Also, the restriction on speech is not great — speech *of the PLO* is prohibited, but speech *of others* favoring the PLO or advancing the PLO's interests is not.

4. Whatever incidental restriction is imposed on alleged First Amendment freedoms in prohibiting agency relationships. or in closing the PLO's offices, or those of its agents, is no more than the minimum necessary to carry out the President's decision with respect to foreign political entities such as the PLO. Neither Congress nor the President could act to expel a foreign political entity

114

from the United States if such an entity could continue to direct the actions of agents here or if the closing of that foreign entity's office were forbidden. The essence of a presence is an office. So long as the PLO and its agents have agents and offices here, the President's decision to expel the PLO as a sign of nonrecognition is not fully executed.

5. Finally, in assessing the available alternative means of communication, it is important to note what these kinds of restrictions on an agency relationship with a foreign political entity does *not* do. In the case of the proposed closure, it does not prevent anyone in the United States from engaging in "independent advocacy" of the Palestinian cause, raising money from the public, or using personal funds in any amount for this purpose. This includes Palestinians in the United States (although they could not, of course, be supported by funds transferred in violation of any legislation which prohibited such a funds transfer). *Cf. Buckley* v. *Valeo*, 424 U.S. 1, 47–54 (1976). Prohibiting a citizen from acting as an agent or closing a foreign entity's office would not place our government in the role of censor or as an inspector or appraiser of ideas. *Lamont* v. *Postmaster General*, 381 U.S. 301 (1965).

In sum, with respect to closure of the PIO, the availability of alternative means for communication minimizes the possibility that Americans will not be able to communicate the point of view of the PLO. The same can be said about the termination of an agency relationship with any foreign political entity. These alternatives serve to demonstrate that the restrictions are no greater than necessary and that the government's purpose is plainly not to curtail the free flow of ideas and open debate of issues of national importance. *See Pell* v. *Procunier*, 417 U.S. 817, 824–28 (1974). *Cf. Kleindienst* v. *Mandel*, 408 U.S. at 765. The PLO may freely mail material to the United States, provide interviews to the American and world press, place political advertising, and use any means of communication other than offices or agents supported by funds in a manner that would violate the proposed restriction.

Accordingly, we believe that the First Amendment permits the federal government to prevent a direct agency relationship between a foreign sovereign and domestic organizations or persons. We are constrained, however, to add several important caveats to avoid any misunderstanding of this general statement.

First, and perhaps most important, we must emphasize the distinction between prohibiting an agency relationship and attaching unrelated burdens on the basis of that agency relationship. The Court has struck down a variety of schemes which directly punish or withhold privileges or benefits of citizenship because of membership in a political organization. For example, the Court invalidated blanket restrictions on the right of citizens to travel abroad and to be employed in a defense facility where the statute "sweeps indiscriminately across all types of association with Communist action groups, without regard to the quality and degree of membership." *United States* v. *Robel*, 389 U.S. 258, 262 (1967); *Aptheker* v. *Secretary of State*, 378 U.S. 500, 506–07 (1964). These cases reflect the now well-established rule that punishing or restricting a citizen's freedom solely on the basis of association with a group is impermis-

115

sible unless it is shown that "the group itself possessed unlawful goals and . . . the individual held a specific intent to further those illegal aims." *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982).

Because somewhat analogous, albeit not identical, First Amendment interests are implicated in the context of association with foreign governments, it might well be argued that establishing such penalties because of association with a foreign sovereign constitutes similar imposition of "guilt by association." On the other hand, the Court has upheld the imposition of regulations on organizations "substantially directed, dominated, or controlled by the foreign government or foreign organization controlling the world Communist movement . . . and . . . operat[ing] primarily to advance [its] objectives." *Communist Party*, 367 U.S. at 8. We note, however, that the regulations at issue in *Communist Party* largely related to registration and disclosure of membership lists, which are not generally perceived as particularly severe infringements on the freedom of association or speech.

More important for present purposes, it must again be emphasized that the restrictions at issue in *Robel*, *Aptheker*, and *Communist Party* are different in degree and kind from a prohibition directed precisely and only at the act of representation itself. In those cases, the government used the fact of an agency relationship to burden the organization directly, or its members' pursuit of important activities unrelated to participation in the association. In contrast, a policy preventing a formal agency relationship between foreign and domestic entities runs only to representation, it does not burden speech as such.

Citizens affected by the regulation remain entirely free to associate with like-minded citizens, unburdened by regulations and uninhibited in their ability to express their views. The only impediment to First Amendment interests is the prohibition on the domestic organization's official representation of a foreign power. For the reasons discussed previously, we do not view such a facial decoupling as a serious infringement on the freedoms to speak or to associate. Thus a regulation prohibiting, for example, a public relations firm from officially representing a foreign government would pass constitutional muster, while a regulation restricting the firm's other business dealings because of its representation of the foreign entity might well not.

Our second important caveat is that unless the domestic organization officially acknowledges or professes an identity with the foreign power, it is difficult to define with any precision whether and under what circumstances there is a nexus sufficient to treat a domestic organization as legally indistinguishable from a foreign power, with the attendant constitutional disabilities. Such definitional problems are particularly acute with respect to single-purpose organizations, as opposed to individuals or firms which represent a number of different clients. First, there is no bright-line test analogous to citizenship to distinguish American from foreign corporations or associations. Second, unlike individuals, many organizations exist for only one purpose and are defined by that purpose. That is, organizations whose sole purpose is to act on behalf of or advance the interests of a foreign government have no life

116

outside that relationship. Thus, while it is quite possible readily to differentiate between an individual's or, say, a law firm's official and other activities, it is not possible to do so with respect to a single-purpose organization. A ban on acting as an agent of a foreign power is a ban on the existence of such a single-purpose organization determined to be an agent even if this determination is made in the face of its contrary assertions. Thus, discerning the nationality of a single-purpose organization presents distinct conceptual difficulties, and a finding of an agency relationship with respect to such organizations has particularly serious consequences.[6] Although this question is not raised by the proposed closure of the PIO, it is raised by the proposed legislation, which prohibits maintaining offices for or receiving funds from, the PLO's agents.

Various Supreme Court cases dealing with Communist Party membership provide the most direct guidance. As noted above, *Robel* and *Aptheker* invalidated penalties imposed on unknowing party members who did not have a specific intent to further the Party's unlawful aims. Similarly, in *Bridges* v. *Wixon*, 326 U.S. 135 (1945), the Supreme Court refused to allow the deporta-

---

[6] This does not mean, of course, that the courts are foreclosed from making such an inquiry. A person or association which does not openly profess an identity with, or hold itself out as the voice of, a foreign sovereign may nonetheless be treated as such against its wishes. Supreme Court precedent strongly indicates that the United States need not accept a domestic organization's statements regarding its relationship with a foreign government at face value, but may look behind this to determine whether an agency relationship in fact exists. As previously indicated, the Supreme Court gave effect to Congress' definition of the Communist Party as an organization "substantially directed, dominated or controlled" by a foreign power even though the Party itself vigorously resisted any such designation. *See Communist Party*, 367 U.S. at 8–9. Moreover, in *First National City Bank* v. *Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983), the Court found that a Cuban bank which the Cuban government had established as a separate juridical entity should nonetheless not be treated as such, despite the international law principle that a foreign sovereign's determination concerning the separate legal status of its institutions is presumptively valid. *Id.* at 623–28. Concluding that Cuba could not "reap the benefits of our courts while avoiding the obligations of international law," *id.* at 634, the Court declined to "adhere blindly to the corporate form when doing so would cause . . . an injustice." *Id.* at 632. The Court found that the bank's corporate form could not be "interposed to defeat legislative policies." *Id.* at 630. "To hold otherwise would permit governments to avoid the requirements of international law simply by creating juridical entities whenever the need arises." *Id.* at 633. *Cf. National City Bank* v. *Republic of China*, 348 U.S. 356, 360, 362 (1955) ("we have a foreign government invoking our law, like any other litigant, but it wants our law free from the claims of justice").

Thus, the Supreme Court did not give dispositive effect to the views of the Cuban government or the bank concerning the bank's juridical status, but "pierced the corporate veil" to determine the actual relationship between the Cuban government and the bank. Because the Court decided the case solely on the basis of international law and equity, without any specific congressional guidance, it follows *a fortiori* that the courts need not give preclusive effect to a foreign sovereign's characterizations of its institution's legal status where Congress or the Executive has expressed a contrary view. The political branches' view of the status of foreign entities are given substantial deference by the courts. *Cf. Republic of Mexico* v. *Hoffman*, 324 U.S. 30, 35 (1945) ("it is therefore not for the courts . . . to allow immunity on new grounds which the government has not seen fit to recognize"); *Baker* v. *Carr*, 369 U.S. 186, 216, 217 (1962). In this regard, we note that congressional statutes treat distinct juridical entities as foreign states or agents pursuant to definitions relating to the extent of the foreign sovereign's financial or other control over the entity. *See, e.g.*, Foreign Agents Registration Act, 22 U.S.C. §§ 611–620; Foreign Intelligence Surveillance Act, 18 U.S.C. §§ 2511, 2518, 2519, 50 U.S.C. §§ 1801–1811; Trading with the Enemy Act, 50 U.S.C. app §§ 1–44; International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–1706; Foreign Sovereign Immunities Act, 28 U.S.C. § 1603(b)(2).

We therefore conclude that the federal government may treat citizens or domestic organizations as instrumentalities of foreign sovereigns even when the citizen or domestic organization disavows such status. Nonetheless, for First Amendment purposes, the circumstances in which this "piercing the veil" approach would be appropriate would be quite limited and are most difficult to describe in the abstract.

117

tion of an alien who was not proven to be a "member" of the Communist Party and who did not meet the nonexclusive statutory definition of "affiliation." Narrowly defining the statute and the concept of "affiliation," the *Bridges* Court said:

> Whether intermittent or repeated, the act or acts tending to prove "affiliation" must be of that quality which indicates an adherence to or a furtherance of the purposes or objectives of the proscribed organization as distinguished from mere cooperation with its unlawful activities. The act or acts must evidence a working alliance to bring the program to fruition.

326 U.S. at 144–45. Although this line of cases is not directly on point, it may be argued by analogy that if "mere cooperation in the lawful activities" of an organization with unlawful aims is not sufficient to vest an individual member with liability for those proscribed purposes, then a person's or organization's mere cooperation with a foreign power is not sufficient to establish a representative or agency relationship for First Amendment purposes. Rather, there must be a "specific intent" or "working alliance to bring the [foreign power's] program to fruition."

In the *Communist Party* case, as previously noted, the Court upheld restrictions on domestic organizations "substantially directed, dominated, or controlled by" a particular foreign government or organization. There the Court focused on whether such domination could exist only if the foreign government had the "power, in the event of noncompliance, effectively to enforce obedience to its will." 367 U.S. at 36. The Court concluded that this level of domination was not necessary so long as there existed a "relationship in which one entity so much holds ascendancy over another that it is predictably certain that the latter will comply with the directions expressed by the former solely by virtue of that relationship, and without reference to the nature and content of the directions." *Id.* at 38.

The Court upheld the Subversive Activity Board's findings that such a relationship exists between the Communist Party and foreign Communist powers on the basis of the eight factors set forth in the legislation. Among these factors were: (i) the extent to which an organization's policies were formulated and carried out and its activities performed to effectuate the policies of the foreign enemy; (ii) the extent to which its views did not deviate from those of such foreign entities; (iii) the extent to which it received financial or other aid, directly or indirectly from or at the direction of a foreign power; (iv) the extent to which it sent members or representatives to any foreign country for instruction or training in the foreign power's principles; (v) the extent to which it reported to the foreign power; (vi) the extent to which its principal leaders or a substantial number of its members were subject to a recognized or disciplinary power of such foreign entity or its representative; and (vii) the extent to which its principal leaders or a substantial number of its members considered the allegiance they owed to the United States as subordinate to their obligations to a foreign entity. *See* 367 U.S. at 13–14.

As noted, the Court held that the relationship between the Communist Party and foreign powers was sufficient to justify registration and disclosure requirements that would be constitutionally impermissible with respect to domestic political organizations in the absence of such a relationship.

We also stress that any finding of an agency relationship which is based primarily on the similarity between the speech and political activities of the domestic and foreign entities would be constitutionally unsound. The basic rationale for this conclusion is that restrictions on the speech of domestic organizations may be premised on a relationship with a foreign government, but not on the content of the organization's speech. Accordingly, finding an agency relationship on the basis of the content of a domestic group's speech would render this analysis wholly circular and ensnare within its ambit purely domestic groups exercising their First Amendment right to speak in support of foreign entities. Accordingly, similarity of speech cannot be used as a significant or primary indicium of agency.

So long as an organization does not profess an identity with a foreign entity, we believe it would be very difficult to establish an agency relationship sufficient to justify restrictions on expressive activities allegedly within the scope of that relationship absent a direct financial or contractual relationship. We do not believe that such a nexus could be established by virtue of a comparison between the speech of the domestic and foreign entities. Beyond this, any agency analysis would necessarily be a fact-specific inquiry concerning similarity of personnel between the two organizations, whether compliance with the foreign sovereign is voluntary, the nature and extent of contacts between the two organizations, and so forth.

In sum, we believe it is constitutionally permissible to treat domestic agents of foreign governments as unprotected by the Constitution and to sever formal non-speech links between the foreign and domestic entities, but that it is impermissible to restrict the expressive or other activities of American citizens unrelated to their association with a foreign government. We will now apply these general principles to the specific legislation before us.

## II. Application of General Principles

As noted above, the first step in the First Amendment analysis is to identify the party asserting the right of speech or of political association. The PLO is a foreign sovereign or political entity for constitutional purposes. Although the United States chooses not to recognize the PLO as such, the PLO nonetheless interacts with the United States as a foreign political entity within the structure of international law.

The PLO has been accorded observer status at the United Nations, G.A. Res. 3237, 29 U.N. GAOR, 29th Sess., Supp. No. 31, at 4, U.N. Doc. A/9631 (1974). It is reported to have diplomatic relations with approximately one hundred countries throughout the world. *See* Kassim, *The Palestine Liberation Organization's Claim To Status: A Juridical Analysis Under International*

119

*Law*, 9 Denv. J. Int'l L. & Pol. 1, 2–3 (1980). It considers itself a "state" for the purposes of international law, and it claims privileges and immunities generally extended only to a sovereign nation and its representatives.

Although the United States does not afford diplomatic status to the PLO, it accords to the members of the PLO Observer Mission certain privileges relating to entry into and residence in the United States, as well as transit to the United Nations, by virtue of the Headquarters Agreement between the United States and the United Nations. 21 U.S.T. 1416. These privileges would otherwise be denied to these individuals under the so-called Solarz Amendment. *See* 22 U.S.C. § 2691(c). In addition, the PLO claims that it is entitled to even greater privileges and immunities than are accorded under the Headquarters Agreement, although the United States has consistently resisted these claims. The PLO plainly views itself as a foreign sovereign in its relationship to the United States, not "amenable" to United States sovereignty. *The Schooner Exchange*, 11 U.S. (7 Cranch) at 137. As a foreign political entity, the PLO does not itself enjoy constitutional protection.[7]

Whether the PIO is a foreign political entity for purposes of constitutional standing is more problematic. It might plausibly be asserted that the PIO is a juridical entity separate and distinct from the PLO, and is thus not a foreign political entity as such. We need not definitively resolve this issue since the PIO is, at most, a *foreign* juridical person and/or professes an official identity with the PLO. If it is a foreign "person," it is subject to expulsion for any *bona fide* foreign policy reason, regardless of whether that reason is premised on political activities. In any event, because it maintains and professes an identity with the PLO, the same rules governing the United States' legal relationship with the PLO apply to the PIO.

Accordingly, it is immaterial whether the PIO (or the PLO itself) is considered a foreign state or a foreign person, or whether it is viewed as an official representative and voice of the United States of the PLO; in either event, it may be expelled from American soil consistent with the Constitution. Cutting off foreign funding and prohibiting the maintenance of an office are ways in which this permissible goal may be accomplished.

In fact, we have previously so concluded in a virtually identical context. In 1977, this Office concluded that a proposed executive order to close the Rhodesian Information Office (RIO) was constitutional. Harmon Memorandum, *supra*, at 2. There, as here, the United States did not recognize as a legitimate sovereign the government maintaining the office. The order closing

---

[7] It would be anomalous if the Executive's decision to withhold recognition from a foreign political entity — with respect to which it has complete discretion — invested that entity with rights greater than those enjoyed by friendly sovereigns present in the United States. It is clear, for example, that the PLO would not be recognized by American courts as a juridical entity capable of bringing a constitutional claim. *United States* v. *Pink*, 315 U.S. 203, 229 (1942) Neither will the argument that the PLO is not a sovereign nation bring it within the constitutional fold. The PLO cannot have it both ways: it is either a foreign political entity claiming aspects of sovereignty interacting with the United States within the structure of international law, or it is a purely domestic organization, subject to the sovereignty of the United States and all of its laws, with no diplomatic status.

**0390**

the RIO was pursuant to a program of international sanctions in which the United States had participated for twelve years. The United States viewed the government as an "illegal racist minority regime." 77 Dep't St. Bull. 64 (1977) (*quoted in* Harmon Memorandum, *supra*, at 2–3). Plainly, the United States did not regard Rhodesia as a "co-equal" sovereign, and had no formal diplomatic relations with Rhodesia. Nevertheless, interpreting *Mandel*, this Office concluded that any limits placed on the information-gathering abilities of citizens were indistinguishable from that involved in *Mandel* and were therefore permissible. We stated:

> A fair reading of that decision suggests that in a case such as the present one involving a foreign affairs power where Congress has conferred discretion on the Executive, a showing that the reason for the action is facially legitimate and bona fide would conclude the matter. Clearly as we have shown, that is the case here.

Harmon Memorandum, *supra*, at 4. The reason justifying closure in that case — that the United States was obligated as a matter of international law to implement United Nations Resolution 409 imposing mandatory sanctions on the government in Southern Rhodesia — was certainly no more legitimate than the reasons here. The PLO is an avowed terrorist organization. It is a declared policy of the United States that terrorism presents a serious danger to civil order. That policy has been embodied in a wide array of legislation. For example, Congress has asserted jurisdiction over terrorist attacks against United States aircraft, 18 U.S.C. § 32, and against American citizens abroad, 18 U.S.C. § 2331. The President is authorized to provide special assistance to other parties to combat terrorism, 22 U.S.C. § 2349aa-2, to ban imports to and exports from Libya, 22 U.S.C. § 2349aa-8, or any other country supporting terrorism, 22 U.S.C. § 2349aa-9. The closing of offices maintained at the direction of the PLO would further serve this important policy.

The Harmon Memorandum also analyzed the closing of the RIO with respect to the constitutional rights of United States citizens. Applying the *O'Brien* test, this Office concluded that closing the information office of a foreign entity is a valid exercise of government power. *See also* "The President's Authority to Take Certain Actions Relating to Communications from Iran (Dec. 27, 1979)," 4A Op. O.L.C. 153, 158 (1980) (opining that the United States probably could sever "all telephonic, postal, communication satellite, and microwave links" with Iran in connection with the hostage crisis).

We conclude therefore that, whatever standard of analysis is adopted, the proposed closure does not violate the First Amendment.

### III. An Analysis of S. 1203 and H.R. 2587

H.R. 2587 and S. 1203 each contain three basic prohibitions. They make unlawful, "if the purpose is to further the interests of the Palestine Liberation

Organization or any of its constituent groups . . . or any agent thereof": (1) the receipt of "anything of value, except informational materials," from the PLO, its constituent groups or agents; (2) the expenditure of any such funds; (3) the establishment or maintenance of an office in the United States "at the behest or direction of or with funds provided by" the PLO, its constituent groups or agents. H.R. 2587, § 3, 100th Cong., 1st Sess. (1987). Section 4 of H.R. 2587 and of S. 1203 states that "the Attorney General shall take the necessary steps and institute the necessary legal action to effectuate the policies and provisions of this section."

As an initial matter, we believe that requiring the Executive Branch to take legal action against offices connected with the PLO may well unconstitutionally infringe on the President's right to receive ambassadors, and therefore recommend against the enactment of this legislation. The right to decide whether to accord to the PLO diplomatic status and what that diplomatic status should be is encompassed within the right of the President to receive ambassadors. U.S. Const. art. II, § 3. This power is textually committed to the Executive alone. *See Baker* v. *Carr*, 369 U.S. 186, 212–13 (1962); *Jones* v. *United States*, 137 U.S. 202, 213 (1890). Under the proposed bills, the President may, as a practical matter, establish diplomatic relations with the PLO only if he certifies to the President *pro tempore* of the Senate and to the Speaker of the House that the PLO, and "its constituent groups, and all successors and agents of the PLO groups, no longer practice or support terrorist actions anywhere in the world." In our view, attaching such conditions to the Executive's absolute power to receive ambassadors constitutes a serious infringement on the President's recognition authority. This problem is seriously exacerbated by the provision directing that the Attorney General "*shall*" take necessary legal action to enforce the bill's prohibitions.

To be constitutional, therefore, two changes would have to be made to the proposed legislation. First, § 5(b) of each bill should be changed so that it would permit the establishment of any PLO diplomatic premises the President, for whatever reason, elects to recognize formally.[8] Next, the section *requiring* the Attorney General to take the steps necessary to effectuate the policies of the bill, must be changed to *authorize* him to take such steps. With that preface, we now turn to a discussion of the specific provisions of the bills and their validity under the First Amendment.

*A. Restriction of PLO Funds*

We have little doubt that the political branches may prohibit the flow of funds into the United States. This choice to "accommodat[e] the exigencies of self-preservation and the values of liberty," *Communist Party*, 367 U.S. at 96, is within the authority of the political branches. This Office reached that

---

[8] This change would have the salutary effects of excepting the PLO Observer Mission to the United Nations and precluding the need to repeal this legislation in the event United States policy changes regarding diplomatic recognition of the PLO.

0392

conclusion in assessing the constitutionality of the imposition of mandatory sanctions on Rhodesia, *see* Harmon Memorandum, *supra*, at 3, and has assumed the constitutionality of the International Emergency Economic Powers Act, 50 U.S.C. §§ 170–176, which gives the President the power to regulate direct investment, *see* "Legality of Certain Non-Military Action Against Iran," 4A Op. O.L.C. 223, 223–24 (1980). *See also Nielsen* v. *Secretary of the Treasury*, 424 F.2d 833 (D.C. Cir. 1970) (upholding constitutionality of predecessor act); *Pike* v. *United States*, 340 F.2d 487 (9th Cir. 1965) (upholding constitutionality of predecessor act). Congress has often acted to freeze or seize foreign state property. For example, the Trading with the Enemy Act, 50 U.S.C. app. §§ 1–44, has been used to block assets of, and prevent funds transfers to, adversaries including North Korea and North Vietnam. Cuban assets frozen in response to Castro's nationalization program are still blocked. *See* Cuban Assets Control Regulations, 31 C.F.R. § 515 (1986). Economic sanctions have been imposed against numerous countries, including the Soviet Union, *see* 15 C.F.R. § 385.2 (1986), Libya, *see* 15 C.F.R. § 385.7 (1986), South Africa, *see* Exec. Order No. 12532, 3 C.F.R. 387 (1985); Comprehensive Anti-Apartheid Act of 1986, Pub. L. No. 99–440, 100 Stat. 1086 (1986), and Nicaragua, *see* Nicaragua Trade Control Regulations, 31 C.F.R. § 540 (1986). The Supreme Court has upheld restrictions on the contributions of funds intended for use to finance exercise of the right of freedom of expression in far more sensitive areas. *Buckley* v. *Valeo*, 424 U.S. 1, 29 (1976). Here, where any impingement on speech is plainly incidental to the prohibition of funds transfers — a nonspeech activity — the restrictions on the receipt of PLO funds is surely constitutional.[9]

## B. First Amendment Concerns

However, the prohibition against opening or maintaining an office "at the behest or direction of" the PLO clearly has a broader reach than proposed restrictions applying only to the PIO as currently constituted or its constituent groups. Accordingly, we must determine whether opening such an office is an act of agency for the PLO or whether the bill otherwise survives constitutional scrutiny.

The language of the proposed bills may not be sufficiently precise to reach only agents of the PLO. This inquiry turns in large part on how one defines the meaning of "at the behest . . . of" and the prohibition of maintaining an office for, and receiving funds from, agents of the PLO. As discussed above, the more attenuated the nexus between a foreign power and the domestic citizen or organization, the more constitutionally suspect the restriction.

Given the importance of the concept of agency to our analysis and to the proposed legislation, we turn to a description of the circumstances in which a

---

[9] We assume as a matter of logic that a permissible restriction on the receipt of funds necessarily makes permissible a prohibition of the expenditure of those same funds. The latter merely serves to implement the former.

0393

domestic organization or person is accorded the constitutional nonstatus of the foreign power for all purposes or, alternatively, the circumstances in which there are sufficient links between the foreign and domestic entities to justify some less intrusive restrictions on the domestic actor. We also set forth various formulations of agency to determine which might best be added to the legislation to cure any potential vagueness or overbreadth problems.

The myriad of formulations used to define an agency relationship "carries meaning only as a situation in human relationships which arises and takes shape in different modes and patterns in the context of different circumstances." *Communist Party*, 367 U.S. at 37. Moreover, any such attempt at a regulatory definition should be as narrow and as precise as feasible in order to enhance its constitutional viability. For, as a general rule, "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton* v. *Tucker*, 364 U.S. 479, 488 (1960). Although the general rule is tempered in the foreign affairs field by the Court's oft-repeated admonition that regulations in this area may sweep with a broader brush and that distinctions "need not be as 'carefully tuned to alternative considerations,'"[10] it nonetheless remains true that precision in regulation is an important virtue when First Amendment interests are implicated.

Activities at the extremes are easy to classify. Plainly, First Amendment protection extends to all the expressive activities of the United States citizen who, without ever having contact with a PLO, forms an organization called "Friends of the PLO," finances it entirely without PLO funds, and writes or distributes literature spreading the teachings of the PLO. It is equally clear that an official diplomatic agent is "identified completely with the foreign state" so that "his communications, like his acts, are treated as if they were those of the sending state." Harmon Letter, *supra*, at 7. Although the PLO is not recognized by the United States and thus has no agents with official diplomatic status, by analogy we think it clear that if a member of the PLO addresses the United Nations on behalf of the PLO, his "speech" is not protected by the Constitution. His speech is protected solely by the agreement between the United States and the United Nations, which is the reason and the condition for the PLO's official presence in the United States.

In between these two extremes lies a constitutional gray area. Consideration of other formulations used to describe various agency relationships may shed some light on where a line may properly be drawn. The Restatement of Agency defines an "agent" as a "fiduciary relation [with the principal] which results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control." *Restatement (Second) of Agency*, § 1 (1958). We think that this definition would withstand constitutional scrutiny, because the requirement of manifest consent to the principal's control may fairly be said to cloak the agent with the constitutional non-status of his foreign

---

[10] *Fiallo*, 430 U.S. at 799 n.8 (quoting *Trimble* v. *Gordon*, 430 U.S. 762, 772 (1977)).

principal. We also think that the definition of an "agent of a foreign power" contained in the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801(b), would be constitutionally defensible. "Agent of a foreign power" is there defined as:

> (1) Any person other than a United States person, who —
>> (A) acts in the United States as an officer or employee of a foreign power, or as a member of a [group engaged in international terrorism or activities in preparation therefor];
>
>> (B) acts for or on behalf of a foreign power which engaged in clandestine intelligence activities of the United States . . . or when such a person knowingly aids or abets any person in the conduct of such activities . . . .

50 U.S.C. § 1801(b).

In contrast, we believe the definition of an agent used under the Foreign Agents Registration Act probably sweeps too broadly to impose restrictions other than registration requirements. In that Act, an agent is defined, *inter alia*, as "any person who acts as a representative . . . or . . . in any other capacity at the request of . . . a foreign principal . . . [and who] engages in political activities within the United States for or in the interest of such foreign principal[s] . . . ." 22 U.S.C. § 611(c)(1) (Foreign Agents Registration Act of 1938, as amended). Courts are apt to require as narrow and restrictive a definition of agency as possible to limit the potential infringement on citizens' First Amendment rights.

Thus, if "behest" is read to mean "at the request of" the PLO, the legislation probably sweeps within its ambit action taken outside of an agency relationship. Voluntarily acquiescing in a single request by Yasir Arafat to open or maintain an office is not sufficient to establish that one is thereby acting as his agent; it may be "mere cooperation" with the PLO. "Behest" may be read far more narrowly, however, thus minimizing such over-breadth problems. *Webster's Third International Dictionary* defines "behest" as "a command; a mandate; an injunction." The *American Heritage Dictionary*, however, defines behest as *both* "[a]n order or authoritative command" and "a request or bidding."

It is thus unclear whether the bill imposes a prohibition that embraces the acts of citizens who are not PLO agents or reaches only those persons who, by virtue of their agency relationship with the PLO, have adopted its constitutional nonstatus. This definitional ambiguity is of obvious significance. Commands are generally given by a principal to an agent; requests are made by one co-equal party to another. Acceding to an "order" or "authoritative command" of the PLO to open an office could thus naturally be viewed as an act of agency, while acquiescing in a request should not be so viewed.[11]

---

[11] For this reason we would have serious doubts about any proposed bill that, for example, would prohibit speech or the dissemination of information "at the behest of the PLO." Of course, neither H.R. 2587 nor S. 1203 imposes such a direct prohibition on expressive activity. Rather, they restrict only the maintenance of an
Continued

Accordingly, we believe that the safer course would be to change the language of H.R. 2587 and S. 1203 to eliminate the phrase "at the behest of" and to draft the bill focusing only on those acting at the "direction" and/or "control" of the PLO. As noted above, this language has been deemed acceptable by the Supreme Court in the past in the *Communist Party* case. It avoids the problem of including within the statute's restrictions the kind of conduct considered to be constitutionally-protected "affiliation." Alternatively, if the phrase "at the behest of" is to be included in the bill, the legislative history should indicate as clearly as possible that the more restrictive definition of "behest" is the one intended for use in applying the statute.

## C. Bill of Attainder

Finally, that the PLO is named in the bill does not make it unconstitutional as a bill of attainder, for it is not "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon* v. *Administrator of General Services*, 433 U.S. 425, 468 (1977). As noted above, the Bill of Attainder clause of the Constitution does not apply to the PLO. Furthermore, with respect to American citizens, these bills do not satisfy any of the three requirements that make a bill of attainder: (i) they lack the requisite specification for affected persons; (ii) they are not a legislatively-imposed punishment; and (iii) punishment is not being imposed without a judicial trial. *Selective Service System* v. *Minnesota Public Interest Research Group*, 468 U.S. 841, 847 (1984).

First, the statutes do not use past activity as "'a point of reference for the ascertainment of particular persons ineluctably designated by the legislature' for punishment." *Id.* (quoting *Communist Party*, 367 U.S. at 87). Congress' purpose here is to discourage terrorism and to give effect to the Executive's decision not to recognize the PLO. The acts would apply only to those who contravene their prohibitions; any individual can avoid their application simply by not engaging in the forbidden activities.

Next, even if the specificity element is deemed satisfied, the bills do not implicate the Bill of Attainder clause because they do not "inflict forbidden

---

[11] (. . . continued)

office at the PLO's behest. Thus, we believe the bills might nonetheless withstand constitutional scrutiny. Maintaining an office, while perhaps an important symbolic action, is not a restriction on speech *per se*. The incidental restriction on speech seems necessary to a legitimate foreign policy goal, and the restriction does not prevent the flow of information about the PLO to American citizens. For example, the PLO and its agents may provide interviews to the press, issue press releases, place political advertising, and so forth. *See United States* v. *O'Brien*, 391 U.S. 367, 377 (1968). Of course the PLO's citizen-friends, acting in their individual capacities, may continue to communicate information as they choose.

Nor do the bills unduly restrict the associational rights of American citizens. *Zemel* v. *Rusk*, 381 U.S. 1 (1965) and *Regan* v. *Wald*, 468 U.S. 222 (1984), establish that the right to associate with foreign entities is by no means absolute. *See Kleindienst* v. *Mandel*, 408 U.S. 753 (1972). The restriction on the maintenance of an office — like the restrictions on travel by American citizens to Cuba — furthers important foreign policy objectives of the United States. Each is based on the current policy of the United States towards that foreign entity with which association is restricted. The restriction is incidental to the achievements of important foreign policy goals and is narrowly drawn.

126

punishment," *Selective Service*, 468 U.S. at 852. The sanction is merely forbidding the maintenance of an office on behalf of, and the receipt or expenditure of funds from the PLO. Citizens "'carry the keys of their prison in their own pockets,'" *Id.* at 853 (quoting *Shillitani* v. *United States*, 384 U.S. 364, 368 (1966)). The bill serves important nonpunitive goals: to combat worldwide terrorism and deter the PLO's illegal activities.[12] Forbidding the PLO to be represented here is "plainly a rational means," *id.*, towards accomplishing the congressional goal of deterring the PLO's terrorist activities. Congress seeks not to punish, but to promote compliance with international law. No punishment has been imposed without a judicial trial. No one is punished by the statute automatically — the Attorney General must bring an action to enforce the statute in court.

The *Communist Party* case supports this conclusion that the bills are not bills of attainder. There, the bill was aimed at the Communist Party as an identifiable entity. 367 U.S. at 82. The Court held that the "Act is not a bill of attainder," for "[i]t attaches not to specified organizations but to described activities in which an organization may or may not engage." 367 U.S. at 86. Domestic organizations supporting the PLO are simply prohibited from maintaining an office on its behalf or at its direction and from receiving money from it. Forbearance from such activities will insulate the group or individual from prosecution. In enacting either of these bills, Congress would be making a legislative finding to regulate activity "potentially dangerous to the national interest." *Id.* at 88. They are not bills of attainder.

### Conclusion

The PLO *qua* PLO, as a foreign entity, has no constitutional rights. Nor do those individuals and organizations who act at the direction and control of the PLO, even if engaged in otherwise constitutionally protected activities, so long as they act in their capacity as agents of the PLO. Although the determination of when and whether an individual or group is acting as the agent of a foreign entity is a difficult one, a restriction can be narrowly drawn to limit the application of the restriction to United States citizens only insofar as they are acting as the PLO's agents. H.R. 2587 and S. 1203, to the extent that they might require the closing of the PIO, therefore, are constitutional so long as the PIO either is itself a foreign entity or is an agent of the PLO, acting at its direction and control. Broad restrictions on the receipt of funds in the United States from the PLO or its agents are in any event constitutional.

MICHAEL A. CARVIN
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[12] In this context, it is worth noting that the bill would continue in effect only until such time as the President certifies that the PLO no longer practices or supports terrorism. H.R. 2587, § 5; S. 1203, § 5.

0397

# EXHIBIT F

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 14-7170                                     September Term, 2015

FILED ON:   JANUARY 15, 2016

MICHALI TOUMAZOU, ET AL.,
                          APPELLANTS

v.

TURKISH REPUBLIC OF NORTHERN CYPRUS, ET AL.,
                          APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-01967)

Before: HENDERSON, GRIFFITH, and KAVANAUGH, *Circuit Judges*.

## J U D G M E N T

This case was considered on the record from the United States District Court for the District of Columbia and on the briefs and oral arguments of the parties. The Court has afforded the issues full consideration and has determined that they do not warrant a published opinion. *See* FED. R. APP. P. 36; D.C. CIR. R. 36(d). For the reasons stated below, it is

**ORDERED AND ADJUDGED** that all orders of the district court on appeal be **AFFIRMED**.

The putative Toumazou class is a group of Cypriots who were allegedly displaced during events that led to the formation of the Turkish Republic of Northern Cyprus (TRNC). Before the district court, the putative class asserted numerous claims alleging that the TRNC is engaged in an ongoing conspiracy with HSBC Holdings, PLC and HSBC Bank USA, N.A. to interfere with the class members' real and personal property in Cyprus by, in part, selling property in the United States. The district court dismissed these claims and, at the same time, denied the putative class the opportunity to conduct jurisdictional discovery and leave to file a third amended complaint. We affirm.

The putative class failed to establish that the district court had personal jurisdiction over the TRNC based on the asserted claims. To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), a plaintiff must make a prima facie showing of specific and pertinent jurisdictional facts that connect the defendant to the forum. *See First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378-79 (D.C. Cir. 1988). A plaintiff cannot carry this burden by making only bare allegations or conclusory statements. *Id.* And, for specific jurisdiction, a plaintiff must

**0399**

allege that the defendant's contacts with the forum gave rise to the asserted claims. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011); *see also* D.C. CODE § 13-423. Here, the plaintiffs failed to carry this burden because they never identified any specific sale or advertisement of their property by the defendants that occurred in the United States, much less the District of Columbia. Because the plaintiffs also expressly conceded in their brief before this court that there is no basis for general personal jurisdiction, we do not consider that issue. The district court thus properly dismissed the claims against the TRNC for lack of personal jurisdiction.

For a similar reason, the district court did not abuse its discretion by denying the putative class jurisdictional discovery. A court may deny jurisdictional discovery in "the absence of any specific indication . . . regarding what facts additional discovery could produce that would affect" the court's jurisdictional analysis. *Cheyenne Arapaho Tribes of Okla. v. United States*, 558 F.3d 592, 596 (D.C. Cir. 2009) (quotation marks omitted). Although it was given repeated opportunities to identify such useful facts, the putative class instead continued to base its request for jurisdictional discovery on vague descriptions of an alleged conspiracy and mischaracterizations of the jurisdictional evidence provided by the TRNC. The district court was thus well within its discretion to deny jurisdictional discovery.

The district court also did not abuse its discretion in denying the putative class's request to amend its complaint a third time. While Federal Rule of Civil Procedure 15 requires the court to freely give leave to amend a complaint when justice so requires, leave may be denied due to futility. *See Richardson v. United States*, 193 F.3d 545, 548-49 (D.C. Cir. 1999). The district court properly concluded that amendment would be futile in this case because the putative class's third amended complaint failed to allege any additional specific facts that would cure the deficiencies of its second amended complaint.

Finally, the putative class makes no viable argument that the district court erred by dismissing the claims against the HSBC defendants. We will not consider the putative class's new argument regarding HSBC's liability because the class failed to present that claim to the district court. Because the putative class also does not challenge either of the district court's grounds for dismissing its other claims against the HSBC defendants, we will not consider whether the district court erred in dismissing those claims. *See Harris v. U.S. Dep't of Veterans Affairs*, 776 F.3d 907, 915 (D.C. Cir. 2015).

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or rehearing en banc. *See* FED. R. APP. P. 41(b); D.C. CIR. R. 41(a)(1).

<u>**Per Curiam**</u>

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:    /s/
        Ken Meadows
        Deputy Clerk

**0400**

# EXHIBIT G

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 2 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 1 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 129

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHALI TOUMAZOU, *et al.* | : |
| | : |
| Individually and on behalf of all others similarly situated | : |
| | : |
|     Plaintiffs, | : |
| | : |
| v. | : Case No. 09-1967 (PLF) |
| | : |
| | : |
| TURKISH REPUBLIC OF NORTHERN CYRPUS, e*t al.* | : |
| | : |
|     Defendants. | : |
| | : |

## **PLAINTIFFS" OPPOSITION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS[1]**

The United States Court of Appeals for the 7th Circuit, in affirming a decision where the now Defendant "TRNC" sought to intervene in litigation involving property from the north of Cyprus namely, Christian mosaics, by wrongfully claiming title to the property under its constitution, quoted the Siege of Corinth by Lord Byron.  "As Byron's poems laments, war can reduce our grandest and most sacred temples to mere "fragments of stone". Only the lowest of scoundrels attempt to reap personal gain from this collective loss.  Those who plundered the churches and monuments of a war-torn Cyprus , hoarded their relics away, and are now smuggling and selling them for large sums, are just such blackguards" See *Autocephalous Greek Orthodox Church of*

---

[1] Plaintiffs' counsel has experience more than his share of computer issues unrelated to the scanner but in an attempt to upload the files that are substantial, the files were not loading properly despite accessing the ecf  filing system on the evening of May 4, 2010 to file. Plaintiffs' counsel has been the victim of a cyber attack on his computer system that was thought to have been resolved. Plaintiff is submitting this late due to the problems uploading files and in the event the files cannot be filed electronically, what can be filed will and the remaining shall be presented to the clerk in the morning of May 5, 2010 for a solution.  Plaintiff's counsel apologizes to the court and Defendant who will not be prejudiced unfairly by the additional hours needed to accomplish this filing one way or the other.

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 3 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 2 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 130

*Cyprus, et al v. Goldberg, et al 917 F.2d 278 (7th Cir. 1990)*. The court rightfully resolved the title to property in favor of the Church of Cyprus.

According to the affidavit of the so called "TRNC" Representative in Washington DC, Himil Akil, the sole purpose for the "TRNC" office in the United States is to "interact with the United States Federal Government... gathering information on legislation and U.S. Policies that may impact Turkish Cypriot people and informing the U.S. Government of my Government's position and opinions vis-à-vis such legislation and policies".  The credibility of the "TRNC" and its agents are simply tumbling while not respecting the laws of the District of Columbia or United States.

## I.    INTRODUCTION AND FACTS SUPPORTING PERSONAL JURISDICTION

This lawsuit brought as a result of the interference and deprivation of the rights towards property belonging to the Plaintiffs and the Class by the pseudo state, Defendant so called "TRNC"  from at least 1983 and continue to do so to the present (See Sec. Am. Comp. ¶¶ 2,3,8,9,10, 17-21, 31, 34, 35, 39-42, 45-60, 64-71).

The Defendants "TRNC" and HSBC[2] are actively engaged in the advertising, marketing, financing, encumbering, developing, leasing, renting, using or selling of property belonging to the plaintiffs and the Class, and restricting their return by the threat of force, in violation of law (id. Also See ex. 5,7 and 8). The pseudo state "TRNC" is more closely associated with an illegal criminal syndicate than that of a government, as it has and continues to wrongfully interfere with the rights of property owners and discriminate against them  (Id.).  The United States Government has issued warnings to banking institutions about dealing with the TRNC.  As a matter of fact, the State Department website has issued warnings about the title of the property, yet HSBC knowingly assisted in interfering with the rights to property of hundreds of thousands of individuals, including the Plaintiffs and the Class (Id.).  The

---

[2] HSBC refers to all the banks using the HSBC named in the Complaint or otherwise referred to therein.

Case 1:21-cv-03043-RM-STV    Document 69-8    Filed 09/19/22    USDC Colorado    Page 4 of 22
Case 1:09-cv-01967-PLF    Document 20    Filed 05/05/10    Page 3 of 21
Appellate Case: 23-1286    Document: 010110991829    Date Filed: 01/29/2024    Page: 131

pseudo state, "TRNC", illegally governs, sells, finances, rents, leases, advertises, taxes, profits and markets the properties, businesses and lands belonging to the Plaintiffs' and the Class to others, including third parties, under a fraudulent property scheme involving HSBC, real estate brokers and other companies located in the U.S and elsewhere (Id).; See Also Ex. 1 and 5).

The so called "TRNC", is not sovereign nation, government or diplomatic body recognized by the civil world nor by the executive office of the United States but acts as an unincorporated association committing illegal acts towards the Plaintiffs and the Class, that is not registered with the authorities of the District of Columbia or obtaining U.S. diplomatic status exemptions (id.).  The 'TRNC" believes it has duped authorities by concealing who and what it is, which includes Himil Akil, a known lobbyist and representative of the "Turkish Cypriot Community" as proclaimed by the U.S. Government, and not a representative of the "TRNC" or any it government. (See Ex.2 - Ltr. from US Dept of State- June 14, 2007 addressed to whom it may concern). Mr. Akil, despite his audacious reference as an ambassador in the U.S, is nothing more than a lobbyist and representative of a "Turkish Cypriot Community" and not a diplomat visa or the representative of the "TRNC" or so called 'Turkish Republic of Northern Cyprus" (Ex. 1 and 2).  In the eyes of the U.S. Government and the courts, Mr. Akil is a lobbyist given a business visa to conduct his business and treated as such by the U. S Government concealed within the Defendant's exhibits. (See Ex. 3 -Himil Akil Visa and passport; Also Ex. 2).   The use of "TRNC" as anything related to a government or state, even diplomatic status does not exist in the eyes of the U.S. Government and therefore the courts (See Ex.2).  Therefore, any acts by Mr. Akil and the "TRNC" are pervasive, systematic and continuous in the District of Columbia and the United States since the 1980's that includes references to it as an embassy, government, "defacto" state or  republic, that include  seeking litigation in federal court in 1989, banking transactions with HSBC, website development, hiring employees, meeting with individuals, advertising property, Tips to buy property, how to buy property,

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 5 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 4 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 132

explaining property laws,   (See Sec. Am. Comp. ¶¶ 2,3,8,9,10, 17-21, 31, 34, 35, 39-42, 45-60, 64-71; Ex. 2, Ex. 4- Affid. Izzet Zorlu[3] ¶7; Also See Ex's.,5, 7-8).

No where in any of the Defendant's opposition does it or Mr. Akil, suggest to use the proper title given to it, namely, a lobbyist or the" Turkish Cypriot Community", by the U.S. Government in any material, website content and development, filing court documents, literature, business cards, letterhead, office listing but rather "TRNC"  or "Turkish Republic of Northern Cyprus" and references to Government operations. (Id.).

Despite the assurances of the so called "TRNC" that it resides in the District of Columbia solely for contacts with the U.S. Government[4] (without ever providing a scintilla of proof to a request to come and open offices in the District of Columbia since at least the 1980's). The so called "TRNC" has engaged in the following, unrelated to U.S. Government legislation towards the "Turkish Cypriot Community", activities in the District of Columbia since the 1980's:

1)      In 1989, the "TRNC" through its Washington DC office, sought to intervene in litigation before the USDC in Indianapolis and claim ownership of ancient mosaics

---

[3] Izzet Zorlu has provided an affidavit that is not based on his personal knowledge and therefore improper and should not stand for the purposes provided for by the Defendant.  Likewise, Mr. Himil's affidavit is allegedly based on personal knowledge of facts with exceptions that are not discernable. In other words, it is impossible to view someone appointed to an alleged post as a representative of a "Turkish Cypriot Community" in 2006, to have personal knowledge of facts relating to Cyprus for hundreds of years, let alone not.   Clearly, these are Defendant's self serving declarations sought to interfere with the administration of justice and this court's power over it that necessitates jurisdictional discovery to flush out the facts.   Clearly, the extent of business activity or contacts in the District of Columbia, such as congressmen, DC Government authority to operate in the District, banking information, schedules, appointments, business policies, Himil Akil's  bank account activity, including HSBC, and other employees and staff, any payments made on its behalf, the lease and payments to the landlord, where the money originates, loans provided to or obtained from the SBA.  Also, who constructed its website and provided its content is jurisdictional in nature and is discoverable.  The Defendant and Mr. Akil have the contents of the website and have refused to provide it and rather give us their representative "opinion" of the content.   This is a classic "sandbagging" technique that individuals use to conceal facts and not for the administration of justice perhaps it is the way things are done in the "Turkish Cypriot Community" but not in the United States and certainly not before this court.  I urge the court to compel the discovery that is material and demonstrate the contacts in the District sufficient for personal jurisdiction.
[4] Aff. of Akil.

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 6 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 5 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 133

belonging to the Church of Cyprus, which is the same issue before this court.  (See Ex.

7 ).  The court properly did not recognize it as a state or government[5].

2)       Hiring employees from abroad and sending them as representatives or staff to the

District of Columbia , leasing office space, hiring and paying lawyers, letterhead,

interactive website, phone, email, facsimile, maps and a DC postal address, writing

letters to newspapers, speaking at universities , having offices other  "TRNC"

representative who are business owners, (See Ex. 1-Akil  Aff.; Ex.s' 11, 12).

3)       Involved itself in the Small Business Administration's  "Entrepreneur" conference

held in the Southern United States after it allegedly abandoned its website in 2005, that

ironically was listed in SBA document in its conference material of April 2006. (See

Ex. 9 - Entrepreneur- pp, 60 and 66 in fn. 10, 16).  The trncwashdc.org website appears

with the director of the SBA Mr. Doug Gurley, who suggests the members, that

indicates the trncwashdc.org website/office, provided loans or funds in the amount of

$75,000.00 to assist businesses affected by hurricane Katrina. (Id. Also see Ex. 10-

Doug Gurley statement)

4)       Himil Akil, is a known lobbyist and representative of the "Turkish Cypriot Community

and not the so called "TRNC" and has no diplomatic status or visa, nor is his employer

recognized as a government or state in the United States.  (See Ex.2 )   Despite this,

Mr. Akil held himself out as an ambassador in Washington DC to at least Turkey

without blinking an eye as to the laws of the United States and its rule of law. (See Ex.

1  ¶ 16); also Ex. 14. .

---

[5] The "TRNC"  by filing a counterstatement of facts of 20 pages, and other unrealistic facts attributing the recognition of the "TRNC" as a government or state should not be tolerated by this court pursuant to Article III of the U. S. Constitution. This court is much smarter than what the "TRNC" is trying to sell as if no one would notice. Therefore, Plaintiffs seek to strike all allegations referencing any government action on its part of others and to submit to the court its true identity that being an unincorporated association of the "Turkish Cypriot Community" as properly titled by the U.S. Department of State.   Plaintiffs move this court to strike the content as it reaches the realm of politics and not appropriate for this court to entertain but left to the executive branch.   Plaintiffs will file a separate motion to strike if necessary by the court. (See Ex. 8).

**0406**

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 7 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 6 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 134

5)      Does banking transactions with HSBC and its network of institution under its name
that assist in marketing, sale, advertisement, financing, of properties belonging to the
Plaintiffs and the Class. , (See Sec. Am. Comp. ¶¶ 2,3,8,9,10, 17-21, 31, 34, 35, 39-42,
45-60, 64-71¶, maintained an operated a website with an internet address of
www.trncwashdc.org since the 1990's as admitted by the Defendant. (See  Akil Aff. ¶
28); also Ex.'s 5, 11 and 12).

6)      The website material consist of more than what Mr. Akil is stating in his Affidavit and
includes purchasing property, and other commercial acts, airline fares, cruises, banking
transactions, tourism, laws, and the address of the Washington DC office and contact
information.   The trncwashdc.org website was interactive prior to being taken down
and had substantial visitors (See Ex.'s 5, 16 and 18).

7)      Monies must be transferred to and from banking institutions namely, defendant HSBC,
with whom it conducts business transactions and maintains bank accounts, to at least
pay the over $300,000.00 expenses run through its DC office.

8)      Mr. Akil misrepresents the facts of a disclaimer that the "TRNC" has no control or
authority over  the website www.trncproperty.eu "(Ex. 2 at ¶,33) Rather, the "TRNC"
website under terms and conditions states  in its disclaimer on several pages in bold
lettering that it does belong to the "TRNC"  (See Exhibit 6- Disclaimer).  The
Defendant even admits to several other websites operating without allegedly "TRNC"
authority but fail to divulge the websites. (Id. ¶,34).

9)      The "TRNC" is operating without a business license issued by the DC Government,
nor has it provided any evidence of paying taxes in the District despite admitting to
having and paying employees, having leased office space that requires a certificate of
occupancy that is not shown in any records of the DC Government (See Ex. 14).

10)     The TRNC has a West coast representative (who happens to be a business man and
operating a substantial company) and a NY Representative all using the title of

**0407**

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 8 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 7 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 135

representative of the "Turkish Republic of Northern Cyprus" that does not exist as a recognized or registered entity, let alone a state or government in the District of Columbia (See Ex . 2, 11 , 14 - 16).

## II.   LEGAL ARGUMENT

Defendant has moved, pursuant to Rule 12(b)(2) and (3) of the Federal Rules of Civil Procedure, for an order dismissing this action for lack of personal jurisdiction or Venue[6], and to Dismiss Plaintiff MICHALI TOUMAZOU[7] for failing to provide his exact home address. Defendant's argument throughout its motion is that it is present strictly to interact with the U.S. Government and seeks "defacto" immunity when in fact the Plaintiffs, this court and the world have no idea what the so called "TRNC" really is and is explained herein. What we do know is that "it" is not a government or state which it holds itself out to be to the unknowing public in the United States and has no diplomatic status or recognition whatsoever, which begs the question what is the so called "TRNC".

---

[6] The USDC for the District of Columbia is the proper Venue for this matter because one of the Defendant's, HSBC, at least is properly present in the United States and in the District Columbia. See 28 USC. 1391(b)

[7] The Defendant's attack on a requirement for the home address of MICHALI TOUMAZOU (hereinafter "TOUMAZOU") is misplaced. TOUMAZOU is a professor at a prestigious university and seeks to protect himself and his family from the intrusion of what maybe threats towards him, which is a real fear. TOUMAZOU has asked not to expose his family to any animosity that may exist because of the nature of this case and the political climate. Believing the Local Rule allowed counsel to list the address on the caption TOUMAZOU as filed was sufficient under the Rule that was recently amended. TOUMAZOU lives and works in the town of Davidson, North Carolina and the Post Office Box is located at the University where he works as an internationally acclaimed Archeologist and professor in classics. Plaintiff requests this court to allow TOUMAZOU this small sanctuary. Should this court not agree, Plaintiffs ask to provide the actual home address if necessary, and preferably under seal. Despite the temper of Defendant's argument regarding TOUMAZOU, he is in effect necessary for subject matter jurisdiction, which issue no doubt Defendant seeks to raise should this court dismiss TOUMAZOU. If the court is inclined to do that, Plaintiff asks that this court allow a short period to provide the court that information. I believe the intent of the Rule was to protect forum shopping, and the Plaintiff is a resident of Davidson, NC.

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 9 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 8 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 136

In it's Motion to Dismiss, the so called "TRNC" attempts to trick this court so it may be viewed as it so desperately sought for over 20 years in the District of Columbia, namely a recognized government.  The "TRNC" seeks "defacto" government status by masquerading its so called representatives among embassies, the UN and referring to themselves as either a representative and at times an ambassador, it is clear that members of the public in the District and elsewhere are being tricked by the intentional misrepresentations by this Defendant, when no such entity known as the "TRNC" or "Turkish Republic of Northern Cyprus" exist in the District of Columbia. Moreover, the U.S. Department of State has made it clear, that Mr. Akil is a lobbyist and a representative of the "Turkish Cypriot Community" and does not recognize the pseudo state or "TRNC"  (See Ex.  1, 2 , 6 -8).

Additionally, there is legal support to stop the Defendant from attempting to provide good faith gestures from the United States into being diplomatic status when it is not.  Without giving any substance to its deceptive Motion to Dismiss, one must wonder what is the Defendant thinking parading itself before the court as a government when it is not, hoping the court will provide some recognition that it is a government over nearly 40% of the island nation of Cyprus. It is the Republic of Cyprus that has been the only recognized sovereign on the island except for Turkey. The attempt is clear, that it is trying to use court access to promote that it is a government or state.  From its counter statement of false facts to its disregard for U.S. standards and laws, the "TRNC" cannot be allowed to parade itself before this court and the citizenry of the District of Columbia as a recognized or "defacto" government of the "TRNC" or equivalent. The "TRNC" is not.   Courts in the U.S. admonished the "TRNC" in the past for doing just that when it sought to intervene and take title to mosaics belonging to the Church of Cyprus for over a millennium. This is the same issue here except it now knows it has no defense and chooses to

**0409**

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 10 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 9 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 137

hide. *See Autocephalous Greek Orthodox Church, et al v. Goldberg, et al, 916 F.2d 278 (7th Cir. 1990); See also Autocephalous Greek Orthodox Church v. Goldberg,717 F. Supp. 1374  (IN. 1989)* and are attached as Exhibit 8.

The conduct of foreign relations was committed by the Constitution to the political departments of the government, and the propriety of what may be done in the exercise of this political power [is] not subject to judicial inquiry or decision, . . . [and] who is the sovereign of a territory is not a judicial question, but one the determination of which by the political departments conclusively binds the courts. (Id .citing *United States v. Belmont,* 301 U.S. 324, (1937) (citing *Oetjen v. Central Leather Co.,* 246 U.S. 297, (1918)).   The 7th circuit would not allow it and neither should the learned Judge of this court.   Plaintiffs ask that an Order issue restricting its authority to argue, reference or discuss government matters as it seems to be encroaching on the court's powers and authority.  The "TRNC" is strictly a foreign unincorporated association and nothing more and ask the court that all references regarding it acting in any governmental or diplomatic role or function including but not limited to titles.

## A.  Establishing Personal Jurisdiction

"To establish personal jurisdiction over a non-resident, a court must engage in a two part inquiry: a court must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." See *GTE New Media Servs. v. BellSouth Corp., 199 F.3d 1343, 1347 (D.C. Cir. 2000).*

The D.C. Circuit has defined the bases for long-arm jurisdiction in this District are as follows:  "to establish specific personal jurisdiction under the District long-arm statute, [the plaintiff] would have to demonstrate either (1) that its claims arose from the defendant

**0410**

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 11 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 10 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 138

transacting business in the District of Columbia . . .; or (2) that [the defendant] caused it tortious

injury in the District by its conduct in the District . . .; or (3) that [the defendant] caused it

tortious injury in the District by its conduct outside the District and that [the defendant]

"regularly does or solicits business" in the District, "engages in any other persistent course of

conduct" there, or "derives substantial revenue" from goods used or services rendered". *See*

*Trintec Industries, Inc. v. Pedre Promotional Products, Inc., 395 F.3d 1275, 1280* (*Fed. Cir.*

*2005).*

      Based on the facts presented herein, there is no doubt that the defendant caused violated the

Lanham Act by making false allegations about ownership and title of property situated in the

north of Cyprus in the District of Columbia as it related to its "official" status and to the

title/ownership of property considered abandoned yet belonging to the Plaintiffs and the Class

who have proper title and seek its return[8].

### B.  **Defendant Was Properly Served in the District of Columbia**.

      The constitutional requirements have been held to be "co- extensive" with a D.C. general

personal jurisdictional provision, D.C. Code § 13- 334(a), which authorizes D.C. courts to

"exercise general jurisdiction" over a foreign corporation as to claims not arising from the

corporation's conduct in the District, if the corporation is doing business in the District."  See

*AGS Int'l Servs. S.A. v. Newmont USA Ltd., 346 F. Supp.2d 64, 74 (D.D.C. 2004); quoting*

*Gorman v. Ameritrade Holding Corp., 293 F.3d 506, 509 (D.C. Cir. 2002*). This "doing

business" test "is whether [the defendant"s] contacts with the District have been so continuous

and systematic that it could foresee being haled into court in the District of Columbia." See *AGS*

---

[8] The "TRNC" is occupying the lands belonging to the Plaintiffs and the Class and do not let them return to their properties as indicated in the alleged constitution of the "TRNC"  (See Sec. Am. Compl.

**0411**

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 12 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 11 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 139

*Int'l Servs. S.A. v. Newmont USA Ltd.346 F. Supp. 2d at 74.*

Although on its face § 13-334(a) appears only to specify proper methods of service, the District of Columbia Court of Appeals has held that compliance with the statute gives rise to personal jurisdiction over a foreign corporation doing business in the District. See *AMAF Int'l Corp.*, 428 A.2d at 850; *see El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 673 n.7 (D.C. Cir. 1996).

Since the Defendant has waived any issue of personal service[9] if an issue even existed, personal jurisdiction is established as a matter of law. Therefore, Defendant's motion to Dismiss should be denied.

### C.  Claims Arise from Defendant's Transaction of Business in D.C.

Plaintiffs have alleged that monies wrongfully derived from the property belonging to the Plaintiffs' and the Class are transferred by and through HSBC, in the District of Columbia. See The illegal gains are transferred through the HSBC banking system to and from the "TRNC" in whole or in part, that include the Washington DC offices of both Defendants. (See Sec. Am. Comp. ¶¶ 2,3,8,9,10, 17-21, 31, 34, 35, 39-42, 45-60, 64-71). The Defendant does not deny that it spends over $300,000.00 for its District operations without providing a source of income. Obviously a banking system is used to accommodate these transactions which the Defendant intentionally does not disclose but pays the bills for over 20 years in the District. (See Ex. 13-Accounting Report of Defendant's DC office).

The so called TRNC by and through Defendant HSBC has illegally profited to the detriment of the Plaintiffs from acts originating outside of the District of Columbia but include the District of Columbia as monies are transferred to and from bank accounts located in the

---

9

**0412**

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 13 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 12 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 140

District of Columbia by agreement with HSBC. (See Sec. Am. Comp. ¶¶ 2,3,8,9,10, 17-21, 31,

34, 35, 39-42, 45-60, 64-71).   The fraudulent property scheme requires financing and the

transfer of funds that occurred through HSBC, in whole or in part, in the District of Columbia

(id).  The TRNC presence in Washington DC was not for government interaction or contact[10] as

clandestinely argued and presented but to assist in the transfer of funds illegally obtained from

property belonging to the plaintiffs to bank accounts with HSBC that occur in whole or in part in

Washington, DC.

Additionally, the false statements on the ownership of property as stated in its published

"constitution" giving rise to Plaintiffs' federal claim on the interactive website

www.trncwashdc.org, was maintained, controlled or operated by the Defendant admittedly until

at least 2005 (See Sec. Am. Comp. ¶¶ 2,3,8,9,10, 17-21, 31, 34, 35, 39-42, 45-60, 64-71; Akil

Affid.¶28-30, Ex. 5, 12, 17, 19-20).  This interactive website included the sale of property, how

to buy property, forms to be submitted for buying property, title of property, hiring attorneys and

estate agents, airlines, cruises etc. The website even contained the so called laws/constitution in

which the "TRNC" admits to interfering in the property rights of the displaced individuals

consisting of the Plaintiffs' and the Class. (Ex.'s 5, 19-20).

However, the Defendant has taken the website down under the pretext that it is owned and

controlled by another namely, Izzet Zorlu.  At the very least, if the court does not find the

necessary contacts, it is necessary to allow jurisdictional discovery so that the Plaintiffs can show

the full extent of contacts and representation made on the website, along with the banking

---

[10] The government contact exception to personal jurisdiction is nothing more than an attempt of "defacto" immunity.  The case cited by the Defendant relies upon a transient passing to file papers with an administrative agency rather than a over 20 year existence in District without abiding by its laws for doing business without a business license, certificate of occupancy nor paying DC taxes.  As a matter of fact, there is nothing evidencing the "TRNC" with the DC Government for service or process or otherwise which suggest "doing business" illegally without proper licensing that is a misdemeanor crime.  This Argument shall be supplemented (See Ex. 14).

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 14 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 13 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 141

information relevant and indicative of its nature of business in the District of Columbia, including meetings, visitors, loans, payments, articles, speaking engagements and business.

Based on the fats presented by the Plaintiff, and even the Defendant, sufficient contacts exist with the District of Columbia for this court to find personal jurisdiction over the Defendant "TRNC" having purposefully availed itself therein

### D.      Combined Internet and Non-Internet Related Contacts in the District of Columbia Are Sufficient to Establish Personal Jurisdiction.

Generally, jurisdiction in cyberspace has revolved around two issues: passive web sites versus interactive web sites, and whether a defendant's Internet-related contacts with the forum combined with other non-Internet related contacts are sufficient to establish a persistent course of conduct.

"If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions.  A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction.  The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer.  In these cases, the court's exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site". *See Zippo Mfg. Co. v. Zippo Dot Com. Inc., 952 F. Supp. 1119, 1124 (W. D. Pa. 1997).*

In *Heroes, Inc. v. Heroes Foundation,*  the court found that it did not need to decide whether the defendant's home page by itself subjected the defendant to personal jurisdiction in

**0414**

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 15 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 14 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 142

the District of Columbia because the defendant had substantial non-Internet related contacts with

the District that were sufficient under the D.C. long-arm statute.  The defendant's home page

solicited contributions and provided a toll-free number which browsers used to donate money;

the solicitation also appeared in advertisements in the Washington Post.  Judge Flannery

concluded that these non-Internet related contacts with the District of Columbia, together with

the maintenance of a web site constantly available to D.C. residents, constituted a persistent

course of conduct that reasonably connected the defendant to the forum. *Heroes. Inc, v. Heroes*

*Foundation*, 958 F. Supp. 1, 4-5 (D.D.C. 1996); *see also* *Telco Communications v. An Apple A*

*Day*, 977 F. Supp. 404, 407 (E.D. Va. 1997) (*posting of web site advertisement solicitation over

the Internet, which could be accessed by Virginia residents 24 hours a day, is a persistent course

of conduct; two or three press releases rise to the level of regularly doing or soliciting business);

*See* *Digital Equipment Corp. v. Altavista Technology. Inc.*, 960 F. Supp. at 467 (maintenance of

web site that can be accessed by Massachusetts citizens 24 hours a day coupled with other

contacts is persistent course of conduct sufficient to confer personal jurisdiction).

The courts in each of these cases required only a relatively tenuous electronic connection

between the creator of a web site and the forum to effect personal jurisdiction, so long as there

were sufficient other non-Internet connections. Under the analysis adopted by these courts, the

exercise of personal jurisdiction is contingent upon the web site involving more than just the

maintenance of a home page; it must also allow browsers to interact directly with the web site on

some level.  In addition, there must also be some other non-Internet related contacts between the

defendant and the forum state in order for the court to exercise personal jurisdiction.

Justice Ginsburg in <u>Crane v. Carr</u> has described these as the "plus factors," factors that

demonstrate some "reasonable connection" between the jurisdiction in which the court sits

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 16 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 15 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 143

"separate from and in addition to" the injury caused in the jurisdiction. <u>Crane v. Carr</u>, 814 F.2d at 762. The "plus factor" or factors "need not be related to the act that caused the injury; all that is required is 'some other reasonable connection' between the defendant and the forum." <u>Id.</u> at 762-63.  The "plus factor" does not itself provide the basis for jurisdiction (the injury does) "but it does serve to filter out cases in which the inforum impact is an isolated event and the defendant otherwise has no, or scant, affiliation with the forum." <u>Id.</u> at 763.

The Plaintiffs have shown a "persistent course of conduct" by the "TRNC" in the District of Columbia or other reasonable connections between the forum and the "TRNC" besides the alleged website use and the alleged injury of the false statements contained therein. Unfortunately for the Defendant, the "TRNC" tripped over its own lies when it stated its sole existence in the District of Columbia was to interact with the U.S. Government.  There is sufficient evidence showing, it engages in providing maps, meetings letters to newspapers that are published, Speaking at Universities, engaged in banking activities, hiring lawyers, trying to intervene as the rightful owners to Christian mosaics belonging to the Church of Cyprus and this is what can be found without discovery (See Ex.s'.  5, 11, 12, 13, 17, 19 and 20).  These facts alone establish contacts sufficient for personal jurisdiction and due process.  The concealment of obvious facts, left to the interpretation and control of material evidence including the website content that is no longer available in any manner even archived, without inspection or cross examination, is simply unfair and indicative of a scoundrel looking to hide through deception. Limited discovery on the agents and information possessed by the "TRNC" in Washington, DC are necessary to prove the contacts for personal jurisdiction should this court find them lacking.

The presence for over 20 years in the District of Columbia conducting business and litigation albeit unsuccessful, without obtaining a business license or otherwise registering its

**0416**

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 17 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 16 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 144

name shows a disregard for the laws of this country.  The "TRNC" believes it can make its own

rules when it sees fit despite the requirements that it conform to the laws of the District of

Columbia due to its non government, diplomatic or "TRNC" status that it refuses to conform

(See Ex. 2). Mr. Akil believes because Turkey recognizes the "TRNC" that is provides him the

right in the United States to be referred to and title himself as an ambassador. Plaintiffs also note,

and Defendant admits, that he has been in contact (via e-mail, telephone and the U.S. mail) with

business visitors in the District of Columbia  (Aff. Akil  ¶¶  16, 25, 31).

The interactive nature of the "TRNC" website coupled with non internet contacts are

sufficient, alone or together, to establish that Defendant engaged in a persistent course of conduct

in the District of Columbia.

### E.      Due Process

Traditionally, in order to exercise personal jurisdiction over an out-of-state defendant, a

court must determine whether the defendant has sufficient minimum contacts with the

jurisdiction in which the court sits such that maintenance of a suit does not offend "traditional

notions of fair play and substantial justice."  International Shoe Co. v. Washington, 326 U.S.

310, 316 (1945).  While in the Internet context there must be "something more" than an Internet

advertisement alone "to indicate that the defendant purposefully (albeit electronically) directed

his activity in a substantial way to the forum state," Cybersell. Inc. v. Cybersell. Inc., 130 F.3d at

414, such that he should "reasonably anticipate being hated into court" there, Burger King Corp.

v. Rudzewic , 471 U.S. 462, 474-75 (1985), that test is easily met here. See, e.g., Digital

Equipment Corp. v. Altavista Technology, Inc., 960 F. Supp. at 469-70.  Because subsection

(a)(4) of the long-arm statute does not reach the outer limits of due process, Crane v. Car , 814

**0417**

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 18 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 17 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 145

F.2d at 762, and the Court has concluded that there are sufficient "plus factors" to meet the requisites of subsection (a)(4), it follows that there are also sufficient minimum contacts to satisfy due process.

For over 20 years, Defendant has purposefully sent employees, leased and occupied office space in the District of Columbia, where it seems to be lacking a business license or otherwise registering its trade name because there is no "Turkish Republic of Northern Cyprus" recognized by the U.S. Government unnervingly admitted by the Defendant.  During these years, and without rehashing the facts, the Defendant made banking transactions, hired lawyers, was listed as a speaker at University, wrote op-ed letters and submitted letters to the U.N., as matter of fact, even the newspapers contained the reference to the Washington DC "TRNC" website or its representative.   All of these facts, let alone the information on banking, meetings, letters, taxes, loans, payments to and from the Washington DC office as it operated at a substantial cost that funds to pay for them, including, by and through, HSBC[11], demonstrate the purposeful of the Defendant purposefully entered the District of Columbia to conduct business[12] for over 20 years that would foresee it being haled into court there.

E.     **In The Alternative, the Federal Long Arm Statute Provides Personal Jurisdiction Pursuant to FRCP 4.**

In some circumstances, Federal Rule of Civil Procedure 4(k)(2) eliminates the need to employ the forum state's long-arm statute. *See Mwani v. Osama bin Laden, 417 F.3d 1, 10 (D.C.*

---

[11] Additionally, since HSBC has not yet Answered or been served, which will be done shortly, it is premature and unfair to decide this motion against the Plaintiffs if the court was inclined to do so.  Rather, jurisdictional discovery should be allowed to go forward immediately to allow for Plaintiff to respond after having the information clearly withheld by the Defendant including but not limited to banking statements, website content and a list of U.S. citizens or DC residents who sought the services of the "TRNC" in Washington DC, and/or who have purchased property through the TRNC in the north of Cyprus.

[12] As the "TRNC" is not a government, the Defendant took a risk in entering the United States to what seems to be protect its interests namely the property that it allegedly rules over and sells the lands that belong to the Plaintiffs and the Class.  The Defendant cannot be shielded from what it purposefully set out to do and now finds itself in a legal quagmire.

**0418**

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 19 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 18 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 146

*Cir. 2005)*. Should the court find that the DC long arm statute contacts requirement has not been satisfied, the federal long arm statute is designed to avoid the very injustice the so called 'TRNC" seeks to impose on this courts jurisdiction and integrity by false testimony of what and who it is let alone what it is doing in the District of Columbia, unregistered as a business, does, not pay taxes, does not have a certificate of occupancy not recognized diplomatically or as a state or government.

Under FED. R. CIV. P. 4(k)(2), a federal court can exercise personal jurisdiction over a defendant (1) for a claim arising under federal law, (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States.

In the instant case, the claims arise under federal law (Lanham Act) and the summons was properly served. Whether the exercise of jurisdiction is consistent with the Constitution turns on whether a defendant has sufficient contacts with the <u>nation</u> as a whole to satisfy due process. *See* FED. R. CIV. P. 4(k) advisory committee's notes to 1993 amendments.

The remaining question here is whether the "TRNC" is subject to the jurisdiction of the courts of general jurisdiction of any state." FED. R. CIV. P. 4(k)(2). Determining whether a defendant is subject to the jurisdiction of a court "of any state" presents no small problem. One could, of course, ponderously "traipse through the 50 states, asking whether each could entertain the suit." *ISI Int'l, Inc. v. Borden Ladner Gervais LLP,* <u>256 F.3d 548</u>, 552 (7th Cir.2001).

A defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed. Naming a more appropriate state would amount to a consent to personal jurisdiction there (personal jurisdiction, unlike federal subject-matter jurisdiction, is waivable). If, however, the defendant contends that he cannot be sued in the forum state and

**0419**

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 20 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 19 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 147

refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2). The plaintiffs have amply made a prima facie showing that the so called "TRNC" has "`purposefully directed' [its] activities at residents" of the United States, *Burger King,* 471 U.S. at 472, (quoting *Keeton,* 465 U.S. at 774), and that this litigation results from injuries to the plaintiffs "that `arise out of or relate to' those activities," *id.* (quoting *Helicopteros Nacionales,* 466 U.S. at 41). The "TRNC" therefore had "fair warning" that its activities would "subject it to the jurisdiction" of the United States. *Id.*

The fact that injured Cypriots[13], not injured Americans, are the plaintiffs in this case does not deny the court personal jurisdiction over the defendant(s). *See Calder v. Jones,* <u>465 U.S. 783</u>, 788, (1984) ("The plaintiff's lack of `contacts' [with the forum] will not defeat otherwise proper jurisdiction."); *Keeton,* 465 U.S. at 780 ("[The] plaintiff's residence in the forum State is not a separate requirement, and lack of residence will not defeat jurisdiction established on the basis of the defendant's contacts.").

The Defendant's decision to purposefully direct its so called government and laws, along with personnel, stationary, banking transactions, payroll, office space, and driver in the District and at the United States while also benefitting from bank transactions involving HSBC and the Plaintiffs properties, and the fact that the Plaintiffs' federal claims arose out of those activities, should suffice to cause the defendant(s) to "reasonably anticipate being haled into" an American court. *See Mwani v. Osama bin Laden, 417 F.3d 1, 10 (D.C. Cir. 2005)* citing *Burger King,* 471 U.S. at 474,(quoting *World-Wide Volkswagen,* 444 U.S. at 297).

---

[13] Defendant raises an argument that alternative fora exist such as the European Court of Human Rights that has recently or to go and see what the victimizer "TRNC" would provide for the victim plaintiffs, which is almost as insulting to the integrity and powers of this court to allow its jurisdiction to be taken away by a non-entity because it would like to bypass the rule of law yet again.

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 21 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 20 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 148

Despite the "TRNC" argument for alternative fora, a plaintiff's citizenship may affect whether the court has subject matter jurisdiction or the plaintiff has a cause of action but not where to litigate. Here, however, the plaintiffs have sued under the Alien Tort Claims Act, which the Supreme Court has held to supply both subject matter jurisdiction and a cause of action for a narrow set of claims brought by aliens and involving violation of the law of nations. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, (2004).

Where a defendant, like the so called "TRNC" has purposefully directed his activities at forum residents and seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *See Mwani v. Osama bin Laden, 417 F.3d 1, 10 (D.C. Cir. 2005)*.

Here, the defendant purposefully directed its activities at forum residents, the U.S. Government and others, located in the U.S. and the fact that the plaintiffs are Cypriots who were injured in the process is not a consideration that would render the assertion of American jurisdiction incompatible with substantial justice.  Therefore, under FRCP 4(k)(2) this court has personal jurisdiction over this defendant.  As an alternative, the Defendant may pick a proper forum of its choosing for this litigation, if this court finds the DC long arm statute is insufficient.


**CONCLUSION**

For the foregoing reasons, the Defendant's Motion to Dismiss must be denied in its entirety and allow jurisdictional discovery to commence immediately.

**0421**

Case 1:21-cv-03043-RM-STV   Document 69-8   Filed 09/19/22   USDC Colorado   Page 22 of 22
Case 1:09-cv-01967-PLF   Document 20   Filed 05/05/10   Page 21 of 21
Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 149

Respectfully submitted,


TSIMPEDES LAW FIRM                         Dated: May 5, 2010


BY:     /s/ Athan T. Tsimpedes, Esq.
        Bar no. 452341
        1050 Connecticut Avenue, NW                .
        Suite 1000
        Washington, D.C. 20036
        Phone: 202-772-3159
        Fax: 202-449-3499
        Attorney for Plaintiffs

# EXHIBIT H

RECORD NO. 14-7170

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals
## For The District of Columbia Circuit

## MICHALI TOUMAZOU, *et al.*,

*Plaintiffs – Appellants*,

**v.**

## TURKISH REPUBLIC OF NORTHERN CYPRUS, *et al.*,

*Defendants– Appellees.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————————

## BRIEF OF APPELLANTS

———————————

**Athan T. Tsimpedes**
**TSIMPEDES LAW FIRM**
**1200 New Hampshire Avenue, NW, Suite 725A**
**Washington, DC  20036**
**(202) 464-9910**

*Counsel for Appellants*

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 3 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 152
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 2 of 43

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

The following information is provided pursuant to the Court's Order and

D.C. Circuit Rule 28(a)(1):

**A.**     **Parties, Intervenors and *Amici***

The following parties were named in the district court:

**Plaintiffs/Appellants**: Michali Toumazou, Nicolas Kantzilaris and Maroulla

Tompazou. As well as the plaintiffs identified by the district court in its Orders

now on appeal or in the related cases that will be identified and provided by

separate cover.

**Defendants/appellees:** Turkish Republic of Northern Cyprus, HSBC

Holdings PLC, HSBC Bank USA, N.A, and Mehmet Ali Talat; and all defendants

named in the related cases otherwise identified.

**B.**     **Rulings Under Review.**

The rulings under review are all Orders of the U.S. District Court For the

District of Columbia (Friedman, J.), in case no. 1:09---1967 including but not

limited to Orders entered on September 30 2014, October 9, 2014, granting

Defendant---Appellee Turkish Republic of Northern Cyprus' motion to dismiss for

lack of personal jurisdiction, and granting Defendants--- Appellees HSBC

Holdings PLC and HSBC Bank USA, N.A.'s motion to dismiss for failure to state

**0425**

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 4 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 153
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 3 of 43

a claim; and the Orders in the related cases dismissed on October 31, 2014 as a result of similar issues involved.

## C.   **Related cases.**

The following are related cases identified by the court in it Orders dated September 30, 2014 and/or October 9, 2014 that is being appealed; District Court for the District of Columbia: *Fiouris, et al. v. Turkish Cypriot Community, et al.,* Case No. 10--- 1225, dismissed October 31, 2014 and *Latchford, et al. v. Turkish Republic of Northern Cyprus, et al.,* Case No. 12---0846, dismissed October 31, 2014. This case has not previously been before this Court or any court other than the U.S. District Court for the District of Columbia.

Respectfully submitted,

/s/Athan T. Tsimpedes

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 5 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 154
OSCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 4 of 43

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ...............i

TABLE OF CONTENTS .......................................................... iii

TABLE OF AUTHORITIES...........................................................v

GLOSSARY OF ABBREVIATIONS…………………………………………...x

STATEMENT OF SUBJECT MATTER AND
APPELLATE JURISDICTION........................................................1

STATEMENT OF THE ISSUES .....................................................1

STATUTES AND REGULATIONS ..................................................2

STATEMENT OF THE CASE .......................................................2

SUMMARY OF THE ARGUMENT..................................................5

ARGUMENT ..........................................................................6

    I.    WHETHER THE US DISTRICT COURT FOR THE
        DISTRICT OF COLUMBIA ERRED IN GRANTING
        DEFENDANT TRNC's MOTION TO DISMISS DUE TO
        LACK OF PERSONAL JURISDICTION ..........................................6

    STANDARD OF REVIEW ..........................................................6

    A.    PERSONAL JURISDICTION...........................................6

        1.    Specific Jurisdiction Under The District of Columbia
            Long Arm Statute, § 13-423 .......................................8

**0427**

Case 1:21-cv-03043-RM-STV    Document 69-9    Filed 09/19/22    USDC Colorado    Page 6 of 44

Appellate Case: 23-1286    Document: 010110991829    Date Filed: 01/29/2024    Page: 155
OSCA Case #14-7170    Document #1567109    Filed: 08/10/2015    Page 5 of 43

    A.    Personal Jurisdiction Over the TRNC is based on Non US Government contacts, its Agent's Affidavit and published website materials that are based on or relate to the Plaintiffs' cause of action, in that the property belonging to the Plaintiffs' and the Class are falsely advertised as abandoned or made available for purchase through TRNC titles .................................................................12

    B.    Conspiracy Theory Based Jurisdiction allows the Acts of HSBC to be imputed to the TRNC to Establish Personal Jurisdiction.................................................................17

    C.    An Unincorporated Association Can Be Sued In Its Own Name.................................................................19

    D.    TRNC's Nationwide Contacts Sufficient For Personal Jurisdiction.................................................................21

II.    WHETHER THE COURT ERRED IN NOT FINDING PLAINTIFFS' STATED A CAUSE OF ACTION AGAINST THE HSBC DEFENDANTS-APPELLEES ..........................................................22

III.    WHETHER THE COURT ABUSED ITS DISCRETION BY DENYING PLAINTIFFS' JURISDICTIONAL DISCOVERY...........................................................................25

IV.    THE COURT ABUSED ITS DISCRETION BY DENYING LEAVE TO FILE A THIRD AMENDED COMPLAINT..........................................29

CONCLUSION ...................................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

**0428**

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 7 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 156
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 6 of 43

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Al Maqaleh v. Hagel,*
  738 F.3d 312 (D.C. Cir. 2013) ......................................................25

*Atlantigas Corp. v. Nisource, Inc.,*
  290 F. Supp. 2d 34 (D.D.C. 2003) ................................................10

*Autocephalous Greek Orthodox Church of Cyprus, et al v. Goldberg, et al,*
  917 F.2d 278 (7th Cir. 1990)...................................................7, 22

*Autocephalous Greek Orthodox Church v. Goldberg,*
  717 F. Supp. 1374 (IN. 1989) .......................................................22

*Brunson v. Kalil & Co.,*
  404 F. Supp. 2d 221 (D.D.C. 2005) ...............................................9

*Burger King Corp. v. Rudzewicz,*
  471 U.S. 462 (1985) .....................................................................10

*Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC,*
  148 F.3d 1080 (D.C. Cir. 1998) ....................................................27

*Crane v. N.Y. Zoological Soc'y,*
  894 F.2d 454 (D.C. Cir. 1990) ................................................. 6-7

*Daimler AG v. Bauman,*
  134 S. Ct. 746 (2014) ..............................................................7, 8

*Chief Authorities are marked with an asterisk
*Dooley v. United Technologies Corp.,*
  786 F. Supp. 65 (D.D.C. 1992) ....................................................17

*Dorman v. Thornburgh,*
  740 F. Supp. 875 (D.D.C.1990), *aff'd in part and appeal
  dismissed in part*, 955 F.2d 57 (D.C. Cir. 1992)..........................17

**0429**

*Edmond v. United States Postal Serv. Gen. Counsel,*
    949 F.2d 415 (D.C. Cir. 1991) ................................................................7

*Edmond v. United States Postal Serv. Gen. Counsel,*
    953 F.2d 1398 (D.C. Cir. 1992) ...........................................................28

*El-Fadl v. Cent. Bank of Jordan,*
    75 F.3d 668 (D.C. Cir. 1996), *abrogated on other grounds by*
    *Samantar v. Yousef,* 560 U.S. 305 (2010) ......................................25

*Exponential Biotherapies, Inc. v. Houthoff Buruma N.V.,*
    638 F. Supp. 2d 1  (D.D.C. 2009) ......................................................27

*Firestone v. Firestone,*
    76 F.3d 1205 (D.C. Cir. 1996) ...........................................................29

*Foman v. Davis,*
    371 U.S. 178 (1962) ...........................................................................29

*Goodman Holdings v. Rafidain Bank,*
    26 F.3d 1143 (D.C.  Cir. 1994) ..........................................................25

*Goodyear Dunlop Tire Operations, S.A. v. Brown,*
    131 S. Ct. 2846 (2011) .........................................................................7

*GTE New Media Servs. v. BellSouth Corp.,*
    199 F.3d 1343 (D.C. Cir. 2000) ...........................................................8

*Hasenfus v. Corporate Air Servs.,*
    700 F. Supp. 58 (D.D.C. 1988) ..........................................................17

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee,*
    456 U.S. 694 (1982) ...........................................................................18

*International Shoe v. Washington,*
    326 U.S. 310 (1945) .........................................................................7-8

*Kopff v. Battaglia,*
    425 F. Supp. 2d 76 (D.D.C. 2006) .....................................................27

**0430**

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 9 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 158
OSCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 8 of 43

*Mandelkorn v. Patrick,*
    359 F. Supp. 692 (D.D.C. 1973) ...................................................17

*Millenium Square Residential Ass'n v. 2200 M St., LLC,*
    952 F. Supp. 2d 234 (D.D.C. 2013) ...........................................20

*Mwani v. Osama bin Laden,*
    417 F.3d 1 (D.C. Cir. 2005) ...............................................7, 9, 21

*Naartex Consulting Corp. v. Watt,*
    722 F.2d 779 (D.C. Cir. 1983), *cert. denied sub nom.*
    *Naartex Consulting Corp. v. Clark,* 467 U.S. 1210 (1984) .........................28

*Novak-Canzeri v. Saud,*
    864 F. Supp. 203 (D.D.C. 1994) ...................................................9

*Plan Comm. v. Pricewaterhousecoopers, LLP,*
    2007 WL 1191917 (D.D.C. Apr. 20, 2007) ..................................20

*Second Amendment Found. v. U.S. Conference of Mayors,*
    274 F.3d 521 (D.C. Cir. 2001) .......................................................7

*Simon v. Republic of Hungary,*
    2014 WL 1873411 (D.D.C. May 9, 2014) ....................................25

*Triad at Jeffersonville I, LLC v. Leavitt,*
    563 F. Supp. 2d 1 (D.D.C. 2008) ...............................................29

*United States v. Ferrara,*
    54 F.3d 825 (D.C. Cir. 1995) ........................................................9

*United States v. Trucking Employers, Inc., II and III,*
    72 F.R.D. 101 (D.D.C. 1976) and 75 F.R.D. 6821 (D.D.C. 1977) ..............20

*Urban Inst. v. FINCON Servs.,*
    681 F. Supp. 2d 41 (D.D.C. 2010) .................................................7

**0431**

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 10 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 159
OSCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page: 9 of 43

## STATUTES

D.C. Code § 13-423 ....................................................................1, 8, 9, 10, 11

18 U.S.C. § 1964 ...............................................................................................1

28 U.S.C. § 1330 ...............................................................................................1

28 U.S.C. § 1331 ...............................................................................................1

28 U.S.C. § 1332 ...............................................................................................1

28 U.S.C.  § 1602, *et seq.* .............................................................................4

31 U.S.C. § 5311 *et seq.* ...............................................................................22

31 U.S.C. § 5318 .............................................................................................24

## REGULATION

Title 12, Code of Federal Regulations, § 21.21 ...........................................24

## RULES

Fed. R. Civ. P. 4(k)(2) ...........................................................................18, 20, 21

Fed. R. Civ. P. 15(a)(2) ...................................................................................28

Fed. R. Civ. P. 17(b)(3) ...................................................................................19

Fed. R. Civ. P. 23(a) ........................................................................................20

## OTHER AUTHORITIES

Note, Damages in Class Actions: Determination and Allocation
10 B.C. INDUS. & COM. L. REV. 615, 619 (1969) ............................................20

UN Sec. Counsel. Res. 541 (1983) ...................................................................5

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 11 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 160
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 10 of 43

*WRIGHT & MILLER. FEDERAL PRACTICE & PROCEDURE:*
*CIVIL* § 1770 (1972) .................................................................................2

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| Affid. | Affidavit |
| BSA | Bank Secrecy Act |
| DC | District of Columbia |
| D.I. | Docket number |
| Dism. | Dismiss |
| Ex./Exs. | Exhibit/Exhibits |
| FRCP | Federal Rule of Civil Procedure |
| HSBC/ HSBC Group | An association of HSBC USA, N.A., HSBC Holdings, PLC and other HSBC banks assisting the TRNC. |
| HSBC Bank A.S. | HSBC A.S. |
| HSBC USA | HSBC Bank USA, N.A. |
| Mot. | Motion |
| ROC | Republic of Cyprus |
| SAC | Second Amended Complaint |
| TAC | Proposed Third Amended Complaint |
| TRNC | Turkish Republic of Northern Cyprus, an Unincorporated Association of Organized Crime. |
| UK | United Kingdom |
| USA | United States of America |

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 13 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 162
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 12 of 43

## STATEMENT OF SUBJECT MATTER AND
## APPELLATE JURISDICTION

The District Court of the District of Columbia had jurisdiction under DC

Code Sec. 13-423 and 28 USC 1331, 1332, 1330[1] and 18 U.S.C. §1964.

Appellate Jurisdiction from the district court's order resides in 28 USC

1291. The district court Order was entered on September 29, 2014 and the

memorandum opinion entered on October 9, 2014 on civil action No.: 09-1967

with related cases, _Fiouris, et al v. TRNC et al., case no. 10-1225 and Latchford, et_

_al v. TRNC et al., case no. 12-00846_ dismissed based on the same order.

Appellants timely filed their appeal on October 29, 2014.

## STATEMENT OF THE ISSUES

1.      Whether the US District Court for the District for Columbia erred in

granting Appellee TRNC's Motion to Dismiss due to lack of personal jurisdiction,

without an evidentiary hearing and without jurisdictional discovery, particularly

where the internet website, its content, and other commercial acts, including

employment, banking transactions, bank accounts and handling customers, were

alleged, without the opportunity for Appellants' and the Class to cross examine the

motives and circumstances.

---

[1] The Republic of Turkey was to be rejoined as a defendant in the proposed 3rd Amended
Complaint.

[2] _Latchford, et al v. TRNC et al., case no. 12-00846, related case._

[3] D.I. followed by a number indicates the docket number assigned to the
document on the District Court's docket sheet. If a document has an

1

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 14 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 163
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 13 of 43

2.      Whether the US District Court for the District for Columbia erred in granting Appellees HSBCs', Motion to Dismiss due to failure to state a cause of action without an evidentiary hearing and without jurisdictional discovery, particularly where TRNC and HSBC are co-conspirators and are in exclusive possession and control of concealed non-public information; and where they were found to violate the rights of the Plaintiffs' and the Class in the same fraudulent property scheme in the United Kingdom[2].

## STATUTES AND REGULATIONS

The relevant statute and regulations are identified in the table of contents, within this brief or will be included in the deferred joint appendix.

## STATEMENT OF THE CASE

The Original Complaint was filed On October 19, 2009 and amended on February 26, 2010, D.I. 1[3] and 5.  A second amended Complaint was filed on March 19, 2010 D.I. 14 (Second Am. Compl.). The plaintiffs[4] filed a proposed class action alleging that the TRNC unlawfully interfere with their property, real and personal, in northern areas of the Republic of Cyprus (ROC), JA7, JA16,

---

[2] _Latchford, et al v. TRNC et al._, case no. 12-00846, related case.

[3] D.I. followed by a number indicates the docket number assigned to the document on the District Court's docket sheet. If a document has an attachment or exhibit, it is designated by a hyphen.

[4] Consists of citizens and residents of the USA, Cyprus, UK, Greece and South Africa.

**0436**

JA19, JA20, JA25 [D.I. 14],  ¶¶ 10-14, 18-20, and has masterminded a broad

scheme to profit from the sale of such properties "in the United States, Europe and

around the world with the aid, assistance and support of HSBC[5] Group, through

bank transactions using TRNC bank accounts in the US that are cleared by the

correspondent HSBC USA, NA[6] with its principal offices located in New York ."

JA240, JA270, JA283, JA 25 [D.I. 14 ¶¶ 45-60]. Plaintiffs allege that the HSBC

defendants "do business with the TRNC through transactions in the illegally

occupied areas in the north of the ROC and in the United States and knowingly aid,

assist, support and benefit from the transaction of the fraudulent property scheme

of the TRNC, JA7, JA16-25, JA240, JA248, JA270, JA25 [D.I. 14] ¶¶ 2,3,8,9,10,

17-21, 31, 34, 35, 39-42, 45-60, 64-71; JA 179 [D.I. 30] ¶¶ 51-56, 83-111, 133-

136.  This lawsuit was brought as a result of the interference and deprivation of the

rights to property belonging to the Plaintiffs and the Class by TRNC from at least

1983 and continue to do so to the present. Id. TRNC publishes and advertises

properties belonging to displaced Greek Cypriots consisting of the plaintiffs and

the Class for sale at its office in the District of Columbia, which a has a dedicated

---

[5] HSBC shall mean and refer to defendant HSBC Group which term is used to
describe an association of subsidiaries and/or affiliates of defendants HSBC
Holdings, PLC and/or HSBC USA, NA.
[6] HSBC USA, N.A. is referred to as HSBC USA and is headquartered in McLean,
Virginia.

**0437**

website, trncwashdc.org, which was created in or around the District of Columbia for the TRNC office in the District of Columbia. Id.

Specifically, the plaintiffs[7] and the Class have brought claims for: (1) interference and denial of property rights including access, use and enjoyment of property; (2) violation of international and customary law; (3) civil conspiracy; (4) aiding and abetting; (5) unjust enrichment; (6) violation of the Lanham Act; (7) intentional interference with property rights; and (8) and accounting. JA25 [D.I.14] ¶¶ 85-134.

Plaintiffs' proposed Third Amended Complaint ("TAC") sought to join additional plaintiffs for claims based on the same conduct, transactions and occurrences alleged against Defendant TRNC. JA 179 [D.I. 29, 30] **(**Mot for Leave to Amend) *Compare* Complaint, ¶¶ 13-55 and Third Amended Complaint, ¶¶ 15-112). The TAC also joins HSBC Holdings, PLC and HSBC Bank U.S.A., N.A. based on their active involvement in the conduct, transactions and occurrences alleged against Defendant. The TAC also re-joins the Republic of Turkey based on that nation's culpability in the mass evictions and for the continuing restraints on the Plaintiffs' use and enjoyment of their properties in northern Cyprus. The Plaintiffs' claims against Turkey arise from the conduct, transactions and occurrences alleged against Defendant TRNC. The Plaintiffs

---

[7] When referring to the Plaintiffs or Appellants herein it shall also include the Class members.

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 17 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 166
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 16 of 43

allege a "commercial activity" exception to Turkey's immunity from suit under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602, *et seq*.

The TAC alleges additional claims in law and equity: common law fraud (Count III, JA179 [D.I. 30], ¶¶ 127-132); Conspiracy (Count IV, JA179 [D.I. 30], ¶¶ 132-136); Lanham Act violations (Count VII, JA 179 [D.I. 30], ¶¶ 150-154); intentional interference with prospective business activity/contract (Count VIII, JA179 [D.I. 30], ¶¶ 155-158); trespass (Counts IX and X, JA179 [D.I. 30] ¶¶ 159-163); and an accounting (Count XI, JA179 D.I. ¶¶ 164-168).

## SUMMARY OF THE ARGUMENT

The TRNC[8] through an organized federation of conspirators, including the HSBC defendants, are actively engaged in advertising, marketing, financing, encumbering, developing, renting, leasing or selling of property belonging to displaced Greek Cypriots. Such transactions are based on fraudulent title, falsely and illegally issued, or represented as owned, by the TRNC to the detriment of the Plaintiffs and the Classes (hereinafter referred to as the "Illegal Commercial Enterprise" or "Fraudulent Property Scheme), JA7-23, JA240, JA248, JA270, JA271, JA283, JA179 [D.I. 30] ¶¶ 36, 40, 41, 42,43, 44, 45, 47, 48, 49,50, 51-57, 61-75, 81-145.  The Fraudulent Property Scheme is aided and supported by the co-

---

[8] The United States does not recognize a "Turkish Republic of Northern Cyprus" or "TRNC" as a sovereign state and has quite the contrary condemned it  *See UN Sec. Counsel. Res. 541 (1983).*

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 18 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 167
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 17 of 43

conspirator HSBC defendants, which has assisted the "TRNC" as co-conspirators in laundering money obtained from its illegal operations by bank transactions in and out of the northern part of the Republic of Cyprus[9] related to the fraudulent property scheme and into the US banking system and to the offices of the TRNC located in Washington DC through HSBC USA which is the correspondent bank of both HSBC Holdings PLC and HSBC A.S operating in the occupied areas under the control of the TRNC, JA270, JA179 [D.I. 29, 30] (TAC) ¶¶ 36, 40, 41, 42,43, 44, 45, 47, 48, 49,50, 51-57, 61-75, 81-145.

## ARGUMENT

I.   **WHETHER THE US DISTRICT COURT FOR THE DISTRICT OF COLUMBIA ERRED IN GRANTING TRNC's MOTION TO DISMISS DUE TO LACK OF PERSONAL JURISDICTION**

Appellants' will show the required minimum contacts exist to establish personal jurisdiction over the TRNC.

**STANDARD OF REVIEW**

A.   **PERSONAL JURISDICTION**

---

[9] When using the term "Republic of Cyprus" it shall also mean and be interchangeable with "Cyprus."  Likewise, reference to the "north", "northern part", "occupied north", "occupied territories" or "occupied areas" of Cyprus shall mean the areas recognized to be within the jurisdiction of the Republic of Cyprus as the only recognized State and Government on the island despite not having effective control over these areas that are occupied illegally by the Republic of Turkey's military, agents and authorities including those operating under the so called "TRNC" trade name or association.

When personal jurisdiction is challenged under Rule 12(b)(2), the plaintiff bears the burden of establishing a factual basis for asserting personal jurisdiction over a defendant. *See Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990). Plaintiffs "can satisfy that burden with a prima facie showing.'" *See Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) (*quoting Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991)). To do so, the plaintiff cannot rest on bare allegations or conclusory statements but "must allege specific acts connecting [the] defendant with the forum." See *Second Amendment Found v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001) (internal quotation marks omitted). "To make such a showing, the plaintiff is not required to adduce evidence that meets the standards of admissibility reserved for summary judgment and trial[;]" but rather, the plaintiffs may "rest [their] arguments on the pleadings, 'bolstered by such affidavits and other written materials as [they] can otherwise obtain[10].'" See *Urban Inst. v. FINCON Servs.*, 681 F. Supp. 2d 41, 44 (D.D.C. 2010) (quoting *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005).

---

[10] The hostility towards Greek Cypriots consisting of the Plaintiffs and the Class by Turkish or TRNC authorities has been documented in the US Court of Appeals. *See Autocephalous Greek Orthodox Church of Cyprus, et al v. Goldberg, et al, 917 F.2d 278 (7th Cir. 1990*) (the court rightfully resolved the title issue in favor of the Church of Cyprus over the TRNC which is the same issue present on this appeal).

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 20 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 169
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 19 of 43

There are two types of personal jurisdiction that a court can exercise, general jurisdiction and specific jurisdiction.  Both[11] basis of personal jurisdiction were at issue before the district court. Due to changes in the law occurring during the pendency of the litigation, specific jurisdiction is the sole focus of this appeal[12].

## 1. Specific Jurisdiction Under The District of Columbia Long Arm Statute, § 13-423.

To establish specific personal jurisdiction over a non-resident, the court must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." See *GTE New Media Servs. v. BellSouth Corp.*, 199

---

[11] A court may assert jurisdiction over a foreign defendant "to hear any and all claims against [it]' only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum state.'" *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014) (*quoting Goodyear Dunlop Tire Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011)); *see also Goodyear*, 131 S. Ct. at 2853 (*quoting International Shoe v. Washington*, 326 U.S. 310, 318  (1945) (General jurisdiction consists of ''instances in which the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.'')

[12] Plaintiffs were not provided any discovery for any defendants and note the court in *Daimler AG v. Bauman*, 134. S. Ct. 746 (2014) provide jurisdictional discovery to the plaintiff prior to dismissal. Plaintiffs' direct the court's attention to the Certificate of Occupancy which states there is a change in ownership in the realty used as office space operating as the TRNC offices used to employ and direct activities unrelated to US Government contacts as further stated herein.  Owning real property (or bank accounts through HSBC in Washington DC) is a basis for exercising general jurisdiction, through proxies like the representatives Hilmi Akil, Osman Ertug, and others named and unnamed individuals identified in this brief and/or the Joint Appendix.

0442

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 21 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 170
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 20 of 43

F.3d 1343, 1347 (D.C. Cir. 2000). The District of Columbia Long Arm Statute, §

13-423, and its relevant sections applicable to the TRNC, provides that a District of

Columbia court may exercise personal jurisdiction over a person, who acts directly

or by an agent, as to a claim for relief arising from the person's -- (1) transacting

any business in the District of Columbia; … (3) causing tortious injury in the

District of Columbia by an act or omission in the District of Columbia; (4) causing

tortious injury in the District of Columbia by an act or omission outside the District

of Columbia if he regularly does or solicits business, engages in any other

persistent course of conduct, or derives substantial revenue from goods used or

consumed, or services rendered, in the District of Columbia; (5) having an interest

in, using, or possessing real property in the District of Columbia.

"[W]hen ruling upon personal jurisdiction without an evidentiary hearing, a

court ordinarily demands only a prima facie showing of jurisdiction by the

plaintiffs." *See Mwani v. bin Laden*, 368 U.S. App. D.C. 1, 6, 417 F.3d 1, 6 (2005).

In addition, the benefits of jurisdictional discovery denied to Plaintiffs' by the

district court was provided by the court in *Daimler* prior to dismissal.

Under D.C. Code § 13-423(a)(1) specific jurisdiction "requires a nexus

between a foreign corporation's particular contact with the District of Columbia

and the claim that the plaintiff asserts." *Id. (citing Novak-Canzeri v. Saud*, 864 F.

Supp. 203, 206 (D.D.C. 1994)). "[The] 'transacting any business' clause has been

interpreted to provide jurisdiction to the full extent allowed by the Due Process Clause." *See United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995); *see also Brunson v. Kalil & Co.*, 404 F. Supp. 2d 221, 237 (D.D.C. 2005). "Transacting business" therefore requires that the TRNC "purposefully avail[ed] itself of the privilege of conducting business within the forum state" and that it has established sufficient minimum contacts in the forum state so that it "should reasonably anticipate being haled into court there." *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985); *see Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 43 (D.D.C. 2003).

The TRNC caused tortious injury in the District of Columbia by an act or omission in the District of Columbia when it falsely portrayed the property belonging to the Plaintiffs and the Class as being owned by TRNC, or as the TRNC having power to issue title to the property, all the while denying plaintiffs their property rights on the basis of race or ethnicity. *See D.C. Code § 13-423(a)(3).*

Under D.C. Code § 13-423(a)(4), the TRNC has sufficient minimum contacts if it regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.  The TRNC has admitted that it prints and distributes tourism maps with commercial aspects to its

10

Case 1:21-cv-03043-RM-STV    Document 69-9    Filed 09/19/22    USDC Colorado    Page 23 of 44

Appellate Case: 23-1286    Document: 010110991829    Date Filed: 01/29/2024    Page: 172
USCA Case #14-7170    Document #1567109    Filed: 08/10/2015    Page 22 of 43

customers/visitors in the District of Columbia. These benefit the TRNC and harm the rights of the Plaintiffs and the Class.  By creating the content and maintaining its DC website directing traffic to the TRNC office in the District of Columbia, and the fact that customer visitors do visit the office and are provided maps for tourism purposes, demonstrates that TRNC regularly does or solicits business, engages in any other persistent course, JA7, JA74, JA126, JA152, JA154, JA158, JA240, JA179 [D.I., 30] ¶¶  In addition, the HSBC banking transactions or property purchase inquiries made to the TRNC's office in the District of Columbia also suggest that TRNC may derive substantial revenue from services rendered in D.C. Without discovery, Plaintiffs' have been at a disadvantage due to the TRNC's lack of transparency. Meanwhile, the TRNC is allowed to submit substantial affidavits which interestingly never deny the ownership or maintenance of HSBC bank accounts in the District of Columbia, nor the conspiratorial relationship between the TRNC and the HSBC defendants regarding banking transactions involving the properties of the Plaintiffs and the Class, JA179 [D.I. 30] ¶¶  A discovery deposition of one affiant, Hilmi Akil, would have yielded answers regarding the HSBC financial transactions occurring or involving the US and the District of Columbia to support jurisdiction, but jurisdictional discovery was denied.

The TRNC uses, possesses and/or has an interest in real property in the District of Columbia D.C. Code § 13-423(a)(5). The TRNC leases, if not owns, the

office space where it is located in D.C. and from where it operates its website. Its functions are not related to federal government contacts. It promotes tourism and provides visitors to the DC office with maps to identify for sale properties, which actually belong to the plaintiffs' and the Class, JA179, JA74, JA126, JA152, JA154, JA158 [D.I. 30] TAC ¶¶,  Akil Affid**.**

The TRNC intends to deceive the public of the District of Columbia, US and throughout the world, while continuing to harm the property rights of the Plaintiffs and the Classes. An example was the advertising and marketing of the U.S. singer/actress Jennifer Lopez by the TRNC to host the grand opening of the Cratos hotel and casino that unbeknownst to Ms. Lopez was erected on property belonging to displaced Greek Cypriots (who would be a members of the Class) in this matter. Ms. Lopez cancelled her performance after being informed of the history of the TRNC and TURKEY towards civilians [Greek Cypriots consisting of the Plaintiffs and the Class] of the Republic of Cyprus, and stated she "would never knowingly support any state, country, institution or regime that was associated with any form of human rights abuse[13]."  JA179 [D.I. 30] at 91(TAC-Nature of the Case)

---

[13] (See http://www.hurriyetdailynews.com/n.php?n=jennifer-lopez-scraps-cyprus-concert-after-pressure-report-2010-07-09).

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 25 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 174
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 24 of 43

**A.** **Personal Jurisdiction[15] Over the TRNC is based on Non US Government contacts, its Agent's Affidavit[16] and published website materials that are based on or relate to the Plaintiffs' cause of action, in that the property belonging to the Plaintiffs' and the Class are falsely advertised as abandoned or made available for purchase through TRNC titles.**

The TRNC, through the use of alleged 3rd persons[17] and the HSBC Group banking system, harms the rights of US citizens and others consisting of the Plaintiffs' and the Class arising or relating to contacts in the District of Columbia or the US. The "TRNC" through its agents are pervasive, systematic and continuous in the District of Columbia and the United States since the 1990's that includes references to it as an embassy, government, "defacto" state or republic, that include seeking litigation in federal court in 1989 on property regarding the same subject matter in this case, including appeal in 1990 to the US Court of Appeals for the 7th Circuit, hiring attorneys, banking transactions with HSBC, website development for a DC based website unrelated to US Government contacts, hiring employees, meeting with individuals and members of the public which included individuals seeking to buy property at the DC office, advertising

---

[15] The TRNC's Motion to Amend the Caption and its Reply before this court is a waiver of or consent to personal jurisdiction as it goes beyond the limited appearance to challenge personal jurisdiction. By making arguments about how it is perceived or prejudiced by the moniker imputed to it in the District of Columbia.
[16] Hilmi Akil.
[17] Including but not limited to HSBC Bank A.S and the corresponding HSBC USA who are obligated under the Banking Secrecy Act to perform due diligence and identify money laundering operations but have failed to do so regarding the activities of the TRNC.

0447

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 26 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 175
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 25 of 43

property, Tips to buy property, how to buy property, explaining property laws, including property belonging to displaced Greek Cypriots and a false history that the properties were abandoned that is portrayed on the trncwashdc.org website directing members of the public to the DC office.  JA7, JA16-23, JA240, JA283, JA25 [D.I. 14]  ¶¶ 2,3,8,9,10, 17-21, 31, 34, 35, 39-42, 45-60, 64-71; [D.I. 20, 21-23] (Opp. to Mot to Dism. Exhibits 1-20) – 1-20; D.I. 15-2  (Mot to Dism., Ex. 2 Hilmi Akil Affidavit), D.I. 26-1 (Hilmi Akil Supplemental Affid.).  Mr. Akil admits in his affidavit to publishing articles in the Washington Times which is a local DC newspaper directed to residents of the District of Columbia.

The "TRNC" through its agents has engaged in the following, unrelated to U.S. Government contacts and activities[18] in the District of Columbia:

    1)    Hiring employees from the US and abroad as representatives or staff to the District of Columbia , leasing office space[19], hiring and paying lawyers, letterhead, interactive website, phone, email, facsimile, publishing and distributing maps (with commercial information including hotels)  and a DC postal address, writing letters to DC newspapers, speaking at universities , leasing or owing offices space, appointing TRNC representative who are US business owners. JA74, JA126, JA152, JA154, JA158, JA240, JA248, JA270, JA271, JA283 [D.I. 46-1, 11-12], (Opp. to Mot to Dism. Exs. 1, 11-12).

---

[18] JA25 [D.I. 14] ¶¶ 2,3,8,9,10, 17-21, 31, 34, 35, 39-42, 45-60, 64-71;  D.I. 14 -2, 4, 5-8, JA179 [D.I. 30] ¶¶ 36, 40, 41, 42, 43, 44, 45, 47, 48, 49,50, 51-57, 61-145
[19] and possibly owning property as stated in the Certificate of Occupancy in the District of Columbia. JA179 [D.I. 30] at 115.

0448

2)      Involved in the Small Business Administration's "Entrepreneur"
        conference material of April 2006.  D.I. 46- 9  (Pls' Memo. Opp.,
        Ex. 9- Entrepreneur- pp, 60 and 66 in fn. 10, 16.

3)      Maintains banking accounts and conducts transactions with HSBC
        and HSBC USA and its network of institutions under its name and
        logo that assist in marketing, sale, advertisement, financing, of
        properties belonging to the Plaintiffs and the Class, JA270, JA240
        JA25 [D.I. 14] ¶¶ 2,3,8,9,10, 17-21, 31, 34, 35, 39-42, 45-60, 64-71.

4)      Maintained an operated a website directing members of the public to
        its office in Washington DC with an internet address of
        www.trncwashdc.org clearly identifying itself in the District of
        Columbia since the 1990's as admitted by the Defendant, [D.I. 20],
        21-23 (Opp. to Mot to Dism. Exhibits 1-20) – 1-20; JA126, JA 74
        [D.I. 15-2]  (Mot to Dism., Ex. 2 Hilmi Akil Affidavit), JA158 [D.I.
        26-10 (Hilmi Akil Supplemental Affid.

5)      The trncwashdc website was designed to direct customers/visitors to
        the TRNC office. The website content included forms and
        information for purchasing property, and other commercial acts,
        airline fares, cruises, banking transactions, tourism, hotels, laws, and
        the address of the Washington DC office and contact information.
        The trncwashdc.org website was interactive and had substantial
        visitors, Id.

6)      TRNC in agreement with and through the HSBC defendants,
        transfers monies to and with whom it conducts business transactions
        and maintains bank accounts, to at least pay the over $300,000.00
        expenses run through its DC office that paid for the construction,
        deployment, maintenance and operation of the trncwashdc.org
        website since 1996 and pays to create manufacture, print and
        distribute maps to members of the public in the District of Columbia
        residents, and other visitors, which website and maps identify the
        property belonging to the TRNC to the detriment of the Plaintiffs
        and the Class, Id.

7)      The TRNC has authorized a West Coast representative (who
        happens to be a business man and operating a substantial company)

15

**0449**

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 28 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 177
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 27 of 43

and a NY Representative all using the title of representative of the "Turkish Republic of Northern Cyprus" that has been alleged to advertise, sell, finance, market properties belonging to the Plaintiffs and the Class, JA175 [D.I. 20-2,11,14 – 16]; JA179 [D.I. 30] ¶¶ 36-57, 83-136.

8)    Mr. Akil admits that the "TRNC" office in Washington DC has been in contact (via e-mail, telephone and the U.S. mail) with business visitors in the District of Columbia, JA74, JA126, JA152, JA158, JA240, JA248, JA283 [D.I. 15-2, 20, 26-1] ( Akil Affid. ¶¶ 16, 23, 25 and 31).

9)    The HSBC Bank A.S operating in the occupied areas of the Cyprus under the "TRNC" authority and for its benefit, does facilitate the fraudulent property scheme by using the HSBC correspondent bank in the USA to launder monies to and from HSBC accounts including those belonging to TRNC agents[20] in the District of Columbia and from the areas it illegally controls affecting the rights and property of the Plaintiffs and the Class, JA179 [D.I. 30] ¶¶ 36, 40, 41, 42,43, 44, 45, 47, 48, 49,50, 51-57, 61-67, 83-136.

10)    The TRNC through its agents, use monies obtained from HSBC USA accounts to hire individuals to create a website, with content, and publish the content dedicated to non US Government contacts to further the commercial activities of the TRNC that includes banking, tourism, hotel accommodations and purchasing properties, which properties include those belonging to the Plaintiffs and the Class, with directed to individuals in the District of Columbia and to the offices of the TRNC in Washington DC that customers/visitors patronize. These customers/visitors to the District of Columbia TRNC office are provided information about purchasing property or tourist maps, JA16-23, JA74, JA126, JA152, JA154, JA158, JA175, JA240, JA248, JA270, JA271, JA283 [D.I. 15-2, 20, 26-1] (Akil Aff. ¶¶ 16, 23, 25, 31).

11)    TRNC promotes tourism, air fare and hotel accommodations which is a commercial activity by having maps available for its customers

---

[20] Including Mr. Akil and other representatives who are used to funds activities unrelated to US Government contacts.

**0450**

containing commercial information intended for distribution to customers or are available for them at the "coffee table" in the District of Columbia. Id.

12) Mr. Akil admits that visitors to the DC office seek to purchase property that would presumably include property owned by displaced Greek Cypriots or their families that is published, advertised and marketed as owned by the TRNC, and that they were allegedly "abandoned" by Greek Cypriots and that the TRNC will issue title to property to any investor, and provides them the forms to complete to obtain the TRNC titled property, is false deceptive and unrelated to US government contacts but clearly related to the claims of the Plaintiffs and the Class all occurring in the District of Columbia, Id. ¶ 25. ; JA74, JA126, JA158, JA179 [D.I. 30] TAC ¶¶ 107.

13) Direct affect of Money Laundering Operations in the US Banking system through banks in TRNC. JA7, [D.I. 14 ¶ 48, 14-2] (SAC, Exhibit B- US Dept. of Treasury- Office of Terrorism; U.S. Mission to EU Statement dated August 24, 2004; US Dept. of Treasury Financial Crimes Unit dated March 20, 2008).

**B.    Conspiracy Theory Based Jurisdiction allows the Acts of HSBC to be imputed to the TRNC to Establish Personal Jurisdiction.**

Under the "conspiracy theory of jurisdiction," "acts within the forum of one co-conspirator in furtherance of an alleged conspiracy, subject a non-resident co-conspirator to personal jurisdiction." See *Mandelkorn v. Patrick,* 359 F.Supp. 692, 696 (D.D.C.1973); *See Dooley v. United Technologies Corp.*, 786 F. Supp. 65, 78 (D.D.C.1992). Thus, in order to succeed on the conspiracy theory, plaintiff must allege 1) the existence of a conspiracy of which the defendants were members and 2) overt acts committed in the District of Columbia in furtherance of the

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 30 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 179
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 29 of 43

conspiracy. *See Dorman v. Thornburgh*, 740 F. Supp. 875, 878 (D.D.C.1990), *aff'd in part and appeal dismissed in part*, 955 F.2d 57 (D.C.Cir. 1992); *Hasenfus v. Corporate Air Servs.*, 700 F.Supp. 58, 62 (D.D.C.1988). However, "[b]ald speculations that defendants are alleged co-conspirators do not constitute a threshold showing necessary to carry the burden of establishing personal jurisdiction" over nonresident defendants under District of Columbia law. *Hasenfus*, 700 F. Supp. at 58.

Plaintiffs' and the Class have alleged sufficient facts detailing how the TRNC and HSBC Bank A.S or HSBC PLC through its correspondent bank HSBC Bank USA N.A., located in the US conspire to launder and transfer monies through the US banking system into Washington DC or otherwise assist the TRNC to maintain, operate or fund its operations worldwide and in DC that include(s) hiring employees, printing maps for commercial purposes, the financing of the websites and its false or deceptive content directly related to purchasing property and issuing title to property belonging to the Plaintiffs' and the Class and that such properties were abandoned**,** JA179 [D.I. 30] **¶¶** 83-111**.** Moreover, the defendants concerted actions and agreement formed a civil conspiracy violate the Bank Secrecy Act from conduct in the District of Columbia or within the US as the illegal benefits procured from the sales of illegal property or tourism occurring on property belonging to the Plaintiffs and the Class are transferred to and from, by

**0452**

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 31 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 180
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 30 of 43

and between, HSBC A.S. or HSBC Holdings PLC through HSBC USA and to the

TRNC Washington DC office through its HSBC bank accounts controlled or

maintained by the TRNC, through its agents,[21] in Washington DC.

Even absent minimum contacts, personal jurisdiction will still be found if

the defendant expressly or implicitly consents to suit in the forum state. *See Ins.*

*Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982)

(discussing "constructive consent" and noting, "[b]ecause the requirement of

personal jurisdiction represents first of all an individual right, it can, like other such

rights, be waived"). By hiring employees, representatives or lobbyists conducting

commercial acts in the District of Columbia or nationwide is constructive if not

expressed consent to the personal jurisdiction of the courts in the District of

Columbia, especially when the TRNC obtains a certificate of occupancy

purposefully availing itself of the laws and benefits of the District of Columbia

while stating it is doing business as a non profit entity that assumes it relies on tax

payers funds and federal assistance which has not been denied by the TRNC, is

such a waiver or consent.  Moreover, the TRNC's maintenance, control and use of

HSBC bank accounts in the District of Columbia, leasehold if not ownership of

realty in the District of Columbia, is further proof or consent or waiver by its

purposeful directed acts seeking the benefits of the District of Columbia, unrelated

---

[21] The TRNC agents' actions in New York and/or California are imputed to it
under the nationwide contacts test under FRCP 4k.

to US Government Contacts that establishes personal jurisdiction.

## C.   An Unincorporated Association Can Be Sued In Its Own Name.

The court also suggest that it is unlikely the TRNC has the capacity to be sued for state law claims in the District of Columbia, given the plaintiffs' repeated insistence that the TRNC is an "unincorporated association" D.I. *53* ¶¶ 4-5, fn.6. *citing Millenium Square Residential Ass'n v. 2200 M St., LLC*, 952 F. Supp. 2d 234, 243 (D.D.C. 2013) (quoting *Plan Comm. v. Pricewaterhousecoopers, LLP*, 2007 WL 1191917, at *3-4 (D.D.C. Apr. 20, 2007)) ("[T]he common law of the District of Columbia is that an unincorporated association may not be sued in its own name"); see also FED. R. CIV. P. 17(b)(3).

As the court has correctly identified the plaintiffs' have filed a class action, which under Federal Rule 23 allows an unincorporated association to be sued in its common name when a federal question or statute is the basis of the subject matter as is the case here. *See* FED. R. Civ. P. 23(a). "One or more members of a class may sue or be sued as representative parties on behalf of all ...."  Even the supplemental state law claims would be viewed differently under Rule 23, that would not affect this appeal.  *See United States v. Trucking Employers, Inc., II and III, 72 F.R.D. 101, 105-07 (D.D.C. 1976) and 75 F.R.D. 682, 687-91 (D.D.C. 1977).*

Exercising personal jurisdiction over a non resident defendant by having the

**0454**

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 33 of 44

USCA Case #23-1286   Document #010110991829   Date Filed: 01/29/2024   Page: 182
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 32 of 43

requisite contacts for at least one defendant or creating a defendant class for

personal jurisdiction has been employed in civil rights cases[23] and in actions

against unincorporated associations, such as labor unions. *See WRIGHT &*

*MILLER. FEDERAL PRACTICE & PROCEDURE: CIVIL § 1770, at 659 (1972)*.

### D.   TRNC's Nationwide Contacts Sufficient For Personal Jurisdiction.

Pursuant to Rule 4(k)(2), which states that service establishes jurisdiction if

"the defendant is not subject to jurisdiction in any state's courts of general

jurisdiction" and "exercising jurisdiction is consistent with the United States

Constitution and laws." Fed. R. Civ. P. 4(k)(2).  Under this provision, Plaintiffs are

not required to show that there is no jurisdiction in any state court over the TRNC.

*See Mwani*, 417 F.3d at 11. Because the TRNC "does not concede to jurisdiction in

another state, [this C]ourt may use 4(k)(2) to confer jurisdiction.'' *Id*. "Whether the

exercise of jurisdiction is 'consistent with the Constitution' for purposes of Rule

4(k)(2) depends on whether a defendant has sufficient contacts with the United

States as a whole to justify the exercise of personal jurisdiction under the Due

Process Clause of The Fifth Amendment." *Id.* Accordingly, the inquiry in this case

is whether the TRNC has sufficient contacts with the United States as a whole.

---

[23] Note, Damages in Class Actions: Determination and Allocation 10 B.C. INDUS. & COM. L. REV. 615, 619 (1969).

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 34 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 183
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 33 of 43

The TRNC has contacts[24] throughout the US as described herein that are not related to US Government contacts such as in Maryland where Mr. Akil has a residence, the ownership, maintenance and control of HSBC bank accounts or funds through HSBC USA, the hiring of a website designer allegedly located in Towson Maryland, which website falsely publishes on the internet and media that it was abandoned property and now claimed it nationalized the property and belongs to its offices in NY where the US Government contacts exception would be non existent, as well as the hiring of a Turkish Cypriot NJ attorney, to serve as local counsel with an Indiana Law Firm in seeking to claim ownership of property that was smuggled and trafficked under the TRNC or its predecessor's control from displaced Greek Cypriots, the Church of Cyprus. *See Autocephalous Greek Orthodox Church, et al v. Goldberg, et al*, 916 F.2d 278 (7th Cir. 1990); *See also Autocephalous Greek Orthodox Church v. Goldberg*, 717 F. Supp. 1374  (IN. 1989).

## II.   WHETHER THE COURT ERRED IN NOT FINDING PLAINTIFFS' STATED A CAUSE OF ACTION AGAINST THE HSBC DEFENDANTS-APPELLEES.

---

[24] The contacts include those previously mentioned and imputed HSBC Group contacts within the USA, including the TRNC bank accounts, and that HSBC USA serves as a registered agent in the US under the BSA for the HSBC Holdings, PLC and HSBC A.S operating under the control or authority of the TRNC.

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 35 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 184
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 34 of 43

The liability of the HSBC defendants and HSBC Group is supported by the Bank Secrecy Act, Title 31, United States Code, Section 5311 et seq. (the "BSA"), and its implementing regulations to address an increase in criminal money laundering activity through financial institutions. The BSA sets forth the minimum duties that were breached by the HSBC defendants that allowed transactions to occur affecting the rights of the Plaintiffs and the Class while furthering the fraudulent property scheme of the TRNC which used the US banking system to do so and is a source and/or the manner in which the TRNC office in Washington DC receives its funding, JA179 [D.I. 30] ¶¶ 42-107, 133-136.  Among other things, the BSA requires domestic banks, insured banks, and other financial institutions such as HSBC to maintain programs designed to detect and report suspicious activity that might be indicative of money laundering, terrorist financing, and other financial crimes, and to maintain certain records and file reports related thereto that are especially useful in criminal, tax, or regulatory investigations or proceedings.

The HSBC bank in the occupied areas of Cyprus alleged to be in the "TRNC" uses the HSBC Group members, including HSBC Bank A.S. to launder the monies through the HSBC USA[26] correspondent bank and has appointed the defendant HSBC USA to act as an agent for service of process in the United States as required by the BSA. Since the HSBC USA coordinates bank accounts for the

---

[26] HSBC USA is the registered agent for HSBC A.S. and HSBC Holdings, PLC under the BSA.

**0457**

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 36 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 185
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 35 of 43

TRNC (through its agents including those in Washington, DC) and transactions and for its benefit through these illegal transactions, then HSBC USA's personal jurisdictional contacts and that of HSBC A.S which has appointed HSBC USA as its registered agent should be imputed to the TRNC to establish co-conspirator personal jurisdiction.

Through the use of alleged 3rd persons[27] who are actually agents of the TRNC, and with the aid and assistance of the HSBC defendants and their banking system, the TRNC navigates it's way through the laws of the civilized world to harm the rights of US citizens and others consisting of the Plaintiffs' and the Class while it protects outlaws. Pursuant to Title 31, United States Code, Section 5318(h)(1) and Title 12, Code of Federal Regulations, Section 21.21, HSBC Bank USA was required to establish and maintain an anti-money laundering ("AML") compliance program that, at a minimum, provides for: (a) internal policies, procedures, and controls designed to guard against money laundering; (b) an individual or individuals to coordinate and monitor day-to-day compliance with the BSA and AML requirements; (c) an ongoing employee training program; and (d) an independent audit function to test compliance

---

[27] Including but not limited to HSBC Bank A.S and the corresponding HSBC USA is obligated under the Banking Secrecy Act to perform due diligence and identify money laundering operations like the ones occurring to the detriment of the Plaintiffs and the Class while benefiting from the TRNC scheme through its US based bank accounts with HSBC. JA179 [D.I. 30] ¶¶ 42-136.

programs. Pursuant to Title 31, United States Code, Section 5318(i)(1), banks

that manage private banking or correspondent accounts in the United States

for non-U.S. persons must establish due diligence, and, in some cases,

enhanced due diligence, policies, procedures, and controls that are designed

to detect and report suspicious activity related to certain specified accounts.

For foreign correspondent accounts, the implementing regulations require

that the due diligence requirements set forth in Section 5318(i)(1) include an

assessment of the money laundering risk presented by the account based on

all relevant factors, including, as appropriate: (i) the nature of the foreign

financial institutions' business and the market it serves; (ii) the type, purpose,

and anticipated activity of the account; (iii) the nature and duration of the

bank's relationship with the account holder; (iv) the AML and supervisory

regime of the jurisdiction issuing the license for the account holder; and (v)

information reasonably available about the account holder's AML record.

III.   **WHETHER THE COURT ABUSED ITS DISCRETION BY DENYING PLAINTIFFS' JURISDICTIONAL DISCOVERY.**

The plaintiffs requested jurisdictional discovery to "show the full extent of

[the TRNC's] contacts and representation made on the website, along with banking

and information relevant and indicative of its nature of business in the District of

Columbia, including meetings, visitors, loans, payments, articles, speaking

**0459**

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 38 of 44

Appellate Case: 23-1286   Document: 010110091829   Date Filed: 01/29/2024   Page: 187
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 37 of 43

engagements and business." JA7, JA16, JA19, JA20, JA23, JA54, JA74, JA126,

JA54, JA152, JA158 [D.I. 15-2, 26-1] (Akil Aff. ¶¶  16, 23, 25, 31); D.I. 20 ¶¶ 12-

13, 15, 17 n.11**.**  Such jurisdictional discovery "lies within the district court's

discretion," *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1147 (D.C.  Cir.

1994), However, discovery is appropriate "if it could produce facts that would

affect [the court's] jurisdictional analysis." *See Al Maqaleh v. Hagel*, 738 F.3d 312,

325-26 (D.C. Cir. 2013).   Jurisdictional discovery is not appropriate, however, "in

the absence of some specific indication regarding what facts additional discovery

could produce." Id. The plaintiffs therefore must "demonstrate with plausible

factual support amounting to more than speculation or conclusory statements that

discovery will uncover sufficient evidence" to establish personal jurisdiction. *See*

*Simon v. Republic of Hungary*, 2014 WL 1873411, at *41 (D.D.C. May 9, 2014);

*see, e.g., El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996),

*abrogated on other grounds by Samantar v. Yousef*, 560 U.S. 305 (2010) (plaintiff

was entitled to jurisdictional discovery based upon evidence of specific

transactions by defendant bank in the forum).

The district court abused its discretion to deny jurisdictional discovery as it

disregarded alleged contacts demonstrating a good faith basis existed. Personal

jurisdiction could be established from the TRNC held HSBC bank accounts or in

Mr. Akil's affidavit where there is sufficient evidence of non US Government

**0460**

contacts[29].  The TAC stated that, the TRNC through its agents created, owned, controlled and maintained a website, trncwashdc.org that is obviously directing web users including those in the District of Columbia to its website and offices, and according to Mr. Akil hired an independent contactor allegedly from Maryland to create the website and host the content for its office located in the District of Columbia, which content includes buying property belonging to displaced Greek Cypriots which consists of the Plaintiffs and the Class.

The TRNC further admitted through its representative that members of the public, presumably from the District of Columbia, do come to its office in DC that has nothing to do with communicating with the federal government.  Furthermore, The TRNC admits that some of the members of the public presumably from the District of Columbia seek to purchase property that again is not a government contact. These contacts which are non governmental in nature are enough for the court to exercise personal jurisdiction on its face, but at a bare minimum are enough to establish a good faith basis to allow jurisdictional discovery on the HSBC bank accounts owned or operated by the TRNC through its agents, and the HSBC USA transactions as a correspondent bank related to the subject matter of the claims of the Plaintiffs and the Class that demonstrate contacts sufficient for

---

[29] TRNC Customers or visitors seeking to buy property, maps with commercial information being published and distributed to customer/visitors in the District of Columbia Office of the TRNC; $300,000 being held in bank accounts maintained in HSBC accounts allegedly to operate its DC office.

0461

this court to exercise personal jurisdiction. *See Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998)(good faith belief); *see also Exponential Biotherapies, Inc. v. Houthoff Buruma N.V.*, 638 F. Supp. 2d 1, 11 (D.D.C. 2009) (holding that [j]urisdictional discovery … is justified only if the plaintiff reasonably 'demonstrates that it can supplement its jurisdictional allegations through discovery.'") (*quoting Kopff v. Battaglia*, 425 F. Supp. 2d 76, 89 (D.D.C. 2006)).

At the early stage of litigation and before discovery, plaintiffs cannot be expected to have complete knowledge of an alleged conspiracy or concealed facts of fraud in area controlled by individuals who discriminate against the Plaintiffs and the Class by selling their properties under the fraudulent property scheme described.  In opposition to defendants' motions to dismiss, plaintiffs asserted that "[t]he Court should deny the motions to dismiss by the TRNC and HSBC defendants prior to discovery." D.I. 20.  The District of Columbia Circuit also supports the Plaintiff's position that discovery should have been provided prior to dismissal on jurisdiction. See *Naartex Consulting Corp. v. Watt*, 722 F.2d 779 (D.C.Cir.1983), *cert. denied sub nom.*, *Naartex Consulting Corp. v. Clark*, 467 U.S. 1210 (1984) *and Edmond v. United States Postal Serv. Gen. Counsel*, 953 F.2d 1398 (D.C.Cir.1992) *(*per curiam). In *Edmond*, then-Circuit Judge Ruth Bader Ginsburg noted the importance of affording a plaintiff "ample opportunity" to take

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 41 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 190
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 40 of 43

discovery relevant to personal jurisdiction before dismissing a claim against a defendant. However, the court did need not decide whether plaintiff was abided a fair opportunity to pursue discovery keyed to the issue of personal jurisdiction because the court found that plaintiff's claim of conspiracy is sufficient to maintain personal jurisdiction.

## III.   THE COURT ABUSED ITS DISCRETION BY DENYING LEAVE TO FILE A THIRD AMENDED COMPLAINT.

The Plaintiffs' requested leave to amend their complaint for a third time which was denied based on futility. See DI  "The grant or denial of leave to amend is committed to the sound discretion of the district court." *See Triad at Jeffersonville I, LLC v. Leavitt*, 563 F. Supp. 2d 1, 11 (D.D.C. 2008) *(citing Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)). While leave to amend a complaint should be freely granted when justice so requires, see FED. R. CIV. P. 15(a)(2), the Court may deny a motion to amend if such amendment would be futile, *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

Based on the allegations made in the TAC,  the Plaintiffs' properly alleged sufficient facts namely that HSBC and the "TRNC", entered into a conspiracy, by agreement or assisted the other by allowing HSBC bank accounts with a nexus to the District of Columbia to be used to launder monies obtained through transactions upon property, titled by or alleged to be owned by the TRNC or its agents but in reality belong to the plaintiffs and the Class that can be further

identified with specificity from limited discovery which information is in the

exclusive control of defendants.

## CONCLUSION

For the reasons stated above the decision of the District Court should be reversed.

Dated:         August 10, 2015                Respectfully submitted,
               Washington, DC

                                              Tsimpedes Law Firm

                                              /s/Athan T. Tsimpedes
                                               DC Bar No. 45232
                                              1200 New Hampshire Avenue, N.W.,
                                              Suite 725A
                                              Washington, D.C. 20036
                                              Ph: 202-464-9910
                                              Fax: 202-747-2947
                                              athan@tsimpedeslaw.com
                                              *Attorney for Plaintiffs and the Classes*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    (i)   this brief contains [7509] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

    (ii)  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using *Microsoft Word 2010* in *14pt Times New Roman*

Dated: August 10, 2015        /s/ Athan T. Tsimpedes
                              *Counsel for Appellants*

**0465**

Case 1:21-cv-03043-RM-STV   Document 69-9   Filed 09/19/22   USDC Colorado   Page 44 of 44

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 193
USCA Case #14-7170   Document #1567109   Filed: 08/10/2015   Page 43 of 43

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 10th day of August, 2015, I caused this Brief of

Appellants to be filed electronically with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

David S. Saltzman                    Edward Brian MacAllister
Saltzman & Evinch, PC                Perles Law Firm, PC
1050 K Street, NW, Suite 1150        1050 Connecticut Avenue, NW, 10th Floor
Washington, DC 20001                 Washington, DC 20036
(202) 637-9877                       (202) 955-9055
dsaltzman@saltzmanevinch.com         emacallister@perleslaw.com

*Counsel for Appellee Turkish Republic of Northern Cyprus*

Michael O. Ware                      Paul Whitfield Hughes
Mayer Brown LLP                      Andrew John Pincus
1221 Avenue of the Americas          Mayer Brown, LLP
New York, NY 10020                   1999 K Street, NW
(212) 506-2500                       Washington, DC 20006-1101
mware@mayerbrown.com                 (202) 263-3000
                                     phughes@mayerbrown.com
                                     apincus@mayerbrown.com

*Counsel for HSBC Holdings PLC, HSBC Bank USA, N.A.*

I further certify that I caused the required copies of the Page-Proof Brief of

Appellants to be hand filed with the Clerk of the Court.

/s/ Athan T. Tsimpedes
*Counsel for Appellants*

**0466**

# EXHIBIT I

```
                                                               1
         C89QsokC1
 1       UNITED STATES DISTRICT COURT
 1       SOUTHERN DISTRICT OF NEW YORK
 2       ------------------------------x
 2
 3       MARK I. SOKOLOW, et al.
 3
 4                       Plaintiffs
 4
 5            v.                          04 CV 397 (GBD)
 5
 6       THE PALESTINE LIBERATION
 6       ORGANIZATION, et al.
 7
 7                       Defendants
 8
 8       ------------------------------x
 9                                       New York, N.Y.
 9                                       August 9, 2012
10                                       11:00 a.m.
10
11       Before:
11
12                       HON. GEORGE B. DANIELS
12
13                                       District Judge
13
14                          APPEARANCES
14
15       DAVID I. SCHOEN Attorney at Law
15            Attorney for Plaintiffs
16       2800 Zelda Road, Suite 100-6
16       Montgomery, AL 36106
17       DAVID I. SCHOEN
18       MILLER & CHEVALIER CHARTERED
18            Attorneys for Defendants
19       655 15th Street NW, Suite 900
19       Washington DC 20005
20       DAWN MURPHY-JOHNSON
20       LAURA FERGUSON
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

**0468**

```
                                                              2
      C89QsokC1
 1                 (In open court)
 2                 THE DEPUTY CLERK:  Mark Sokolow v. Palestine
 3      Liberation Organization 04 CV 397.
 4                 Please stand and state your name for the record
 5      starting with the plaintiffs.
 6                 MR. SCHOEN:  Good morning, your Honor.  David Schoen
 7      for the plaintiffs.
 8                 THE COURT:  Good morning, Mr. Schoen.
 9                 MS. MURPHY-JOHNSON:  Good morning, your Honor.  Dawn
10      Murphy-Johnson and Laura Ferguson on behalf of the defendants.
11                 THE COURT:  Good morning.
12                 MR. FERGUSON:  Good morning.
13                 THE COURT:  Let me first hear from defendants with
14      regard to the motion.
15                 MS. MURPHY-JOHNSON:  Would you prefer that I come to
16      the podium?
17                 THE COURT:  It would probably be easier for the court
18      reporter.
19                 MS. MURPHY-JOHNSON:  Your Honor, this is a complex
20      case that was filed in 2004 by 42 plaintiffs involving seven
21      attacks that occurred around Jerusalem between 2001 and 2004.
22                 The complaint asserts 13 counts against the
23      defendants.  The first count is a Federal Anti-Terrorism Act
24      claim.  The second through 13th counts are a mix of non-federal
25      claims and a variety of theories of liability and theories of
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

**0469**

3

C89QsokC1

1   damages.
2           The defendants have moved to dismiss plaintiffs
3   non-federal claims based on the defendant's lack of capacity to
4   be sued for those claims.  Those non-federal claims are the
5   second count which is wrongful death, the fourth count which is
6   battery, the fifth count which is assault, the seventh count
7   which is negligence, the eighth count which is the intentional
8   infliction of emotional distress, and the ninth count which is
9   the negligent infliction of emotional distress.  The plaintiffs
10  have also alleged in their papers that the sixth count, loss of
11  solatium and consortium is a cause of action.
12          Under Federal Rules of Civil Procedure 17(b)(3), the
13  law of the forum state controls the capacity of an
14  unincorporated association to be sued for non-federal claims,
15  and here that's New York General Associations's Law Section 13
16  under which an unincorporated association cannot be sued in its
17  own name.  And here the PA and PLO, which are unincorporated
18  associations, have been sued in their own names warranting
19  dismissal of those claims.
20          THE COURT:  Let me first start out with a basic
21  question, because the PLO has been in litigation before and has
22  taken different positions on that issue.  Is it your position
23  that you are conceding, admitting, acknowledging that the PLO
24  is in fact an unincorporated association?
25          MS. MURPHY-JOHNSON:  Well, your Honor, for purposes of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

C89QsokC1

this motion, yes.

1            THE COURT:  All right.  That's not the way I phrased
2     it, because for purposes of -- the real question is not for
3     purposes of this motion.  The real question is one of two:  If
4     that is what you acknowledge and admit, then that's going to be
5     the PLO's acknowledgment and admission, and every judge is not
6     going to have to go through this depending on what's to the
7     advantage or disadvantage of either party in terms of what they
8     want to assert.  But this is really your affirmative defense.
9            MS. MURPHY-JOHNSON:  Right.
10           THE COURT:  So, you have to tell me whether or not you
11    say that you're asserting this as an affirmative defense
12    because in fact the PLO is an unincorporated association and
13    acknowledges that and admits that and concedes that, and your
14    position is there's significant evidence to support this court
15    and every other court to make that determination for now and
16    all time.
17           MS. MURPHY-JOHNSON:  Well, as you are aware, your
18    Honor, historically, the PA and the PLO have argued that they
19    should be recognized as states or as nations, and routinely
20    every court that's addressed that issue has rejected that.
21           THE COURT:  Right.
22           MS. MURPHY-JOHNSON:  So, we have come to the point
23    where we have to acknowledge that we are unincorporated
24    associations because the courts refuse to acknowledge the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0471**

5

C89QsokC1

```
 1   defendant's status as states.
 2          THE COURT:  Well, let's put it this way, you have yet
 3   to convince a court that you have any evidence to demonstrate
 4   something other than that, so I'm trying to understand whether
 5   or not you -- again, this is your affirmative defense.  It's
 6   not a question of everybody else has done it so I should do it
 7   too.  It seems to me it's a question of fact, and either you
 8   say that that is the fact or you say that that is not the fact.
 9   It's a little awkward for me to have you argue that I should
10   make decisions on that basis, not because you say it's so, but
11   because you say other judges have assumed that to be the case.
12          MS. MURPHY-JOHNSON:  Could I seek the Court's
13   permission to have Ms. Ferguson address this particular
14   question?
15          THE COURT:  Surely.  Whoever has a straight answer for
16   me can address the question.
17          MR. FERGUSON:  Ms. Murphy-Johnson is at a disadvantage
18   because her exposure with the case is a little more recent than
19   mine.  I have been representing the PA since 2007.  I am
20   familiar with the litigation history of the immunity question,
21   so if I could clarify.  Predecessor counsel, since the lawsuits
22   began in the U.S. against the PA and the PLO, argue that the PA
23   should be treated as a sovereign state.
24          THE COURT: Right.
25          MR. FERGUSON:  And that argument really focused on the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0472**

6

C89QsokC1

1    PA rather than the PLO.  There is not really a conceivable
2    argument that the PLO has any even quasi-state status, but the
3    PA, they argued, as a quasi-state should be accorded sovereign
4    immunity.  And the courts acknowledged -- the courts found that
5    the facts just weren't there to support it.  In fact, the whole
6    conflict is over the PA's desire to be recognized as a state.
7    That hasn't happened yet.  So, when my firm came in to
8    represent the PA and PLO, we recognized that there was no
9    sovereign immunity defense, and that the cases needed to be
10    litigated on the merits.  So, that's what we've proceeded to
11    do.
12         So we are not making a state to a claim for the PLO.
13    We are not making a state to a claim for the PA.  If at some
14    point the PA becomes a recognized state, that would be
15    different, but here and now the PA is not a recognized foreign
16    state.
17         THE COURT:  That's even not my issue.  I am not asking
18    you whether you contend or don't contend in this litigation
19    that the PA or PLO is a sovereign state.  That's not the
20    question.  The question is solely the question of whether or
21    not -- I mean, it has been debated back and forth in almost
22    every single case in which the PLO is in, not just the issue of
23    whether it's a sovereign state, but because the determination
24    of whether it is or isn't a sovereign state is not a
25    determination that it is or is not an unincorporated

7

C89QsokC1
1    association.
2              The only question before me is whether or not in fact
3    the PLO and the PA have the status of being an unincorporated
4    association.  If that is your position, whether or not it is or
5    isn't a sovereign state, whether or not for all purposes -- for
6    purposes of service, for purposes of standing, for every other
7    purpose -- if you are urging me to make the conclusion that you
8    say is acknowledged by the PA and PLO, that you are in fact an
9    unincorporated association.
10             MR. FERGUSON:  There is only a certain number of
11   potential baskets the PA and PLO can fall within.
12             THE COURT:  I mean, I don't know.
13             MR. FERGUSON:  We are not a corporation, not a
14   partnership, not a state.
15             THE COURT:  If you say so.
16             MR. FERGUSON:  Right.  Yes, I think the best framework
17   for these are sui generis entities is under the Federal Rules
18   of Civil Procedure and unincorporated association, and that's
19   how the courts have treated the PLO, how the Southern District
20   of New York treated the PLO in the Klinghoffer case.  That's
21   how the District of Columbia has treated the PA and the PLO in
22   the Kliman and Parsons case, as unincorporated associations.
23   We accept that designation.  And even the plaintiffs have
24   acknowledged the PLO is an unincorporated association.
25             THE COURT:  Well, but that is where I have to start
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

0474

8

C89QsokC1

```
 1  because I have been asked basically to take judicial notice of
 2  this fact.  While I can take judicial notice that the other
 3  courts in their resolutions of the issues that were before them
 4  said for the purpose of those issues that the PLO is an
 5  unincorporated association, that isn't quite judicial notice.
 6  I'm not sure that it's appropriate for me to take judicial
 7  notice that that is in fact true because another judge has
 8  ruled that way.  If that was the case, I couldn't disagree with
 9  my colleague next door because they ruled one way and I've
10  decided to rule a different way.  I can take judicial notice
11  that they've ruled that way, but I can't take judicial notice
12  that that's either a fact independently or that that is the
13  legal consequence for all time in every case or even if I had
14  made the same decision, given the same set of circumstances
15  that I would have made the same judgment.
16          So, as I say, my attitude is it's more in the hands of
17  the PLO and the PA as to what it is that you say the facts
18  demonstrate that you are rather than an argument that simply
19  you've made the opposite argument and have lost that argument,
20  and so, therefore, since you've lost the argument, everybody
21  else has to accept it in every litigation even though your
22  position might be different.
23          MR. FERGUSON:  Your Honor, I don't think there is much
24  dispute or uncertainty about what the basic facts are of what
25  the PA is or what the PLO is.  The question is, how do you
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

**0475**

9

C89QsokC1

1    categorize that sort of sui generis entity for purposes of the
2    U.S. Federal Rules of Civil Procedure.
3            THE COURT:  Well, no, I think that there is --look,
4    the fact is that it may or may not be my role, but I know
5    what's going to happen; that if you are going to argue to me,
6    literally, and I think it's appropriate, it's time to stop
7    debating this issue depending on whether it's to the advantage
8    of some plaintiff or the advantage of the defendant.
9            If you want me to accept the fact that the PLO is in
10   fact an unincorporated association, then you're going to have
11   to tell me that, and you tell me that it is and tell me why it
12   is, and tell me the evidence supports that, and my guess is
13   that people are going to quote this back to you in future
14   litigation because I don't think it's appropriate for me to
15   have you tell me that I should make that determination and the
16   consequences for that determination in this case, and then you
17   represent that to me in this case, and then the next case if
18   it's not to your advantage for either service or some other
19   purpose, then you want to make the opposite argument because,
20   you know, this is not --
21           MR. FERGUSON:  I accept that, your Honor.
22           THE COURT:  -- it's not so much a legal argument.  It
23   is a fact; either you are an unincorporated association or
24   you're not an unincorporated association, and you have to tell
25   me whether or not you believe it is so, and you have to tell me

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

10

C89QsokC1

1   on what basis you believe that, particularly in this context
2   because this is your affirmative defense.
3           MR. FERGUSON:  Right.  I believe the PLO is an
4   unincorporated association.  I believe it should be treated as
5   an unincorporated association because it is sort of an umbrella
6   group for a variety of political parties and factions who share
7   a common purpose of a Palestinian national movement with
8   recognition of a Palestinian state.  It's not incorporated.  It
9   is a loose affiliation of members who share a common purpose.
10   So it best falls under the rubric of an unincorporated
11   association.
12           THE COURT:  On what basis do I even have in this
13   record at this stage of the proceeding to say that the PLO has
14   members?  Who are the PLO's members?
15           MR. FERGUSON:  Your Honor, I could first say that the
16   plaintiffs have acknowledged the PA is an unincorporated
17   association.  Their argument is that the law where it is --
18   where the association was formed to govern its capacity to be
19   sued, but they don't contend that it's not an unincorporated
20   association.  There is no dispute between the parties about the
21   PLO's status.
22           But with respect to the membership of the PLO, the PLO
23   represents all the Palestinians, including the Palestinians
24   that are in the Diaspora, so those that are not in the West
25   Bank and the Gaza Strip.  And they represent all those

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0477**

11

C89QsokC1

1   Palestinians who share in the Palestinian national movement.
2          THE COURT:  That's not the definition of an
3   unincorporated association.  The fact that they take the
4   position that they represent the interest of all of those
5   individuals does not make all of those individuals members of
6   the PLO.  That is not the definition of an unincorporated
7   association for legal purposes.
8          MR. FERGUSON:  Well, I can refer the Court to the
9   Kliman decision in the District of Columbia where it concluded
10  that the PLO fell within the definition of unincorporated
11  association precisely because it's composed of individuals
12  without a legal identity -- I'm quoting from the Kliman
13  decision from the District of Columbia.
14         It has been determined by other federal courts that
15  the PLO qualifies as an unincorporated association because it
16  is "composed of individuals without a legal identity apart from
17  its membership formed for specific objectives."  Citing the
18  Ungar decision from Rhode Island and also the Klinghoffer
19  decision from this court.
20         So, with respect to the PA, again, it's this problem
21  of a sui generis entity.  It has an executive branch.  It has a
22  legislative branch.  It has courts.  It took the position we
23  are close enough to a state, we should be treated as state for
24  some purposes.  That's been rejected.
25         THE COURT:  I understand that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0478

12

C89QsokC1

1          MR. FERGUSON:  So that's why I accept that the next
2     best framework is unincorporated association.
3          THE COURT:  But there is no such thing as a default
4     framework.  You see what I'm saying?  So you can't say that
5     because it's not an apple, it must be an orange.  That's not
6     the way it works.  As I say, you have to tell me why you say
7     it's unincorporated -- is your position that the PA is an
8     unincorporated association?
9          MR. FERGUSON:  Yes, it is, and because we have to pick
10    a set of rules that govern capacity to be sued, that govern
11    service of process, that govern immunity, and we have to define
12    for U.S. law purposes how we're going to treat the sui generis
13    purposes for purposes of applying the Federal Rules of Civil
14    Procedure.
15         THE COURT:  But you are defining that because you give
16    me a set of factors that meet that definition, and then you
17    tell me why the PA or the PLO meets those factors.  It's not an
18    analysis that if the PLO or the PA has been rejected, it's one
19    thing, they must be by default something else, that's an
20    unincorporated association.  That's not true.  Because if
21    you're not a state, you could be a corporation.  You could be,
22    you know, a partnership.  There are a lot of things you could
23    be depending on the facts.
24         So, the question is not, you know, is there a space to
25    push them in.  The question is what is the nature of the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

**0479**

13

C89QsokC1

 1    organizations, and in what way does the nature of that
 2    organization meet the requirements of being an unincorporated
 3    association?  Now, you know, this first question may be much
 4    ado about nothing because when I ask them the same question,
 5    they may say to me, well, Judge, that's what we think they are,
 6    and then they have to give me a good reason then why they
 7    shouldn't be treated that way for all purposes.
 8            But I just want to first start out with the premise
 9    because almost every other case you've cited to me in which the
10    court ruled that -- and not in all contexts, but in most
11    contexts it had to deal with the issue of service, but there
12    were some cases that also had to --
13            MR. FERGUSON:  The Parsons case specifically addressed
14    the capacity of the Palestinian Authority to be sued for
15    non-federal law claims.
16            THE COURT:  But in every one of those cases, my
17    recollection is -- and you correct me if I'm wrong -- in every
18    one of those cases the PLO and the PA took the opposite
19    position, said that they were not.
20            MR. FERGUSON:  That they were not?
21            THE COURT:  Unincorporated associations.
22            MR. FERGUSON:  I don't think that's the case in
23    Parsons, your Honor.
24            THE COURT:  You think the case in Parsons -- I have to
25    look at that, but I don't -- I'm not sure they even

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

**0480**

14

C89QsokC1

1 specifically took that position.  Maybe in Parsons they took
2 the position for the purpose of capacity and --
3          MR. FERGUSON:  In Parsons we did not argue sovereign
4 immunity.  That was one of the recent cases that was filed --
5          THE COURT:  Right.  And my recollection was that not
6 in Parsons that you said -- I don't know if you were in
7 Parsons.
8          MR. FERGUSON:  I think how we framed it is that the PA
9 and the PLO -- or especially the PA has argue stages.  That has
10 been rejected.  The PA accepts that that's the consistent
11 ruling of the U.S. courts and, therefore, the PA should be
12 treated as an unincorporated association, as the court did in
13 Kliman.
14          THE COURT:  I remember everything that you just stated
15 except the fact that you say you accept that.  I'm not sure
16 that I read -- I don't know what the underlying position was,
17 but in the case law that I read, I am not sure that you said we
18 accept the fact that we are unincorporated association.
19 Obviously, you wanted the benefit of excluding the cause of
20 action, the underlying cause of action, if that was what the
21 finding was going to be, but I'm not sure that you urged upon
22 the court that in any of those cases that the PA and/or the PLO
23 was in fact an unincorporated association.
24          MR. FERGUSON:  I can tell you that the PA is no longer
25 standing on sovereign immunity claims and takes the position
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

**0481**

15

C89QsokC1

1   that it's best treated for the Federal Rules of Civil Procedure
2   as an unincorporated association, and that's what the courts
3   consistently have done.
4            THE COURT:  Well, best treated is not --
5            MR. FERGUSON:  Well, it's not a corporation.  It's not
6   a partnership.  What is it is the problem.
7            THE COURT:  Well, no, I understand that, but the
8   question before me is not what it's best treated as.  The
9   question before me is whether you have an affirmative defense
10  of lack of capacity to be sued because you are in fact an
11  unincorporated association.  Isn't that really the only issue
12  for me at this point?
13           MR. FERGUSON:  There are two issues before you.  One
14  is whether there's a capacity to -- whether the PA and PLO have
15  the capacity to be sued.  The second is whether the Court
16  should decline exercise of supplemental jurisdiction.
17           THE COURT:  But I haven't gotten to that yet.
18           MR. FERGUSON:  But with respect to the capacity
19  question, yes, a threshold determination undoubtedly is that
20  the PA and PLO are unincorporated associations.  I don't think
21  there's any dispute as to the PLO.
22           As to the PA, you know, it's a group of Palestinians
23  living in the West Bank and Gaza Strip, and there is a
24  governmental structure there, but it is not treated as a state.
25           THE COURT:  But as you just described it is not the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

0482

16

C89QsokC1

 1   definition of an unincorporated association.
 2            MR. FERGUSON:  The question is then how do we
 3   determine this thing's capacity to be sued and how it should be
 4   served?
 5            THE COURT:  I don't know, but that's not my issue at
 6   this point.  The only issue for me right now is whether or not
 7   in fact the PA should be dismissed from this case because --
 8            MR. FERGUSON:  Certainly we're not -- right, the
 9   Anti-Terrorism Act may continue the court case.
10            THE COURT:  Yes, I misstated it.  Whether or not
11   the -- I'll call them the common law clauses of action.
12            MR. FERGUSON:  Right.
13            THE COURT:  The common law causes of action should be
14   dismissed because it is an unincorporated association and the
15   law indicates that an unincorporated association does not have
16   the capacity to be sued.
17            MR. FERGUSON:  Your Honor, I can't stand here and kind
18   of neatly tick off the elements of the PA and sort of link them
19   directly to a definition of unincorporated association.  Courts
20   that have looked at this issue have found that that's the best
21   framework.  That's really all I can offer you.  But if this
22   seems too -- you know, the fact that the PA is so sui generis
23   that it makes it difficult to resolve the capacity argument,
24   then that is really sort of another reason that the Court
25   should not take on the seven non-federal law claims because,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

**0483**

17

C89QsokC1

1    again, this is another aspect of the complexity that these
2    claims bring to the case.
3              THE COURT:  Then the way I am trying to analyze it is
4    that may or may not be -- that may be correct, but the question
5    is, does that mean that this can be resolved at this stage of
6    the proceeding rather than at a later stage of the proceeding.
7              MR. FERGUSON:  I cannot contemplate any discovery that
8    would shed any light on whether the Palestinian Authority
9    should be treated as an unincorporated association.  The Oslo
10   Accords that set up the Palestinian Authority are widely
11   available.  They're a matter of public record.  So the
12   structure of the PA is well-known.  There is no discovery that
13   would aid this inquiry.  Ultimately, we're left with the sui
14   generis entity and we have to decide what basket it best fits
15   into.  I recognize this is a novel question and it doesn't fit
16   neatly into any of the baskets, but that's what we're left
17   with.  I think I've hijacked Ms. Murphy-Johnson's argument.
18             THE COURT:  Go ahead.
19             MS. MURPHY-JOHNSON:  I am looking at to where we
20   should next go.
21             THE COURT:  I mean, your basic argument is fairly
22   straightforward.
23             MS. MURPHY-JOHNSON:  It is.
24             THE COURT:  And your basic argument is that -- if I
25   articulate it correctly -- that the PLO, that you have an
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

**0484**

18

C89QsokC1

1   affirmative defense that requires no further factual
2   examination, and that affirmative defense is that the PLO and
3   the PA are unincorporated associations, meet that definition
4   for all purposes, and, therefore, whatever rules apply to an
5   unincorporated association with regard to the common law claims
6   should apply in this case.
7           MS. MURPHY-JOHNSON:  Correct.
8           THE COURT:  Fairly straightforward argument.  I can
9   accept that if everyone says to me that that's the way the
10  issue is to be viewed.  As I say, it doesn't make the case go
11  away.  The only thing I disagree with initially in terms of the
12  proposition is that I think all of the claims that you ticked
13  off, other than the last claim, would fall into that category
14  because I'm not sure that -- was it Count Six?
15          MS. MURPHY-JOHNSON:  Yes.
16          THE COURT:  I'm not sure that Count Six would qualify
17  as an independent cause of action.
18          MS. MURPHY-JOHNSON:  Right, and we take that position
19  as well.
20          THE COURT:  They can explain to me if they think that
21  that's an independent cause of action, but I don't know of any
22  underlying elements of liability that independently prove to
23  demonstrate that as an independent cause of action unless
24  you've established an underlying cause of action.  That seems
25  to me to be also related to the issue of damages.  I thought
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

**0485**

19

C89QsokC1

1   that the plaintiffs pretty much argued that or at least lumped
2   that into the same category as the other claims, but maybe not.
3   Hold on just a second.
4           MS. MURPHY-JOHNSON:  Your Honor, if I might --
5           THE COURT:  Yes.
6           MS. MURPHY-JOHNSON:  -- in the plaintiff's opposition
7   to our motion -- this is DE-196 at page 3 -- the plaintiffs
8   grouped Count Six in with what they characterized as
9   garden-variety non-federal causes of action.
10          THE COURT:  I'm sorry.  Where are you looking, at page
11  3 of their response?
12          MS. MURPHY-JOHNSON:  Yes.
13          THE COURT:  Oh, I see.  Yes.  Then I will discuss that
14  with them.  All right.
15          Well, if you have anything further to say you want to
16  say about the standing issue, then I will hear you; otherwise,
17  let's just talk briefly about your argument that I should not
18  assert supplemental jurisdiction.
19          MS. MURPHY-JOHNSON:  Certainly.  We'll shift gears
20  then to that argument.
21          So, independent of this capacity issue, the defendants
22  request that the Court nonetheless decline to exercise
23  supplemental jurisdiction over the plaintiff's non-federal
24  claims under 28 U.S.C. 1367 which states that the Court can
25  decline to exercise supplemental jurisdiction if non-federal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0486**

20

C89QsokC1

1   claims raise complex questions of foreign law or if they would
2   come to substantially predominate over the federal claim at
3   issue in the case.
4         We strongly feel that that is what would happen here.
5   The case is already inherently complex on the federal grounds
6   alone.  There are seven different attacks involved over a
7   period of three years, all involving different factual
8   scenarios, potentially different militant groups allegedly
9   involved.  There are 42 plaintiffs.
10        THE COURT:  So why should I double that?
11        MS. MURPHY-JOHNSON:  Why should you quadruple that?
12   Quintuple that?
13        THE COURT:  Right.  But my question is different than
14   your question.  You are asking why should I quadruple that in
15   this case.  I'm saying why should I quadruple that in two to
16   four different cases?  What sense does that make?  Why should
17   you have to go through this twice, here and in another
18   jurisdiction?
19        MS. MURPHY-JOHNSON:  Well, because here doing so would
20   mean engaging experts on potentially up to four or five
21   different foreign bodies of law --
22        THE COURT:  Well, they argued that -- look, as I said,
23   this isn't rocket science.  Wrongful death is wrongful death.
24   What expert do I need to tell me -- I don't see any place where
25   you argued, one, that -- well, I'm not quite sure what your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
                                                                21
        C89QsokC1
 1   position is as to where these supplemental claims should be
 2   litigated and what law should apply.
 3           MS. MURPHY-JOHNSON:  The question of what law should
 4   apply is actually a very complicated one since the Second
 5   Circuit issued its decision in the Licci matter.  I don't know
 6   if I'm pronouncing that correctly.
 7           THE COURT:  OK.
 8           MS. MURPHY-JOHNSON:  There the Second Circuit held
 9   that the law of the jurisdiction having the greatest interest
10   on litigation should be applied.  And then tort cases such as
11   negligence intentional infliction of emotional distress where
12   conduct-regulating rules apply, the law of the location where
13   the tort occurred applies.
14           THE COURT:  Who is going to make that determination?
15   And what are you urging that determination to be?
16           MS. MURPHY-JOHNSON:  Well, if I could, I'm not sure
17   that it necessarily warrants a definitive determination.  I
18   think that the question itself presents so much complexity and
19   we could engage in years of litigation over which law actually
20   applies.
21           THE COURT:  But why?  I understand that in the
22   abstract, but I don't understand how that applies to this case,
23   and I am not sure how it makes it more efficient to do that in
24   two or three different forums when we're all talking about the
25   same underlying activity --
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

```
                                                          22
        C89QsokC1
  1              MS. MURPHY-JOHNSON:  Sure.
  2              THE COURT:  -- that just translates into different
  3    causes of action.  I mean, their argument is this:  That there
  4    are only two choices.  You are either going to apply New York
  5    law or you're going to apply Israeli law.  I don't know if you
  6    say there is a third choice, but you haven't articulated a
  7    third choice, so at least we've narrowed it down to two
  8    choices.
  9              MS. MURPHY-JOHNSON:  If I might articulate that now.
 10    As we attempted to articulate in our June 6 letter to the
 11    Court, because of the Licci decision, it does appear that there
 12    is another alternative here, aside from New York law and
 13    Israeli law, and that would be however we would characterize
 14    Palestinian law because that is where the PA and the PLO at
 15    least for some part --
 16              THE COURT:  Where do I look to find Palestinian law?
 17              MS. MURPHY-JOHNSON:  Well, yes.  That's how --
 18              THE COURT:  Where does any forum look to find
 19    Palestinian law?
 20              MS. MURPHY-JOHNSON:  Well, I will tell you.
 21              THE COURT:  Wait.  Stop.  So, you are saying that
 22    there is such a thing as Palestinian law that's been applied in
 23    a court of law to resolve these disputes?
 24              MS. MURPHY-JOHNSON:  I can't say for sure because I'm
 25    not an expert on Palestinian law.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

23

C89QsokC1

1           THE COURT:  Well, you got to say for sure, otherwise,
2     I can't accept that argument.  You can't just make it up.
3           MS. MURPHY-JOHNSON:  I'm not making it up.
4           THE COURT:  Well, that's as I say -- let's put it this
5     way:  They argue that there are certain injuries and deaths
6     that occurred in Israel, so, therefore, under normal
7     circumstances, given the fact that there are U.S. citizens,
8     that the -- and I characterize them as the common law causes of
9     action will either be causes of action under New York law or
10    causes of action under Israeli law.  In the first instance that
11    makes sense.
12          You say now that there's something else called
13    Palestinian wrongful death law that is somehow different than
14    Israeli or New York law that some court needs to go through --
15    and I'm not sure which court you say needs to do that -- but
16    some court needs to go through and determine what that is in
17    order to litigate that issue.  Is there something called
18    Palestinian wrongful death law?
19          MS. MURPHY-JOHNSON:  Just like everything else in this
20    case, that is also a complicated question, and I know that's
21    not helpful to you.
22          THE COURT:  It's not a complicated question.  It's a
23    very simple question.  If you can tell me there is such a
24    thing, then I will say, all right, then somebody has to analyze
25    that.  If you can't tell me that you have a basis to say there

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0490**

24

C89QsokC1

1   is such a thing, then why is that a consideration for me?
2           MS. MURPHY-JOHNSON:  Over history, depending on what
3   foreign nation has governed the region, those various
4   countries' laws have been exercised in the Palestinian
5   territories, and over a time they've all become layered on top
6   of each other.
7           So, for conduct that occurred in the Gaza Strip,
8   arguably Ottoman Law could apply because at some period of time
9   Ottoman Law governed that region.  And if certain conduct
10  occurred in the West Bank, there could be a combination of
11  British Mandate law, Jordanian Law, Israeli mililtary orders or
12  Israeli law, but this has all been --
13          THE COURT:  Well, what does that have to do with the
14  plaintiffs wanting to invoke and having available to them to
15  invoke either the laws of Israel or the laws of New York?  If
16  your argument is that they cannot establish their cause of
17  action under one of those laws, then you may prevail on summary
18  judgment or before a jury in being able to convince the Court
19  or a jury that, no, protections of those laws do not apply
20  here.  But what does that have to do with my declining to
21  assert jurisdiction over this?  How is this somehow easier for
22  some other court to deal with and address than this Court?
23          MS. MURPHY-JOHNSON:  The plaintiffs themselves believe
24  that they could potentially bring these cases, the non-federal
25  claims, in Israeli courts.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0491**

                                                                    25

C89QsokC1

 1                 THE COURT:  Right.
 2                 MS. MURPHY-JOHNSON:  But I'm not saying that the
 3     choice is solely between -- and if this court were to exercise
 4     supplemental jurisdiction here, that it's a question of
 5     choosing between New York law and Israeli law.  My only extra
 6     additional point is that if this Court were to address these
 7     claims, there is likely this third body of law that's developed
 8     over the past several decades in the Palestinian courts
 9     involving all these different layers of foreign law.
10                 So my point is, that if the Court were to accept
11     supplemental jurisdiction over those claims, even the choice of
12     law issue alone adds so much complexity to an already complex
13     case that there is no doubt that these non-federal claims would
14     come to predominate over the federal ATA claims.
15                 THE COURT:  But I don't understand in the detail of
16     that argument what that argument means.  It sounds
17     superficially logical, but what is it that this Court has or
18     any court has to determine?  They will invoke -- and you will
19     either agree or disagree -- that they have the protection of
20     either New York State common law or Israeli law, and they will
21     say that we can prove that those laws do apply and should be
22     applied and we can prove our cause of action under those laws.
23                 MS. MURPHY-JOHNSON:  But I think under Licci that that
24     is not accurate any more because the defendants -- if the
25     defendants solely committed their tortious acts in Israel, then
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

26

C89QsokC1
```
 1   under Licci, Israeli law would arguably apply.  But there is a
 2   whole list of allegations in the complaint that the PA and PLO
 3   from their headquarters, which are not in Israel, acted
 4   negligently to, for example, release prisoners who then went on
 5   to allegedly commit these acts.
 6             THE COURT:  OK.
 7             MS. MURPHY-JOHNSON:  Or paid people from their
 8   headquarters, which are not in Israel, to commit acts.
 9             THE COURT:  What does that have to do with a cause of
10   action for negligence?
11             MS. MURPHY-JOHNSON:  I'm sorry?
12             THE COURT:  I'm just trying to pick a cause of action.
13   Explain to me how that complicates any one of these causes of
14   action.
15             MS. MURPHY-JOHNSON:  Because then the PA or the PLO
16   acted in the West Bank negligently to release a given prisoner
17   who then went and committed an attack.
18             THE COURT:  But that's not the nature of anyone's
19   claim here.
20             MS. MURPHY-JOHNSON:  I'm sorry?
21             THE COURT:  That's not the nature of anyone's claim
22   here.
23             MS. MURPHY-JOHNSON:  It is.
24             THE COURT:  Whose?
25             MS. MURPHY-JOHNSON:  The plaintiffs have alleged that.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0493**

27

C89QsokC1

1                THE COURT:  Have alleged what?
2                MS. MURPHY-JOHNSON:  That the PA or the PLO have
3     released certain people who were in their custody intentionally
4     for the purpose of committing acts of terror.
5                THE COURT:  OK.  Maybe I have to go back to the
6     complaint again.  I will accept your premise for now, but I'm
7     not quite sure where you say that that requires some other
8     alternative choice of law.
9                MS. MURPHY-JOHNSON:  Well, that's what Licci tells us.
10    In Licci the question was -- and, unfortunately, it was a
11    question between New York law and Israeli law, so I don't want
12    to cabinet in those terms, but there the court found that
13    American Express had acted in New York.
14               THE COURT:  Right.
15               MS. MURPHY-JOHNSON:  Those acts then resulted in
16    rocket attacks in Israel, but New York law applied because New
17    York is where American Express took its actions.  So what I'm
18    saying is Palestinian law, however one eventually comes to
19    define it, would apply to any claim that the plaintiffs have
20    that the PA acted tortiously within the Palestinian
21    territories.
22               THE COURT:  So who is supposed to decide, and why is
23    it somehow more convenient for some other court to decide
24    that -- and even more convenient for the parties for some other
25    court to decide that rather than in the case in which you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0494**

                                                                    28
        C89QsokC1
 1   litigated already the issues with regard to the injuries and
 2   deaths for the crime?
 3           MS. MURPHY-JOHNSON:  Because if it were litigated
 4   here, it adds a substantial layer of complexity.
 5           THE COURT:  How?  All I have to do is decide if you
 6   weren't giving me Ottoman Law.  In their brief it says Ottoman
 7   Law applies, and, therefore, this is your defense, I'm sure I
 8   could decide that.  That wouldn't take any more time than it
 9   has taken me to decide any of the other motions that I have to
10   decide.
11           MS. MURPHY-JOHNSON:  Because I think, your Honor, it
12   would become so much more complex because of the number of
13   claims involved, the number of plaintiffs involved, the
14   theories of liability, whether it's direct liability or
15   respondeat superior.
16           THE COURT:  That's going to be true whether or not the
17   supplemental claims went somewhere else or not.
18           MS. MURPHY-JOHNSON:  True, but on top of that we would
19   have to hire experts.
20           THE COURT:  You're going to have to do that anyway.
21           MS. MURPHY-JOHNSON:  We're going to have to have
22   translators.  Everything is in a foreign language.
23           THE COURT:  You're going to have to do that anyway.
24   I'm sorry, I didn't mean to interrupt you, but I'm trying to
25   focus you on this issue.  Part of my analysis is, you're saying
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

29

C89QsokC1

1   that -- and you're not saying that I'm required to do it or you
2   have a right for me to have to settle this on this basis.  I
3   have the discretion to do this, and you're asking me to
4   exercise my discretion appropriately to do this.
5            My question is, first, if I do this, I must consider
6   whether there is a reasonable alternative forum for the parties
7   to litigate this dispute.  What do you claim is the reasonable
8   alternative forum that I should decline jurisdiction over these
9   claims so that those claims can be litigated in another forum?
10  Do you understand my question?
11           MS. MURPHY-JOHNSON:  I do understand your question,
12  but to tell you the truth, I'm wondering if that is more
13  appropriate if this were being raised as a forum non conveniens
14  argument.
15           THE COURT:  But I can't imagine that it would be
16  appropriate for me to act properly and not abuse my discretion
17  by declining to assert supplemental jurisdiction over what
18  would otherwise be valid claims if the consequence of that is
19  that the plaintiff has no forum in which to litigate those
20  claims.
21           MS. MURPHY-JOHNSON:  Well, the plaintiffs themselves
22  have said that they believe that Israel could be a proper forum
23  for these claims.
24           THE COURT:  But you say no.
25           MS. MURPHY-JOHNSON:  No.  I'm saying that Israeli law
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

**0496**

30

C89QsokC1

 1   might not necessarily apply; not that Israel might not be the
 2   proper forum for the claims.
 3            THE COURT:  So are you saying that I should decline
 4   jurisdiction over these claims in order that the plaintiffs can
 5   re-assert these claims in an Israeli court if they wish.
 6            MS. MURPHY-JOHNSON:  Correct.
 7            THE COURT:  All right.  That's all I'm trying to say.
 8            MS. MURPHY-JOHNSON:  OK.  Let me see if there was
 9   anything else.
10            THE COURT:  All right.  Let them respond because I
11   have some questions for them, and then I will let you respond.
12            MS. MURPHY-JOHNSON:  Thank you very much, your Honor.
13            MR. SCHOEN:  Your Honor, I'm David Schoen, and I
14   represent the plaintiffs.  I see the Court has read the papers
15   thoroughly, so I don't intend to just reiterate what's in the
16   papers.  I'd actually like to start at a different place than I
17   intended originally, just to respond to a couple of things that
18   were said, and maybe the lead line is, quite frankly, a comment
19   the Court made.  This applied to Section 1367, the choice of
20   law argument.  The Court said -- I'm paraphrasing -- it
21   understands this argument in the abstract but does not
22   understand how it applies in this case.  That's it in a
23   nutshell.
24            That's exactly, with all due respect, what happened
25   here.  A number of legal arguments were thrown against the wall

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0497**

31

C89QsokC1

```
 1   to see which stick, but when you break it down to this case,
 2   none of them applies to this case.  We don't get, for example,
 3   to the choice of law issue and these so-called complicated
 4   questions of now we hear Palestinian law or Israeli law because
 5   they've never shown there was a conflict between New York law
 6   and those laws.  In fact, the Court well versed in these issues
 7   commented in the Licci case that the Court is familiar with
 8   Israeli law, and when it comes to these kinds of things, there
 9   really isn't any difference.
10            But I heard some things today in the argument that,
11   quite frankly -- and, again, I mean it with all due respect --
12   I was quite surprised to hear.  For example, we heard from
13   Ms. Ferguson today the rather shocking proposition which turns
14   everything on its head that if the -- I'm paraphrasing again --
15   the fact that the question of whether the PA is an
16   unincorporated association is too difficult to really determine
17   should argue against hearing these claims, should make you
18   dismiss these claims and send it away because we can't tell if
19   it's an unincorporated association.
20            The defendants have missed their burden here
21   completely and missed the appreciation of their burden in all
22   regards.
23            Again, as the Court noted, we can't appear before this
24   court and say, well, one argument didn't work; therefore, maybe
25   this one will work, and then flowing from that should be the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0498**

32

C89QsokC1

1   prejudice to these plaintiffs because contrary -- and I know
2   she believed it when she said it -- but contrary to what
3   Ms. Murphy-Johnson said, we don't say these claims can be
4   brought in Israeli court today.  We say that's part of the
5   extreme prejudice that's happened in this case because they
6   waited so late to raise these things, the statute of
7   limitations has run in the Israeli courts, and we submitted an
8   affidavit from this Jeremy Stern to that effect.
9          THE COURT:  Let me start you with the basic premise
10  that I started them with.  Is it your position that they are or
11  are not an unincorporated association?
12         MR. SCHOEN:  It is my position that they are not, and
13  it's my position primarily that they have the burden of
14  establishing that they are, and on this record they certainly
15  have not done that.
16         THE COURT:  Well, I'm in the same position with you as
17  I am with them is that your position is inconsistent and
18  inconsistent -- understandably inconsistent because it is one
19  way depending on what's to your advantage.  Now, the position
20  has always been consistently for service purposes and for other
21  purposes that they're an unincorporated association.
22         They argue, and I don't think you directly addressed
23  the issue -- they argued that you served them on that basis,
24  OK?  And that's the way you proceeded on that basis, and,
25  therefore, you would like to consistently cite every court's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0499**

33

C89QsokC1

 1   ruling that they're an unincorporated association for the
 2   purpose of service; but then when it's to be applied to the
 3   causes of action, now you want to say, oh, they can't prove
 4   that.  Well, what do you claim is their status?
 5           MR. SCHOEN:  Respectfully, your Honor, let me explain
 6   why I believe there is no inconsistency.
 7           We've taken the position that they are not a
 8   governmental entity entitled to sovereign immunity, but that,
 9   as the Court said earlier, doesn't lead to the conclusion that
10   for purposes of New York law they are an unincorporated
11   association with members, therefore, not subject to suing or
12   being sued.
13           And, with all due respect, the argument on service
14   that the defendants have raised is simply wrong.  We didn't
15   serve them or assert that we served them as an unincorporated
16   association.  Under Rule 4(h) that's the catchall for
17   organizations.  Frankly, the argument works in our favor.  Why?
18   Because Rule 4(h) says it applies to organizations or
19   associations subject to suit under a common name.  They have
20   never challenged that part of it.  If they're subject to suit
21   under a common name, that tears asunder their argument that
22   they're not an entity operating under a common name.  Their
23   argument is we need to -- when you're talking about an
24   unincorporated association, it's just a loose conglomeration of
25   members and, therefore, you need to get the approval or

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

**0500**

34

C89QsokC1

1   ratification of every member.  Well, if there is anything to be
2   drawn from Rule 4(h) it is that it authorizes service for an
3   organization or association subject to suit under common name.
4            Again, let me get to a little more basic question.
5   The defendant said, well, it's complicated.  We're not sure
6   what to look at.  Maybe we should look at Palestinian law.
7   We're not sure what to look at about whether they could sue or
8   be sued because it's complicated.
9            Well, how about a basic created document, the Oslo
10  Accords that created the PA and that the PLO negotiated with
11  the United States.  It could not say more expressly that the PA
12  is an entity authorized with the power to sue or be sued.
13  Again, I don't think you could have it both ways.
14           What are they trying to do?  They're trying to say in
15  New York they don't have the right to sue or be sued because
16  it's an unincorporated association.  Well, I would suggest to
17  the Court, with all due respect to the defendants, that the
18  fact that it is this quasi-governmental entity, which is what
19  they argued in the Knox case and how the court in Knox treated
20  them.  I can give the page cites for that.  It's 306 F.Supp.2d
21  424 to 435.  Either they're that or they're this other kind of
22  organization.  Well, that's exactly why the Court in cases like
23  the Massachusetts Trust case that we cited and other cases in
24  the reply, that's exactly why the Court said if they don't
25  really fit into what we call an unincorporated association with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0501**

35

C89QsokC1

1   the members, and, after all, it's the membership that makes it
2   where you can't sue them.  You have to show approval by the
3   individual members because it's such a loosey-goosey
4   organization, but in the Massachusetts case, we say we look
5   then how were they treated back home?  And back home that
6   organization that they argued was an unincorporated
7   association, had the power to sue and be sued.
8         They said, wait a minute now.  That's going to be
9   unfair if we go to Massachusetts, and so we're not going to
10  treat them like an unincorporated association here.  Whatever
11  they're called -- again, we have to analyze it under New York
12  law specifically.
13        THE COURT:  But every court that has opined on this
14  issue for any purpose relating to any legal question, has
15  determined that they qualified as an unincorporated
16  association.  What authority are you citing to me that would
17  give you a basis to argue in law or in fact that that is not
18  the case?
19        MR. SCHOEN:  I'm telling the Court, respectfully, that
20  none of those courts has analyzed the question in this
21  framework.  It says it in Parsons.  The decision they
22  submitted.  It says the defendants haven't shown us any reason
23  otherwise.  It wasn't analyzed or argued.
24        THE COURT:  It wasn't analyzed or argued, but that
25  status was applied to them in all of those cases to both the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0502**

36

C89QsokC1

```
 1   advantage and disadvantage of both sides.
 2            MR. SCHOEN:  I'm saying, your Honor, I know that this
 3   Court is fully capable of analyzing the question on its own,
 4   and it has been presented and framed here.  Again, the burden
 5   is on them.  They have shown no membership.  Who are the
 6   members of the PA?  Who are the members of the PLO?  And,
 7   again, respectfully, we do not concede that for purposes of New
 8   York law and this question under New York law that the PLO is
 9   an unincorporated association.  There's reference made to it as
10   an unincorporated association on page 17 of our papers, but
11   then if you go to page 18, we say they haven't shown they have
12   any members.  So, while it might be called unincorporated
13   association for some purposes, under New York law they've got
14   to show they've got members and so on.  And, frankly, if you
15   had to show -- if we had discovery on the case, and they said,
16   well, what would they determine in discovery?  I suppose we
17   have a laundry list, starting with their charter and the right
18   to sue and be sued.  How do they operate?  Who are their
19   members, and all that?
20            Frankly, if their members are what they said in their
21   United States Supreme Court brief that the PLO is an umbrella
22   organization of different factions, well, frankly, every one of
23   those factions has a charter that would condone, ratify or
24   approve this kind of terrorism that occurred in this case.
25            THE COURT:  Well, my direct question to you is the
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

**0503**

37

C89QsokC1

1   same as to them:  Is it your position that they are or are not
2   an unincorporated association?
3          MR. SCHOEN:  It is my position that as that term is
4   used in New York law for these purposes, they are not.  They
5   are something like a quasi-governmental entity as the Court
6   treated them in Knox in analyzing the question.  They are
7   not -- we have seen no proof on this record that they are a
8   voluntary membership organization any more than any
9   administrating authority, whether it's the Port Authority here
10  or a governmental authority like a county government, is a
11  voluntary membership organization.  Its constituents, it has
12  said, are all the factions of the Palestinian people.  That
13  doesn't sound or look like a voluntary membership organization.
14  If they have the proof, they haven't made that proof.
15         But all of it, again -- by the way, I just wanted to
16  take one or two baby steps back.  That is, I know the Court is
17  aware that we also have pending motions to strike these
18  affirmative defenses on procedural grounds, and specifically
19  with this issue, a waiver issue, because this issue was raised
20  a long time ago in a subject matter jurisdiction motion which
21  was denied, and then didn't appear again in the next series of
22  motions to dismiss that we saw, and it's coming up now.  That's
23  relevant both for waiver and for the exercise of this Court's
24  discretion because one of the many important factors for this
25  Court to consider is the prejudice that arose from the way in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0504**

38

C89QsokC1

1   which the defendants have engaged in their litigation of this
2   case specifically with respect to that issue, and that means
3   throwing these folks out of Court and throwing these claims out
4   of court; not just for the plaintiffs who are non-Americans,
5   but for the American plaintiffs that wouldn't be able to have
6   the benefit of these kinds of claims which have different
7   elements from the ATA.
8           THE COURT:  Well, that may go to your argument of
9   whether or not they should be allowed to dismiss those claims
10  on this basis at this time, but the plaintiff was put on notice
11  that they had an affirmative defense.
12          MR. SCHOEN:  In the answer, your Honor?
13          THE COURT:  Yes.
14          MR. SCHOEN:  Yes, your Honor.
15          THE COURT:  So, there is no prejudice in the sense of
16  surprise that at some point during this litigation they were
17  intending to put forth that affirmative defense.
18          MR. SCHOEN:  Your Honor, is distinguishing between
19  surprise and prejudice because that answer was filed after the
20  statute limitations would have run in the Israeli courts, so we
21  didn't have another forum to go to.
22          THE COURT:  But I can't fault them for that aspect of
23  it, as long as their answer was timely filed, whether or not it
24  was timely filed in relationship to the statute of limitations
25  some place else is not their fault.  They get to timely file an

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

39

C89QsokC1

1   answer, and they get to assert affirmative defenses that they
2   say they're going to rely upon in defending this lawsuit.  So,
3   it may be prejudice to the plaintiff, but it's not undue
4   prejudice.
5           MR. SCHOEN:  I follow your Honor.  My suggestion was
6   that the waiver argument arises because there were motions to
7   dismiss -- and this issue had been discussed -- and there were
8   motions to dismiss before the answer was filed, and this wasn't
9   raised in those, and we say they abandoned it by not raising
10  it.
11          THE COURT:  That may be a waiver of the motion to
12  dismiss.  It is not a waiver of the affirmative defense.
13          MR. SCHOEN:  But I think it puts us in the position of
14  assuming that issue isn't going to be in the case any more
15  until it arises again in the answer years later.  That is, if
16  we have to evaluate at some point on our own, well, could it be
17  that they are going to argue lack of capacity down the road,
18  therefore, we have to cover our bases and file in Israeli
19  courts in case somehow a court dismisses these things down the
20  road.  No reason to believe that until the answer is filed.
21  When they filed other motions to dismiss when this subject the
22  lack of capacity had been raised earlier, that motion was
23  denied in the context of subject matter jurisdiction motion --
24  sorry -- had been denied and then subsequent motions to dismiss
25  are filed, it's not raised again.  I'm just saying in terms
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

**0506**

40

C89QsokC1

1    of --
2              THE COURT:  But that's what I'm saying, I want to
3    understand your argument.  I understand that argument to be a
4    waiver of a subsequent motion to dismiss for lack of capacity.
5              MR. SCHOEN:  I follow you, your Honor.  Your Honor is
6    being very precise.
7              THE COURT:  It is not a waiver of an affirmative
8    defense because they have not yet filed an answer asserting
9    affirmative defense, and as long as they still have the right
10   to file an answer asserting their affirmative defenses, it
11   doesn't automatically -- as related to your other motion
12   automatically say I'm supposed to strike their affirmative
13   defense because they didn't make it in a motion to dismiss.
14             MR. SCHOEN:  Your Honor is being very precise and
15   absolutely correct, I believe.
16             However, that brings us to the other argument again
17   about how they raised it in the answer.  As your Honor is also
18   aware, we have raised this argument, and under Rule 9 they fail
19   to allege it with particularity and with the supporting facts
20   that are required.  We cite the cases in the brief that require
21   that kind of allegation.  We can't just throw out there lack of
22   capacity.
23             I know I've skipped all around.  I would like to just
24   kind of put in a nutshell a little bit the first argument and
25   just reiterate what our arguments are on this unincorporated
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

**0507**

41

C89QsokC1

1    association, and then I would like to just put in a nutshell
2    our 1367 arguments, and then I would like three minutes to
3    discuss with the Court why in all of this, and especially in
4    the exercise of the Court's discretion, it makes absolutely no
5    sense to dismiss these cases for any of the prudential reasons
6    that courts sometimes dismiss what I, in the old days, called
7    pendent supplemental jurisdiction to dismiss those kinds of
8    cases in this case.
9              On the unincorporated association, as I say,
10   fundamental position after we get past the waiver and all
11   that -- and that would be one way to decide it is on waiver --
12   is that the burden is on them because they're looking here for
13   an escape for these claims in this case.  They have the burden
14   of proving that they are an unincorporated association under
15   New York law.  And that doesn't end it.  It's a matter of
16   capacity, even if they are an unincorporated association that
17   they don't have the capacity to sue or be sued.  That's
18   relevant here because they are this unique sort of animal,
19   let's call it -- unique sort of entity, both the PA and the
20   PLO.
21             So, again, I say with respect to the PA, you look to
22   the organic document that created them.  It says expressly,
23   which the PLO negotiated for, we have the right to sue and be
24   sued.  Again, we don't have to guess because we pulled a series
25   -- doing discovery on our own, we pulled a series of about 10

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0508**

42

C89QsokC1

1   to 14 case necessary which the PA has sued.  They're the
2   plaintiff in 10 to 14 cases at least.  That was just in one
3   glance in the Israeli court.  So they recognize they have the
4   right to sue and be sued.
5             So what we say in this argument is when you're dealing
6   with, even if it's an unincorporated association --
7             THE COURT:  Slower.
8             MR. SCHOEN:  I'm sorry.  If it's a foreign
9   unincorporated association -- and by foreign, I just mean a
10  non-New York unincorporated association -- we have to look to
11  how that entity is treated back in its domicile.  Those are the
12  cases we've cited that they take issue with, and we cite it
13  again in the reply later on.  I can give the Court the cites to
14  pleadings and all that, but, again, I can see the Court has
15  read them all.  So that is an answer to that.
16            The 4(h) argument we've discussed.  The only reason I
17  raise it is because they've tried to claim mileage out of that
18  saying well, they served it under 4(h) as an unincorporated
19  association.  That's the catchall for organizations.  Again, it
20  undercuts their argument because it only applies to groups that
21  can be sued under a common name.  Their position is we can't be
22  sued under a common name.  You got to name our president or
23  treasurer and then prove all the members approved it or
24  ratified it.  That's a different kind of entity.
25            I think that pretty well covers it.  Again, they have

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

**0509**

43

C89QsokC1

1   the burden of showing what it is and of establishing that they
2   are members, or, as the Court alluded to, or suggested -- I
3   don't see that the Court came to any conclusion -- as the Court
4   threw out as an issue, isn't it fundamentally a question of
5   fact?  If it's a question of fact, then we have no business
6   deciding it at this point.  Certainly nobody has been
7   prejudiced and nobody would be prejudiced by having it go
8   forward all the way through.
9            In fact, two of the five plaintiffs, who they claim
10  shouldn't have any claims here on their demand, on the
11  defendant's demand, have flown over to New York, have had their
12  depositions taken on damages, and have had Rule 35 examinations
13  taken already at great expense and great inconvenience to them.
14           On the Section 1367 argument, your Honor, first of
15  all, again, we don't even get there.  There has been no showing
16  of any conflict of laws in the first place.  Why is that
17  important?  Because they rely on two prongs:  They rely on the
18  prong that you have the discretion to get rid of these claims
19  if it raises a novel issue, that sort of thing.
20           Let me just read from 1367, your Honor.
21           Their claim is that "this case raises a novel or
22  complex issue of state law" -- you know, some jurisdiction
23  other than the federal court -- "and that the claim or
24  Subsection 2" -- I'm reading from 28 U.S.C. 1367(c)(1) and (2).
25           The first one says "it raises a novel or complex issue

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

44

C89QsokC1

1  of state law."  The second one is "these claims substantially
2  predominate over the claim or claims over which the district
3  court has jurisdiction" -- the ATA claims.
4          "The last proposition, cannot be supported under any
5  reasonable good faith argument that these garden-variety claims
6  of wrongful death and assault and battery would predominate
7  over this thing."
8          What they mean is, well, we would have to apply
9  foreign law for them, and they would predominate because we'd
10  all get bogged down, as Ms. Murphy-Johnson said, in having
11  experts in here for two or three years with foreign law and all
12  that.  Nonsense.  I don't mean that disrespectfully, but it's a
13  nonsensical argument because we don't get to the first part.
14          First of all, case law ad infinitum, and the
15  commentators all say, as the Court said earlier, when we're
16  dealing with torts, contract claims, and that sort of thing,
17  these are not the kind of novel or complex issues that are
18  contemplated by Section 1367(c).  That's right out of Wright  &
19  Miller and cases that they cite.
20          On the second part of it, will they predominate, this
21  is the classic case in which the state court claims are
22  intertwined -- inextricably intertwined with the federal claim.
23  The proof is the same.  The evidence is the same.  You go
24  through one trial with no difference except maybe the elements
25  are more simple than in the ATA.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0511**

45

C89QsokC1

1        But, again, let's talk about the burden.  The first
2   burden is on them to prove that there is a conflict between New
3   York law and Israeli law or Palestinian law.  And to say to the
4   Court today, well, now we don't know what law would apply in
5   Palestinian territories -- they are the law.  They're the
6   legislature there.  They are the courts there.  They have the
7   burden to tell the Court.  It can't just be let's throw it
8   against the wall, and in the abstract we could have an issue
9   here, and it could be real complicated, maybe Judge.  Can't
10  tell you why.  Can't tell you how.  Can't tell you what the
11  differences are or what that body of law is, but, you know, in
12  the abstract, that could be out there; therefore, Judge, why
13  don't you just get rid of these things and makes things simple?
14  That's not the way it works, the Court knows that, and it's not
15  fair.
16        Another relevant question:  Would it enlarge the scope
17  of the action at all?  Not at all.  Not at all.  Let me
18  explain.  I think the best way for me to explain what I mean by
19  that, it will take me about three minutes because I want to
20  concretize it and put it in real terms.  I want to tell the
21  Court who the five plaintiffs are that we're talking about and
22  how their claims arise to perfectly, I believe -- not me -- the
23  facts perfectly demonstrate the point I'm trying to make here;
24  both why it wouldn't complicate the case at all and why it's
25  perfectly appropriate for these claims to be in this case.  In

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0512**

46

C89QsokC1

1    fact, this is the classic case.
2            The first plaintiff -- we're talking, again, about
3    five plaintiffs on these claims.  The first plaintiff is
4    Guetta.  In January of 2001, just outside Jerusalem, four men
5    with Kalashnikov machine guns opened fire on a car in which
6    Varda Guetta was traveling with a 14 year-old son Oz.  The
7    shooters got out of their car and they fired at the Guettas'
8    car just a few feet away.  Varda got a close look at some of
9    them.  We intend to prove in this case that those men were
10   officers with the PA Police Department Security Forces.  Many
11   of them are now sitting in jail for carrying out similar
12   attacks in that same area.  The son, Oz, was struck with
13   machine gun bullets and has serious injuries.  He is an
14   American citizen and has an ATA claim.  Somehow, miraculously,
15   the bullets missed Varda, but she has significant mental health
16   issues, as they know from depositions, and, as a result, she
17   has a physically and emotionally crippled son.  And she deals
18   with that every single day.
19           It would be unfair in the extreme to deny Varda the
20   opportunity to present her claims from this same incident in
21   which the claims for her son's injuries are going to be
22   presented.  She has claims for the emotional distress.  She has
23   claims for the loss of consortium, the loss of her mother/son
24   relationship as it was over the last ten years.  So it doesn't
25   add to the scope of this case because the evidence will be the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

**0513**

47

C89QsokC1

1    same.  The evidence will be that she was there and what she
2    suffered.  So, yes, if we have to put on some damages evidence
3    about her, that can increase it a little bit.  That's not the
4    kind of thing we talk about in why we have to get rid of these
5    claims because they would predominate.
6            I'll make it real quick on the others.  In the Bauer
7    incident we allege in March 2002, a suicide bomb blew up on
8    King George Street in downtown Jerusalem.  Dr. Alan Bauer and
9    his young son, Yehonathon, were injured severely and several
10   Israelis were killed.  Again, two officers in the PA Security
11   Services, Abdel Akrim Aweis and Nasser Shawish were convicted
12   of planning the attack and sending the bomber.  They proudly
13   admitted it.  This is one of those cases in which General Zinni
14   handed the PA a list of known terrorists, people who were
15   committing these acts.  They locked up Aweis for about a week
16   or two and then released him.  They knew who he was; they knew
17   what he was going to do.
18           The story gets even worse.  Let me cut to the chase
19   here.  Alan Bauer and his son, Yehonathon, are Americans.  They
20   had ATA claims.  But Revital Bauer, who is Alan's wife and
21   Yehonathon's mother, is not American.  She only has the
22   non-federal claims.  So, again, she'd be out of court, but
23   there's no reason for her to be because this case is going to
24   be tried here and now with all of the same evidence at trial.
25           Goldberg is the third case.  January 2004, a PA

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0514**

48

C89QsokC1

```
 1  policeman Ali Jara got into the number 19 bus in Jerusalem.
 2  The attack was planned, we allege, and we will prove, by two
 3  other PA policeman, Achmed Salah and Halmi Hamash, who were
 4  convicted and got multiple sentences for it.  Among those
 5  murdered in the bombing was Stuart Scott Goldberg.  He was
 6  Canadian.  So his estate doesn't have an ATA claim, but his
 7  wife and seven minor children, who are American, do.  They have
 8  their ATA claims here, and they will be litigating it.  So what
 9  an absurd result to throw the estate of the fellow who was
10  murdered out while the relatives will be in here and have the
11  right to be in here.
12          Finally, there's the Mandelkorn case, which are two of
13  the plaintiffs.  There in June 2002 a suicide bomber blew up in
14  a crowded bus stop in Jerusalem, killing a group of Israelis
15  and wounding plaintiff Shaul Mandelkorn.  He's not American,
16  but his father, Rabbi Leonard Mandelkorn, is American, and,
17  therefore, the father has a claim under the ATA; but since
18  Shaul is not American, he doesn't have a claim, nor does his
19  mother under the ATA.  But, again, you'll have the father going
20  forward here, all of the facts of that incident, that terrible
21  terrorist incident will be put before the Court and jury in
22  this case in all their detail whether or not those plaintiffs
23  are here.  Those plaintiffs deserve an opportunity to have
24  their case heard.
25          In terms of the depositions, as I say, Revital Bauer,
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0515**

49

C89QsokC1

1   the wife, the husband of Alan and the mother of Yehonathon, was
2   deposed already, and she's already had her Rule 35 examination
3   done.
4           Varda Guetta was deposed already June 28.  She had her
5   mental examination June 27 at their demand.  And they already
6   have demands out there for immediately taking the depositions
7   and Rule 35 examinations of the other plaintiffs.  Well, then
8   they should do it because these claims ought to go forward,
9   your Honor.
10          I hate to even throw this out here because, again, I
11  don't think we get off first base with these claims, but if we
12  did, then we ought to be able to amend the complaint at this
13  point and name the president and the treasurer of the
14  association and prove to the Court then that the kinds of -- we
15  don't know who their members are, but if they claim the members
16  are these factions, that each one of those factions has a
17  charter and a policy and a practice of engaging, approving and
18  ratifying these kinds of terrorist acts, so that we would get
19  them that way also.
20          The bottom line is the estate claims ought to go
21  forward for all the reasons we've said, your Honor.  I
22  appreciate the time.  I know the Court has read the papers.  We
23  also rely on the papers.  And I don't mean to undercut anything
24  in the papers that I've said here today.
25          THE COURT:  Let me ask you a side question with regard

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0516**

50

C89QsokC1

1   to your Count Six.  Why is that an independent count?
2               MR. SCHOEN:  Your Honor, it could well be a misnomer
3   considering it to be a cause of action.  This is a solatium and
4   consortium count.  The fact of the matter is, under the ATA we
5   have the right to those kinds of damages.
6               THE COURT:  Damages.
7               MR. SCHOEN:  Yes, your Honor.
8               THE COURT:  That's a determination of damages.  That's
9   not, as I understand it, an independent cause of action.  You
10  say that you want to allege it as a separate non-federal cause
11  of action.  The fact that it may be related to damages in a
12  federal cause of action doesn't make it independently a cause
13  of action unless there is such a cause of action in Israeli law
14  or in New York law, and I fail to find it.
15              MR. SCHOEN:  Let me say this, your Honor ---
16              THE COURT:  I assume you put it in that category of
17  other of common law or non-federal claims, but --
18              MR. SCHOEN:  Because we believe those kinds of damages
19  are also recoverable under the state.
20              THE COURT:  That is what you said, let me go to --
21              MR. SCHOEN:  The Court's point is, it's not a separate
22  cause of action.  I have been in the case two days, and I think
23  that's right, and the Court knows it far better than I do, and
24  the Court has been in the case a lot longer.
25              THE COURT:  You've talked about garden-variety

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0517**

51

C89QsokC1

1   non-federal causes of action, such as wrongful deaths, loss of
2   consortium and solatium, assault and battery, negligence and
3   infliction of emotional distress.  Then you talk about the five
4   remaining counts:  Conscious pain and suffering, civil
5   conspiracy, aiding and abetting, vicarious liability and
6   respondeat superior and inducement.  They set forth theories of
7   liability and/or types of damages available, not separate
8   causes of action.
9           It seems to me that Count Six falls in that category,
10   not the first category.
11           MR. SCHOEN:  I can't disagree, your Honor.
12           THE COURT:  OK.
13           MR. SCHOEN:  I hesitate to speak for lawyers who have
14   done ten years of work in the case and I'm in it two days, but
15   that's the way I read it.
16           THE COURT:  That's not determinative of this case.
17           Let me just go back to one other issue with regard to
18   your motion to strike.
19           MR. SCHOEN:  Yes, your Honor.
20           THE COURT:  Let me put aside for a second the lack of
21   capacity in the affirmative defense.  What is the utility or
22   purpose of striking all of the affirmative defenses at this
23   point or striking anything at this point?  I understand the
24   difference between a motion to dismiss and a motion to strike.
25   Why am I striking?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0518**

52

C89QsokC1

 1          MR. SCHOEN:  Again, your Honor, I think part of this
 2   is -- I will tell you how I read it, your Honor.  I have a
 3   little bit of my own baggage in this one.  The judge I happened
 4   to clerk for was real big on this sort of stuff.  That is, he
 5   would call up the parties at the time and say, listen, you've
 6   thrown this in your answer, I don't want this all -- we're
 7   going to have a have a trial on that.  Let's just clean it up.
 8   I think part of that is what this is.  For example, one of the
 9   objections in the motion to strike is that the defenses are
10   just too conclusory.  Then we break it down.
11          But as to affirmative defenses three and six, we say
12   these allege personal jurisdiction and improper venue, those
13   have already been ruled on.  No reason for them to be in the
14   answer.  They were dismissed on a motion.
15          THE COURT:  So I ignore them.
16          MR. SCHOEN:  OK.
17          THE COURT:  As I say, it's just a matter of style.
18   You're right.  Your judge may have stricken them.  I don't even
19   want to spend the time having to argue about striking them.  I
20   will just ignore them.  If those issues have been resolved,
21   they've been resolved.  Every time I dismiss something out of a
22   case, I don't need to go back and rewrite the pleadings.  It's
23   not there.  My attitude is that if they have alleged
24   sufficiently and put you on notice of any claim, counterclaims,
25   or affirmative defenses, the only question in my mind for me to

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

**0519**

53

C89QsokC1

1   address is whether or not at the end of discovery there is a
2   basis in which to put forth those affirmative defenses in
3   support of a summary judgment motion or to go to a jury with
4   those affirmative defenses.
5           MR. SCHOEN:  I understand, your Honor.  I think
6   another issue, just as a matter of law, was plaintiffs take the
7   position that Twombly and Iqbal apply to affirmative defenses,
8   and we cite a whole host of cases that say that, and say if
9   they can't support these things, they ought to go out --
10          THE COURT:  Which affirmative defense don't you
11  understand that they are asserting and why they are asserting
12  them?
13          MR. SCHOEN:  I think we understand them.
14          THE COURT:  So, what else does Iqbal and Twombly
15  require other than sufficient specificity for you to understand
16  the nature of the affirmative defense so that you can confront
17  that affirmative defense?
18          MR. SCHOEN:  I think specifically, for example, for
19  the fourth defense of lack of capacity, this dovetails with
20  that argument under Rule 9, and, that is, they have the burden
21  of setting out the facts that they know about that make them
22  this unincorporated association.
23          THE COURT:  They don't have to prove it in their
24  answer.  They just have to give you notice of what they claim
25  is the nature of the affirmative defense.  It seems to me that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0520**

54
C89QsokC1

1    when anyone reads from the plaintiff's side that they were
2    asserting a lack of capacity, that the only reasonable
3    conclusion to reach at that point was that they were asserting
4    a lack of capacity based on the fact that they are not an
5    unincorporated association.
6              MR. SCHOEN:  I hear the Court.  I would just say that
7    I think the rules require them to also set out the facts that
8    support it, and, remember, we have this problem with their
9    26(a) disclosures.
10             THE COURT:  Well, that's a different question.
11             MR. SCHOEN:  That's right.
12             THE COURT:  You could have enforced the 26(a)
13   disclosures or moved on the basis that the disclosures are
14   insufficient, but that doesn't go to the pleadings.  The
15   disclosure doesn't go to the pleadings.  It goes to whether or
16   not they made sufficient disclosures.
17             MR. SCHOEN:  Yes, your Honor.  That's raised in our
18   cross motion, of course.  The disclosures were insufficient,
19   and that that's relevant to this issue as well.
20             THE COURT:  Well, the disclosures may be insufficient
21   and may warrant preclusion of certain evidence that wasn't
22   disclosed, but I'm not sure how that independently factors into
23   my evaluation as to whether the pleadings are sufficient.  I
24   assume that you would say I should reject their argument that
25   your disclosures were insufficient, so, therefore, you fail to
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

**0521**

55

C89QsokC1

1    state a cause of action in your complaint.  Those aren't
2    related to each other.  Those are two different legal analyses.
3                MR. SCHOEN:  I hear you, Judge.
4                THE COURT:  So, at this point, as I say, my reaction
5    is for the purpose of cleaning up the pleadings, if I spend
6    most of my time trying to do that in cases, I'd be spending a
7    lot more time doing that than concentrating on the merits of
8    the case.  With regard to any affirmative defense, I'm not sure
9    that you have articulated which affirmative defense -- I
10   understand your arguments about what issues have already been
11   addressed, and that they're no longer in this case; but with
12   regard to an argument as to any particular affirmative defense,
13   I'm not sure which affirmative defense that you say is
14   inadequately pled on the basis that it is not pled in a manner
15   in which you sufficiently understand what is the nature of the
16   affirmative defense that they intend to pursue in order to
17   defeat liability.
18               MR. SCHOEN:  I understand, your Honor.
19               THE COURT:  So, is it your position that -- when you
20   say the underlying facts, I assume it's not your position that
21   even with regard to capacity, if they said that we assert the
22   affirmative defense of lack of capacity because we are an
23   unincorporated association, and, therefore, cannot be sued, you
24   wouldn't argue that some other factual allegation of proof
25   would be necessary beyond that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0522**

56

C89QsokC1

1              MR. SCHOEN:  Under Rule 9, I would, your Honor.
2              THE COURT:  What else would you say would be -- they
3    would have to give you the proof on that?
4              MR. SCHOEN:  They have to make the assertion with
5    their defense, and that facts are peculiarly within their
6    knowledge.
7              THE COURT:  But what facts are peculiarly within their
8    knowledge?  If they simply said, we have the affirmative
9    defense, and they didn't articulate this, but I think you
10   understood this to be their position.  So if they had
11   specifically articulated in the affirmative defense, that we
12   have the affirmative defense of lack of capacity to be sued
13   because we have been determined to be and we are in fact an
14   unincorporated association which cannot be sued under New York
15   law for these non-federal claims, you are not saying that they
16   would have to lay out in attached chapter and verse what
17   created them and who their members are and how they're an
18   unincorporated association, as long as they put you on -- this
19   is notice to you.  Even in terms of affirmative defenses, that
20   is clearly a plausible theory under Twombly and Iqbal, and it's
21   clearly sufficient to put you on notice that they claim to
22   establish as a defense to any cause of action that you might
23   otherwise establish that you have sued an entity which cannot
24   be sued.  I'm not quite sure what else you say that they would
25   be required to put in a plea.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

**0523**

57

C89QsokC1

1               MR. SCHOEN:  Your Honor, I refer the Court to DE 196
2       at page 9.  We just kind of set out sort of the body of case
3       law starting with the Pressman v. Estate of Steinvorth case.
4       What they say in there in fleshing this out, what do we mean by
5       Rule 9(a) and what's a waiver?  They say:  He waived the
6       capacity defense by waiting more than seven years before
7       raising it.  That's not what your Honor is talking about right
8       now.
9               THE COURT:  But they're not even raising a waiver
10      argument in that regard.  You're raising an insufficient
11      pleading argument.
12              MR. SCHOEN:  In this argument, of course, the Court's
13      aware we are waiving the waiver argument but they waited so
14      long -- they raised it first and then they, we say abandoned
15      it, and then raised it again.  That's what happened in
16      Pressman.
17              THE COURT:  Slow down.  Slow down for a second.
18              I understood your waiver argument and the failure to
19      sufficient plead the affirmative defense argument to be two
20      separate arguments.  Is that not two separate arguments?
21              MR. SCHOEN:  Two separate arguments.  The only reason
22      I raise it now is because in Pressman, they put it in that
23      context.
24              THE COURT:  Right, in the waiver context.
25              MR. SCHOEN:  Not just the waiver -- I'm sorry, your
                       SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

**0524**

58

C89QsokC1

1     Honor.  They say because he failed to be more explicit in his
2     answer, he has waived it.  So it's a waiver because he didn't
3     properly or timely raise it.  That's an argument we have.  And
4     in this context, the way they call it in Pressman is they call
5     it a waiver by not explicitly laying out supporting facts.
6     Rule 9(a) requires not only pleader to make a specific negative
7     averment of the plaintiff's capacity to sue, but also that
8     averment to include "such supporting particulars as are
9     peculiarly within the pleader's knowledge."
10              In this case, they only asserted that we lacked the
11    requisite standing to bring the case, but they didn't give any
12    particulars or explanation, the Court said, and the Southern
13    District here, the Court said, and, therefore, they waived the
14    issue for not being specifically -- for not laying out the
15    supporting facts.  In this case, I would say who the members
16    are, what makes them an unincorporated association, because it
17    gives us notice then.
18              THE COURT:  On what point do you say they waived this
19    because at some point you knew this, so they didn't.
20              MR. SCHOEN:  I still don't know why they claim they're
21    an unincorporated association.
22              THE COURT:  And you say because you don't know at this
23    point why they claim that they're an unincorporated
24    association, that they have waived that argument?
25              MR. SCHOEN:  Yes, your Honor.  And I don't believe
                          SOUTHERN DISTRICT REPORTERS, P.C.
                                  (212) 805-0300

**0525**

59

C89QsokC1

1   they are a membership organization, as we know that to be
2   required under unincorporated association.  If they are, I
3   don't know who their members are, and I say -- they do know.
4   If they are going to take the position --
5           THE COURT:  But you do know it to one extent.  You
6   know it to the extent that they have been determined to be an
7   unincorporated association in other cases, so you are at
8   least -- to sort of say it is somehow a surprise to you that
9   somebody would say this and why they would say that is a little
10  bit --as I said, that's why I say it sounds to me you are
11  making solely a waiver argument.  You are not making anything
12  other than a waiver argument.
13          (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

**0526**

                                                              60
        C895sok2                    argument
 1              MR. SCHOEN:  It's a waiver and an insufficiency
 2      argument under Rule --
 3              THE COURT:  Well, I'm not sure -- as I say, I'm not
 4      sure that it's a waiver of argument that they didn't put you on
 5      notice as to the nature of the affirmative defense so that you
 6      can obviously have an opportunity to either move to dismiss it
 7      or to explore any discovery.  I don't understand that you were
 8      in such a position.
 9              MR. SCHOEN:  Well, we have said we needed discovery on
10      that issue, of course before --
11              THE COURT:  Right.  So, if you get discovery on the
12      issue then why is it waived?
13              MR. SCHOEN:  I still think it is a violation of Rule
14      9.
15              THE COURT:  Have you requested discovery on that
16      issue?
17              MR. SCHOEN:  Yes, your Honor.  We have discovery
18      requests for cases in which they've sued and been sued.
19              THE COURT:  Okay.
20              MR. SCHOEN:  That sort of thing.
21              THE COURT:  Are they somehow in default on responding
22      to those outstanding requests?
23              MR. SCHOEN:  I don't know the answer to that but
24      they're asking your Honor to dismiss these claims and are
25      saying we don't need any discovery.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

61

C895sok2                        argument

1          THE COURT:  No, but I'm not -- I'm not focusing on
2    what they're asking me to do, I'm focusing on what you're
3    asking me do.  I mean, you are saying they have waived it even
4    though you targeted a discovery request that is still
5    outstanding, they have not defaulted on appropriately and
6    timely responded to that discovery request.  So why, under
7    those circumstances, should I say that they have -- you're in a
8    position to say that you don't understand the nature of their
9    claim and that's sufficient for you to confront and disprove
10   that affirmative defense?
11          MR. SCHOEN:  Let me put it like this, your Honor.
12          THE COURT:  Or explore that in discovery.
13          MR. SCHOEN:  Let me put it like this, if may.
14          I think part of the reason for the rule is that
15   requires this so that we are not just engaging in endless
16   motion practice and briefing, let's flesh it out from the start
17   so we know what we're talking about with the answer; not so
18   that, your Honor, we can show up today after all of this
19   motions practice and say -- I don't mean this in any way as a
20   personal attack at all -- but I'm saying from the defendant's
21   perspective, well, I guess we're an unincorporated association
22   because we haven't been anything else so far.
23          THE COURT:  But aren't you already in that position?
24   If you weren't in that position you wouldn't have been in a
25   position to articulate and generate the specific discovery

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

**0528**

62

C895sok2                    argument

1   requests that you say were relevant to that issue.  You have
2   already done that.  Why would a -- if you have already
3   requested what you know is the relevant inquiry to defeat that
4   affirmative defense or to argue that they produce no proof and
5   so order that from the defendants, in what way should I say
6   that?
7           MR. SCHOEN:  If the Court's position is no harm, no
8   foul, in a sense, I hear you.  I think there is a foul because
9   I think it cost us a great deal extra time and effort and money
10  and so on having to deal with the issue without knowing --
11  without them meeting their obligation because it is part of the
12  same obligation carrying a burden of proof, that is, why are
13  you an unincorporated association, who are your members, how do
14  you establish those things.  And in the answer there is a Rule
15  98 for a reason.  It distinguishes between lack of capacity and
16  other kinds of other defenses and it says you have to give us
17  the underlying facts.
18          Judge, are we finished?
19          THE COURT:  Yes.
20          MR. SCHOEN:  I mean you make it -- this is what a
21  lawyer lives for, frankly, to have a Court this prepared when
22  we come in here for argument.
23          THE COURT:  I know.  It is important for all parties.
24          MR. SCHOEN:  I very much appreciate it.
25          THE COURT:  I will let them respond.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

```
                                                           63
         C895sok2                    argument
 1               MS. FERGUSON:  You have me back again, your Honor.
 2               THE COURT:  Sure.
 3               MS. FERGUSON:  Just briefly on whether there was sort
 4      of a foul in the way in which the affirmative defense of lack
 5      of capacity was raised.
 6               The PA and PLO fully briefed this issue back in 2007
 7      and the Court wanted to defer ruling on that question until the
 8      threshold of personal jurisdiction issue was resolved.  That
 9      took some time to resolve and, meanwhile, we preserved our lack
10      of capacity argument and then, of course, raised it in the
11      answer so there has been no waiver, there has been no
12      prejudice.  The plaintiff has been on notice since 2007 not
13      just that we intended to raise a lack of capacity defense but
14      of the very nature of the argument and what it rested on
15      because we actually briefed the issue in 2007.  So, I wanted to
16      make that point clear.
17               With respect to the lack of capacity argument, I think
18      it has become somewhat muddled in terms of what the different
19      kind of points of inquiry are and what law one looks to for
20      these different points of inquiry, and I think it is very
21      important to distinguish between the first question of:  What
22      kind of entity is this?  Is it a corporation?  Is it a state?
23      Is it an unincorporated association versus if it is an
24      unincorporated association what law do we look to determine
25      whether it has the capacity to be sued?  And my opposing
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

64

C895sok2                    argument

1   counsel has argued that well, sure, the PLO might be an
2   unincorporated association in a general sense, but under New
3   York Law it is not an unincorporated association.  Well, New
4   York Law does not govern the status of the PLO or the PA under
5   the Federal Rules of Civil Procedure.  That's become a question
6   of federal common law, the what is it.
7           What the Federal Rules of Civil Procedure then tell
8   you is that if the PLO is an unincorporated association, then
9   you go to the law of the forum to determine its capacity to be
10  sued.
11          There is also this question that sort of comes into
12  play that creates some confusion about, well, who are its
13  members and did its members ratify the unincorporated
14  association's actions.  Well, we don't even get to that point
15  because if you accept the premise that the PA and the PLO are
16  unincorporated associations and then you go to law of the
17  forum, New York, it tells you that the unincorporated
18  associations cannot be sued in their own name, they have to be
19  sued in the name of the president or the treasurer.  If the
20  plaintiffs had done that, which they didn't, then there would
21  be the question of whether they sufficiently alleged that the
22  members had ratified the conduct.  But we don't have that, the
23  valid complaint even moves forward because it named the PA and
24  PLO, not the president or treasurer and the plaintiffs, even
25  though they have been on notice since 2007 that we have this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0531**

65

```
C895sok2                        argument
 1   lack of capacity defense and the nature of that defense, they
 2   have not sought leave to amend.  They haven't filed a complaint
 3   against the president or treasurer.  So, the notion that we
 4   need discovery to determine every single member of the PLO or
 5   whether every single member of the PLO ratified this action,
 6   that's putting the cart way before the horse because they don't
 7   even have, under New York Law, a valid claim to proceed on
 8   because they've sued the wrong entity, or they've sued it in
 9   its own name, I should say.  So, I wanted to clarify that point
10   as well.
11           I also think, your Honor, that it would be a mistake
12   to keep sort of kicking this can down the road with respect to
13   these supplemental law claims by suggesting, well, maybe there
14   is some other facts out there that would help us resolve this.
15   These are, I acknowledge, sui generis organizations, the PA and
16   the PLO, but I submit that the plaintiffs have not identified
17   specific discovery that would help us to figure out how, under
18   U.S. law, we are going to treat this sui generis thing that is
19   the PA and PLO and we all sort of know in broad, general terms
20   what they are.  They want discovery on, well, I would like to
21   see charters of every individual member of the organization to
22   see if they've ratified it.  Well, we don't get to that
23   question.  We don't get to that question because they haven't
24   filed a suit against the president or treasurer.  So, there is
25   no reason to keep kicking this can down the road because there
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0532**

66

C895sok2                    argument

1    isn't another avenue with respect to the capacity point.
2              With respect to the supplemental, our sort of
3    additional argument under 1367, I understand your Honor's
4    position that well, yes, it is complex here, but it would be
5    complex against Israel as well and I think it is important to
6    understand that we did raise this argument of lack of capacity
7    back in 2007 when the statute of limitations had not run in
8    Israel.  Moreover, this is a highly -- I can't stress enough
9    how difficult it is for the PA and the PLO to litigate complex
10   cases in U.S. Courts and deal with the obligations of U.S.
11   civil discovery.  We have been in discovery for quite a time
12   now, this case has been ongoing since 2004, active since 2007.
13   We are getting -- we are getting very near the end of fact
14   discovery.  Fact discovery is set to close December 21st.  And
15   so, the PA is sort of getting there but now to open up this
16   entire tranche of additional claims involving different sources
17   of foreign law and requiring -- and where all the facts and the
18   experts and the witnesses and the documents, everything is over
19   there, so it is very expensive to litigate it here as opposed
20   to in the region.  It is very burdensome.  The issues are
21   considerable, considerable expense and delay, and it truly is
22   already a complex case.
23             THE COURT:  Well, the PLO and PA has been involved in
24   numerous litigation in the United States in various courts.
25             MS. FERGUSON:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0533**

67

C895sok2                        argument

1           THE COURT:  I don't know why this is any more
2    burdensome than any other litigation that they must expect,
3    particularly under the ATA, to be involved in.  And, as I say,
4    even I if I accept your argument, this case doesn't go away.
5           MS. FERGUSON:  No, this case does not go away because
6    under the statute, if a U.S. national has been injured, they
7    have a right to bring suit here.
8           THE COURT:  So, I can't give them a more convenient
9    forum, I can only put them into forums which is less than
10   convenient.
11          MS. FERGUSON:  But, with respect to embarking on what
12   would be a complicated, lengthy, burdensome process of expert
13   discovery and litigation of numerous foreign law claims --
14          THE COURT:  If you don't, give me a scenario where you
15   won't have to do that anyway.
16          MS. FERGUSON:  Well, they should have brought those
17   claims in Israel.
18          THE COURT:  The only argument that I can assume you
19   are making is that if I grant your motion, since they are
20   time-barred in Israel, you won't have to do that again in any
21   other forum because they will have no forum to litigate these
22   common law claims.
23          MS. FERGUSON:  Even if Israel were to toll the statute
24   and allow the claims to move forward.
25          THE COURT:  Then you would have double work.  I mean,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0534**

68

C895sok2                          argument

1   how does that --
2                 MS. FERGUSON:  Except the experts are likely to be in
3   the region.
4                 THE COURT:  Okay.
5                 MS. FERGUSON:  We will have more access to people that
6   speak those languages in the region.
7                 THE COURT:  Why is it that you don't have access to
8   those people in the region even if you are litigating
9   ultimately in a case here?
10                 MS. FERGUSON:  Well, the PA's U.S. counsel doesn't --
11   we don't read Arabic or Hebrew.
12                 THE COURT:  That's not where it should be, that is who
13   the lawyer should be.  Get yourself some lawyers who speak
14   Arabic or Hebrew because that is what is going to have to
15   happen.  That is not a compelling argument about the forum,
16   that's a compelling argument about who is involved and what
17   lawyers and support staff is involved in litigating.
18                 MS. FERGUSON:  Your Honor, there is a case in front of
19   the Supreme Court right now, the Kiobel case involving the
20   alien tort statute where the Court is inquiring as to under
21   what circumstances should U.S. Courts exercise jurisdiction
22   over claims involving foreign defendants, involving foreign
23   plaintiffs and actions that occur abroad.  Now, here there is a
24   statute that says, yes, the U.S. Court will take it if the U.S.
25   national has been injured but now that's become the vehicle for

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

**0535**

69

C895sok2                          argument

1    attaching any number of other claims.
2              THE COURT:  That arise out of those incidents.
3              MS. FERGUSON:  Right, but that add even more -- that
4    now have a U.S. Court not just adjudicating a federal statute
5    but now you have the U.S. Court trying to decide whether under
6    the law of the West Bank whether they actually recognize a
7    claim for negligent infliction of emotional distress.
8              THE COURT:  You keep saying that but I haven't
9    confronted that in this case yet and I'm not sure on what
10   scenario you say that this Court is going to have to confront
11   that.  That has not been an issue that's raised by either
12   party, that somehow that we are going to be trying to decide
13   whether or not the defendants are liable under some other law
14   other than the law -- the ATA and the law that is consistent in
15   both New York and Israel.
16             MS. FERGUSON:  Well, that's where we keep going back
17   to the Second Circuit case that says that the choice of law
18   rules for torts would have the Court, as to conduct-regulating
19   activity, apply the law where the conduct occurred.  And some
20   of the conduct here is alleged to have occurred in -- not in
21   Israel but in the West Bank.
22             THE COURT:  Well, that issue, in all of these years,
23   has not been raised in this Court, so now you say that you
24   anticipate that that's what you may raise in the future and
25   make those arguments.  There is only a limited amount of
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

**0536**

70

C895sok2                     argument

1    consideration that I should give to the fact that you say now,
2    Judge, send it someplace else because we think we are going to
3    raise an issue somewhere down the line that some other law
4    should apply other than the law we have all been talking about
5    all of these years.
6              MS. FERGUSON:  Well --
7              THE COURT:  I mean, you have never raised that issue
8    in this case.  That issue has never been raised.
9              MS. FERGUSON:  These aren't our claims.
10             THE COURT:  That's your claim.  That's your issue.
11   They're not raising that issue.
12             MS. FERGUSON:  But the complaint, in a way it puts us
13   at a considerable advantage because they don't say what the
14   source of law is for these claims.  They definitely don't say
15   it is anything other than New York or Israel.  They're silent
16   on it.
17             THE COURT:  They're not silent.  They specifically
18   said in their papers it is New York or Israel and those laws
19   are not inconsistent with each other.  If you have a different
20   position you have not raised a different position with regard
21   to what law applies until today when we started discussing
22   this.  Anybody is going to raise that --
23             MS. FERGUSON:  Subsequent to the briefing the Second
24   Circuit decision came out holding that it is not the place
25   where the injury or the loss occurs that controls but the place

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0537**

71

C895sok2                    argument

1    where the conduct occurred.  So, there was a recent development
2    that came off our briefs that we alerted the Court to in a
3    letter so that's why this has come up, because there is this
4    recent Second Circuit case decided after the briefing that
5    makes not the law of Israel controlling but the law where the
6    conduct occurred.
7             THE COURT:  Well, even if I were to accept all of that
8    argument it does not lead to the conclusion in the abstract
9    that this case should be somewhere other than here because the
10   majority of the activity that's at issue -- the activity that
11   you say you want to rely upon and the situs of the activity
12   that you say you want to rely upon is the minority of the
13   activity that is at issue here, not the majority of the
14   activity that is at issue here.  So, you're saying that even
15   though most of the activity affected U.S. citizens in Israel,
16   you say because of the connection with activity that you say is
17   attributed to the PLO or the PA in a different region should
18   compel that the law of that region be applied.  It is unlikely
19   that you, on these facts, that that is going to be a compelling
20   argument because that's not -- you have not even articulated
21   that that's -- making that analysis would compel one to say
22   that some other law other than the law of Israel or New York or
23   the ATA should apply.  You haven't even articulated such a
24   position.
25             MS. FERGUSON:  But with respect to the plaintiff's
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

**0538**

C895sok2                        argument
1   claims that the PA and PLO's own conduct creates liability --
2           THE COURT:  That's a limited part of the claim.  That
3   is a limited -- that is not the predominant part of the claim.
4           MS. FERGUSON:  I am missing, then, what the
5   predominant part of the claim is.
6           THE COURT:  The predominant part of the claim is the
7   injury and death that occurred at the locations that they
8   occurred and its effect on United States citizens.  That's the
9   primary part of the claim.  That's not a sophisticated thing.
10          You are saying that because they say the PLO made some
11  decisions in the region that somehow that should mean that all
12  of these claims should be decided in that region or according
13  to that law.  Now, if you want to make that argument maybe
14  there will be appropriate time to make that argument but, right
15  now, as an argument in the abstract, it is not a compelling
16  argument for me to say that, you know, I should -- oh, that's
17  too complicated in this case, it is much less complicated for
18  some other unknown jurisdiction to go do that analysis
19  separately even though we're litigating here, and somehow even
20  a balance of convenience says it is more convenient for that to
21  be done someplace else.  You haven't articulated where and how
22  it is more convenient or that there is really going to be any
23  compelling reason, compelling evidence to indicate that the
24  factors to consider are going weigh, somehow, more heavily
25  somewhere else other than Israel or the United States.

73

C895sok2                         argument

 1              MS. FERGUSON:  I would just encourage your Honor to
 2     review the recent Second Circuit decision because with respect
 3     to the damages issues there you do look to the place where the
 4     injury occurred and that would be Israel.
 5              THE COURT:  You want me to review --
 6              MS. FERGUSON:  The Second Circuit decision.
 7              THE COURT:  I'm aware of the Second Circuit Licci
 8     decision.  Very familiar with it, even before it was a Second
 9     Circuit decision.
10              MS. FERGUSON:  I understand, your Honor.
11              THE COURT:  I know what the issue is and I know the
12     limited issue that they addressed and I know the more broader
13     issue that I had to address before they got it and I don't
14     think that that changes, at all, my analysis here.  Matter of
15     fact, it is very consistent with my analysis here.  If you were
16     standing here making an argument that you could articulate a
17     basis to conclude that this litigation is more appropriate
18     someplace else or some law is more appropriate to apply, then
19     the laws that we have been discussing, then that would advance
20     that argument.  But, to argue in the abstract, well, we are
21     going to argue at some point that maybe there is connections
22     with the different region and that other laws might be laws
23     that can be considered, that doesn't get you over the hurdle of
24     trying to convince me on this record that I'm aware of at this
25     point that somehow this is more appropriate for a region or to

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

```
                                                               74
        C895sok2                argument
   1    apply some laws that are different than either the laws of the
   2    United States, New York, or Israel; I just haven't articulated
   3    the compelling place or set of laws that should apply instead
   4    of those.
   5            MS. FERGUSON:  I didn't know if it would be useful to
   6    have a briefing on some of these choice of law issues.
   7            THE COURT:  If that becomes relevant at the
   8    appropriate time.  That's usually my response.
   9            MS. FERGUSON:  Our foremost argument is the lack of
  10    capacity argument, so thank you, your Honor.
  11            THE COURT:  You're welcome.
  12            MR. SCHOEN:  May I have a minute, your Honor?
  13            THE COURT:  Okay.  I will give you one minute.
  14            MR. SCHOEN:  Your Honor, just in brief response.
  15            I'm not sure how the last thing fits in with not
  16    kicking the can down the road but, in any event, I know
  17    Ms. Ferguson is trying but the idea here, it is just
  18    transparent.  They have different experts in the region.  There
  19    is no special expert for Varda Guetta.  There are other mothers
  20    in the case who suffered the kind of injury and damage.
  21    They're the same experts, that's the whole point here why we
  22    don't dismiss the case here, it is the same trial.
  23            THE COURT:  I thought she was moreso -- maybe I am
  24    incorrect, moreso referring to experts on what law would apply
  25    rather than experts.
```

75

C895sok2                       argument

1        MR. SCHOEN:  Those were two different subjects.  She
2   raised that and then raised this and because she said how
3   difficult it is for them to conduct discovery in the United
4   States.  That's an argument for Congress.  They're conducting
5   the same discovery -- we have the ATA.  Congress made that
6   decision and the Licci case, again, nobody is going to tell the
7   Court about that case, the Court knows the case better than
8   anyone, but that has to do with the American Express Bank
9   there, their only role in the case was transactions.  That's
10   not someone situated like Ms. Guetta or these other people
11   because that case is already here.  Are you trying that other
12   case?  In that case are you not otherwise trying a bank
13   transaction case?  The facts of this case are the facts of this
14   case and that doesn't change whether these plaintiffs are in it
15   or these state law claims are in it.
16        By the way, the idea of this Palestinian law and that
17   they can just throw this out there again, we have lost all
18   concept of burdens here.  Again, they are the law.  If there is
19   law that's inconsistent or in conflict with New York or Israeli
20   law, they should have told you that.  It probably isn't,
21   frankly, because of the mandated authority that operated there
22   but I don't know, we don't need to guess.  It is not an issue
23   in this case.
24        Anyway, thanks, Judge.
25        THE COURT:  This is what I am going to do because I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0542**

76

C895sok2                        argument

1   think it is time to move this case forward so I am going to
2   rule today on both of these motions.
3         With regard to the defendant's motion I'm going to
4   deny defendant's motion.  I think that in this case that it is
5   inappropriate at this stage of the proceeding to grant the
6   defendant's motion to dismiss for lack of capacity on this
7   record.  I will do so without prejudice to revisit this issue
8   on a record after discovery.
9         This is an affirmative defense.  It is the burden of
10  the defendant to prove this defense and it is the burden of the
11  defendant to demonstrate on what evidence they intend to prove
12  this defense of a lack of capacity either on summary judgment
13  or before -- quite frankly, I'm not even sure that I can
14  imagine a situation where this is a jury question but, you
15  know, if there are factual disputes it could be possibly.  But,
16  clearly, it is the defendant's burden to prove its affirmative
17  defense and having that burden the defendant can't simply rely
18  on the pleadings or prior litigation.  It must specifically
19  point to evidence on which they say indisputably demonstrates
20  that affirmative defense to the exclusion of any other
21  conclusion.  At this stage of the proceeding defendants have
22  not done that nor are they in a position because no discovery
23  is -- even outstanding discovery requests have not -- related
24  to this issue have not yet been responded to.
25        So, on this record I think it is inappropriate for me

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0543**

77

C895sok2                    argument

1   to dismiss this case based on any finding that the defendant
2   has demonstrated and met its burden to demonstrate its
3   affirmative defense of lack of capacity when there is no
4   evidence in this record, there has been no discovery in this
5   case, there isn't even an articulable set of facts that have
6   been developed in this case for me to make a decision that
7   these sets of facts demonstrate the affirmative defense of lack
8   of capacity without disputed evidence and leading to only one
9   conclusion for that, the PLO lacks the capacity and the PA
10  lacks the capacity to sue and be sued on New York Law.  In
11  fact, the defendants even raised an additional issue by the
12  discussion today with regard to which actual law applies.  So,
13  if the issue is to be whether or not and it is argued that
14  somehow I should decline to assert jurisdiction over these
15  claims because it is a complicated issue to determine which law
16  applies with regard to non-federal ATA claims, then it is
17  obviously I am not in a position if I can't even determine at
18  this point that, which laws apply with regard to these claims
19  that somehow the defendant has already met its burden to
20  demonstrate that it has an affirmative defense with regard to
21  the applicability of New York Law.  One cannot argue that some
22  other law other than New York Law would apply, might apply with
23  regard to this or other issues and then say at the same time
24  that indisputably they have a lack of capacity to be sued
25  because New York Law says that they cannot be sued as an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0544**

78

C895sok2                        argument

```
 1   unincorporated association.  If the defense wishes to prove
 2   that affirmative defense and establish that affirmative
 3   defense, then they have an obligation to exchange this
 4   information and the evidence on that that they intend to rely
 5   upon, the specific evidence that they intend to rely upon, and
 6   then they have an obligation to meet their burden of proof to
 7   demonstrate that they are in fact what they wish this Court to
 8   conclude at this stage without any evidence in the record
 9   that's been developed during this litigation, that they are in
10   fact an unincorporated association.  As I stated, I think it is
11   inappropriate for me to simply say that such a determination
12   that that burden is met simply because Courts in other
13   litigation, first with regard to specific issues that the Court
14   was addressing, even with regard to similar issues that have
15   been addressed in this Court, have made a determination that
16   for the purpose of those issues that they would accept that as
17   having a premise and that may prove, in this case, I see no
18   evidence which I can review which gives me basis to understand
19   that any Court has gone through an analysis -- a factual
20   analysis with regard to the nature of the PA and the PLO, its
21   establishment and its organization to articulate on what facts
22   that an independent objective conclusion is to be made, that it
23   is an unincorporated association and that its status is an
24   unincorporated association would preclude their bringing
25   non-federal claims under New York or Israeli law.
```

**0545**

79

C895sok2                       argument

1              So, I'm going to deny that motion because the
2      defendant is not able to demonstrate, based on this record at
3      this stage of the proceeding, that they have indisputably an
4      affirmative defense of lack of capacity that would preclude
5      liability in this case.
6              Also, I am denying the application and decline to
7      assert ancillary pending jurisdiction over the nonfederal
8      claims.  In this case, given all the consideration of what
9      factors to consider with regard to assertive or decline to
10     assert jurisdiction, primarily any issues that are
11     determinative here that makes no sense to turn this one case
12     into more than one case in more than one jurisdiction.  There
13     is no compelling argument for me to do that.  The only
14     compelling argument to, which would give me a scenario that's
15     different than that is that, as I say as I heard it in a movie,
16     to get one big falling object and turn it into a number of big
17     falling dangerous objects isn't a compelling argument.
18             The only argument that this would somehow simplify
19     rather than complicate for all parties and -- the argument that
20     this would put a lesser burden than a greater burden on any of
21     the parties would simply be the argument that I should decline
22     jurisdiction because it would preclude the plaintiffs from
23     pursuing these claims in any jurisdiction because of the
24     statute of limitations.  Again, that is not a compelling
25     argument for me to decline jurisdiction if I know that it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0546**

80

C895sok2                     argument

1   simply denies the plaintiff the forum that they have already
2   chosen and they have no reasonable alternative of forum at this
3   point to resolve these issues and they have a legal right to
4   resolve those issues in this forum.  If they have a legal right
5   to resolve these issues in this forum it is not compelling to
6   say that I should decline jurisdiction knowing that they will
7   be denied the right to go in an alternative forum because the
8   statute of limitations has already run.
9           All of your arguments made with regard to the
10  complication of proceeding with these issues and resolving
11  these other issues, whether they would be in conflict of law
12  issues or issues of practical discovery and trial, I think that
13  this Court will be, whatever issues that this Court is
14  confronted with in court, any additional Court that has to deal
15  with those issues separately are going to also have to be
16  confronted with.
17          So, I think that this Court, particularly since they
18  are ATA claims and there are ATA claims which will not go away
19  and those claims arise out of the same set of facts and actions
20  which underlie all of the other claims and there is no related
21  claims that don't arise out of the same set of facts, the most
22  efficient and effective way to resolve the issues and the
23  claims that arise out of the activities at issue is in one
24  lawsuit in one jurisdiction and not in duplicate lawsuits in
25  different jurisdictions simply because they're alleged as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0547

81

C895sok2                        argument

1   different causes of action in different jurisdictions under
2   different law.
3            So, I am going to deny both the motion for partial
4   summary judgment -- I mean motion for judgment on the pleadings
5   and I'm going deny the motion to assert jurisdiction over the
6   pending ancillary claims.
7            There is also a motion -- I believe that there was
8   also a motion by the plaintiffs to, alternatively, to convert
9   this into a Rule 56 motion.  I think that that is inappropriate
10  at this stage of the proceeding.  The defendants have not moved
11  on the basis of independent evidence that's been disclosed in
12  discovery.  Both sides have clearly given indication and
13  particularly the plaintiffs have given an indication that there
14  is significant other evidence that they would be entitled to
15  review in this issue to combat or to determine whether or not
16  the defendants can assert the affirmative defense and so I
17  think that given the status of discovery and the nature of this
18  issue, that it would be inappropriate to convert this to any
19  other motion and the motion as it was stated.
20           With regard to the plaintiff's motion to strike, I'm
21  going to deny that motion.  I think with regard to the issues
22  that have already been resolved a motion to strike is
23  unnecessary and is not appropriate spending time and effort on
24  that.
25           With regard to the motion to strike based on waiver or

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

82

C895sok2                    argument

1    and/or failure to state -- sufficiently state the affirmative
2    defenses, I find that the affirmative defenses, as alleged,
3    have articulated what the nature of the affirmative defenses
4    are and sufficiently put the defendant -- the plaintiff on
5    notice as to what affirmative defenses, the nature of those
6    affirmative defenses, and to the extent that there is a
7    question about the underlying facts which would support those
8    affirmative offenses, I believe that is appropriate for
9    discovery.  There it already has been the subject of discovery
10   requests and those issues are to be resolved in discovery.  To
11   the extent that defendant does not wish to engage in discovery
12   in those issues that are relevant to any of the affirmative
13   defenses, then they can withdraw those affirmative defenses or
14   those affirmative defenses can be precluded.
15        So, I think that the appropriate thing is to move
16   forward efficiently with discovery at this point.  I think that
17   I am not satisfied with the pace of discovery.  I think I told
18   Magistrate Judge Ellis that I expected him to be firm with
19   discovery.  I have also indicated to him that any position, if
20   I deny the motions that are on standing here, my issue is going
21   to be that any position is going to be that other than one
22   summary judgment motion after the close of discovery, there are
23   to be no other motions filed without first a pre-motion
24   conference with Magistrate Judge Ellis, and that pre-motion
25   conference must be preceded by no more than a two-page letter

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0549**

83

C895sok2                              argument

1  indicating what the nature of the motion is that the parties
2  believe are appropriate at this stage of the proceeding and the
3  nature of the motion and the underlying basis for the motion
4  and why the motion is timely made and is not premature in
5  discovery motion.
6          I think that the motions that have been made, there
7  have been too many piecemeal motions and I think one issue that
8  we have discussed and I think that primarily some is probably
9  even related to the plaintiff's motion to strike in an attempt
10 to preclude piecemeal, untimely motion, I will be able to
11 preclude that from all parties at this stage of the proceeding.
12 All the motions to dismiss should have been made.  If they have
13 not been made I think you need to have a pre-motion conference
14 with the magistrate judge and give him that letter and tell him
15 what motion you intend to make and tell him why that motion is
16 not untimely or premature short of completion of discovery and
17 summary judgment.
18         So, the parties should move forward to complete
19 discovery, move forward in anticipation of full summary
20 judgment briefing if that's the step to take after discovery,
21 and to anticipate that you will be spending, devoting your time
22 to completing discovery on these issues for the rest of the
23 year rather than engaging in further motions generating other
24 pleadings or generating other claims or affirmative defenses.
25         So, what I am going to do is I am going to schedule

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**0550**

84
C895sok2                          argument
 1    before me -- discovery is supposed to be completed in December.
 2    I am going to schedule before me a conference January 17th at
 3    10:00.  We may not have to meet on that date.  If things move
 4    efficiently I would anticipate that you would be complete with
 5    discovery by then and you can agree upon a motion schedule for
 6    full summary judgment submission and you can give me that
 7    schedule and then I can, unless there are other issues to be
 8    addressed on January 17th, we can move that date until after
 9    the summary judgment motion is fully submitted and if you want
10    to be heard on summary judgment motion.
11            So, as I say, I am going to have further conversation
12    with Magistrate Judge Ellis to make sure that things are moving
13    efficiently and that he makes sure that they're moving
14    efficiently.  If, for some reason, there are some applications,
15    letter applications that are submitted to Magistrate Judge
16    Ellis and he holds a pre-motion conference and he determines
17    that it is a timely and not premature motion that should be
18    addressed in substance on its merits, then he can indicate to
19    me the nature of that motion and I will grant him the authority
20    to tell the parties to go ahead and brief that issue for me or
21    for him or make an independent determination based on my review
22    of the nature of the letter response -- the letter and response
23    and the record before him at the conference whether or not
24    that's a motion that is both ripe and timely to be made in this
25    case.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

85

C895sok2                    argument

1          Otherwise, I will see the parties on January 17th at
2     10:00 and we will see where we are at that point in time.  If
3     any issues arise with regard to discovery, they should be
4     raised in writing right away with Judge Ellis.  If we need to
5     meet again before that time let me know and I will schedule a
6     conference before me to address any issues that need to be
7     addressed before that time.  But, otherwise, I will instruct
8     Magistrate Judge Ellis to make sure the parties are on schedule
9     and move forward efficiently and resolve quickly an issue that
10    might otherwise delay the completion of discovery in this case.
11          Is there anything else we need to address?
12          MR. SCHOEN:  No, your Honor.
13          THE COURT:  Anything else by defense?
14          MS. FERGUSON:  No, your Honor.
15          THE COURT:  Thank you, and I will see you, and good
16    luck and I will talk to Magistrate Judge Ellis as soon as I get
17    off the bench.
18          MR. SCHOEN:  Thank you.
19          MS. FERGUSON:  Thank you.
20                          o0o
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

Appellate Case: 23-1286   Document: 010110991829   Date Filed: 01/29/2024   Page: 280