Case Nos. 23-1286 and 23-1335

IN THE

# United States Court of Appeals

## FOR THE TENTH CIRCUIT

◆◆

**CHAYA WERFEL, et al.,**

*Plaintiffs – Appellants*

— v. —

**PALESTINE LIBERATION ORGANIZATION, et al.,**

*Defendants – Appellees*

_____

**UNITED STATES OF AMERICA,**

*Intervenor-Appellant*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO (Denver)
District Court Case No. 21-cv-03043; The Honorable Gordon P. Gallagher

**BRIEF OF APPELLEES
ORAL ARGUMENT REQUESTED**

| | |
|---|---|
| Joseph S. Alonzo<br>SQUIRE PATTON BOGGS (US) LLP<br>1211 Avenue of the Americas<br>26th Floor<br>New York, N.Y. 10036<br>Telephone: (212) 872-9831<br>joseph.alonzo@squirepb.com | Gassan A. Baloul<br>Mitchell R. Berger<br>Amy Brown Doolittle<br>SQUIRE PATTON BOGGS (US) LLP<br>2550 M Street, N.W.<br>Washington, D.C. 20037<br>Telephone: (202) 457-6000<br>gassan.baloul@squirepb.com<br>mitchell.berger@squirepb.com<br>amy.doolittle@squirepb.com<br><br>*Counsel for Appellees* |

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, counsel for Defendants-Appellees Palestinian Authority and Palestine Liberation Organization hereby certify that they do not have a parent corporation or corporate shareholders.

Dated: April 11, 2024

SQUIRE PATTON BOGGS (US) LLP

*/s/ Gassan A. Baloul*
Gassan A. Baloul
Mitchell R. Berger
Amy Brown Doolittle
Joseph S. Alonzo

*Counsel for Defendants-Appellees*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF CONTENTS............................................................................................ ii

TABLE OF AUTHORITIES ................................................................................... iv

LIST OF RELATED CASES ................................................................................... xii

INTRODUCTION ....................................................................................................1

STATEMENT OF THE ISSUES...........................................................................2

STATEMENT OF THE CASE...............................................................................3

SUMMARY OF THE ARGUMENT .....................................................................8

ARGUMENT ...........................................................................................................15

I.     Exercising Personal Jurisdiction Over Defendants Would Violate Due Process. ................................................................................................................15

     A.    Courts Have Consistently Held that Defendants Lack Sufficient Contacts with the United States to Support the Exercise of Personal Jurisdiction. ......................................................................16

     B.    Defendants Have Not "Consented" to Personal Jurisdiction in the United States.....................................................................................20

          1.    Consent to Personal Jurisdiction Must Be Knowing and Voluntary. ..............................................................................20

          2.    Defendants Have Not Knowingly and Voluntarily Consented to Personal Jurisdiction. ..........................................30

               a.    Social Welfare Payments Made in Palestine Do Not Evince Agreement to Personal Jurisdiction in the United States. ..........................................................30

b.      Plaintiffs' Allegations Regarding Defendants' U.S.
Activities and Physical Presence Fail to
Demonstrate Knowing and Voluntary Consent..............34

C.     Permitting Congress to Impose "Deemed Consent" to Personal
Jurisdiction Based on Constitutionally-Inadequate Conduct
Would Eviscerate Due Process Protections. .......................................40

D.     *Fuld* and *Mallory* Confirm the Due Process Standards
Applicable to "Consent" to Personal Jurisdiction...............................47

II.    This Court Should Reject Plaintiffs' Remaining Arguments.......................49

A.     Every Court to Consider the Issue Has Held that Defendants
Are "Persons" Entitled to Jurisdictional Due Process. .......................49

B.     *Ford* Did Not "Overrule" Prior Decisions Holding that
Defendants Are Not Subject to Specific Jurisdiction..........................55

C.     The Federal Rules of Civil Procedure Do Not Create Personal
Jurisdiction Over Defendants. ............................................................58

1.      Rule 23.2 Does Not Override Due Process Limits on
Personal Jurisdiction. .................................................................58

2.      Rule 23.2 Does Not Apply to Plaintiffs' Claims Here. ............61

III.   The PSJVTA Violates Separation of Powers. ...............................................63

CONCLUSION ......................................................................................................64

REQUEST FOR ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Armstrong v. Pomerance*,
  423 A.2d 174 (Del. 1980) ...................................................................27

*AT&T Commc'ns. v. BellSouth Telecomms. Inc.*,
  238 F.3d 636 (5th Cir. 2001) .............................................................25

*Bank Markazi v. Peterson*,
  578 U.S. 212 (2016)....................................................................15, 63

*Battle Fowler v. Brignoli*,
  765 F. Supp. 1202 (S.D.N.Y. 1991) ...................................................61

*Bernhardt v. Islamic Republic of Iran*,
  47 F.4th 856 (D.C. Cir. 2022)............................................................56

*Brewer v. Williams*,
  430 U.S. 387 (1977)...........................................................................64

*Brown v. Lockheed Martin Corp.*,
  814 F.3d 619 (2d Cir. 2016) ..............................................................27

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)............................................................ 16, 21, 40-41

*Calagaz v. Calhoon*,
  309 F.2d 248 (5th Cir. 1962) .............................................................61

*CGC Holding Co., LLC v. Hutchens*,
  974 F.3d 1201 (10th Cir. 2020) ....................................................59, 60

*Chen v. Dunkin' Brands*,
  954 F.3d 492 (2d Cir. 2020) ..............................................................12

*City of Boerne v. Flores*,
  521 U.S. 507 (1997)..............................................................45, 63, 64

*College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense*
  *Bd.*, 527 U.S. 666 (1999) ....................... 10, 12, 21, 24-26, 28, 38, 42

*Coniglio v. Highwood Servs., Inc.*,
    60 F.R.D. 359 (W.D.N.Y. 1972) .........................................................................62

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)....................................................................................41, 43

*Dickerson v. United States*,
    530 U.S. 428 (2000)...........................................................................................64

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
    46 F.4th 226 (5th Cir. 2022) ...............................................................46, 58, 59

*Ezratty v. Puerto Rico*,
    648 F.2d 770 (1st Cir. 1981)...............................................................................52

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983)...........................................................................................51

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021)..................................................................... 14, 40, 55-57

*Fuld v. PLO*,
    578 F. Supp. 3d 577 (S.D.N.Y. 2022) ............................. 7, 26, 30, 40, 43-44, 49

*Fuld v. PLO*,
    82 F.4th 74 (2d Cir. 2023) ........................ 1, 4, 7, 13, 15-16, 29-30, 37, 41, 45-48

*Gater Assets Ltd. v. AO Moldovagaz*,
    2 F.4th 42 (2d Cir. 2021) ..................................................................................51

*GCIU-Emp'r Ret. Fund v. Coleridge Fine Arts*,
    700 F. App'x 865 (10th Cir. 2017).....................................................................59

*Gilson v. Republic of Ire.*,
    682 F.2d 1022 (D.C. Cir. 1982).........................................................................44

*Gowan v. U.S. Air Force*,
    148 F.3d 1182 (10th Cir. 1998) .........................................................................40

*GSS Grp. Ltd. v. Nat'l Port Auth.*,
    680 F.3d 805 (D.C. Cir. 2012)...........................................................................50

*Hammond Packing Co. v. Arkansas*,
212 U.S. 322 (1909)......................................................................................23

*Hess v. Pawloski*,
274 U.S. 352 (1927)........................................................................10, 26, 38

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)............................................................................................44

*Hood v. Am. Auto Care, LLC*,
21 F.4th 1216 (10th Cir. 2021) .................................................................57

*Hopper v. Wyant*,
502 F. App'x 790 (10th Cir. 2012) ...........................................................21

*Hovey v. Elliott*,
167 U.S. 409 (1897)......................................................................................23

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
456 U.S. 694 (1982).............................9, 16, 20, 22-23, 29, 31, 47-48

*INS v. Chadha*,
462 U.S. 919 (1983)......................................................................................45

*Estate of Klieman v. Palestinian Auth.*,
923 F.3d 1115 (D.C. Cir. 2019)....................... 5-6, 17-18, 30, 38, 41, 55-56, 64

*Klinghoffer v. S.N.C. Achille Lauro*,
937 F.2d 44 (2d Cir. 1991) ...........................................................19, 36, 50

*Laker Airways Ltd. v. Sabena*,
731 F.2d 909 (D.C. Cir. 1984)...................................................................32

*Leonard v. USA Petroleum Corp.*,
829 F. Supp. 882 (S.D. Tex. 1993)..........................................10, 28, 39

*Litecubes, LLC v. N. Light Prods., Inc.*,
523 F.3d 1353 (Fed. Cir. 2008) ................................................................32

*Livnat v. Palestinian Auth.*,
851 F.3d 45 (D.C. Cir. 2017) .......................5, 19, 30, 41, 44-45, 50-52, 55, 64

*Llacua v. W. Range Ass'n*,
   930 F.3d 1161 (10th Cir. 2019) ........................................................62

*Malinski v. New York*,
   324 U.S. 401 (1945)........................................................................46

*Mallory v. Norfolk S. Ry. Co.*,
   143 S. Ct. 2028 (2023)........................................ 8, 10, 13, 27, 47-48

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) ........................................................64

*Mendelsohn v. Meese*,
   695 F. Supp. 1474 (S.D.N.Y. 1988) ..............................................36

*In re Mid-Atl. Toyota Antitrust Litig.*,
   525 F. Supp. 1265 (D. Md. 1981).............................................27, 28

*Nasious v. Two Unknown B.I.C.E. Agents*,
   492 F.3d 1158 (10th Cir. 2007) ....................................................62

*Nat'l Council of Resistance of Iran v. Dep't of State*,
   251 F.3d 192 (D.C. Cir. 2001)......................................................53

*Nat'l Equip. Rental, Ltd. v. Szukhent*,
   375 U.S. 311 (1964)......................................................................21

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012)......................................................................44

*Northbrook Excess & Surplus Ins. Co. v. Med. Malpractice Joint
   Underwriting Ass'n of Mass.*,
   900 F.2d 476 (1st Cir. 1990)........................................................61

*Owen Equip. & Erection Co. v. Kroger*,
   437 U.S. 365 (1978)......................................................................58

*Peay v. BellSouth Med. Assistance Plan*,
   205 F.3d 1206 (10th Cir. 2000) ....................................................46

*Prewitt Enters., Inc. v. OPEC*,
   353 F.3d 916 (11th Cir. 2003) ......................................................53

*Price v. Socialist People's Libyan Arab Jamahiriya*,
    294 F.3d 82 (D.C. Cir. 2002) ................................................................51

*Rainbow Coal. of Okla. v. Okla. State Election Bd.*,
    844 F.2d 740 (10th Cir. 1988) ..............................................................52

*Resol. Tr. Corp. v. Deloitte & Touche*,
    822 F. Supp. 1512 (D. Colo. 1993).......................................................61

*Reynolds v. Int'l Amateur Athletic Fed'n*,
    23 F.3d 1110 (6th Cir. 1994) ................................................................53

*Roell v. Withrow*,
    538 U.S. 580 (2003)........................................................................20, 21

*In re SEC v. Knowles*,
    87 F.3d 413 (10th Cir. 1996) ..........................................................46, 58

*Shatsky v. PLO*, No. 18-cv-12355,
    2022 WL 826409 (S.D.N.Y. Mar. 18, 2022)..........................................7

*Shatsky v. PLO*,
    955 F.3d 1016 (D.C. Cir. 2020).......................... 5, 11, 17, 18, 30, 31, 41, 55, 64

*Sokolow v. PLO*,
    590 F. Supp. 3d 589 (S.D.N.Y. 2022) ....................................................7

*Sokolow v. PLO*,
    607 F. Supp. 3d 323 (S.D.N.Y. 2022) ...............................................7, 40

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966).............................................................................50

*Swenson v. Thibaut*,
    250 S.E.2d 279 (N.C. Ct. App. 1978)...................................................27

*Toumazou v. Turkish Republic of N. Cyprus*,
    No. 14-7170, 2016 U.S. App. Lexis 787 (D.C. Cir. Jan. 15, 2016) ...................52

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)..............................................................................60

*United States v. Klein*,
   80 U.S. 128 (1871).................................................................................63

*United States v. PLO*,
   695 F. Supp. 1456 (S.D.N.Y. 1988) .......................................4, 35, 36

*van Aggelen v. UN*,
   311 F. App'x 407 (2d Cir. 2009) ..........................................................63

*Verlinden B.V. v. Cent. Bank of Nigeria*,
   461 U.S. 480 (1983)...............................................................................44

*Volkart Bros. v. M/V "Palm Trader,"*
   130 F.R.D. 285 (S.D.N.Y. 1990) .........................................................49

*Walden v. Fiore*,
   571 U.S. 277 (2014)...............................................................................16

*Waldman v. PLO*,
   82 F.4th 64 (2d Cir. 2023) ......................................................................7

*Waldman v. PLO*,
   835 F.3d 317 (2d Cir. 2016) .....4, 5, 17-18, 30, 32, 41, 49, 52, 55, 58, 60-61, 64

*Waldman v. PLO*,
   925 F.3d 570 (2d Cir. 2019) ............................................................6, 38

*Wellness Int'l Network, Ltd. v. Sharif*,
   575 U.S. 665 (2015)........................................................................9, 21, 22

*Wilkinson v. FBI*,
   99 F.R.D. 148 (C.D. Cal. 1983)...........................................................62

*Wuchter v. Pizzutti*,
   276 U.S. 13 (1928)................................................................................26

*Yamashita v. LG Chem, Ltd.*,
   62 F.4th 496 (9th Cir. 2023) .................................................................57

*Zadvydas v. Davis*,
   533 U.S. 678 (2001)...............................................................................50

**Statutes**

Anti-Terrorism Act  ............................5, 11, 12, 18-19, 32, 34-36, 38-39, 45, 57-58

Anti-Terrorism Clarification Act of 2018,
   Pub. L. No. 115-253, 132 Stat. 3183 (2018) ........................................5, 6, 37, 38

Colo. Rev. Stat. § 7-30-106 ...................................................................................62

Colo. Rev. Stat. § 7-30-107(1) ..............................................................................62

Promoting Security and Justice for Victims of Terrorism Act,
   Pub. L. No. 116-94, 133 Stat. 2534 (codified at 18 U.S.C.
   § 2334(e))........... 1-3, 6-9, 11-13, 15, 20, 29-30, 34-37, 39-41, 44-49, 54, 63-64

18 U.S.C. § 2331(1)(B).........................................................................................57

22 U.S.C. § 2378b note.......................................................................................4, 35

22 U.S.C. § 5201(b) .......................................................................................4, 11, 35

22 U.S.C. § 5202 ..................................................................................... 4, 11-12, 35

22 U.S.C. § 5203 ...................................................................................................37

28 U.S.C. § 2072(b) ..............................................................................................58

48 U.S.C. § 1541(b) ..............................................................................................52

**Rules**

Fed. R. Civ. P. 4(k) ...............................................................................................59

Fed. R. Civ. P 12(b)(6)............................................................................................8

Fed. R. Civ. P. 17(b)(3)..........................................................................................62

Fed. R. Civ. P. 23.2 ......................................................................... 3, 8, 14, 58-63

Fed. R. Civ. P. 82 ............................................................................................58, 59

**Other Authorities**

*Anonymous v. Palestinian Auth.*
   (Isr.), CivA 2362/19 (Jerusalem 2022)..............................................................19

Brookings Institution, *Why the discourse about Palestinian payments to prisoners' families is distorted and misleading* (2020)...................................33

Carnegie Endowment for Int'l Peace, *Palestinian Prisoner Payments* (2021) ..........................................................................................................4, 33

DOJ Office of Legal Counsel, *Memo. Op. for the Special Rep. for Guam Commonwealth* (July 28, 1994) ..............................................................52

Memorandum, 57 Fed. Reg. 57, 093 (Nov. 30, 1992)............................................52

*Mentin v. Palestinian Auth.* (Isr.), CivC 3361/09 (Jerusalem 2017) ..............................................................19

*Norz'its v. Palestinian Auth.* (Isr.), CivC 2538/00 (Jerusalem) .......................................................................19

Programme of Work for 2020, CEIRPP, UN Doc. A/AC.183/2020/1 (Feb. 7, 2020).....................................................................................................39

UN Committee on the Exercise of the Inalienable Rights of the Palestinian People, Report, UN Doc. A/75/35 (Oct. 13, 2020)..........................39

## LIST OF RELATED CASES

The following cases involve similar claims and issues:

1. *Fuld v. PLO*, 82 F.4th 74 (2d Cir. 2023).

2. *Waldman v. PLO*, 82 F.4th 64 (2d Cir. 2023).

3. *Shatsky v. PLO*, 2022 WL 826409 (S.D.N.Y. Mar. 18, 2022).

4. *Shatsky v. PLO*, 955 F.3d 1016 (D.C. Cir. 2020).

5. *Estate of Klieman v. Palestinian Auth*., 923 F.3d 1115 (D.C. Cir. 2019), *judgment vacated on other grounds*, 140 S. Ct. 2713 (2020), *opinion reinstated in part*, 820 F. App'x 11 (D.C. Cir. 2020).

6. *Livnat v. Palestinian Auth.*, 851 F.3d 45 (D.C. Cir. 2017), *cert. denied*, 139 S. Ct. 373 (2018).

7. *Waldman v. PLO*, 835 F.3d 317 (2d Cir. 2016), *cert. denied sub nom. Sokolow v. PLO*, 138 S. Ct. 1438 (2018).

## INTRODUCTION

The PSJVTA is the latest legislative attempt to undo an unbroken line of cases holding that the PA and PLO ("Defendants") are not subject to personal jurisdiction in the United States for their alleged involvement in terrorist attacks in Israel and Palestine. Time and again, courts have held that exercising personal jurisdiction over Defendants would violate due process because the attacks did not target Americans, and Defendants lack any constitutionally-sufficient connection to the United States. Because jurisdictional due process protections are rooted in the Constitution, these decisions cannot be undone by legislation.

As recently explained by the Second Circuit, the PSJVTA attempts an end-run around this settled constitutional analysis by declaring that Defendants always shall be "deemed" to "consent" to personal jurisdiction when they engage in the same conduct courts have previously held _insufficient_ to support jurisdiction under the Due Process Clause. _Fuld v. PLO_, 82 F.4th 74, 91 (2d Cir. 2023). The PSJVTA accordingly seeks to elide the constitutional boundaries recognized by the Second and D.C. Circuits in look-alike cases.

The district court saw through this ruse, holding—like every other federal court to consider the issue—that the fiction of "deemed consent" cannot paper over the lack of any constitutionally-meaningful connection between Defendants, the forum, and the conduct that gave rise to Plaintiffs' claims. Defendants have taken

1

no actions that could be understood as "knowing and voluntary" submission to personal jurisdiction: they did not sign a contract agreeing to jurisdiction, accept any benefit from the Government conditioned on submission to jurisdiction, or otherwise voluntarily agree to litigate Plaintiffs' claims in this forum. Rather, the PA and PLO have repeatedly and successfully challenged personal jurisdiction on facts nearly identical to those here.

Plaintiffs reprise two alternative theories (specific jurisdiction and Defendants' purported lack of entitlement to due process) which likewise have been squarely rejected by the Second and D.C. Circuits, and find no support in this Court's precedent. Finally, Plaintiffs propose a novel "class action" approach to personal jurisdiction that violates both constitutional due process and the very wording of the procedural rule upon which they rely.

## STATEMENT OF THE ISSUES

1.    Whether the PSJVTA violates the Due Process Clause by imposing "consent" to personal jurisdiction on Defendants based on conduct previously held insufficient to satisfy due process and which does not constitute knowing and voluntary submission to the jurisdiction of U.S. courts.

2.    Whether this Court should: (1) become the first to hold that non-sovereign political and governmental entities like the PA and PLO are not entitled to jurisdictional due process; (2) find specific jurisdiction based on diplomatic and

2

political activities in the U.S. that other courts have repeatedly found are not related to terrorist attacks in Israel; or (3) expand procedural Rule 23.2 to create personal jurisdiction even where it is otherwise lacking under the Due Process Clause.

3.    Whether the PSJVTA violates separation of powers by directing courts to <u>always</u> find consent to personal jurisdiction if its factual predicates are met, regardless of whether those facts satisfy the standard for consent under the Due Process Clause.

## STATEMENT OF THE CASE

This is the latest in a series of cases arising from terrorist attacks occurring during the Israeli-Palestinian conflict.  Plaintiffs claim the PA and PLO are responsible for those terrorist attacks, and assert they may be haled into U.S. court even though the alleged attacks did not target Americans and Defendants did not engage in any suit-related conduct in the United States.  Over the past decade, every court to reach the issue has dismissed such claims for lack of personal jurisdiction. The district court correctly reached the same conclusion.

### A.    Defendants Are the Non-Sovereign Government of Palestine.

The PA is the domestic government of parts of the West Bank and the Gaza Strip.  It provides "conventional government services," including "public safety and the judicial system; health care; public schools and education; foreign affairs; economic development initiatives …; the payment of more than 155,000

3

government employee salaries and related pension funds; transportation; and, communications." *Waldman v. PLO*, 835 F.3d 317, 322-23 (2d Cir. 2016), *cert. denied*, 584 U.S. 915 (2018).  The PA also administers a social welfare program designed to provide a "social safety net in the face of brutal and oppressive living conditions under Israeli military occupation."[1]  The PLO conducts Palestinian foreign affairs, including operating its foreign missions.  *Id.* at 322-23.

The United States does not recognize Defendants as sovereign.  *Id.* at 329; *see also* Gov't Br. 3 ("The United States does not recognize either the PA or the PLO as the government of a sovereign State.").  But the PA is a "key partner in efforts to stabilize the West Bank," and "the United States has expressed the view that the future of Gaza must include Palestinian-led governance and Gaza unified with the West Bank under the PA."  Gov't Br. 3 n.2.

The PA and PLO are forbidden from operating in the United States.  22 U.S.C. §§ 5201(b), 5202, 2378b note; *United States v. PLO*, 695 F. Supp. 1456, 1465-68, 1471 (S.D.N.Y. 1988).  The UN Headquarters Agreement affords the sole exception, permitting Palestine to conduct activities relating to its role as a UN Non-Member State as an "invitee."  *See Fuld*, 82 F.4th at 82 n.2.  The PLO had a diplomatic

---

[1] Carnegie Endowment for Int'l Peace, *Palestinian Prisoner Payments* (2021), https://carnegieendowment.org/specialprojects/breakingtheisraelpalestinestatusquo/payments.

4

mission in Washington, D.C., but it was closed on October 10, 2018.  *Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1130 (D.C. Cir. 2019).

### B.     Courts Repeatedly Hold that Defendants Are Not Subject to Personal Jurisdiction in the United States.

Because Defendants do not maintain any constitutionally-meaningful connection to the United States, federal courts have long held that exercising personal jurisdiction over Defendants for alleged attacks in Israel and Palestine would violate due process.  In *Waldman*, plaintiffs brought Anti-Terrorism Act ("ATA") claims for a series of attacks allegedly assisted by Defendants.  835 F.3d at 324-25.  The Second Circuit, however, found no specific jurisdiction because Defendants' diplomatic activities in the U.S. were not related to the attacks, and the attacks themselves "were not expressly aimed at the United States."  *Id*. at 332-37.  The fact that Americans were injured was "random and fortuitous."  *Id.*

The D.C. Circuit reached the same conclusion, holding that plaintiffs in three look-alike cases "failed to carry their burden of demonstrating that personal jurisdiction … would meet the requirements of the Fifth Amendment's Due Process Clause."  *Livnat v. Palestinian Auth.*, 851 F.3d 45, 58 (D.C. Cir. 2017); *Klieman*, 923 F.3d at 1127 (same); *Shatsky v. PLO*, 955 F.3d 1016, 1037-38 (D.C. Cir. 2020) (same).

In response, Congress passed the Anti-Terrorism Clarification Act of 2018 ("ATCA"), Pub. L. No. 115-253, 132 Stat. 3183 (2018).  The ATCA provided that

5

Defendants "shall be deemed to have consented to personal jurisdiction" if they: (1) accept certain U.S. foreign assistance, or (2) maintain a U.S. office pursuant to an Executive Branch waiver. Defendants, however, did not accept either of these government benefits, and therefore did not consent to personal jurisdiction. Accordingly, both the Second and D.C. Circuits held that the ATCA failed to provide personal jurisdiction over Defendants. *See Waldman v. PLO*, 925 F.3d 570, 573-75 (2d Cir. 2019) ("*Waldman II*"), *vacated on other grounds*, 140 S. Ct. 2714 (2020); *Klieman*, 923 F.3d at 1128.

### C. Congress Attempts to Circumvent These Decisions By Enacting the PSJVTA.

Congress intervened again by passing the Promoting Security and Justice for Victims of Terrorism Act ("PSJVTA"), Pub. L. No. 116-94, 133 Stat. 2534, 3082-85. The PSJVTA requires courts to <u>always</u> "deem" that Defendants "consent" to personal jurisdiction if they engage in two types of conduct: (1) make payments after April 18, 2020, to persons who were imprisoned for (or families of those who died while committing) "any act of terrorism" that injured a U.S. national; or (2) undertake any "activity" or maintain any office "in the United States" after January 4, 2020. 18 U.S.C. § 2334(e). The latter provision is subject to various exceptions, which preclude courts from considering, *inter alia*, UN-related activities, meetings with government officials, and any conduct "ancillary" to those enumerated exceptions. *Id.*

Following passage of the PSJVTA, plaintiffs in three New York cases attempted to use the statute to subject Defendants to personal jurisdiction in the United States. In all three cases, the district court held that the "deemed consent" provisions of the PSJVTA violated due process. *See Fuld v. PLO*, 578 F. Supp. 3d 577 (S.D.N.Y. 2022); *Sokolow v. PLO*, 590 F. Supp. 3d 589 (S.D.N.Y. 2022), *reconsideration denied*, 607 F. Supp. 3d 323 (S.D.N.Y. 2022); *Shatsky v. PLO*, No. 18-cv-12355, 2022 WL 826409 (S.D.N.Y. Mar. 18, 2022). The Second Circuit recently affirmed those rulings. *See Fuld*, 82 F.4th 74; *Waldman v. PLO*, 82 F.4th 64 (2d. Cir. 2023).

## D.    The District Court Dismisses Plaintiffs' Claims for Lack of Personal Jurisdiction.

This case concerns a terrorist attack at a Jerusalem synagogue nearly a decade ago. CJA-964-65. Plaintiffs allege that the attackers were operatives of the Popular Front for the Liberation of Palestine ("PFLP"), and that Defendants "facilitated, enabled, and caused" the attack. CJA-25.

Rather than suing the PFLP or Defendants in Israel, Plaintiffs instead filed suit in the district court, asserting Defendants "consented" to personal jurisdiction in the United States under the PSJVTA. CJA-22. Defendants moved to dismiss Plaintiffs' claims for lack of personal jurisdiction and failure to state a claim. CJA-77. The Government intervened to defend the constitutionality of the PSJVTA. CJA-868.

7

The district court granted Defendants' motion to dismiss, holding—like every other court to address the issue—that the "deemed consent" provisions of the PSJVTA violate due process. CJA-969-75. As the court explained, "Congress cannot simply legislate that 'any conduct, without regard for its connections to the United States generally or to litigation in the United States specifically, signals a party's intent to submit to the jurisdiction of a United States court.'" CJA-971 (quoting *Fuld*, 578 F. Supp. 3d at 580). The district court's reasoning, and the guidance it correctly gleaned from the Supreme Court's recent decision in *Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028 (2023), are addressed in further detail below.

The district court likewise rejected Plaintiffs' alternative jurisdictional theories that (1) Defendants are not entitled to due process, (2) Defendants are subject to specific jurisdiction, and (3) FRCP 23.2 creates personal jurisdiction over Defendants. CJA-972-78. The district court declined to reach Defendants' additional arguments for dismissal under Rule 12(b)(6). CJA-978-79.

## SUMMARY OF THE ARGUMENT

The PSJVTA does not satisfy the "knowing and voluntary" standard for consent to jurisdiction, but instead improperly attempts to bypass constitutional due-process requirements. Courts have repeatedly held that the same types of activities alleged by Plaintiffs in this case are constitutionally inadequate to support personal jurisdiction over Defendants. Allowing Congress to transform those same activities into "consent"

8

to jurisdiction would strip Defendants of these constitutional protections, and undermine the Supreme Court's jurisprudence on personal jurisdiction. This Court therefore should join the Second Circuit in holding that the "deemed consent" provisions of the PSJVTA violate the Due Process Clause.

## I. Implied Consent to Personal Jurisdiction Must Be Knowing and Voluntary.

The Supreme Court has emphasized that consent to jurisdiction must be "knowing and voluntary." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 685 (2015). To establish valid "consent," Plaintiffs must demonstrate some "actions of the defendant" that support the presumption the defendant knowingly and voluntarily submitted to jurisdiction in the forum. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704-09 (1982) ("*Bauxites*"). The Supreme Court distinguishes between inferring a defendant's knowing and voluntary choice to submit to jurisdiction based on its own conduct, and "'mere assertions' of power" by the forum to impose jurisdiction on a nonconsenting defendant. *Id.* at 705.

As one barometer for valid consent, courts have recognized a narrow category of "implied consent" statutes under which a party agrees to personal jurisdiction by accepting a benefit conferred by the forum. Many states, for example, have enacted statutes conditioning the benefit of driving on public roads on consent to personal jurisdiction for related suits. By "accept[ing]" the "rights and privileges" of driving on public roads, a defendant signifies its "agreement" to submit to personal jurisdiction in

9

the forum.  *Hess v. Pawloski*, 274 U.S. 352, 354-57 (1927).  Many courts have similarly held that a foreign defendant may impliedly consent to personal jurisdiction by registering to do business in the state.  *See, e.g.*, *Mallory*, 143 S. Ct. at 2044.  The Supreme Court likewise recognizes that "acceptance" of "federal funding" by a state may signal its implied "agreement" to submit to jurisdiction in federal court.  *College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd*., 527 U.S. 666, 686-87 (1999).

This type of conduct indicates knowing and voluntary <u>agreement</u> to personal jurisdiction, as distinguished from the forum's unilateral <u>imposition</u> of jurisdiction, because the defendant's acceptance of a benefit or privilege conditioned on consent signals its implicit agreement to submit to jurisdiction in the forum.  By accepting the benefit offered by the forum, the defendant enters a "'bargain' with the state" whereby it consents to personal jurisdiction in exchange for permission to engage in conduct that the state could otherwise prohibit.  *Leonard v. USA Petroleum Corp.*, 829 F. Supp. 882, 889 (S.D. Tex. 1993).

**II.  *Defendants Have Not Consented to Jurisdiction.***  Defendants have not agreed—expressly or impliedly—to consent to jurisdiction in the United States.  Defendants have not signed a contract expressly agreeing to jurisdiction, or taken any action in the litigation itself evincing their intent to submit to jurisdiction.  Defendants also have not accepted any government benefit or privilege conditioned

on consent to jurisdiction.  Unlike the implied consent statutes described above, the PSJVTA does not confer any benefit on Defendants, or offer to waive pre-existing laws prohibiting their activities in the United States, in exchange for their consent to jurisdiction.

The first type of conduct specified by the PSJVTA—social welfare payments in Palestine to families of prisoners or decedents—occurs entirely outside the United States.  Courts have already held that such payments do not confer <u>jurisdiction</u> over Defendants because the payments are not connected to the United States, and Plaintiffs' claims do not arise from or "relate to" such payments.  *See Shatsky*, 955 F.3d at 1022-23.  Any decision to make such payments therefore reflects Defendants' own domestic policy choices, rather than an implied agreement to submit to jurisdiction in a forum (the United States) entirely unconnected to the payments.

The second type of conduct relied upon by Plaintiffs—the operation of Palestine's UN Mission in New York and Defendants' alleged "propaganda" activities in the United States in furtherance of the Mission's work—similarly fails to support the presumption that Defendants knowingly and voluntarily consented to jurisdiction in the United States.  For more than three decades, the Anti-Terrorism Act of 1987 ("1987 ATA") has expressly denied Defendants the "benefit" of engaging in any non-UN related activity in the United States.  22 U.S.C. §§ 5201(b),

5202.  The PSJVTA does not offer to waive any of these restrictions or penalties imposed by the 1987 ATA, nor does it purport to authorize Defendants to engage in any previously-unauthorized activity in the United States.  The PSJVTA thus fails to offer any "benefit" for Defendants to "accept," in exchange for their purported agreement to submit to jurisdiction in the United States.

**III.  The Fiction of "Deemed Consent" Cannot Displace the Requirements of the Due Process Clause.**  Stripped of the fiction of "consent," the PSJVTA attempts to impose jurisdiction over Defendants based on the same activities federal courts have already held insufficient to support personal jurisdiction under the Due Process Clause.  But deemed consent statutes cannot pass constitutional muster merely by providing advance notice of jurisdictional consequences, as Appellants propose, without undermining fundamental due-process protections.

The Supreme Court has already rejected the same "fair notice" argument Appellants make now, *see College Savings Bank*, 527 U.S. at 679-81, and for good reason.  Due process serves as a supervening check on legislatively-imposed "consent" to jurisdiction.  *See Chen v. Dunkin' Brands*, 954 F.3d 492, 499 (2d Cir. 2020) (explaining that if mere notice was enough to satisfy due process, "*Daimler*'s ruling would be robbed of meaning by a back-door thief").  If "fair notice" alone could serve as a valid basis for implying consent to jurisdiction, there is no end to the types of activities that could give rise to "deemed consent" to

12

jurisdiction—including activities the courts have already held insufficient to satisfy the Due Process Clause.

Recent Supreme Court and Second Circuit authority confirm this analysis. In *Fuld*, the Second Circuit concluded that the activities specified by the PSJVTA failed to give rise to valid "consent" to personal jurisdiction because they do not "support a fair and reasonable inference of the defendants' voluntary agreement to proceed in a federal forum." 82 F.4th at 91. Although "it is often fair and reasonable to infer the defendant's voluntary agreement" to jurisdiction, implied consent "cannot be found based solely on a government decree" that the defendant "consent[s]" by engaging in "activities unrelated to being sued in the forum." *Id.* at 88.

As the Second Circuit recognized, that conclusion draws further support from the Supreme Court's recent decision in *Mallory*. *Mallory* reaffirmed that a defendant may impliedly consent to personal jurisdiction by accepting a benefit or privilege from the forum "with jurisdictional strings attached." 143 S. Ct. at 2044. This type of conduct indicates knowing and voluntary <u>agreement</u> to personal jurisdiction, as distinguished from the forum's unilateral <u>imposition</u> of jurisdiction, because the defendant's acceptance of a benefit or privilege conditioned on consent signals its implicit agreement to submit to the court's jurisdiction. *Id.* The PSJVTA, by

13

contrast, fails to offer any government benefit or privilege for Defendants to "accept," in exchange for their purported "consent."

### IV. Plaintiffs' Alternative Jurisdictional Theories Fail.
Plaintiffs offer a variety of alternative jurisdictional theories, all of which have been squarely rejected by the courts. Contrary to Plaintiffs' assertions, no court has ever held that the PA and PLO are not "persons" entitled to due process. Rather, every court to consider the issue has held that Defendants are entitled to the same due-process protections afforded to any other non-sovereign foreign entity, because the United States does not recognize them as a sovereign government.

Plaintiffs are likewise wrong to suggest that the Supreme Court's decision in *Ford* "overruled" prior decisions holding that Defendants are not subject to specific jurisdiction in the United States for the type of claims asserted in this case. Courts have uniformly held that Defendants' limited U.S. activities are not "related to" alleged terrorist attacks in Israel and Palestine, and therefore fail to establish the requisite connection between the forum, Defendants' suit-related conduct, and the claims at issue. *Ford* does not undermine that uniform precedent.

Finally, Rule 23.2 does not provide a basis for jurisdiction in this case. It is well-established that the Federal Rules cannot create personal jurisdiction where it is otherwise lacking under the Due Process Clause. Moreover, Rule 23.2 is a procedural rule governing class actions brought against the <u>members</u> of an

14

unincorporated association.  It does not apply in a case (such as this one) brought against the associations themselves, rather than their members.

    *V.  The PSJVTA Violates Separation of Powers.*  This Court also may affirm on the alternative ground that the PSJVTA violates the separation-of-powers doctrine.  The PSJVTA attempts to usurp the judicial function by dictating that courts must always find "consent" to personal jurisdiction if Defendants engage in certain activities—even though courts have already held that those same activities are insufficient to support the exercise of jurisdiction under the Due Process Clause. *See Bank Markazi v. Peterson*, 578 U.S. 212, 225 (2016) (Congress "may not usurp a court's power to interpret and apply the law to the [circumstances] before it.").

## ARGUMENT

## I.    Exercising Personal Jurisdiction Over Defendants Would Violate Due Process.

    This Court should follow the Second Circuit's recent decision holding that the PSJVTA violates due process.  Just like the district court below, the Second Circuit held that the "deemed consent" provisions of the PSJVTA fail to confer personal jurisdiction over Defendants for the type of claims at issue here because the activities specified by the statute do not "support a fair and reasonable inference of the defendants' voluntary agreement to proceed in a federal forum." *Fuld*, 82 F.4th at 91.  As the court explained, "Congress cannot take conduct otherwise insufficient to support an inference of consent, brand it as 'consent,' and then decree that a

15

defendant, after some time has passed, is 'deemed to have consented' to the loss of a due process right for engaging in that conduct." *Id.* at 101.  This Court should reach the same conclusion.

### A.  Courts Have Consistently Held that Defendants Lack Sufficient Contacts with the United States to Support the Exercise of Personal Jurisdiction.

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).  The personal jurisdiction requirement "represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Bauxites*, 456 U.S. at 702.

To protect this liberty interest, due process "requires that a defendant be haled into court … based on <u>his own affiliation</u> with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State."  *Walden v. Fiore*, 571 U.S. 277, 286 (2014) (emphasis added).  Jurisdiction is therefore "proper" only when some "actions by the defendant <u>himself</u>" create a "substantial connection" with the forum.  *Burger King*, 471 U.S. at 475-76.  "[M]ere injury to a forum resident is not a sufficient connection" to satisfy due process.  *Walden*, 571 U.S. at 289-90.

16

Applying these principles, courts—including the district court in this case—have unanimously held that exercising personal jurisdiction over Defendants would violate due process because Defendants lack the requisite "connection" to the United States. The attacks at issue "were not expressly aimed at the United States," but rather "affected United States citizens only because they were victims of indiscriminate violence that occurred abroad." *Waldman,* 835 F.3d at 337; *see also Shatsky*, 955 F.3d at 1037 (finding no evidence of "'intentional targeting' of Americans or some other form of 'intentional conduct by the defendant' [that] is needed to 'create[] the necessary contacts with the forum'"). "[A]bsent intentional targeting, the fact that an American died in a terrorist incident abroad" is exactly the type of "'random, fortuitous, or attenuated' contact" between Defendants and the forum that is insufficient to support the exercise of jurisdiction. *Klieman*, 923 F.3d at 1126 (quoting *Walden*, 571 U.S. at 286).

Moreover, these decisions specifically reject the same attenuated theory of specific jurisdiction proffered by Plaintiffs here. Plaintiffs allege that Defendants' U.S. activities ("media interviews," "press releases," and "other events" in the United States designed to persuade "the American public") are "related to" terrorist attacks in Israel because Defendants engage in "extensive advocacy activities in the United States" as part of a "double-pronged strategy" to achieve their political goals. CJA-28-29; Pls. Br. 32-33. But the Second Circuit rejected nearly identical claims

in *Waldman*.  Plaintiffs in that case alleged that Defendants maintained a diplomatic office in Washington, D.C. (in addition to Palestine's UN Mission in New York),[2] retained a lobbying firm, and sought "to influence United States policy" through "speeches and media appearances."  835 F.3d at 323, 326, 337, 341.  The Second Circuit concluded that none of those activities created a "substantial connection" between Defendants, the attack, and the United States.  *Id.* at 335-37 (emphasis added).  Defendants' alleged "lobbying activities," the court explained, "are insufficiently 'suit-related conduct' to support specific jurisdiction." *Id.* at 326, 342-44 (emphasis added).

The D.C. Circuit similarly concluded that allegations regarding Defendants' purported "campaign" to "influence" U.S. foreign policy "through the use of U.S. offices, fundraising, lobbying, [and] speaking engagements" were insufficient to confer personal jurisdiction.  *Klieman*, 923 F.3d at 1118, 1123-26.  The court held that allegations regarding Defendants' "payments" in Palestine and a "public relations campaign" in the United States failed to sufficiently "connect[]" the attacks to the United States.  *Shatsky*, 955 F.3d at 1022-23, 1037 (emphasis added); *see also*

---

[2] Defendants closed their D.C. office on October 10, 2018, after the U.S. Government declined to extend the ATA waiver necessary to continue its operation. *See Klieman*, 923 F.3d at 1130.  As the Government concedes (at 7), Defendants do not currently maintain any office or physical location in the United States aside from Palestine's UN Mission in New York.

*Livnat*, 851 F.3d at 57 (same).  Allegations regarding "the Palestinian Authority's general political and financial activities in the United States," the court concluded, simply did not "<u>relate to</u> the attack." *Livnat*, 851 F.3d at 56-57 (emphasis added).

As the district court correctly recognized, this case falls squarely within the unbroken line of cases holding that Defendants lack sufficient contacts with the United States to support the exercise of personal jurisdiction.  CJA-976-77.  Plaintiffs rely on the same types of conduct alleged in prior cases, but courts have uniformly held that Defendants' limited activities in the United States are not sufficiently related to the ATA claims at issue to satisfy due process.  CJA-977.  Accordingly, Plaintiffs fail to establish any "basis to conclude that Defendants may be haled into a federal court in the United States" to address claims based on alleged attacks in Israel.[3]  CJA-977.

In light of this precedent, the question before this Court is whether Plaintiffs can rely upon those same, constitutionally-inadequate contacts to establish "deemed

---

[3] Notably, the district court's ruling does not leave ATA plaintiffs without recourse: Israeli courts allow suits by American plaintiffs against Defendants for alleged attacks in Israel.  The estates of the American victims of the Achille Lauro hijacking (who filed *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991)), for example, obtained a $100 million award against Defendants in Israel.  *See Norz'its v. Palestinian Auth.* (Isr.), CivC 2538/00 (Jerusalem).  Other Israeli courts have granted large awards in similar cases.  *See, e.g.*, *Anonymous v. Palestinian Auth.* (Isr.), CivA 2362/19 (Jerusalem 2022); *Mentin v. Palestinian Auth.* (Isr.), CivC 3361/09 (Jerusalem 2017).

consent" to jurisdiction under the PSJVTA. Over the past two years, four district judges and a three-judge panel of the Second Circuit have considered that question. All seven judges, including Judge Gallagher below, correctly concluded that the constitutional protections afforded to defendants under the Due Process Clause are not so easily evaded.

> **B.    Defendants Have Not "Consented" to Personal Jurisdiction in the United States.**

> > **1.    Consent to Personal Jurisdiction Must Be Knowing and Voluntary.**

"Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Bauxites*, 456 U.S. at 703. A party may expressly consent to the court's jurisdiction, or impliedly consent by "signal[ing]" its agreement "through actions rather than words." *Roell v. Withrow*, 538 U.S. 580, 589-91 (2003). In *Bauxites*, the Supreme Court cataloged a "variety of legal arrangements [that] have been taken to represent express or implied consent to the personal jurisdiction of the court," including submission "by appearance," forum-selection clauses, arbitration agreements, stipulation, "constructive consent" through "the voluntary use of certain state procedures," and failure to assert a jurisdictional defense in a responsive pleading. 456 U.S. at 703-04. Each of these "legal arrangements," the Court explained, reflects some "actions of the defendant" that "amount to a legal submission to the jurisdiction of the court." *Id.* at 703-05.

"[W]hether express or implied," however, the Supreme Court has "emphasiz[ed]" that a party's consent to jurisdiction must be "knowing and voluntary." *Wellness Int'l*, 575 U.S. at 685. An "effective waiver of a constitutional right" generally requires proof of "the 'intentional relinquishment or abandonment of a known right or privilege.'" *College Savings Bank*, 527 U.S. at 682. Because implied or "constructive" consent "is not a doctrine commonly associated with the surrender of constitutional rights," federal courts "indulge every reasonable presumption against waiver." *Id.* at 681-82.

In some cases, determining whether a defendant knowingly and voluntarily consented to personal jurisdiction is straightforward. A party may <u>expressly</u> agree—through a forum-selection clause, for example—to litigate in a particular forum. *See Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315-16 (1964); *Burger King*, 471 U.S. at 472 n.14. Courts may also infer consent to jurisdiction based on <u>actions in the litigation itself</u> that demonstrate intent to submit to jurisdiction. *See, e.g.*, *Roell*, 538 U.S. at 584 (holding parties who "voluntarily participated in the entire course of proceedings" through trial without objecting to jurisdiction "clearly implied their consent" "by their actions"); *Hopper v. Wyant*, 502 F. App'x 790, 792 (10th Cir. 2012) (submission by entering appearance). These canonical forms of consent are not at issue in this case, however, because Plaintiffs do not claim that

21

Defendants expressly consented to jurisdiction, or took any action in the litigation itself evincing their intent to submit to the court's jurisdiction.

In the absence of express consent or litigation conduct evincing submission to jurisdiction, determining whether the defendant knowingly and voluntarily consented to personal jurisdiction is more difficult. To establish implied consent, Plaintiffs must demonstrate some "actions of the defendant" that "amount to a legal submission to the jurisdiction of the court." *Bauxites*, 456 U.S. at 704-05. This is "a deeply factbound analysis" that requires the court to determine "whether [defendant's] actions evinced the requisite knowing and voluntary consent." *Wellness Int'l*, 575 U.S. at 685-86.

In making this determination, the Supreme Court expressly distinguishes between inferring a defendant's knowing and voluntary choice to submit to jurisdiction by its own conduct, and "'mere assertions' of power" by the forum to impose jurisdiction on nonconsenting defendants. *See Bauxites*, 456 U.S. at 705. In *Bauxites*, for example, the Court examined whether the defendant's failure to comply with court-ordered jurisdictional discovery could be treated as constructive waiver of its objection to personal jurisdiction. The Court held that it could, but only because the "preservation of due process was secured by the presumption" that the defendant's specific conduct—its "failure to supply the requested information as to its contacts with [the forum]"—"was but an admission of the want of merit in the

asserted defense." *Id.* at 705, 709 (quoting *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 351 (1909)). By refusing to produce the requested materials, the defendant implicitly acknowledged that it did have sufficient contacts with the forum to support the exercise of personal jurisdiction. *Id.* at 706. The defendant's conduct thus served as a constructive waiver of any objection to jurisdiction. *See id.* ("[T]he sanction is nothing more than the invocation of a legal presumption, or what is the same thing, the finding of a constructive waiver.").

To illustrate the "due process limits" that apply to constructive consent, *Bauxites* distinguished an earlier case, *Hovey v. Elliott*, 167 U.S. 409 (1897), "in which the Court held that it <u>did</u> violate due process for a court to take similar action as '<u>punishment</u>' for failure to obey [a court] order" unrelated to the asserted defense. *Bauxites*, 456 U.S. at 705-06 (emphasis added). The defendant's conduct in that case—failure "to pay into the registry of the court a certain sum of money"—did not support the presumption of a "want of merit" in its asserted defense. *Id.* Subjecting the defendant to the court's jurisdiction, the Court explained, therefore constituted an improper penalty, rather than a valid presumption of constructive waiver drawn from the defendant's own conduct. *See id.* at 706 ("Due process is violated only if the behavior of the defendant will not support the *Hammond Packing* presumption.").

The Supreme Court similarly distinguished between valid, implied consent to jurisdiction and the improper imposition of jurisdiction in *College Savings Bank*. In that case, plaintiffs argued a state agency waived its immunity and "impliedly" consented to jurisdiction in federal court by knowingly and voluntarily engaging in interstate marketing, after a federal statute made clear that such activity would subject it to jurisdiction for Lanham Act claims. 527 U.S. at 671, 676. Writing for the Court, Justice Scalia rejected this "constructive-waiver" theory, explaining:

> There is a fundamental difference between a State's expressing unequivocally that it waives its immunity and Congress's expressing unequivocally its intention that if the State takes certain action it shall be deemed to have waived that immunity. In the latter situation, the most that can be said with certainty is that the State has been put on notice that Congress intends to subject it to suits brought by individuals. That is very far from concluding that <u>the State</u> made an "altogether voluntary" decision to waive its immunity.

*Id.* at 680-81. The constitutional requirement of knowing and voluntary consent would mean nothing, the Court noted, if Congress had "[the] power to exact constructive waivers" of jurisdictional defenses "through the exercise of Article I powers." *Id.* at 683. Accordingly, the Court held that merely providing <u>notice</u> of Congress's intent to subject the defendant to jurisdiction if it "voluntarily" engaged in "federally regulated conduct" was insufficient to establish a constructive waiver. *Id.* at 679-82.

24

In describing the circumstances in which plaintiffs <u>could</u> demonstrate implied consent to jurisdiction, *College Savings Bank* located valid "consent" in the same place as many other implied consent statutes: the defendant's knowing and voluntary acceptance of a government benefit or privilege conditioned upon consent. Congress, the Court explained, may "condition its grant of [federal] funds to the States" upon their willingness to consent to jurisdiction in a federal forum. 527 U.S. at 686-87. The "acceptance of the funds" by the State would signal its "agreement" or consent to the condition attached. *Id.* The Court noted, however, that accepting this type of "gift" or "gratuity" conditioned on consent to jurisdiction presents a "fundamentally different" case than the imposition of jurisdiction by legislative fiat. *Id.* In the latter case, "what Congress threatens if the State refuses to agree to its condition is not the denial of a gift or gratuity, but a sanction." *Id.*; *see also AT&T Commc'ns v. BellSouth Telecomms., Inc.*, 238 F.3d 636, 646 (5th Cir. 2001) (contrasting "forced waiver" with "[a] state's voluntary waiver of immunity, inferred from the state's acceptance of a Congressional gratuity that it was free to decline without loss").[4]

---

[4] Although *College Savings Bank* addressed state sovereign immunity rather than personal jurisdiction, the Court made clear that its analysis was based on broader constitutional principles. Relying on the "classic description of an effective waiver of a constitutional right," the Court explained that "[c]onstructive consent is not a doctrine commonly associated with the surrender of <u>constitutional rights</u>." 527 U.S. at 681-82 (emphasis added). Because "[s]tate sovereign immunity, no less than the right to trial by jury in criminal cases, is constitutionally protected," courts should

Courts have used the same barometer to evaluate other implied consent statutes, examining whether the defendant signaled its agreement to personal jurisdiction by accepting a government benefit or privilege conditioned on consent. Many states, for example, have enacted statutes conditioning the "privilege" of driving on public roads on a non-resident's consent to personal jurisdiction in the state for any suits arising from such conduct. Because the state has the antecedent authority "to regulate the use of its highways" and to "exclude" non-residents from such use, the Supreme Court has held the state may also require non-residents to consent to jurisdiction "in advance of the operation of a motor vehicle on its highway." *Hess,* 274 U.S. at 354-57. By "accept[ing]" the "privilege[]" of driving on public roads, a non-resident defendant implicitly "signifi[es] … his agreement," through his conduct, to consent to personal jurisdiction in the forum. *Id.*; *see also Wuchter v. Pizzutti*, 276 U.S. 13, 19 (1928) ("[T]he act of a nonresident in using the highways of another state may be properly declared to be an agreement to accept service of summons in a suit growing out of the use of the highway.").

Courts apply the same framework to a host of other implied consent statutes as well. Business registration statutes, for example, condition the privilege of doing

---

"indulge every reasonable presumption against waiver." *Id.* at 682. Accordingly, "the principles underlying *College Savings Bank* are not specific to the Eleventh Amendment, but rather apply to constitutional rights broadly." *Fuld*, 578 F. Supp. 3d at 588.

business in the state on consent to personal jurisdiction.  By registering to do business in the state, a foreign corporation impliedly agrees to submit to personal jurisdiction in the forum.  *See, e.g.*, *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 632-33 (2d Cir. 2016) (tracing history of such statutes); *In re Mid-Atl. Toyota Antitrust Litig.*, 525 F. Supp. 1265, 1278 (D. Md. 1981) (foreign corporation "consents" to jurisdiction as "part of a bargain, by which the corporation agrees to accept certain obligations in return for the right to do business in the state").  As explained  below, the Supreme Court recently reaffirmed this line of cases, holding consent may be inferred from a defendant's acceptance of a benefit "with jurisdictional strings attached."  *Mallory*, 143 S. Ct. at 2044.

Several states have also adopted corporate director statutes, which "deem" that non-resident defendants "consent" to jurisdiction by accepting appointment to a corporation's board of directors.  *See, e.g.*, *Armstrong v. Pomerance*, 423 A.2d 174, 176 & n.4 (Del. 1980) (analyzing Delaware corporate director statute).  By accepting the benefits afforded to directors under state law (*e.g.*, interest-free loans, and indemnification rights), non-resident directors impliedly consent to personal jurisdiction in the state for claims related to the corporation.  *Id.*; *see also Swenson v. Thibaut*, 250 S.E.2d 279, 289-91 (N.C. Ct. App. 1978) (same).

In each of these cases, the defendant's acceptance of a benefit or privilege conditioned on consent to jurisdiction signals the defendant's implied agreement to

submit to jurisdiction in the forum.  By accepting the benefit provided by the forum, the defendant enters a "'bargain' with the state" whereby it consents to personal jurisdiction in exchange for permission to engage in conduct the state could otherwise prohibit.  *Leonard*, 829 F. Supp. at 889; *see also Mid-Atl. Toyota*, 525 F. Supp. at 1278 (describing implied "consent" as "part of a bargain").

As *College Savings Bank* recognized, however, implied consent becomes a disguised form of legislatively-imposed jurisdiction when the forum does not offer any corresponding benefit for the defendant to accept or reject, in exchange for its consent.  527 U.S. at 679-86.  If the activity purportedly giving rise to "consent" does not require authorization from the forum, the defendant's choice to engage in the activity does not reflect any implied agreement to submit to jurisdiction because the defendant's ability to engage in the activity did not depend on any benefit (or "gratuity") conferred by the forum in the first instance.  *Id*. at 680-81 (holding Congress's bare "intention" to subject defendant to jurisdiction failed to establish implied consent because "there is little reason to assume actual consent based upon the [defendant's] mere presence in a field subject to congressional regulation").  "Without a received benefit," in other words, "there is no bargain, and without a bargain, there is no due process."  *Leonard*, 829 F. Supp. at 889.

This does not mean that reciprocity or an exchange of benefits is necessary to establish knowing and voluntary consent in every case.  As noted above, a defendant

may expressly consent to personal jurisdiction via a forum-selection clause, for example, obviating any need to determine whether the defendant consented "through actions rather than words."  Consent to jurisdiction also may result from a defendant's failure to comply with "certain procedural rules" governing the waiver of substantive rights.  *See Bauxites*, 456 U.S. at 705 ("The expression of legal rights is often subject to certain procedural rules: The failure to follow those rules may well result in a curtailment of the rights.").  A defendant who enters an appearance and then fails to object to personal jurisdiction, for example, may impliedly submit to the court's jurisdiction, "whether voluntary or not."  *Id.* at 704-05 (discussing waiver).

But Defendants are not aware of a single case—and Appellants have not identified one—implying consent to jurisdiction based on a defendant's choice to engage in non-litigation-related activities in the <u>absence</u> of some benefit or privilege conferred upon the defendant in exchange for its consent.  As the Second Circuit explained, the PSJVTA's "approach to deemed consent is 'simply unheard of,'" as there is not "a single case approving a similar constructive waiver of the personal jurisdiction requirement."  *Fuld*, 82 F.4th at 100.  Reciprocity, or an exchange of benefits, thus provides a useful means of distinguishing between knowing and voluntary consent under an implied consent statute, and improper legislative attempts to unilaterally impose jurisdiction on a nonconsenting defendant.

29

### 2. Defendants Have Not Knowingly and Voluntarily Consented to Personal Jurisdiction.

Measured against these standards, the PSJVTA fails to provide valid, "knowing and voluntary" consent to personal jurisdiction in this case. Rather than identifying conduct that might actually demonstrate implied consent (such as the acceptance of U.S. foreign aid or some other government benefit), "Congress simply took conduct in which the PLO and PA had previously engaged—conduct that the Second and D.C. Circuits had held was insufficient to support personal jurisdiction in *Waldman*, *Livnat*, *Shatsky*, and *Klieman*—and declared that such conduct 'shall be deemed' to be consent." *Fuld*, 578 F. Supp. 3d at 587. As the Second Circuit recognized, "[n]o aspect of these allegedly jurisdiction-triggering activities can reasonably be interpreted as evincing the defendants' 'intention to submit' to the United States courts." *Fuld*, 82 F.4th at 97.

### a. Social Welfare Payments Made in Palestine Do Not Evince Agreement to Personal Jurisdiction in the United States.

The first type of conduct specified by the PSJVTA—payments made in Palestine to families of those imprisoned or killed in terrorist attacks—has "no direct connection to the United States, let alone to litigation in a United States court." *Fuld*, 578 F. Supp. 3d at 587. The payments at issue occur entirely outside the United States under Palestinian law, and do not require authorization from the U.S. government or the involvement of any U.S. entity. The payments thus reflect

30

Defendants' own domestic laws and policy choices, rather than some implicit agreement to knowingly and voluntarily consent to jurisdiction in a forum (the United States) completely unconnected to the payments. Accordingly, under the framework set forth in *Bauxites*, the payments "do not infer any intention on the part of Defendants to legally submit to suit in the United States"—as the district court correctly recognized. CJA-975.

In asserting these payments may constitute "knowing and voluntary" consent to jurisdiction, Appellants repeatedly conflate federal authority to penalize extraterritorial conduct (so-called "prescriptive" or "legislative" jurisdiction) and federal authority to subject nonresident defendants to personal jurisdiction in U.S. courts (so-called "adjudicative" jurisdiction). Although Congress may maintain the authority to legislate that such payments can subject a party to <u>liability</u> (or some other sanction), that prescriptive authority does not answer the separate constitutional question whether Defendants can be forced to <u>adjudicate</u> such claims in U.S. court. As noted above, courts have already held that such payments, standing alone, fail to establish the requisite "connection" between Defendants, Plaintiffs' claims, and the United States to support the exercise of personal jurisdiction. *See, e.g.*, *Shatsky*, 955 F.3d at 1022-23, 1037.

"The personal jurisdiction requirement—which prevents federal courts from exercising authority over defendants without sufficient contacts with the United

States—is an important limitation on the jurisdiction of the federal courts over purely extraterritorial activity that is <u>independent of the extraterritorial reach of a federal statute</u> or the court's subject matter jurisdiction." *Litecubes, LLC v. N. Light Prods., Inc.*, 523 F.3d 1353, 1363 & n.10 (Fed. Cir. 2008) (emphasis added). Although Congress can "extend[] a cause of action to reach extraterritorial activity," a federal court can only adjudicate such claims "providing [it] has personal jurisdiction over the defendants." *Id.* at 1363. In other words, Congress's "prescriptive jurisdiction," its authority to make federal law applicable to foreign conduct, "is activated only when there is personal jurisdiction, often referred to as 'jurisdiction to adjudicate.'" *Laker Airways Ltd. v. Sabena*, 731 F.2d 909, 923 (D.C. Cir. 1984). Accordingly, Congressional authority to impose civil liability for extraterritorial attacks does not answer the separate question whether the court has personal jurisdiction over Defendants.

Appellants also misleadingly suggest that the payments bear a close "connection" to the ATA claims at issue because they are made by reason of attacks that injured or killed U.S. nationals. *See* Gov't Br. 17-18. That assertion overlooks the courts' consistent holdings that the attacks at issue (and *a fortiori* any payments purportedly following from such attacks) did <u>not</u> target the United States, and "affected United States citizens only because they were victims of indiscriminate violence that occurred abroad." *Waldman*, 835 F.3d at 337.

32

The payments at issue are part of a broader program designed to provide a "social safety net in the face of brutal and oppressive living conditions under Israeli military occupation."[5]  As part of the program, the PA provides monthly welfare payments to families of Palestinians imprisoned in Israel for political crimes and security offenses or killed during political violence.[6]  Israel broadly defines what constitutes a security offense in the occupied territories, and Palestinians can be imprisoned for participating in political demonstrations without a permit, waving the Palestinian flag without approval, or posting social media messages critical of Israeli forces and the occupation.[7]  According to the Carnegie Endowment, 70% of Palestinian families have at least one relative detained by Israel.[8]  As of 2017, an estimated 13,000 prisoners and 33,700 families received monthly payments under the program.[9]  Given this context, portraying these payments as rewarding terrorism (*see, e.g.*, CJA-29-31) is "wrong and incendiary."[10]

---

[5] Carnegie Endowment, *supra* note 1.

[6] *Id.*; *see also* Brookings Institution, *Why the discourse about Palestinian payments to prisoners' families is distorted and misleading* (2020), https://www.brookings.edu/blog/order-from-chaos/2020/12/07/why-the-discourse-about-palestinian-payments-to-prisoners-families-is-distorted-and-misleading/.

[7] Carnegie Endowment, *supra* note 1.

[8] *Id.*

[9] *Id.*

[10] Brookings Institution, *supra* note 6.

33

        **b.**     **Plaintiffs' Allegations Regarding Defendants' U.S. Activities and Physical Presence Fail to Demonstrate Knowing and Voluntary Consent.**

Plaintiffs' allegations regarding the second type of conduct specified by the PSJVTA—conducting any non-exempt activities while physically present in the United States or maintaining a U.S. office—similarly fail to establish a basis for knowing and voluntary consent to personal jurisdiction. As noted above, the jurisdictional conduct alleged by Plaintiffs—maintaining Palestine's UN Mission in New York and conducting "propaganda, public relations, lobbying, and social media activities" in the United States (*see* CJA-31-32)—is the same conduct the courts have repeatedly held <u>insufficient</u> to support the exercise of personal jurisdiction under the Due Process Clause. As the district court correctly recognized, Congress cannot "simply [take] conduct in which the PLO and PA had previously engaged— conduct that the Second and D.C. Circuits had held was insufficient to support personal jurisdiction … and declare[] that such conduct 'shall be deemed' to be consent" to jurisdiction. CJA-974.

Appellants attempt to shoehorn this case into the line of implied consent cases described above, asserting the PSJVTA extracts valid "consent" by conditioning a government benefit (entry into the United States) on Defendants' agreement to submit to personal jurisdiction in ATA cases. Pls. Br. 23, 30-31; Gov't Br. 14-15, 25. Noticeably absent from that discussion, however, is a citation to any provision

of the PSJVTA permitting Defendants to enter and operate in the United States, in exchange for their consent to personal jurisdiction.

Since long before passage of the PSJVTA, Congress has blocked Defendants from conducting any activities in the United States. More than three decades ago, Congress enacted the Anti-Terrorism Act of 1987 for the express purpose of denying Defendants the "benefit" of "operating in the United States." *See* 22 U.S.C. § 5201(b). The 1987 ATA prohibits Defendants from operating in the United States by making it unlawful to: (1) "receive anything of value except informational material" from the PLO; (2) "expend funds from the PLO"; or (3) "establish or maintain an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by," the PLO. 22 U.S.C. § 5202.[11]

The 1987 Act has been interpreted as a "wide gauged restriction of PLO activity within the United States," *United States v. PLO*, 695 F. Supp. at 1471, that deprives Defendants of the "many benefits which accrue to organizations operating in the United States, including political stability, access to our press and capital

---

[11] Likewise, 22 U.S.C. § 2378b note, cited in passing by the Government (at 4), is an express "prohibition" on Defendants' presence in the United States, coupled with mechanisms for waiver by the President and enforcement by the Attorney General. The Government cites no evidence of any Presidential waiver or enforcement action, nor does the PSJVTA waive any aspect of this statute.

infrastructure, and … the patina of legitimacy." *Mendelsohn v. Meese*, 695 F. Supp. 1474, 1484 (S.D.N.Y. 1988) ("The avowed interest asserted by Congress in favor of the ATA is a tactical one—to deny the PLO the benefits of operating in the United States."). Consistent with this prohibition, Defendants do not currently operate or maintain any physical presence in the United States—as the Government concedes (at 7).

The sole exception is for activities conducted in furtherance of Palestine's role as a Permanent Observer at the United Nations. The UN Headquarters Agreement ("UNHQA") guarantees "invitees" of the UN, including Defendants, basic rights of "entry, access and residence" in the UN Headquarters District. *United States v. PLO*, 695 F. Supp. at 1465-68, 1471. Under the UNHQA, the United States is "obligat[ed] … to refrain from impairing the function of the PLO Observer Mission to the United Nations," which falls outside U.S. "jurisdiction." *Id.* Courts have thus long held that Defendants' UN-related activities cannot "properly be considered as a basis of jurisdiction." *Klinghoffer*, 937 F.2d at 51. The PSJVTA mirrors this longstanding interpretation of the UNHQA, providing that "[i]n determining whether a defendant shall be deemed to have consented to personal jurisdiction," "no court may consider" Defendants' UN Mission, their UN-related activities and meetings with government

officials, or "any personal or official activities conducted ancillary" thereto.[12]  *See*

18 U.S.C. § 2334(e)(3).

As the Second Circuit explained, the PSJVTA does not "purport to relax or

override these prohibitions" imposed by the 1987 Act, nor does it permit Defendants

to conduct any previously-unauthorized activities in the United States.  *Fuld*, 82

F.4th at 92.  Accordingly, the U.S.-activities prong "cannot reasonably be construed

as requiring a defendant's consent to jurisdiction in exchange for permission to

engage in the predicate activities, because <u>the defendants have not been granted

permission to engage in those activities at all</u>."  *Id.* at 92-93 (emphasis added).

The PSJVTA's failure to establish valid, implied consent to jurisdiction is

perhaps best illustrated by contrasting the PSJVTA with its predecessor statute, the

Anti-Terrorism Clarification Act of 2018.  The ATCA provided that Defendants

"shall be deemed to have consented to personal jurisdiction" if they accepted either

of two government benefits: (1) U.S. foreign aid, or (2) the "benefit" of a formal

"waiver or suspension" of the prohibitions on Defendants' activities under the 1987

Act.  *See* 18 U.S.C. § 2334(e)(1) (2018) (superseded by PSJVTA).

---

[12] The 1987 Act authorizes the Attorney General to enforce its prohibition on non-UN-related activities by filing suit in district court.  22 U.S.C. § 5203.  The lack of any enforcement actions refutes Plaintiffs' assertions that Defendants engage in any non-UN-related activities in the United States.

In defending the constitutionality of the ATCA, the Government specifically argued that because "the political branches have long imposed <u>conditions on these benefits</u>," it was therefore "reasonable and consistent with the Fifth Amendment for Congress and the Executive to determine that the [PLO's] maintenance of an office in this country after a waiver …, or the [PA's] continued receipt of certain foreign assistance, should be 'deemed' consent to personal jurisdiction in civil cases under the ATA."  U.S. Brief 12-13, *Klieman v. Palestinian Auth.*, No. 15-7034 (D.C. Cir. Mar. 13, 2019) (emphasis added).  The ATCA satisfied Fifth Amendment due process, in other words, because it grounded "deemed consent" on Defendants' choice to accept or reject either of two distinct government benefits conditioned upon consent.  This interpretation is consistent with the authorities described above, which similarly hold that acceptance of a government benefit conditioned on consent may constitute a knowing and voluntary waiver of jurisdictional defenses. *See Hess*, 274 U.S. at 354-57; *College Savings Bank*, 527 U.S. at 686.

Defendants elected <u>not</u> to accept either government benefit specified by the ATCA, and the courts uniformly held that the ATCA therefore failed to provide any basis for exercising personal jurisdiction over Defendants.  *See Waldman II*, 925 F.3d at 574-75; *Klieman*, 923 F.3d at 1128-31.  By declining to accept foreign assistance or an ATA waiver conditioned on consent, Defendants knowingly and voluntarily chose <u>not</u> to submit to personal jurisdiction in the United States.

The PSJVTA, by contrast, does not confer any benefit on Defendants in exchange for their purported "consent."  The PSJVTA does not authorize Defendants to engage in activities in the United States prohibited by the ATA, nor does it extend any government benefit (*e.g.*, foreign aid) conditioned upon consent to personal jurisdiction.  Accordingly, "there is no bargain—no social compact" between the parties that could evince Defendants' implied agreement to submit to jurisdiction in the United States.  *Leonard*, 829 F. Supp. at 889.

Plaintiffs offer no substantive response to this analysis in their brief.  Plaintiffs fail to explain how the limited U.S. activities alleged in the complaint could support an inference that Defendants knowingly and voluntarily "consented" to personal jurisdiction for ATA claims; indeed, they told the district court that Defendants' U.S. activities "are not now and likely never will be relevant or necessary to determining jurisdiction under the PSJVTA."[13]  CJA-152.  Other courts presented with far more

---

[13] As Defendants argued below, the limited U.S. activities alleged by Plaintiffs cannot support personal jurisdiction because they fall under the statutory exemption for UN-related and diplomatic activities, which do not trigger "deemed consent" jurisdiction under the PSJVTA.  CJA-98-99 n.7.  As part of its role at the UN, the Palestinian Mission participates in the work of the UN Committee on the Exercise of the Inalienable Rights of the Palestinian People ("CEIRPP").  *See* CEIRPP, Report, UN Doc. A/75/35 (Oct. 13, 2020).  CEIRPP's purpose is to "mobilize the international community" to provide "the broadest possible international support" for the Palestinian people by "end[ing] … the Israeli occupation," supporting the "two-State solution," "highlighting the illegality of Israeli settlement activities in the West Bank," and "rais[ing] international awareness of the political, human rights and humanitarian developments on the ground."  Programme of Work, CEIRPP, UN Doc. A/AC.183/2020/1 (Feb. 7, 2020).  In light of CEIRPP's work, the activities

specific allegations concluded that Defendants' U.S. activities were "too thin to support a meaningful inference of consent to jurisdiction." *See, e.g.*, *Fuld*, 578 F. Supp. 3d at 587; *Sokolow*, 607 F. Supp. 3d at 326.  All the more so here, given Plaintiffs' failure to allege any specific U.S. activities that could support an inference Defendants knowingly and voluntarily consented to suit here.

### C. Permitting Congress to Impose "Deemed Consent" to Personal Jurisdiction Based on Constitutionally-Inadequate Conduct Would Eviscerate Due Process Protections.

Although Plaintiffs and the Government concede that consent to personal jurisdiction must be "voluntary," they pay only lip service to that requirement in their briefs.  Pls. Br. 24-25; Gov't Br. 13.  Instead, they attempt to redefine the applicable standard, asserting a "deemed consent" statute satisfies due process if it merely provides "fair warning" and is "reasonable."  Pls. Br. 26, 28-29; Gov't Br. 1, 14, 23.  The cases upon which they rely, however, do not even address consent, let alone "deemed consent" statutes.  Rather, Appellants draw their purported standard from cases like *Ford* and *Burger King*—the same cases squarely holding that "[t]he Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum <u>with which he has established no meaningful</u>

---

alleged by Plaintiffs are all plainly either official UN business or "ancillary to" such activities under 18 U.S.C. § 2334(e)(3).  The district court did not reach this issue. On appeal, however, this Court "may affirm on any ground supported by the record." *Gowan v. U.S. Air Force*, 148 F.3d 1182, 1189 (10th Cir. 1998).

'contacts, ties, or relations.'" *Burger King*, 471 U.S. at 471-72 (emphasis added);
*see* Pls. Br. 29, 36; Gov't Br. 13, 15.

Appellants' reliance on hornbook "minimum contacts" caselaw to establish
the standard applicable for consent highlights a deeper inconsistency at the heart of
their arguments. On one hand, they attempt to distinguish prior cases like *Waldman*
and *Livnat* because the PSJVTA hinges on "consent," "a separate and independent
basis for personal jurisdiction that can apply even if the requirements for general or
specific jurisdiction have not been established." Gov't Br. 22. But to defend the
PSJVTA as creating valid "consent" to jurisdiction, Appellants turn around and
summon the "fair warning" plus "reasonableness" standard from cases like *Daimler*
and *Burger King*—seminal "minimum contacts" cases. Gov't Br. 13-15. In other
words, rather than focusing on Defendants' purported "consent" as a separate
"traditional basis" for jurisdiction, Appellants instead treat the PSJVTA as if it
simply imposes personal jurisdiction on Defendants by legislative fiat—asking
whether it is "fair" and "reasonable" for Congress to "assert" personal jurisdiction
over Defendants in the United States. *See, e.g.*, Gov't Br. 21 (asserting "the Fifth
Amendment does not prohibit the United States from determining that certain
actions of the PA and PLO properly subject them to personal jurisdiction in U.S.
courts" (emphasis added)). That, of course, is the same question resoundingly
answered in the negative in *Fuld*, *Waldman*, *Livnat*, *Klieman*, and *Shatsky*—all of

which held that it would be unreasonable and unjust to subject Defendants to suit in the United States because they lack any constitutionally-meaningful connection to the forum.

Indeed, *College Savings Bank* expressly rejected the same "fair warning plus reasonableness" standard proffered by Appellants here.  In that case, plaintiffs urged the Court to find implied waiver so long as the Government "unambiguously" warned defendants that engaging in "specified conduct governed by federal regulation" would subject them to suit, and defendants "voluntarily elect[ed]" to engage in the regulated activity.  527 U.S. at 679.  The Supreme Court emphatically rejected that "constructive-waiver" theory, holding there was a "fundamental difference" between the Government "expressing unequivocally its intention" to subject defendants to suit, and a defendant's knowing and voluntary choice to submit to jurisdiction.  *Id.* at 680-81.  Putting the defendant "on notice" of <u>Congress's</u> intention to subject the defendant to suit, the Court explained, remains "very far" from demonstrating that <u>a defendant</u> "made an 'altogether voluntary' decision" to submit to jurisdiction.  *Id.* at 681.

If "fair warning" and reasonableness were all that due process required, Congress and state legislatures could circumvent modern due-process doctrine simply by enacting statutes declaring that the same activities already held insufficient to confer jurisdiction under the Due Process Clause "shall be deemed

consent" to personal jurisdiction.  In *Daimler AG v. Bauman*, for example, the Supreme Court held it would violate due process to allow a California court to exercise jurisdiction over a foreign car manufacturer and its U.S. subsidiary, which distributed vehicles to California dealerships but were incorporated and maintained their principal places of business elsewhere.  571 U.S. 117, 139 (2014).  Despite achieving "sizable" sales in the state, the Court held that defendants' activities were insufficient for general jurisdiction because they were not "essentially at home" in the forum.  *Id.*

Under Appellants' reasoning, California could circumvent that holding simply by enacting a statute declaring that any foreign corporation that distributed vehicles to California dealerships "shall be deemed to have consented to personal jurisdiction" in the state.  The same would be true of virtually any decision dismissing claims for lack of personal jurisdiction: the legislature could simply repackage the contacts with the forum previously found insufficient to support the exercise of jurisdiction as grounds for "deemed consent" to jurisdiction.  Accepting Appellants' argument "would effectively mean that there are <u>no</u> due process limitations on the exercise of personal jurisdiction.  Congress or a state legislature could provide for jurisdiction over <u>any</u> defendant for <u>any</u> conduct so long as the conduct post-dated enactment of the law at issue." *Fuld*, 578 F. Supp. 3d at 590.

The only limit would be the "reach of the legislative imagination—which is to say, that there are no constitutional limits at all." *Id.* at 591.

This Court should likewise reject Appellants' argument that the PSJVTA's deemed consent provisions are "reasonable" because Congress has broad "authority" over "foreign affairs." *See* Gov't Br. 11-12, 16-22; Pls. Br. 28-29.  Although courts may defer to Congress on matters of legislative policy, the Supreme Court has made clear that "respect for Congress's policy judgments … can never extend so far as to disavow restraints on federal power that the Constitution carefully constructed." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).  "Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role …. [T]he Government's 'authority and expertise in these matters do not automatically trump the Court's own obligation to secure the protection that the Constitution grants to individuals.'"  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010).

Accordingly, even in cases involving "foreign affairs" and "national security," courts adhere to the well-settled rule that "a statute cannot grant personal jurisdiction where the Constitution forbids it."  *Gilson v. Republic of Ire.*, 682 F.2d 1022, 1028 (D.C. Cir. 1982); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 491 (1983).  In *Livnat*, for example, plaintiffs urged the court to depart from "ordinary due-process requirements" and exercise personal jurisdiction over

Defendants because the ATA reflected "Congress's intent to provide redress in U.S. courts for terrorism abroad."  851 F.3d at 53.  The D.C. Circuit rejected that argument, holding "Congress cannot wish away a constitutional provision."  *Id.* Deference is even less appropriate where, as here, Congress's explicit purpose is to reverse federal decisions establishing the constitutional limits of personal jurisdiction. *See City of Boerne v. Flores*, 521 U.S. 507, 536 (1997).

The Government's repeated refrain (at 11, 16-17, 21) that the PSJVTA applies only to "*sui generis*" Defendants and a "limited" class of claims amplifies—rather than ameliorates—these constitutional concerns.  The Constitution vests the "judicial powers" in a non-political branch precisely to protect "the rights of one person" from the "tyranny of shifting majorities." *INS v. Chadha*, 462 U.S. 919, 961-62 (1983) (Powell, J., concurring).  A statute (like the PSJVTA) that singles out only two "*sui generis*" groups (the PA and PLO) for disparate treatment therefore warrants <u>more</u> scrutiny, not less. *See Boerne*, 521 U.S. at 529 (holding that if Congress were permitted to define the constitutional protections afforded to individual groups, "it is difficult to conceive of a principle that would limit congressional power").  "Where, as here, a statute impinges on constitutional rights, it cannot be salvaged on the basis that it violates the rights of only a handful of subjects." *Fuld*, 82 F.4th at 101.

45

Finally, there is no support for Appellants' argument that due process standards should be relaxed under the Fifth Amendment based on the Government's "special competence in matters of foreign affairs."  Gov't Br. 20-21; Pls. Br. 28. Courts have long rejected the notion "that federalism's irrelevance in the Fifth Amendment context justifies a 'more lenient' standard for personal jurisdiction." *Fuld*, 82 F.4th at 103; *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 235, 239 & n.24 (5th Cir. 2022) (*en banc*) (collecting cases from various circuits); *see also Malinski v. New York*, 324 U.S. 401, 415 (1945) (Frankfurter, J., concurring) ("To suppose that 'due process of law' meant one thing in the Fifth Amendment and another in the Fourteenth is too frivolous to require elaborate rejection.").

Like every other circuit, this Court routinely applies standards developed under the Fourteenth Amendment to cases under the Fifth Amendment.  *See, e.g.*, *In re SEC. v. Knowles*, 87 F.3d 413, 416 (10th Cir. 1996).  "The Due Process Clauses of the Fourteenth and Fifth Amendments are virtually identical, and both 'were designed to protect individual liberties from the same types of government infringement.'"  *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1211-12 (10th Cir. 2000).  Appellants fail to provide any reason for this Court to depart from well-established precedent by applying a less demanding due-process standard in this case.

### D.   *Fuld* and *Mallory* Confirm the Due Process Standards Applicable to "Consent" to Personal Jurisdiction.

The recent decisions in *Fuld* and *Mallory* confirm the district court's conclusion that "deeming" Defendants "consented" to personal jurisdiction here would violate due process.  In *Fuld*, the Second Circuit analyzed the PSJVTA under the same implied-consent framework described above.  *See Fuld*, 82 F.4th at 88 (discussing *Bauxites*).  The court concluded the PSJVTA fails to provide valid "consent" because the conduct specified by the Act does not "support a fair and reasonable inference of the defendants' voluntary agreement to proceed in a federal forum."[14]  *Id.* at 91.  "Congress cannot take conduct otherwise insufficient to support an inference of consent, brand it as 'consent,' and then decree that a defendant, after some time has passed, is 'deemed to have consented' to the loss of a due process right."  *Id.* at 101.

As the Second Circuit recognized, this conclusion draws further support from the Supreme Court's recent decision in *Mallory*.  *Mallory* reaffirmed that *Bauxites* provides the governing standard for implied-consent statutes, and requires a court to evaluate whether a defendant's "actions … 'amount to a legal submission to the

---

[14] Contrary to Appellants' assertions, the Second Circuit did not "limit" implied consent to just two factual scenarios.  *See* Gov't Br. 24.  Rather, consistent with *Bauxites*, the Second Circuit analyzed whether the conduct purportedly giving rise to "consent" under the PSJVTA provided some reasonable basis to "infer" that Defendants intended to submit to jurisdiction in the forum.  *Fuld*, 82 F.4th at 87-98.

jurisdiction of [the] court.'"  143 S. Ct. at 2039, 2044 (plurality op.).  *Mallory* held that business registration statutes—under which a corporation "consents" to personal jurisdiction "<u>in exchange 'for</u> access to [a State's] markets'"—are one of the "variety of legal arrangements" that can give rise to valid consent under *Bauxites*.  *Id.* at 2033, 2041 n.8 (emphasis added).  A court may thus infer "consent" to personal jurisdiction from a defendant's choice to accept a government benefit "with jurisdictional strings attached."  *Id.* at 2044.

But as the Second Circuit explained, *Mallory*'s discussion of the grounds for inferring valid consent to jurisdiction "underscores" the difference "between the PSJVTA and business registration statutes."  *Fuld*, 82 F.4th at 96.  Unlike a business registration statute, the PSJVTA "does not require that the PLO and the PA consent to jurisdiction as a condition of securing a legal right to do business in the United States, which remains prohibited under current law."  *Id.*  The PSJVTA also does not offer "some in-forum benefit" for Defendants to accept, "in return for an agreement to be amenable to suit in the United States."  *Id*.  The PSJVTA thus falls outside the "exchange-of-benefits" cases reaffirmed by *Mallory*, which hinge on "accepting an in-[forum] benefit with jurisdictional strings attached."  143 S. Ct. at 2044.

As *Fuld* and *Mallory* illustrate, a presumption of valid "consent" to jurisdiction under *Bauxites* must be based on conduct by the defendant that is capable

of "supporting a jurisdictional finding." *Volkart Bros. v. M/V "Palm Trader,"* 130 F.R.D. 285, 289 (S.D.N.Y. 1990). "The chief practical distinction between the assertion of personal jurisdiction through a valid 'presumption' as opposed to an unconstitutional 'punishment' is that the former requires that the defendant's behavior in the transaction at issue support the presumption." *Id.* (citing *Bauxites*, 456 U.S. at 706). The PSJVTA cannot constitutionally "support" a presumption that Defendants submitted to jurisdiction because the PSJVTA relies on "conduct that would otherwise not support personal jurisdiction." *Fuld*, 578 F. Supp. 3d at 590.

## II. This Court Should Reject Plaintiffs' Remaining Arguments.

Although the Government confines its appeal to the PSJVTA's "deemed consent" provisions, Plaintiffs raise a host of alternative jurisdictional theories—all of which have been squarely rejected by the courts. Consistent with that precedent, this Court should reject Plaintiffs' remaining arguments and affirm the district court's ruling that exercising jurisdiction over Defendants would violate due process.

### A. Every Court to Consider the Issue Has Held that Defendants Are "Persons" Entitled to Jurisdictional Due Process.

There is no support for Plaintiffs' assertion that the PA and PLO—two <u>non-sovereign</u> foreign entities—are not "persons" entitled to due process protections. No court has ever accepted that argument, and both the Second and D.C. Circuits (as well as the district court in this case) have expressly rejected it. *See Waldman*, 835

F.3d at 329; *Livnat*, 851 F.3d at 49-53.  The Government has also previously acknowledged the unbroken line of authority holding that the PA and PLO are "persons" entitled to jurisdictional due process.  *See* U.S. Amicus Br. 9-12, *Sokolow v. PLO*, No. 16-1071 (U.S. Feb. 22, 2018) ("*Sokolow* CVSG Br.").  Perhaps for that reason, the Government does not join Plaintiffs' argument here.  *See* Gov't Br. 13.

The Supreme Court has long held that "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."  *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  These holdings extend to foreign entities and associations, whether "corporate" or "non-corporate."  *Klinghoffer*, 937 F.2d at 50.  Because foreign defendants are "forced to appear in the United States" to answer potential claims against them, they are "entitled to the protection of the Due Process Clause."  *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 816 (D.C. Cir. 2012).

The sole exception is for foreign and domestic <u>sovereigns</u>, and subdivisions of those sovereigns.  In *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966), the Supreme Court held that U.S. States are not "persons" under the Due Process Clause.  That exception has been extended to foreign states, which are "juridical equals of the government that seeks to assert jurisdiction over them" and "have available to them a panoply of mechanisms in the international arena through which to seek vindication or redress" "[i]f they believe that they have suffered harm by

50

virtue of being haled into court in the United States." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 98 (D.C. Cir. 2002). "These mechanisms, not the Constitution, set the terms by which sovereigns relate to one another." *Id.*[15]

Plaintiffs' argument is built on the false premise that Defendants are "governmental entities" akin to U.S. States and foreign governments. But every court to consider the issue has rejected that argument because the United States does not treat the PA and PLO as foreign <u>sovereigns</u>. *See Livnat*, 851 F.3d at 48-54 (rejecting the argument that Defendants fall outside the Due Process Clause because they "function[] as a government"). As the D.C. Circuit explained, Defendants lack "<u>attributes of sovereignty</u> like sovereign immunity" and "territorial security." *Id.* at 50. Defendants also do not enjoy other "special privileges" that are "available only to entities that are juridical equals <u>in the eyes of the United States</u>," including "direct dispute-resolution mechanisms" and "comity and international-law principles." *Id.* at 51. Because "neither the PLO nor the PA is recognized by the United States as a sovereign state," the courts have consistently held that they <u>are</u> entitled to the same

---

[15] This exception also includes formal subdivisions of the sovereign, such as local governments and agencies, which generally are not considered "persons." Even this exception is limited, however, as agencies and instrumentalities that are juridically "independent" from the "sovereign" may be entitled to due process. *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 613-14, 620-30 (1983); *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 49 (2d Cir. 2021).

due-process protections traditionally afforded to any other "person" haled into federal court. *Waldman*, 835 F.3d at 329; *see also Livnat*, 851 F.3d at 53-54.

Plaintiffs seek to undermine this uniform precedent in two ways, neither of which is accurate. <u>*First*</u>, Plaintiffs rely on cases addressing U.S. territories like Puerto Rico and the Virgin Islands to assert that "political entities" are not "persons" under the Due Process Clause. Pls. Br. 15-21. But as the same DOJ memorandum cited by Plaintiffs explains, U.S. territories do not receive due process because they are "political subdivisions … of the United States," in the same way cities are "political subdivisions of a State." DOJ Office of Legal Counsel, *Memo. Op. for the Special Rep. for Guam Commonwealth*, 7 (July 28, 1994). U.S. territories also enjoy many of the benefits of statehood, including sovereign immunity, that have been denied to Defendants. *See, e.g.*, *Ezratty v. Puerto Rico*, 648 F.2d 770, 776 n.7 (1st Cir. 1981) (applying Eleventh Amendment to Puerto Rico); Memorandum, 57 Fed. Reg. 57, 093 (Nov. 30, 1992) (Executive "will treat Puerto Rico administratively as if it were a State"); 48 U.S.C. § 1541(b) (granting sovereign immunity to Virgin Islands). Plaintiffs also ignore the multitude of cases applying traditional due process protections to a variety of governmental or "political entities" which (like Defendants) are <u>not</u> subdivisions of the sovereign.[16] Plaintiffs fail to cite a single

---

[16] *See, e.g.*, *Rainbow Coal. of Okla. v. Okla. State Election Bd*., 844 F.2d 740, 743 (10th Cir. 1988) (political parties); *Toumazou v. Turkish Republic of N. Cyprus*, No. 14-7170, 2016 U.S. App. Lexis 787 (D.C. Cir. Jan. 15, 2016) (unrecognized foreign

case supporting their contention that entities are somehow ineligible for due process because they are "political" or "governmental" in nature.

*Second*, Plaintiffs mischaracterize a series of DOJ papers pre-dating creation of the PA in 1994 and recognition of the PLO in 1993 to inaccurately assert that the Government "has consistently taken the position that governmental entities generally—and the PLO specifically—are not 'persons' within the meaning of the Due Process Clause." Pls. Br. 14. The Government itself addressed the "overread[ing]" of these DOJ position papers when it opposed *certiorari* in another case raising this same issue. *See Sokolow* CVSG Br. 11 n.2. As the Government explained, those papers addressed a First Amendment claim asserted by the Palestinian Information Office. The Government "argued that the court of appeals should reject the PLO's claims of a First Amendment violation because sovereign entities lack constitutional rights and the PLO was asserting that it was a sovereign entity." *Id*. "The government's argument rested on the incompatibility of the PLO's assertion of sovereign status with its claim of First Amendment rights, not on an

government); *Prewitt Enters., Inc. v. OPEC*, 353 F.3d 916, 921-22 (11th Cir. 2003) (inter-governmental organizations); *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1112 (6th Cir. 1994) (international unincorporated associations); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 200-03 (D.C. Cir. 2001) (militant quasi-governmental groups designated as Foreign Terrorist Organizations).

independent determination that the PLO's governmental attributes rendered it the equivalent of a sovereign." *Id*. (emphasis added).

Contrary to Plaintiffs' assertions in this case, the Government expressly acknowledged that the Supreme Court "has treated as 'persons' domestic and foreign entities of various types," and that the Court's "existing jurisprudence … [does] not establish that foreign entities like [the PA and PLO] are barred from invoking due process protections." *Id.* at 8-9 (emphasis added). The Government proceeded to oppose the "approach" espoused by Plaintiffs here, explaining that "judicial determination[]" of "which foreign entities operate as 'the effective government of a state'" would conflict with Presidential authority over foreign affairs. *Id.* at 12.

The Government's brief in this case further refutes any contention that it has "consistently" taken the position that "governmental entities" like the PA and PLO can be haled into federal court without basic due process protections. The Government does not challenge the well-established principle that Defendants "have … due process rights," and acknowledges that "the PSJVTA must be assessed under the due process standards of the Fifth Amendment." Gov't Br. 12-13, 19. Those concessions are consistent with the uniform precedent described above, which similarly recognizes that like any other non-sovereign foreign entity, Defendants are entitled to due process.

**B.** ***Ford* Did Not "Overrule" Prior Decisions Holding that Defendants Are Not Subject to Specific Jurisdiction.**

There is similarly no support for Plaintiffs' argument (at 35) that the Supreme Court's decision in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021), "overruled" the "legal grounds" relied upon in the lines of cases holding that Defendants are not subject to specific jurisdiction in the United States for alleged attacks in Israel and Palestine. *See* Section I-A, *supra*. That argument misapprehends both the grounds for those prior decisions and *Ford*'s holding.

*Ford* reaffirmed that to establish specific jurisdiction, Plaintiffs must demonstrate their claims "arise out of or relate to the defendant's contacts with the forum." 141 S. Ct. at 1026. The Court rejected the argument that the necessary "link" "must be causal in nature," explaining that "[n]one of [its] precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do." *Id.* But the Court reiterated that relatedness "does not mean anything goes." *Id.* "In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Id.* To satisfy their burden, Plaintiffs still must demonstrate "a strong relationship among the defendant, the forum, and the litigation—the essential foundation of specific jurisdiction." *Id.* at 1028 (cleaned up).

Contrary to Plaintiffs' assertions, *Ford* therefore did not disturb the "legal grounds" relied upon in *Waldman*, *Livnat*, *Shatsky*, and *Klieman*—which

consistently held that the same type of conduct alleged by Plaintiffs here ("propaganda activities" purportedly designed to influence U.S. policy) were not sufficiently "related to" to the claims at issue to establish specific jurisdiction. *See* Section I-A, *supra*. None of those decisions relied upon the strict "causal" test rejected in *Ford*. Rather, those decisions held that even under the more liberal "related to" prong, plaintiffs failed to establish the requisite connection between Defendants' U.S. activities and the attacks at issue to satisfy due process. *See Klieman*, 923 F.3d at 1126 (expressly clarifying that the court was <u>not</u> applying the stricter "but-for" causal test). The Second and D.C. Circuits' analysis is thus entirely consistent with *Ford*'s reaffirmation of the "related to" prong.

Post-*Ford* decisions confirm that *Ford* did not water-down the substantive requirements for specific jurisdiction, as Plaintiffs suggest. In *Bernhardt v. Islamic Republic of Iran*, for example, the D.C. Circuit held that a bank's evasion of U.S. sanctions did not "support an inference" that a foreign terrorist attack "arose out of or related to" the "sanctions evasion" under *Ford*. 47 F.4th 856, 864-66 (D.C. Cir. 2022). Broad allegations of "possible connections" between defendant "and terrorism generally," the court explained, were insufficient to establish "the necessary connection" between defendant's conduct, the United States, and the specific attack that injured plaintiff. *Id*.

56

This Circuit and others have similarly emphasized that post-*Ford*, the Due Process Clause continues to impose real limits on the types of activities that may satisfy the "related to" prong. *See, e.g.*, *Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1223-24 (10th Cir. 2021) (applying *Ford* and exercising specific jurisdiction where defendant purposefully directed activity at the forum and "plaintiff's claim arises from essentially the same type of activity," but emphasizing "[w]e might not apply that proposition" if plaintiff was not injured "by activity essentially identical to" the activity directed at forum residents); *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 505-07 (9th Cir. 2023) (holding allegations that defendant shipped raw materials and separate products through the forum was not sufficiently "related to" plaintiff's product-liability claims to satisfy *Ford*).  As these decisions illustrate, "to give 'relate to' too broad a scope"—as Plaintiffs suggest here—"would risk 'collaps[ing] the core distinction between general and specific personal jurisdiction." *Yamashita*, 62 F.4th at 506.

Finally, Plaintiffs excise important ATA requirements in wrongly asserting that Defendants' purported "influence campaign" in the United States "<u>fulfills a statutory element</u> of Plaintiffs' ATA claims." Pls. Br. 33-34.  The ATA is not satisfied simply by efforts to influence government policy, but instead requires acts intended "to influence … <u>by intimidation or coercion</u>" or efforts "to <u>intimidate or coerce</u>."  18 U.S.C. § 2331(1)(B) (emphasis added).  Plaintiffs read the words

57

"intimidate or coerce" right out of the statute, as nothing about Defendants' alleged public speeches and press releases in the U.S. relies upon "intimidation or coercion." As the Second Circuit recognized, peaceable dialogue and diplomacy in the U.S. does not implicate the ATA, let alone "fulfill" a "statutory element" as Plaintiffs suggest. *Waldman*, 835 F.3d at 341-42.

### C.    The Federal Rules of Civil Procedure Do Not Create Personal Jurisdiction Over Defendants.

#### 1.    Rule 23.2 Does Not Override Due Process Limits on Personal Jurisdiction.

As discussed above, the exercise of personal jurisdiction over Defendants in this case would violate due process.  Rule 23.2 does not change the constitutional equation.  The Federal Rules of Civil Procedure cannot create personal jurisdiction where it is prohibited by the Constitution.  *See Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 370 (1978) ("[I]t is axiomatic that the Federal Rules of Civil Procedure do not create … federal jurisdiction.").  Rather, the exercise of personal jurisdiction under the Federal Rules remains "subject to constitutional limits." *Knowles*, 87 F.3d at 417.

The Rules Enabling Act reinforces this point.  The Act provides that the Federal Rules "shall not abridge, enlarge or modify any substantive right."  28 U.S.C. § 2072(b).  And "a rule expanding the scope of a court's personal jurisdiction would modify a substantive right." *Douglass*, 46 F.4th at 234.  Rule 82 likewise

provides that the Federal Rules "do not extend or limit the jurisdiction of the district courts." Fed. R. Civ. P. 82.

For that reason, courts have consistently rejected the argument that the Federal Rules provide a "substantive source of personal jurisdiction." *Douglass*, 46 F.4th at 233. In *Douglass*, the *en banc* court rejected plaintiffs' claims that service under Rule 4(k)(2) conferred personal jurisdiction over defendants. *Id*. As the court explained, the Federal Rules "do[] not—and cannot—control the constitutional inquiry whether due process prohibits a court from exercising personal jurisdiction over the defendant." *Id*. Such a "rule-centric view obscures the purely constitutional nature of the personal jurisdiction question at issue." *Id*.

This Court, too, has recognized that the Federal Rules cannot answer the separate question whether "the exercise of federal jurisdiction satisfies Fifth Amendment due process standards." *CGC Holding Co., LLC v. Hutchens*, 974 F.3d 1201, 1208-09 (10th Cir. 2020); *see GCIU-Emp'r Ret. Fund v. Coleridge Fine Arts*, 700 F. App'x 865, 868 (10th Cir. 2017) (where Rule 4(k)(2) applies, assessing whether exercising personal jurisdiction "satisfies Fifth Amendment due process standards").[17] The same analysis applies here—Rule 23.2 cannot supply jurisdiction

---

[17] Courts uniformly reject Plaintiffs' assertion (Pls. Br. 39; CJA-26) that waiver of service creates jurisdiction, holding that Rule 4(k) may only be used "so long as the exercise of federal jurisdiction satisfies Fifth Amendment due process standards."

where neither the "minimum contacts" nor "consent" requirements have been satisfied. As the Second Circuit explained in rejecting a similar argument, "the statute does not answer the constitutional question of whether due process is satisfied." *Waldman*, 835 F.3d at 343.

There is similarly no merit to Plaintiffs' claims that, even if personal jurisdiction is lacking, they may still reach Defendants by exercising general jurisdiction over a U.S. resident who is purported to be a member of the PA and PLO. Pls. Br. 39-40. Plaintiffs served the complaint on Palestine's UN Ambassador, Riyad Mansour, at his home in Florida. But Plaintiffs filed this lawsuit against the PA and PLO, not individual members like Ambassador Mansour. Plaintiffs cannot use Rule 23.2 to gain jurisdiction over Defendants through the artifice of a class action when there is no jurisdiction over Defendants in the first place. The Supreme Court has explained that it would "violate[] the Rules Enabling Act" to give "plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 458 (2016).

Notably, Plaintiffs fail to cite a single case holding that personal jurisdiction over an individual member created personal jurisdiction over associations sued in

---

*Hutchens*, 974 F.3d at 1208-09; *Waldman*, 835 F.3d at 343 (same as applied to Defendants).

their own right.  Instead, Plaintiffs rely on cases in which either the entity was not a party, or personal jurisdiction over the entity already had been established.  *See Calagaz v. Calhoon*, 309 F.2d 248, 253 (5th Cir. 1962) ("If it were sued as an entity, the suit would have to be dismissed for lack of jurisdiction."); *Battle Fowler v. Brignoli*, 765 F. Supp. 1202, 1204 (S.D.N.Y. 1991) (noting partnership "was dropped as a party" in underlying action), *aff'd*, 952 F.2d 393 (2d Cir. 1991); *Resol. Tr. Corp. v. Deloitte & Touche*, 822 F. Supp. 1512, 1515 (D. Colo. 1993) (court had personal jurisdiction over defendant partnerships; issue was whether "the exercise of jurisdiction is constitutional" over non-resident partners).  None of those cases rebuts the well-established principle that the Federal Rules cannot supply jurisdiction over defendants where "due process is not satisfied."  *Waldman*, 835 F.3d at 343.

## 2.     Rule 23.2 Does Not Apply to Plaintiffs' Claims Here.

Even if Plaintiffs could use Rule 23.2 to evade constitutional due-process requirements (and they cannot), the Rule does not apply here.  First, a plaintiff "may not use Rule 23.2 to bring a class action" where state law allows a defendant unincorporated association to "defend a suit in its common name."  *Northbrook Excess & Surplus Ins. Co. v. Med. Malpractice Joint Underwriting Ass'n of Mass.*, 900 F.2d 476, 479 (1st Cir. 1990).  Because Colorado law permits the PA and PLO

to be sued directly,[18] and indeed they are already defendants "in this action, Rule 23.2 is not applicable." *Wilkinson v. FBI*, 99 F.R.D. 148, 152 n.2 (C.D. Cal. 1983).

Second, Rule 23.2 only applies to an action brought "against the <u>members</u> of an unincorporated association <u>as a class</u>." Fed. R. Civ. P. 23.2 (emphasis added). The Rule does not allow suits naming "the association itself … as the proper representative of its members." *Coniglio v. Highwood Servs., Inc.*, 60 F.R.D. 359, 364 (W.D.N.Y. 1972). Yet Plaintiffs assert claims only against the PA and PLO; they admit they are not alleging "any specific tortious conduct" by the Ambassador, who is being sued solely as a "representative of the defendant classes—the <u>associations</u>, which are the tortfeasors." CJA-166-67 (emphasis added); *see* Pls. Br. 4 n.2. Because Plaintiffs do not purport to sue the <u>members</u> of the PA and PLO as a class, Rule 23.2 is inapplicable.

Finally, Plaintiffs lack any basis to name Ambassador Mansour as a defendant because Plaintiffs do not allege that he participated in tortious conduct. *See Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007). Both state and federal law prohibit imposing liability "merely because [the defendant] is a member of the [] association." Colo. Rev. Stat. § 7-30-106(3); *Llacua v. W. Range*

---

[18] Under Fed. R. Civ. P. 17(b)(3), capacity is determined by Colo. Rev. Stat. §7-30-107(1) ("A nonprofit association, in its name, may institute, defend, intervene or participate" in litigation.).

*Ass'n*, 930 F.3d 1161, 1181 (10th Cir. 2019) (rejecting argument that "all members of an association could be deemed to have entered into an antitrust conspiracy simply because they … participated in its governance").  Ambassador Mansour also cannot be liable for the independent reason that, as an invitee of the UN, he has functional immunity under the UNHQA for actions performed in his "official capacity"— including any "membership" he might have in the PA or PLO.  *See, e.g.*, *van Aggelen v. UN*, 311 F. App'x 407, 409 (2d Cir. 2009).

These defects foreclose Plaintiffs' effort to invoke Rule 23.2 to circumvent constitutional due process requirements.

## III.    The PSJVTA Violates Separation Of Powers.

The PSJVTA's deemed consent provisions also violate separation of powers.[19]  Congress oversteps its constitutional authority when it attempts to "usurp a court's power to interpret and apply the law to the circumstances before it."  *Bank Markazi*, 578 U.S. at 224-28; *see also Boerne*, 521 U.S. at 536 (holding Congress cannot override the judiciary's responsibility to "say what the law is"); *United States v. Klein,* 80 U.S. 128, 147 (1871) (holding statute requiring courts to treat pardons of Confederate sympathizers as conclusive evidence of disloyalty "passed the limit which separates the legislative from the judicial power").

---

[19] Given its holding that the PSJVTA violates due process, the district court did not reach this alternative ground for affirmance.

The PSJVTA usurps the judicial function by directing courts to <u>always</u> find consent if its factual predicates are met—regardless of whether those activities satisfy the standard for consent under the Due Process Clause. Determining whether a party has waived constitutional rights is a quintessentially judicial question, requiring "application of constitutional principles to the facts as found." *Brewer v. Williams*, 430 U.S. 387, 403 (1977).

The PSJVTA also violates the well-established principle that Congress cannot "legislatively supersede" decisions "interpreting and applying the Constitution." *Dickerson v. United States*, 530 U.S. 428, 437 (2000). As noted above, *Waldman*, *Shatsky*, *Livnat*, and *Klieman* uniformly held that subjecting Defendants to personal jurisdiction in the United States based on the same type of conduct alleged in this case would violate the Due Process Clause. Permitting Congress to supersede those constitutional holdings by re-labeling the conduct as "consent" would make the Constitution, "like other acts … alterable when the legislature shall please to alter it," in violation of fundamental principles of separation of powers. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *see, e.g.*, *Boerne*, 521 U.S. at 523-24 (rejecting Congressional effort to overturn Supreme Court precedent by creating a different constitutional standard).

## CONCLUSION

For the foregoing reasons, this Court should affirm the decision below.

Date:  April 11, 2024

/s/ Gassan A. Baloul
Gassan A. Baloul
Mitchell R. Berger
Amy Brown Doolittle
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
gassan.baloul@squirepb.com
mitchell.berger@squirepb.com
amy.doolittle@squirepb.com

Joseph S. Alonzo
SQUIRE PATTON BOGGS (US) LLP
1211 Avenue of the Americas
26th Floor
New York, N.Y. 10036
Telephone: (212) 872-9831
joseph.alonzo@squirepb.com

## REQUEST FOR ORAL ARGUMENT

Defendants-Appellees believe that oral argument would be of assistance to this Court given the significance of the constitutional question at issue, and respectfully request oral argument.

## CERTIFICATE OF COMPLIANCE

### Certificate of Compliance With Type-Volume Limit,
### Typeface Requirements, and Type Style Requirements

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and this Court's February 28, 2024 Order because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[x ] this document contains 14,991 words, or

[ ] this brief uses a monospaced typeface and contains <state the number of> lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ x] this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 pt Times New Roman font, or

[ ] this document has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

Date:  April 11, 2024

　　　　　　　　　　　/s/ Gassan A. Baloul
　　　　　　　　　　　Gassan A. Baloul

## CERTIFICATE OF SERVICE

I hereby certify that, on this 11th day of April, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date:  April 11, 2024

/s/ Gassan A. Baloul
Gassan A. Baloul